# 25-700

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

--------------------------------

**Wentworth Rattray**,

       *Plaintiff-Counter-Claimant-Appellant*,

 v.

**Police Officer Jose Cadavid, Badge #9085**, in his individual and official capacity,
**Police Officer Alyssa Trigueno**, in her individual and official capacity,

       *Defendants-Counter-Defendants-Appellees*,

Police Officer Sgt. Mervin Bautista, in his individual and official capacity, The City of New York,

       *Defendants-Appellees*.

---

**APPENDIX** OF APPELLANT WENTWORTH RATTRAY ON APPEAL FROM THE DECISION AND FINAL JUDGMENT OF THE SOUTHERN DISTRICT OF NEW YORK

17-CV-8560

---

## Contact Information

Wentworth Rattray, pro se
1039 Madison Street
Annapolis, MD 21403
(917) 353-9675

# Table of Contents

## Table of Contents

Contact Information ........................................................................................................ 1

Table of Contents .......................................................................................................... 2

Notice of Appeal .......................................................................................................... 3

Judgement and Order (Dkt. 281) .................................................................................. 6

Order Denying Motion for Retrial (Dkt. 300) ............................................................. 7

A 1 – Dkt. Trial filings ................................................................................................ 29

A 2 – Dkt. Jury instruction ......................................................................................... 29

A 3 – Dkt. Motion to Compel un-Redaction ............................................................. 29

A 4 – Dkt. Denying Extension of Discovery ............................................................. 30

A 5 – Dkt. Limiting Discovery ................................................................................... 30

DM Non-Party Witness Deposition Transcript .......................................................... 31

DM NYPD Deposition Officer Alyssa Trigueno 09 20 2021 ..................................... 51

DM NYPD Deposition Officer Jose Cadavid 08 13 2021 ........................................ 109

DM ICAD Event Chronology INCIDENT REPORT (Dkt. 47-2) ........................... 124

DM Plain  DiR P1 DOMESTIC -INCIDENT REPORT (Dkt. 47-2) ....................... 127

Summary of Arguments ................................................... **Error! Bookmark not defined.**

Relevant - Family Court Order ................................................................................. 141

Previous - Family Court Order ................................................................................. 142

Prior - Family Court Order ....................................................................................... 143

MEMORANDUM OPINION & ORDER (Dkt. 300) ............................................... 144

17 CV 8560 PGG 2021 Transcript  Discovery Limitation 2 (Dkt 168) ................... 165

JURY INSTRUCTIONS - (Dkt 277) ........................................................................ 195

JURY TRIAL - TRANSCRIPT - (Dkt 296) ............................................................ 223

Notice of Appeal

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

U.S. DISTRICT COURT
FILED

MAR 2 5 2025

S.D. OF N.Y.

Wentworth Rattray
(List the full name(s) of the plaintiff(s)/petitioner(s).)

17 CV 8560 (PGG   )

-against-

**NOTICE OF APPEAL**

City of New York, Jose Cadavid,
Alyssa Triguono, et al
(List the full name(s) of the defendant(s)/respondent(s).)

Notice is hereby given that the following parties: Wentworth Rattray

_____
(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the     ☑ judgment     ☐ order     entered on: 2/24/2025,  9/5/2023
                                                    (date that judgment or order was entered on docket)

that:

_____
(If the appeal is from an order, provide a brief description above of the decision in the order.)

3/25/2025
Dated

_____
Signature

Rattray, Wentworth
Name (Last, First, MI)

1039 Madison St     Annapolis     Md     21403
Address                City            State   Zip Code

917-353-9675
Telephone Number

GaryRattray@yahoo.com
E-mail Address (if available)

*Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case. Fed. R. App. P. 3(c)(2). Attach additional sheets of paper as necessary.

Rev. 12/23/13

# U.S. District Court

## New York Southern - Manhattan

Receipt Date: Mar 25, 2025 10:16AM

WENTWORTH RATTRAY

Rcpt. No: 38382          Trans. Date: Mar 25, 2025 10:16AM          Cashier ID: #SS (6367)

| CD | Purpose | Case/Party/Defendant | Qty | Price | Amt |
|---|---|---|---|---|---|
| 203 | Notice of Appeal/Docketing Fee | | 1 | 605.00 | 605.00 |

| CD | Tender | | | | Amt |
|---|---|---|---|---|---|
| CH | Check | #31912 | 03/25/2025 | | $605.00 |
| | | | Total Due Prior to Payment: | | $605.00 |
| | | | Total Tendered: | | $605.00 |
| | | | Total Cash Received: | | $0.00 |
| | | | Cash Change Amount: | | $0.00 |

**Comments:** 17CV08560 PGG KHP

Only when the bank clears the check, money order, or verifies credit of funds, is the fee or debt officially paid or discharged. A $53 fee will be charged for a returned check.

# Judgement and Order (Dkt. 281)

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

Wentworth Rattray,

         Plaintiff,                17 **CIVIL** 8560 (PGG)

    -against-                  **JUDGMENT**

Cadavid, et al.,

         Defendants.
------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That after a Jury

Trial before the Honorable Paul G. Gardephe, United States District Judge, the jury having

returned a verdict in favor of Defendants, the Complaint is hereby dismissed.

**DATED:** New York, New York
         September   5, 2023

                              **RUBY J. KRAJICK**

**So Ordered:**

                              **Clerk of Court**

                              BY:    K. mango

**U.S.D.J.**                                  **Deputy Clerk**

Order Denying Motion for Retrial (Dkt. 300)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENTWORTH RATTRAY,

                      Plaintiff,

        v.

THE CITY OF NEW YORK, POLICE
OFFICER JOSE CADAVID (BADGE NO.
9085), and POLICE
OFFICER ALYSSA TRIGUENO,

                 Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 8560 (PGG) (KHP)

PAUL G. GARDEPHE, U.S.D.J.:

        In this Section 1983 action, Plaintiff Wentworth Rattray claims that New York

City Police Department ("NYPD") Officer Jose Cadavid violated his Fourth Amendment rights

by conducting an unlawful search of Rattray's apartment and arresting him without probable

cause. Rattray further alleges that NYPD Officer Alyssa Trigueno is liable for failing to

intervene in the unlawful search and false arrest. Defendants contend, <u>inter alia</u>, that exigent

circumstances justified Officer Cadavid's entry into Rattray's home.

        Rattray's claims proceeded to trial on August 29, 2023. On September 1, 2023,

the jury returned a verdict in favor of the Defendants, finding that Plaintiff had not proven by a

preponderance of the evidence his Section 1983 unlawful search and false arrest claims against

Officer Cadavid. Because the jury found no constitutional violation, Rattray's failure to

intervene claim against Officer Trigueno likewise failed. (Verdict (Dkt. No. 279))

        On September 25, 2023, Plaintiff moved for a new trial pursuant to Fed. R. Civ.

P. 59(a)(1) and 60(b)(2). (Pltf. Br. (Dkt. No. 291)) In moving for a new trial, Plaintiff argues

that "[t]he verdict [was] against the weight of the evidence because Officer Cadavid admitted

that he did not have exigent circumstances to enter Mr. Rattray's home." (Id. at 10) According

to Plaintiff, Officer Cadavid's testimony "precludes" a finding by the jury that exigent

circumstances justified the warrantless entry into Plaintiff's home. (Id. at 11) Rattray also

complains that Officer Cadavid's testimony "regarding the statements and actions by the

responding supervisor, Lieutenant [] Khosh[,] . . . . was new and was not previously provided by

Defendants during the course of discovery when Mr. Rattray was pro se." (Id. at 16)

**BACKGROUND**

**I.    PROCEDURAL HISTORY**

        The Complaint was filed on November 2, 2017 (Cmplt. (Dkt. No. 2)); the

Amended Complaint was filed on November 20, 2017 (Am. Cmplt. (Dkt. No. 6)); and the

Second Amended Complaint ("SAC") was filed on June 29, 2018. (SAC (Dkt. No. 42)).

        On September 10, 2019, this Court granted in part Defendants' motion to dismiss

the SAC. (Dkt. No. 72) On October 28, 2019, Rattray moved for leave to file the Third

Amended Complaint ("TAC"). (Dkt. No. 75)

        On November 7, 2019, this Court referred Rattray's motion to amend to

Magistrate Judge Katharine Parker for a Report & Recommendation ("R&R"). (Dkt. No. 81) In

an April 20, 2020 R&R, Judge Parker recommended that Rattray be granted leave to amend as to

certain claims. (R&R (Dkt. No. 87)) On July 16, 2020, this Court adopted Judge Parker's R&R

(Dkt. No. 98), and Rattray filed the TAC on July 28, 2020. (TAC (Dkt. No. 99))

        The TAC asserts a Section 1983 unlawful search claim against Officers Cadavid

and Trigueno; a Section 1983 false arrest claim against Officer Cadavid; and a Section 1983

failure to intervene claim against Officer Trigueno based on the alleged unlawful search and

false arrest. (Id.)

2

On April 15, 2022, Defendants moved for summary judgment on all of Rattray's claims. (Defs. Mot. (Dkt. No. 206)) This Court referred Defendants' motion to Judge Parker for an R&R. (Dkt. No. 208) In a September 14, 2022 R&R, Judge Parker recommended that Defendants' motion be granted as to the unlawful search claim against Officer Trigueno, the false arrest claim against Officer Cadavid, and the related failure to intervene claim against Officer Trigueno , but denied as to the unlawful search claim against Officer Cadavid and the related failure to intervene claim against Officer Trigueno. (R&R (Dkt. No. 221))

In a March 30, 2023 Memorandum Opinion & Order, this Court adopted Judge Parker's R&R in part. (Dkt. No. 225) This Court granted Defendants summary judgment on Plaintiff's unlawful search claim against Officer Trigueno, but otherwise denied Defendants' motion. (Id.)

Plaintiff's remaining claims against (1) Officer Cadavid for false arrest and unlawful search; and (2) Officer Trigueno for failure to intervene in the alleged false arrest and unlawful search, proceeded to trial on August 29, 2023.

## II.    THE EVIDENCE AT TRIAL

The credible evidence at trial showed the following:

In or about 2006, Plaintiff Rattray had a daughter, "A.", with non-party Wendy Sandy. (See Trial Transcript ("Tr.") 47-49 (Rattray))[1] Rattray's relationship with Sandy later ended, and the two agreed that Rattray would have custody of their daughter, while Sandy would have visitation rights. (See Tr. 50-51 (Rattray)) As time passed, Sandy became concerned that Rattray was deliberately interfering with her ability to see her daughter. Accordingly, in 2016,

---

[1]  Citations to the trial transcript are to the page numbers assigned by the court reporter. Citations to other documents reflect page numbers designated by this District's Electronic Case Files ("ECF") system.

3

Sandy brought an action in New York City Family Court seeking joint custody. (Tr. 51 (Rattray) ("Q. And that informal agreement ended when she filed the lawsuit you mentioned, family court, in January of 2016? A. Correct."); Tr. 63-64 (Sandy) ("One of the reasons why I filed for custody of our daughter is because every time I have to pick her up, it was an excuse. . . . I am [A.'s] mom, and I need to spend more time with her[,] . . . . so I can be in her life."); Tr. 88 (Sandy) ("Q. In fact, prior to November 5th, 2016, plaintiff had previously denied you access to your daughter, correct? A. Yes. Q. And, in fact, just that year you had started a custody case against him? A. Yes. Q. And you did that because you wanted to be in your daughter's life? A. Yes. Q. And before you went to court, he had control over when you can see her? A. Yes, that's true."); Tr. 192 (Rattray) ("Ms. Sandy's petition was for joint custody."))

By the time Sandy filed her custody action, her relationship with Rattray was strained. (Tr. 89 (Sandy) ("Q. And it's fair to say that the plaintiff wasn't happy when you filed for custody? A. No, he was never happy with this. Q. And is it fair to say that you and him didn't have a good relationship? A. No, it wasn't [a good relationship].")) And in the fall of 2016, Sandy and Rattray were engaged in Family Court proceedings regarding custody of A. (See PX1 (Oct. 5, 2016 Family Court Order) (Dkt. No. 251-1) at 2)

In text messages to Rattray on Saturday, November 5, 2016, Sandy stated that she would be coming by later that day to pick up A., who was then ten years old. (Tr. 49 (Rattray); Tr. 61-62 (Sandy)) There is no evidence that Rattray – who had obtained full custody of A. (see PX1 (Oct. 5, 2016 Family Court Order) (Dkt. No. 251-4) at 2) – ever responded to Sandy's text messages. (See Tr. 62, 65, 68 (Sandy)) Sandy also called A.'s cell phone several times, but her calls went "straight to voice mail." (Tr. 65 (Sandy))

4

Rattray took his daughter to a dance class that day, and then to a playdate with a friend. (Tr. 104 (Rattray))  Although A.'s "playdates [generally lasted] two hours," on this occasion Rattray allowed A. to stay at her friend's house, and he returned home alone, arriving at his apartment shortly before 7:00 p.m.  (See Tr. 58, 104-107 (Rattray); PX5 (Nov. 2016 Emails to Family Court Personnel) (Dkt. No. 259-5) at 3)  Meanwhile – although Sandy had not made contact with either Rattray or A. – she decided to drive from Milford, Connecticut to Rattray's Manhattan apartment to pick up her daughter for the weekend.  The drive to Manhattan took 1.5 to 2.5 hours.  (Tr. 74-75 (Sandy))  Sandy brought Family Court papers with her which she understood gave her the right to see A. every other weekend, and to pick up her daughter on November 5, 2016 in particular.  (Tr. 62 (Sandy); Tr. 84 (Sandy) ("Q.  So you traveled from Milford, Connecticut, to New York City, because you believed it was your turn to take [A.]?  A. I did not believe it was my turn to take [A.].  It was my turn.  I had the paper there."))

After arriving at Rattray's apartment building – located at 42 West 120th Street in Manhattan – Sandy rang the doorbell.  (Tr. 84 (Sandy); Tr. 284 (Trigueno))  Rattray came down to speak with her.  She told Rattray that it was her "turn" to see her daughter.  Rattray told Sandy that A. "was not home" and that Sandy would not be able to see her daughter that evening.  He then closed the door and went back upstairs.  (Tr. 84-85 (Sandy))  Their exchange took less than a minute.  (Tr. 183 (Rattray))

Sandy believed that her daughter was upstairs – inside Rattray's apartment – and that Rattray was deliberately preventing her from seeing her daughter.  (See Tr. 85 (Sandy) ("Q. And then he closed the door, as you previously testified, and went back up, inside?  A. Yes.  Q. But you didn't believe what the plaintiff was telling you, correct?  A.  Yeah, yeah, I did not."))  She became extremely upset.  At 6:49 p.m., Sandy called 911 while "hysterical[ly] crying."  She

5

told the 911 operator that she had "visitation rights today," that she had come to pick up her

daughter, and that the father of the child was refusing to give the child to her. (DX A (911 Event

Chronology) (Dkt. No. 258) at 3; Tr. 66-68 (Sandy)) Sandy told the 911 operator that she was

standing in front of Rattray's apartment building at 42 West 120th Street, and she identified his

apartment number. (DX A (911 Event Chronology) (Dkt. No. 258) at 3)

       At trial, Sandy testified that she had become extremely upset by the time she

called 911:

> THE COURT: . . . [H]ow would you describe your tone in speaking with the 911
> operator?
>
> THE WITNESS: Well, I was very upset, and as a mom, and as my only child, I
> was very upset, and I was crying, because that – following that, it was a
> Wednesday, we had finished wrapping up with the court hearing, and I was very
> taken aback by all the stuff that I was hearing. And it wasn't true. So I was taken
> aback, and I was very upset about it. So I guess that did take me back into like
> that same week, because I was very upset about what was going on, and I didn't
> want it to go that way. So that's why maybe I sound like I was upset. But I was
> upset, because that week was a horrible week for me. So I was very upset about
> it, and not only that, I was upset that I was – I did text him to let him know I'm on
> my way. And when I get there, that she wasn't there. . . .
>
> I was very upset, because, like I said, again, I didn't want [A.] to think that I
> didn't care about anything, that I was taking it out on her. So my tone was not in
> the very best way. I was crying that whole entire time. I was like not very happy
> about the outcome with the court hearing, so I was very upset about it.

(Tr. 68 (Sandy))

       Sandy called 911 "because it was [her] turn . . . and [A.] wasn't there." She

believed that if the police came they would "provide and give [her] [A.], so [that she] can have

[A.] for the weekend." (Tr. 86 (Sandy)) Sandy testified that she "was going to fight, no matter

what, because I wanted to show [A.] that . . . I will go to the end of the earth for her." (Tr. 66

(Sandy))

6

NYPD Officers Cadavid and Trigueno responded to the 911 call at approximately 7:00 p.m. (Tr. 330 (Trigueno))  As they approached Rattray's apartment building at 42 West 120th Street, the officers encountered Sandy, who identified herself as the 911 caller. (Tr. 284-85 (Trigueno); Tr. 361 (Cadavid))  As the officers approached Sandy, they noticed that she was upset and crying. (Tr. 340, 345 (Trigueno); Tr. 361-62 (Cadavid))  Sandy told the officers that (1) it was her time to pick up her daughter; (2) Rattray had refused to let Sandy see her; (3) Sandy had not heard from her daughter; and (4) the girl was not answering her phone. (Tr. 291 (Trigueno); Tr. 361 (Cadavid); DXF (Nov. 5, 2016 Domestic Incident Report) (Dkt. No. 258) at 24)

Officer Cadavid told Sandy that he could issue a "Domestic Incident Report" ("DIR") – an NYPD form memorializing the details of a custody dispute – which she could show to a Family Court judge as proof that Rattray was not complying with the Family Court's custody order. (Tr. 337 (Trigueno); Tr. 362 (Cadavid))  Cadavid explained to Sandy that, given the circumstances, issuing a DIR was all that he could do; he was not authorized to enforce visitation rights. (Tr. 362-63 (Cadavid))  After Cadavid told Sandy that he could not enforce her visitation rights, she "became more upset [and] more emotional."  She told Officer Cadavid "that her daughter's life was in danger[] [and that she] was not safe in the apartment.  [Sandy] also stated to [Officer Cadavid] that Mr. Rattray does drugs and that he occasionally has drug dealers in the apartment."[2] (Tr. 363 (Cadavid))

---

[2]  Sandy testified at trial that she did not make these statements to Officer Cadavid. (Tr. 71 (Sandy))  Her testimony on this point was not credible.  It was apparent at trial that Sandy was desperate to see her daughter that evening; that she believed that she had a legal right to see her; and that she believed that Rattray was improperly preventing her from seeing her daughter. Sandy had attempted to arrange visitation that day, but neither Rattray nor her daughter had returned her text messages or calls.  Moreover, Sandy and Rattray were in the midst of a custody battle, and Rattray had interfered in the past with Sandy's efforts to maintain a relationship with

7

Given Sandy's distraught behavior and her statements about Rattray, Officer Cadavid became concerned for "the safety of [Sandy's] daughter [and] . . . . felt [he had] to go upstairs . . . to check on the welfare of the[] child." (See Tr. 364 (Cadavid)) The two officers then proceeded to Rattray's apartment on the third floor, knocked on the door, and told him that they were there to check on the welfare of his daughter. (Tr. 365 (Cadavid)) In response, Rattray "started yelling[] [and] cursing" at the officers, and refused to answer questions. (Tr. 365, 379-80 (Cadavid)) Rattray did not tell the officers that his daughter was not at home, nor did he explain that he had custody of the girl. (Tr. 380 (Cadavid)) Officer Cadavid repeatedly asked Rattray to open the door so that they could speak with him and see A., but Rattray refused. (Tr. 366-67 (Cadavid)) Officer Cadavid eventually threatened to take down the apartment door if Rattray did not open the door. Rattray then cracked the door open. (Tr. 366-68 (Cadavid))

---

her daughter. Although Sandy had not spoken with either Rattray or her daughter to confirm the visit, she nonetheless drove hours from Milford, Connecticut to Manhattan to see her daughter – only to be told that the girl was not at home and that Sandy would not be permitted to see her. Crying hysterically, she called 911, because she was prepared "to go to the end of the earth" to see her daughter and believed that police officers would be able to "give [her] [A.]" (Tr. 66, 86 (Sandy); (DXA (911 Event Chronology) (Dkt. No. 258) at 3) After Officer Cadavid explained to Sandy that all he could do was complete a DIR form, Sandy knew that unless she provided the officers with a compelling reason to go to Rattray's apartment, she had no chance of seeing her daughter. It was at this point that Sandy told Officer Cadavid that her daughter's life was in danger, that Rattray used drugs, and that drug dealers came to his apartment.

At trial, however, Sandy had compelling reasons to deny making these statements. As an initial matter, her statements about Rattray's drug use and association with drug dealers were lies: Rattray "never even drank in front of [her]" and was "a great dad." (Tr. 67, 71 (Sandy)) Moreover, Rattray had insisted that she testify – at deposition and at trial – in support of his Section 1983 claim. He had told her that if she did not testify "there would be a warrant for [her] arrest." (Tr. 92, 96 (Sandy)) In the end, Sandy "only agreed to testify at the deposition because [she] feared that if [she] did not cooperate [with Rattray] in giving that deposition, that would affect [her] ability to see [her] daughter." (Tr. 96 (Sandy))

In sum, Sandy's testimony concerning what she told Officer Cadavid – after he told her that all he could do was complete a DIR form – was not credible. By contrast, Officer Cadavid's testimony on this point was entirely credible.

8

Officer Cadavid then put his foot "between the door frame and the door to prevent [Rattray] from trying to close it." (Tr. 368 (Cadavid))

"[Y]elling[] [and] cursing," Rattray continued to refuse to answer Officer Cadavid's questions about his daughter, complaining that the officers "had no search warrant." (Tr. 383 (Cadavid)) Rattray soon attempted to close the door, but was unable to do so because Officer Cadavid's foot was in the way. (Id.)

At trial, Officer Cadavid testified that Rattray's belligerence, his refusal to answer questions, and his efforts to shut the apartment door made Cadavid's "concern level rise[]" regarding the safety of Rattray's daughter. Officer Cadavid concluded that – in refusing to show his daughter – Rattray was "trying to hide something." (Tr. 383-84 (Cadavid)) Making a "split second decision[,]" Officer Cadavid "pushed [his] way into the apartment." (Tr. 384 (Cadavid)) Once inside the apartment, Officer Cadavid again asked Rattray where his daughter was. Rattray refused to answer the question and became more agitated. (Tr. 384-85 (Cadavid)) Officer Cadavid then spent "approximately one minute" searching the apartment for Rattray's daughter. (Tr. 268 (Rattray); Tr. 385-86 (Cadavid)) The girl was not present in the apartment. (Tr. 386 (Cadavid))

After determining that the daughter was not in the apartment, Officer Cadavid again asked Rattray where his daughter was. Rattray did not provide any information about her whereabouts. He did not tell Cadavid that his daughter was at a friend's house, or that Sandy did not have custody of her. (Tr. 386-87 (Cadavid)) And although Officer Cadavid asked Rattray for "court paperwork" concerning custody of A., Rattray did not disclose that he had obtained multiple court orders awarding him custody of the girl, and granting Sandy only visitation

9

rights.[3] (Tr. 386-87 (Cadavid); Tr. 192-196 (Rattray); PX2 (Oct. 24, 2016 Family Court Order)

(Dkt. No. 259-2) at 2)

       Shortly after Officer Cadavid's search of the apartment, Rattray called 911 to

complain and to request that a supervisor come to his apartment. Officer Cadavid separately

requested that his supervisor come to the apartment to assist in investigating the daughter's

whereabouts. (Tr. 129, 131 (Rattray); Tr. 387 (Cadavid)) NYPD Lieutenant Khosh arrived at

---

[3] Rattray largely disputed Officer Cadavid's description of their interactions at the apartment door and during Officer Cadavid's search. According to Rattray, he was "pretty easygoing" with the officers and had a "regular demeanor" when they arrived at his apartment. Rattray also testified that he told the officers that his daughter was not at home and that he had custody over her. (Tr. 112-16 (Rattray)) Rattray was not a credible witness, however.

For example, Rattray testified on direct examination that he did not show the officers proof that he had custody of A. because he had no such proof; "[t]hey asked for papers, and I didn't have any papers." (Tr. 138 (Rattray)) On cross-examination, however, Rattray admitted that he had obtained six Family Court orders granting him custody of A., and awarding Sandy only visitation rights. (Tr. 192-96 (Rattray))

And at the same time that Rattray was refusing to provide the officers with any information concerning his daughter's whereabouts and the custody arrangements, he was writing emails to Family Court personnel. In a 7:01 p.m. email, Rattray advised the Family Court that Sandy was "downstairs . . . expecting to pick up [A.]." (PX5 (Nov. 2016 Emails to Family Court Personnel) (Dkt. No. 259-5) at 3) In a second email, Rattray states that "there are two officers who have entered my home against my wishes and refuse to leave until I can provide proof that I should have custody of [A.], of [A.'s] well being[,] and of [A.'s] whereabouts." (Id. at 2) While Rattray testified at trial that the officers "never said" that "they were [at his apartment] to check on [Rattray's] daughter's well-being" (Tr. 200 (Rattray)), it is apparent from Rattray's contemporaneous email that this testimony – like much of Rattray's account – is false.

Rattray also testified that – 12 to 18 months after the November 5, 2016 incident – he sought treatment for the alleged emotional trauma he had suffered. He later admitted, however, that he did not seek any such treatment until 2019, after this lawsuit was filed. (Tr. 240-42 (Rattray))

In sum, Rattray was not a credible witness. The credible evidence at trial demonstrated that he was inexplicably belligerent and uncooperative throughout his encounter with Officer Cadavid. His aggressive and violent behavior – considered together with Sandy's information that Rattray used drugs and had drug dealers over to his apartment – gave Officer Cadavid concern about A.'s safety.

the apartment about an hour later. (See Tr. 132 (Rattray))  He spoke with Rattray, and Rattray

stated that his daughter was at a friend's house. (See Tr. 391 (Cadavid))  Lieutenant Khosh then

sent "a police car over to the location where [the] daughter was[] to physically confirm" her

location and her safety.[4] (Tr. 395 (Cadavid))  After Lieutenant Khosh confirmed that Rattray's

daughter was safe, he and the Defendant officers left the apartment. (Id.)

## IV.    JURY VERDICT AND PLAINTIFF'S POST-TRIAL MOTION

On September 1, 2023, the jury returned a defense verdict, finding that Rattray

had not proven his Section 1983 false arrest and unlawful search claims against Officer Cadavid,

and thus had not proven his failure to intervene claims against Officer Trigueno. (Verdict (Dkt.

No. 279))  On September 5, 2023, this Court entered judgment in favor of Defendants.

(Judgment (Dkt. No. 281))

On September 25, 2023, Plaintiff moved for a new trial pursuant to pursuant to

Fed. R. Civ. P. 59(a)(1) and 60(b)(2). (Pltf. Br. (Dkt. No. 291))  Plaintiff argues that the jury's

verdict is against the weight of the evidence. (Id. at 10)

### DISCUSSION

## I.    LEGAL STANDARD

"Rule 59 of the Federal Rules of Civil Procedure permits a court, on motion, to

'grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new

trial has heretofore been granted in an action at [law] in federal court.'" Springer v. Cedro, 894

F. Supp.2d 474, 481 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 59(a)(1)(A)).  "The decision to

grant a new trial pursuant to Rule 59(a) is committed to the sound discretion of the trial judge."

---

[4] Rattray testified that Lieutenant Khosh never asked him where his daughter was, and that
Rattray never told Lieutenant Khosh where she was. (See Tr. 167 (Rattray))  Like much of
Rattray's testimony, this assertion was not credible.

Livingston v. Escrow, 2014 WL 1466469, at *2 (W.D.N.Y. Apr. 15, 2014) (citing Sequa Corp. v.

GBJ Corp., 156 F.3d 136, 143 (2d Cir. 1998)). For a court "to order a new trial under Rule

59(a), it must conclude that the jury has reached a seriously erroneous result or . . . [that] the

verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the

evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal quotations and

citations omitted). "Accordingly, '[o]n a motion for a new trial, the moving party bears [a]

heavy burden.'" Prendergast v. Pac. Ins. Co., 2013 WL 5567656, at *5 (W.D.N.Y. Sept. 25,

2013) (quoting Manes v. Metro-North Commuter R.R., 801 F. Supp. 954, 956 (D. Conn. 1992),

aff'd, 990 F.2d 622 (2d Cir. 1993)). "Furthermore, 'Rule 59 is not a vehicle for relitigating old

issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise

taking a "second bite at the apple."'" Kogut v. Cty. of Nassau, 2013 WL 3820826, at *2

(E.D.N.Y. July 22, 2013) (quoting O'Connell v. Onondaga Cty., 2013 WL 998598, at *1

(N.D.N.Y. Mar. 13, 2013)).

## II.    ANALYSIS

Plaintiff argues that the evidence at trial does not support a jury finding that

exigent circumstances justified Officer Cadavid's warrantless entry into Rattray's home. (Pltf.

Br. (Dkt. No. 291))

With respect to the exigent circumstances exception to the Fourth Amendment's

warrant requirement, the Court instructed the jury as follows:

> As a general matter, in order to search a home, a police officer must obtain a
> search warrant from a magistrate or judge. If a police officer does not have a
> search warrant, an officer may not enter or search someone's home absent consent
> or exigent circumstances. Exigent circumstances exist where a police officer
> reasonably believes that entry or a search is necessary in order to render
> emergency assistance to an injured person, or to protect someone from imminent
> injury.

12

In determining whether exigent circumstances existed in this case, you must consider the totality of the circumstances confronting the defendants, including whether there was a need to make a prompt assessment based on the information that was available.

In determining whether exigent circumstances existed, the core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or to take immediate action with respect to Mr. Rattray's daughter. On the other hand, exigent circumstances did not exist if a reasonable, experienced officer in Officer Cadavid's position, knowing the facts he knew, would not have believed entry was necessary to render aid or to take action.

The question of whether a police officer reasonably believed that someone was in danger or in need of assistance is an objective one. This question should be answered with regard to what a reasonable officer would have believed under the totality of the circumstances. A search is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind[,] as long as the circumstances, viewed objectively[,] justify the search.

While Officer Cadavid must produce evidence supporting the existence of exigent circumstances, the ultimate burden of proof is on Mr. Rattray to prove that Officer Cadavid's entry and search violated his Fourth Amendment right to be free from unreasonable searches. If you find that exigent circumstances existed[] that justify Officer Cadavid's entry into and search of Mr. Rattray's home, then you must find in favor of Officer Cadavid on Mr. Rattray's unlawful search claim.

(Tr. 601-03)[5]

Plaintiff argues that "Officer Cadavid did not have any objectively reasonable basis to believe [Rattray's daughter] was in imminent danger, even if the Court credits his testimony that Ms. Sandy stated there were drugs and possibly drug dealers in the apartment." (Pltf. Br. (Dkt. No. 291) at 11) In this regard, Plaintiff argues that

when Officers Cadavid and Trigueno approached the apartment, they heard no evidence of any other person in the apartment, much less "drug dealers." When Mr. Rattray opened the door, Officers Cadavid and Trigueno both testified that they heard no evidence of other people in the apartment. Officer Cadavid testified that he entered the home because he believed some crime of child abuse was being committed. But, there was no evidence proffered by Ms. Sandy that Mr. Rattray abused [his daughter]. And there was no history of child abuse in Mr.

---

[5]  Plaintiff did not argue at trial, and has not argued in his motion for a new trial, that the Court's jury instruction concerning exigent circumstances is erroneous.

13

Rattray's record, even if Officer Cadavid had run a search for Mr. Rattray's history. Neither defendant heard a child crying or calling for help, or saw any evidence that a child was in the apartment. Officer Cadavid offered no evidence at all to support a suspicion of child abuse.

(Id. at 11-12) (internal citations omitted)

Plaintiff also quotes Officer Cadavid's testimony that while he was concerned that A. was "not safe . . . [and] was in danger," he did not believe that she was in "imminent danger":

"Q.    Okay. So you've got the drugs and the drug dealers, right?

A.    Yes.

. . . .

Q.    And the yelling and the cursing.

A.    Yes.

Q.    And your analysis that it's not normal, it's not a normal reaction, right?

A.    Yes.

Q.    And that's the basis for your belief that the child was in imminent danger.

A.    Not imminent, but also from what Ms. Sandy stated, that she was not safe, that she was in danger.

Q.    Okay. That was the basis for your testimony that she was in imminent danger.

A.    I wouldn't consider that imminent danger.

Q.    You wouldn't consider that imminent danger.

A.    No, not my definition."

(Id. at 13-14) (quoting Tr. 487 (Cadavid)); (see also id. at 14) (citing Tr. 489-91 (Cadavid testifying that he did not believe that the child was in "imminent danger" and that he did not enter the apartment because he believed the child was in "imminent danger"))

Plaintiff goes on to argue that the evidence regarding exigent circumstances was "insufficient to overcome the presumption that a warrantless entry is unreasonable[,]" and that

14

therefore "[t]he jury's verdict is against the weight of all available evidence[] [and a] new trial is warranted." (Id. at 15-16)

As an initial matter, the Court gives little weight to Plaintiff's argument that Officer Cadavid conceded that A. was not in "imminent danger." While Officer Cadavid testified that the circumstances did not meet his "definition" of "imminent" danger, he repeatedly testified that he believed – based on what Sandy had told him about Rattray and Rattray's behavior – that A. was "not safe," was "in danger," and "could be hurt," and that he "needed to take urgent action to address those concerns." (Tr. 487-91, 501-02 (Cadavid))

In any event, the jury's determination as to exigent circumstances did not turn on Officer Cadavid's subjective beliefs. As this Court instructed the jury, "[t]he question of whether a police officer reasonably believed that someone was in danger or in need of assistance is an objective one. . . . A search is reasonable under the Fourth Amendment[,] regardless of the individual officer's state of mind, as long as the circumstances[,] viewed objectively[,] justify the search." (Tr. 602; see also Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'") (quoting Scott v. United States, 436 U.S. 128, 138 (1978) (emphasis in Brigham City); Michigan v. Fisher, 558 U.S. 45, 49 (2009) ("the test . . . is not what [a police officer] believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger") (quoting Brigham City, 436 U.S. at 406).

In determining whether exigent circumstances exist, "'the totality of the circumstances confronting law enforcement agents in the particular case [must be considered].'" United States v. Klump, 536 F.3d 113, 117 (2d Cir. 2008) (quoting United States v. MacDonald,

916 F.2d 766, 769 (2d Cir. 1990) (en banc)). "Ultimately, '[t]he essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an "urgent need" to render aid or take action.'" Loria v. Gorman, 306 F.3d 1271, 1284 (2d Cir. 2002) (quoting MacDonald, 916 F.2d at 769) (quoting Dorman v. United States, 435 F.2d 385, 391 (D.C. Cir. 1970) (en banc)). Here, the "totality of the circumstances" confronting Officer Cadavid would have indicated to a reasonable police officer that the ten-year-old A. might be in danger, and that there was an "urgent need" to "take action" to ensure her safety.

As an initial matter, when Officer Cadavid arrived at 42 West 120th Street – in response to the 911 call – he encountered Sandy, the "hysterically crying" mother who had called 911. Sandy identified herself as the 911 caller, and the officers noticed that she was upset and crying. (Tr. 284-85, 340, 345 (Trigueno); Tr. 360-62 (Cadavid))  Sandy told the officers that (1) it was her time to pick up her daughter; (2) Rattray had refused to let Sandy see her; (3) Sandy had not heard from her daughter; and (4) the girl was not answering her phone. (Tr. 291 (Trigueno); Tr. 361 (Cadavid); DXF (Nov. 5, 2016 Domestic Incident Report) (Dkt. No. 258) at 24)  Sandy also told Officer Cadavid that "that her daughter's life was in danger[] [and that she] was not safe in the apartment."  Sandy explained "that Mr. Rattray does drugs and that he occasionally has drug dealers in the apartment." (Tr. 363 (Cadavid))  In that moment, there was no obvious reason for Officer Cadavid to distrust Sandy's account, and he quite reasonably determined that he had "to go upstairs . . . to check on the welfare of the[] child." (Tr. 364 (Cadavid))

When Officer Cadavid knocked on Rattray's door, he explained that he was there to check on the welfare of Rattray's daughter. Rattray flew into a rage, aggressively yelling and

16

cursing; he refused to answer Officer Cadavid's questions about the whereabouts of his daughter,

he refused to open the door, and he attempted to close his door once he cracked it open. (Tr.

365, 379-83 (Cadavid))  As Officer Cadavid testified, Rattray's behavior was "not a normal

reaction" to the sort of welfare check that the officer was attempting to perform. (Tr. 487

(Cadavid))  Indeed, Rattray's aggressive behavior led Officer Cadavid to believe that Rattray

might be "under the influence of something," which tended to corroborate Sandy's assertion that

Rattray used drugs. (Tr. 369 (Cadavid))  Rattray's continued belligerence, his refusal to answer

questions, his refusal to open his door, and his later efforts to close the door once opened made

Officer Cadavid's "concern level rise[]" for the safety of the ten-year-old girl.  Officer Cadavid

concluded that Rattray was "trying to hide something." (Tr. 383-84 (Cadavid))

   Rattray's behavior in response to the officers' child welfare check – considered

together with Sandy's assertions that (1) she was scheduled to pick up her daughter at Rattray's

apartment; (2) Rattray had refused to produce the girl; (3) Sandy could not reach her daughter;

(4) the girl was not safe and Sandy feared for her life; and (5) Rattray used drugs and had drug

dealers over to his apartment – sufficed to create exigent circumstances.

   "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to

invoke the emergency aid exception." Fisher, 558 U.S. at 49. "'Probable cause for a forced

entry in response to exigent circumstances requires finding a probability that a person is in

"danger."'" Fernandez v. City of New York, 457 F. Supp. 3d 364, 381 (S.D.N.Y. 2020) (quoting

Kerman v. City of New York, 261 F.3d 229, 236 (2d Cir. 2001)).  "When information is received

from a putative victim or an eyewitness, probable cause exists unless the circumstances raise

doubt as to the person's veracity." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001)

(internal citations omitted); see also Lenzo v. City of New York, 2022 WL 656831, at *2

17

(S.D.N.Y. Mar. 4, 2022) (report of stalking made by arrestee's girlfriend was sufficient to sustain

finding of probable cause absent indicia of falsity); Szil v. de Blasio, 2017 WL 11490683, at *3

(S.D.N.Y. Oct. 27, 2017) ("Plaintiff's allegations that police arrested him in response to a call

from an alleged victim of domestic violence fail to state a claim that officers arrested him

without probable cause. He does not allege, for example, that police officers had any reason to

doubt his wife's statements."). As noted earlier, Officer Cadavid had no reason to doubt Sandy's

veracity.

      Loria v. Gorman, 306 F.3d 1271, 1276-77 (2d Cir. 2002) and United States v.

Paige, 493 F. Supp. 2d 641, 647 (W.D.N.Y. 2007) – cited by Plaintiff (Pltf. Reply (Dkt. No. 295)

at 3-4) – do not support his argument that exigent circumstances were absent here.

      In Loria, police officers went to Loria's home to investigate a noise complaint.

Loria refused to speak with the officers about the noise complaint, and then attempted to close

his door on the officers. Loria, 306 F.3d at 1276-77. The defendant officer – Charles Gorman –

pushed the door open, stepped into Loria's home, and arrested him, charging him with

obstructing governmental administration. Id. at 1277. After the obstruction charge was

dismissed, Loria brought a Section 1983 claim for false arrest arguing, inter alia, that there were

no exigent circumstances justifying the warrantless arrest in his home. Id. at 1278-79, 1283-84.

Defendant Gorman conceded that "at the time of the arrest no one was in danger and no

'emergency situation' existed." Id. at 1284. Given these facts, the Second Circuit concluded

that "exigent circumstances were not present." Id. at 1285.

      Loria provides no support for Rattray's arguments here. As discussed above, a

reasonable officer would conclude – in the circumstances here – that there was an "urgent need"

to determine whether A. was safe or was in danger. Acknowledging Plaintiff's argument that a

18

person's "lack of cooperation [with the police] does not create exigent circumstances" (Pltf.

Reply (Dkt. No. 295) at 4), the facts here involve much more than a lack of cooperation.

In Paige, the court addressed a motion to suppress evidence recovered in a

warrantless search of Paige's apartment. Police officers had responded to a 911 call reporting a

stabbing "around the corner from" Paige's apartment building. Police found a stabbing victim at

that location. Paige, 493 F. Supp. 2d at 643. Although there was "no evidence [that] connected

the sole stabbing victim, found in front of [an apartment building located] some distance from

Defendant's apartment, or any other participant in the altercation, to Defendant's apartment or to

Defendant as the assailant[,]" police officers conducted a warrantless search of Paige's

apartment, and recovered a firearm. Id. at 645, 647. In opposing Paige's motion to suppress, the

Government argued "that the officers' warrantless entry was justified by exigent circumstances

based on the need to locate and assist potential victims of the earlier altercation in front of

Defendant's apartment." Id. at 647. The Paige court rejected that argument, because "there was

no indication . . . that someone in the apartment was in need of assistance." Id. at 648. Here, by

contrast, a reasonable officer would have concluded that a person in need of assistance – the ten-

year-old A. – might be located inside Rattray's apartment.

In sum, Plaintiff Rattray has not demonstrated that the jury reached a "seriously

erroneous result" in concluding that Officer Cadavid's search of Rattray's apartment was

justified by exigent circumstances. Manley, 337 F.3d at 245 (internal quotations and citations

omitted).

Plaintiff also argues that a new trial is warranted under Fed. R. Civ. P. 60(b)(2)

because Officer Cadavid's testimony regarding certain "statements and actions by the responding

supervisor, Lieutenant Filipp Khosh[,]" constitutes "new evidence." (Pltf. Br. (Dkt. No. 291) at

19

16) The testimony referenced by Plaintiff concerns Lieutenant Khosh's direction that a patrol car confirm that A. was safe at her friend's home. (See id.) (citing Tr. 475-76, 484, 390 (Cadavid)).

Because Rule 60(b) "allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances." Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986). To obtain relief under Rule 60(b)(2), a party must show that "'(1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.'" United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 392 (2d Cir. 2001) (quoting United States v. IBT, 179 F.R.D. 444, 447 (S.D.N.Y. 1998)); accord Apex Emp. Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc., 2017 WL 456466, at *7 (S.D.N.Y. Feb. 1, 2017).

Here, the alleged "new evidence" Plaintiff cites was not in fact new. After extended colloquy with the lawyers at trial, and after reviewing Officer Cadavid's deposition (see Tr. 475-84), this Court concluded that Officer Cadavid "clearly testified at his deposition that the lieutenant did in fact obtain information about the whereabouts of the daughter and that she was at a friend's house." (Tr. 484) Accordingly, there is no basis for relief under Rule 60(b)(2).

20

## CONCLUSION

For the reasons stated above, Plaintiff's motion for a new trial (Dkt. No. 290) is

denied. The Clerk of Court is directed to terminate the motion and to close this case.

Dated: New York, New York
      February 24, 2025

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge

21

# A 1 – Dkt. Trial filings

| 02/24/2025 | 300 | MEMORANDUM OPINION & ORDER re: 290 MOTION for New Trial . filed by Wentworth Rattray. For the reasons stated above, Plaintiff's motion for a new trial (Dkt. No. 290) is denied. The Clerk of Court is directed to terminate the motion and to close this case. (Signed by Judge Paul G. Gardephe on 2/24/2025) (rro) (Entered: 02/25/2025) |
|---|---|---|
| 11/16/2023 | 296 | TRANSCRIPT of Proceedings re: Jury Trial held on 8/31/2023 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2023. Redacted Transcript Deadline set for 12/18/2023. Release of Transcript Restriction set for 2/14/2024..(Moya, Goretti) (Entered: 11/16/2023) |
| 09/25/2023 | 290 | MOTION for New Trial . Document filed by Wentworth Rattray..(Benoit, Angela) (Entered: 09/25/2023) |
| 09/06/2023 | 282 | LETTER addressed to Judge Paul G. Gardephe from Melissa S. Geller dated 09/06/2023 re: Post-Trial Briefing Schedule. Document filed by Wentworth Rattray. (Wang, Yudi) (Entered: 09/06/2023) |
| 09/05/2023 | 281 | JUDGMENT: It is hereby ORDERED, ADJUDGED AND DECREED: That after a Jury Trial before the Honorable Paul G. Gardephe, United States District Judge, the jury having returned a verdict in favor of Defendants, the Complaint is hereby dismissed. (Signed by Judge Paul G. Gardephe on 9/5/2023) (ate) (Entered: 09/05/2023) |
| 09/01/2023 | 280 | DECLARATION OF WENTWORTH RATTRAY(Supplement). Document filed by Wentworth Rattray. (sc) (Entered: 09/05/2023) |
| 08/31/2023 | 277 | Jury Instructions. Members of the jury, that concludes my instructions to you. I will ask you to remain seated for a moment while I confer with the attorneys to see if there are any additional instructions that they would like me to give. The Marshal will now be sworn. Members of the jury, you may now begin your deliberations. (yv) (Entered: 09/01/2023) |

# A 2 – Dkt. Jury instruction

| 08/31/2023 | 277 | Jury Instructions. Members of the jury, that concludes my instructions to you. I will ask you to remain seated for a moment while I confer with the attorneys to see if there are any additional instructions that they would like me to give. The Marshal will now be sworn. Members of the jury, you may now begin your deliberations. (yv) (Entered: 09/01/2023) |
|---|---|---|

# A 3 – Dkt. Motion to Compel un-Redaction

| 06/21/2021 | 146 | FIRST MOTION to Compel Defendants and Defendant's Employer (The City Of New York and the NYPD) to Unredacted copy of all disciplinary reports and investigation/arrest report for Cadavid as a result of his off-duty hit-and-run incident; compelling the City of New York to forensically retrieve and produce the 911 recordings; Subpoena for Deposition of key NYPD personnel *Allow Zoom Depositions* and |
|---|---|---|

| | | *Plaintiff's.*, FIRST MOTION for Extension of Time to Complete Discovery *until August 5th 2021 pending Defendant's providing documents and agreeing to scheduling depositions*. Document filed by Wentworth Rattray..(Rattray, Wentworth) (Entered: 06/21/2021) |

## A 4 – Dkt. Denying Extension of Discovery

| 10/20/2021 | 176 | ORDER denying 170 Motion for Reconsideration ; denying 174 Motion for Extension of Time to Complete Discovery; denying 175 Motion for Protective Order. The Court denies these motions. The Federal Rules of Civil Procedure give District Courts broad discretion to manage discovery. In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 69 (2d Cir. 2003). The Court has discretion to limit the frequency and extent of use of discovery methods, including depositions, if the discovery is unreasonably cumulative or duplicative, if the party seeking discovery already has had ample opportunity to obtain the information sought, or if the burden or expense of the discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2), as further set forth in this Order. As noted in the previous Order, the parties were directed to submit a status report to this Court advising it of the mutually agreed-upon deposition date. The Court understands that the parties are still attempting to land on a date on or before October 28, 2021 and trusts they will work cooperatively and promptly to finalize a date and time. Because the deposition is limited to one hour, the parties and witness should be able to find a time by then. Accordingly, the Court excuses the parties from submitting a letter regarding the time and date of the deposition; however, the parties should submit a letter by October 31, 2021 confirming that the deposition has been completed. The Clerk of the Court is directed to terminate ECF Nos. 170, 174, and 175. SO ORDERED.. (Signed by Magistrate Judge Katharine H. Parker on 10/20/2021) (vfr) (Entered: 10/20/2021) |

## A 5 – Dkt. Limiting Discovery

| 01/07/2021 | 119 | ORDER. Defendants have raised objections to certain discovery served by Plaintiff in this case. At today's conference, this Court held that Defendants would not be required to produce documents pertaining to dismissed claims, documents pertaining to Defendants' medical and mental health and drug and alcohol use, and documents pertaining to Defendants' family. The Court also narrowed many of the document requests in ECF 115-2, and the Court refers the parties to the transcript of the conference for the court's decision on these requests. With respect to requests 74, 75, 76, 81, 82, 86, 87, Defendants need not respond insofar as they do not seek relevant information and are disproportionate to the needs of the case. To the extent Plaintiff has served contention interrogatories, they are improper at this time and Defendants need not respond to the extent they do not comply with the Local Rules. Additionally, many of the questions in ECF 115-1 can be posed to Defendants in their depositions, which is a more efficient way of obtaining the information. Therefore, Plaintiff is directed not to pose any additional interrogatories without leave of Court and Defendant is excused from answering the interrogatories. Defendants are directed to respond to Plaintiff's requests to admit in accordance with the FRCP. (HEREBY ORDERED by Magistrate Judge Katharine H. Parker) (Text Only Order) Copies of Notice of Electronic Filing To Be Mailed By Clerks Office. (Parker, Katharine) (Entered: 01/07/2021) |

# DM Non-Party Witness Deposition Transcript



COURT REPORTING

LEGAL VIDEOGRAPHY

VIDEOCONFERENCING

TRIAL PRESENTATION

MOCK JURY SERVICES

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS



NAEGELI
Expect Excellence

DEPOSITION AND TRIAL

CELEBRATING 35 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

WENTWORTH RATTRAY,

      PLAINTIFF,

vs                                    CASE NUMBER 17-CV-8560

POLICE OFFICER CADAVID BADGE
NUMBER 9085, IN HIS INDIVIDUAL
AND OFFICIAL CAPACITY; POLICE
OFFICER ALYSSA TRIGUENO, IN
HER INDIVIDUAL AND OFFICIAL
CAPACITY,

      DEFENDANTS.

_____

**REMOTE DEPOSITION BY VIDEOCONFERENCE**

**WENDY SANDY**

**TAKEN ON**
**TUESDAY, OCTOBER 26, 2021**
**11:25 A.M.**

**CONNECTICUT**

1     **Q    Okay.  So you called and you explained to**

2  **her.  Who is "her?"**

3     A    I can't remember it was a her or a man.  I

4  know that I spoke to someone when I called 911 and I

5  explained to the person stating this is the

6  situation that's happened.

7     **Q    Okay.  So you called 911 and you explained**

8  **to the person who picked up the phone at the other**

9  **end?**

10     A    Yes.

11     **Q    All right.  Great.  And you said you told**

12  **them that -- you said "not around?"**

13     A    You said Autumn was not around.  You said

14  she was not around to take her to my house.

15     **Q    Okay.  So she was not around.  And you**

16  **wanted to take her to your house.**

17     A    Yeah.  It was my turn to take her.  And

18  you said that she was not around.

19     **Q    Okay.**

20     A    And that's the reason I called.

21     **Q    Understood.  Understood.**

22         **Now, after that time, did you say anything**

23  **else to that 911 operator?**

24     A    No, I did not.

25     **Q    Okay.  Did you tell the 911 operator that**

1   your child was in danger?

2        A     No, I cannot remember saying anything like

3   that.

4        Q     Okay.  Okay.  So, after -- after that

5   call, did police officers show up?

6        A     Yes, they did.

7        Q     Okay.  So the police officers showed up.

8   Do you recall how long it was before they showed up?

9        A     I honestly cannot remember that.  They

10  showed up.  I cannot tell you the time or whatever.

11       Q     Understood.  Now, when they showed up, do

12  you recall who the officers were that showed up?

13       A     It was five years ago.  I cannot remember.

14       Q     Understood.  Just general, general

15  descriptions.

16       A     I can't put a description because I cannot

17  remember.

18       Q     Okay.  Were they two men?  Were they in

19  uniform?  Were they in plain clothes?

20       A     They were in uniform.

21       Q     In uniform, okay.  And two men, two women?

22       A     One was a woman.  One was a man.

23       Q     Okay.  And which officer did you speak

24  with, the man or the woman?

25       A     I spoke to the lady.

1      **Q      You spoke to the lady.  Okay.**

2      A      Yes, I spoke to the officer.  She was --

3      she's a lady.  I mean, I can't remember her name.

4      **Q      Okay.  That's all right.  So you spoke to**

5      **the lady.  And what did you tell the lady?**

6      A      I show her the paper that I got from the

7      court that it was my turn.  And I said to her like

8      it's my turn.  And you came downstairs and you told

9      me that Autumn is not home.

10     **Q      Okay.  So you told her that I told you**

11     **that the child was not home.**

12     A      Yes.  And you did told me that.

13     **Q      Okay.  All right.  Did you speak to the**

14     **male officer?**

15     A      No.  I cannot remember speaking to any

16     male officer.

17     **Q      Okay.  All right.  So that's what you said**

18     **to them when they arrived, when they showed up; is**

19     **that correct?**

20     A      Yes.  That's exactly what I said.

21     **Q      Okay.  And that's before they went inside?**

22     **Did the officers go inside the building?**

23     A      That's before they went into the building.

24     They asked me and I told them what happened.

25     **Q      Okay.  Fantastic.  So that was before they**

1 **went inside.  Do you remember having conversations**

2 **with them after they came out of the building?**

3      A     No.  I cannot remember having any

4 conversation after they came out.  I can't remember

5 that.

6      **Q     Okay.  So, after they came out, do you**

7 **remember filling out a form?**

8      A     I did remember filling out a form stating

9 that -- that was after they left.  They came out of

10 the apartment.  I was downstairs.  And she asked me

11 to fill out the form.  I filled out the form stating

12 that it was my turn to pick up my daughter, our

13 daughter.  And I did not get my daughter.

14      **Q     Okay.  So which officer did you fill out**

15 **the form with?**

16      A     It was a young lady.  The officer, I don't

17 remember her name.

18      **Q     Okay.  So, did you ever speak to the male**

19 **officer?**

20      A     No, no, I did not.  And I know this -- no.

21      **Q     So you never spoke with the male officer?**

22      A     No.  Not that I recall.  Like, I cannot

23 remember speaking to a male officer.  I know when

24 they first came, both of them were there when I told

25 them the incident.  But besides that, I didn't speak

1  to him one-on-one.  I never speak to any officer

2  one-on-one.  The only one-on-one conversation I had,

3  it was with the officer and she was a lady.  And she

4  asked me to write something down saying that I did

5  not pick up my daughter.  And that's what I did.

6      **Q     Understood.  Thank you.  Okay.  So I'm**

7  **going to ask you some specific questions now.**

8  **Specifically, and to the best of your recollection,**

9  **did you tell 911 operator that you were married to**

10 **plaintiff?**

11     A    No, I did not.

12     **Q     Did you tell the officers that you were**

13 **married to plaintiff?**

14     A    No, I did not.  I cannot remember. Because

15 we were not.

16     **Q     Understood.  Did you tell the officers you**

17 **were married at the time?**

18     A    No.  I say we were engaged.  My husband,

19 my husband then, we were engaged.

20     **Q     So, did you tell either officer that**

21 **plaintiff was not giving you back your child?**

22     A    No, I did not.  I show them the paper,

23 that it was me.  I showed them the paper.  And it

24 was that day that I supposed to pick up our

25 daughter.  And that's one of the reasons why I

1  called, because it was my turn.  And I did not get

2  Autumn to take her home.

3      **Q    Okay.  Great.**

4      A    I called.

5      **Q    All right.  Did you tell the officers that**

6  **you saw your daughter going inside the home?**

7      A    No, I did not.

8      **Q    Okay.**

9      A    I did not.  So I can't say I saw Autumn

10 went in the house when I did not see anything.

11     **Q    Understood.  Did you tell the officers**

12 **that you saw drug dealers going inside the home?**

13     A    No.

14     **Q    Okay.**

15     A    Unheard of.  I would never say anything

16 like that.  That's not -- that's not who I am.  I

17 don't make up stuff.  And so I would never say I saw

18 anything going in that house because I had never

19 seen anything like that.

20     **Q    Understood.  Did you tell officers that**

21 **you -- did you tell officers that plaintiff, your**

22 **child's father, is a drug user?**

23         **MR. SCHEINER:**  Objection, form.

24         **THE WITNESS:**  No, I did not.  I've never

25 said anything like that.  Never.  And I would never

1 say anything because that's not the truth.

2 BY MR. RATTRAY:

3     Q    Okay.  Did you tell officers that you were

4 concerned for your daughter's safety?

5     A    No.

6         MR. SCHEINER:  Objection to form.

7         THE WITNESS:  No.

8 BY MR. RATTRAY:

9     Q    Okay.  Did you tell the female officer

10 that you feared for your daughter's safety?

11    A    No.  I never did.

12        MR. SCHEINER:  Objection to form.

13 BY MR. RATTRAY:

14    Q    Okay.  Did you tell the male officer?

15    A    No, I never did.

16    Q    Okay.  Did you tell the 911 operator --

17    A    No.

18    Q    -- that you --

19        MR. SCHEINER:  Objection to form.

20 BY MR. RATTRAY:

21    Q    Did you tell the -- did you tell the

22 officer, the female officer that you spoke with, did

23 you tell her that you were the child's mother?

24    A    Yes, I am the child's mom.

25        MR. SCHEINER:  Objection to form.

Wendy Sandy    October 26, 2021    NDT Assgn # 53738                    Page 39

1    BY MR. RATTRAY:

2         Q    Did you tell the female officer that the

3    man in the apartment, me, that I was the child's

4    father?

5         A    Yes, you are.

6         Q    Did you tell that to the officer, though?

7         A    Yes, I did.  I told him that.

8         Q    Okay.  All right.  Now, did you ask the

9    officers to call ACS, Agency for Child Support?

10        A    No.

11             MR. SCHEINER:  Objection to form.

12   BY MR. RATTRAY:

13        Q    Ms. Wendy Sandy, to be clear, did you tell

14   the officers that you were worried about your

15   daughter?

16             MR. SCHEINER:  Objection to form.

17             THE WITNESS:  No.

18   BY MR. RATTRAY:

19        Q    Okay.

20             Did you tell the officers anything that

21   could have made them worry about the safety of your

22   daughter?

23             MR. UDALOV:  Objection to form.

24   BY MR. RATTRAY:

25        Q    Ms. Sandy?

1      A     No, I did not say that.  And I did not

2    give -- I was crying because I did not get my

3    daughter at that time.  That's -- I wasn't crying. I

4    didn't say anything that saying she's in danger.

5           **MR. RATTRAY:**  Understood, Ms. Sandy. Thank

6    you.  At this point plaintiff has asked the witness

7    I believe all the pertinent questions. Plaintiff

8    needs a moment to review.

9           And, Mr. Scheiner, you may go ahead and

10   continue your deposition, your portion of the

11   deposition, and plaintiff will pick up the last five

12   minutes, if that's okay with you.

13          **MR. SCHEINER:**  No.  The way this proceeds

14   is you complete your questioning and then we do our

15   cross-examining.  If you do have anything after

16   that, and you have not exhausted your time, then you

17   can ask Redirect if it's within the scope.  So do

18   you have anything further to ask now?

19          **MR. RATTRAY:**  I don't have anything

20   further to ask.  And I will reserve 10 minutes to

21   Redirect afterwards.  Thank you.  I have not

22   exhausted my time.

23   **CROSS-EXAMINATION**

24   **BY MR. SCHEINER:**

25       **Q     Ms. Sandy?**

 1     A     Yes.

 2     Q     **Were you served with a subpoena to appear**

 3 **to testify here today?**

 4     A     No.

 5     Q     **So you agreed with Mr. Rattray to testify**

 6 **here today?**

 7     A     Well, the only reason why I agreed,

 8 because the way he put it to us on the -- I want to

 9 say the 8th of October.  And I was scared.  So

10 that's the reason why I said it, I said I would do

11 it.

12     Q     **And when you say the way he put it to us**

13 **on the 8th of October, what do you mean?  How did he**

14 **put it to you?**

15     A     The way -- so on the 3rd, I received a

16 phone call from my sister that lives in Maryland.

17 And she said to me, "Did you take a look at your

18 email?"  I said no.  She said, "Well, Gary is --

19 wants you to do a deposition."  And she was freaking

20 out, also.  I said no, I didn't because I was at

21 work at that time.

22          And then the Saturday, which is -- the

23 Monday he send the text and he said I'm letting you

24 know I send you an email but I did not respond to

25 it.  When I went to pick up our daughter on the 8th,

1  I think it's the 8th or the 9th, he said that he

2  wants to speak to my husband and myself.  And my

3  husband came out of the car.  I was there with Mr.

4  Rattray.  And he said that he sent an email and he

5  did not respond to it.  And he said if I don't going

6  to do it, then he's going to go back to the judge

7  and ask the judge to do a deposition and if I don't

8  do it, then there will be a warrant for my arrest.

9  And so that's the reason why I said I was going to

10  do it.

11      **Q    And currently do you have -- what's your**

12  **custody situation with Mr. Rattray and your**

13  **daughter?**

14      A    So, our daughter, I pick her up every

15  other weekend Saturday at 6 o'clock from her house

16  and I take her back on Sunday at 6 o'clock.  But

17  sometimes I try to be mindful that she has a lot of

18  homework to do, so I take her back maybe an hour and

19  a half early so she can pick up from where she left

20  off on Saturday.

21      **Q    And did you also have the fear that if you**

22  **did not cooperate in giving this deposition that**

23  **that would affect your ability to see your daughter?**

24      A    Yes, yes.  I honestly do.

25      **Q    And why did you fear that?**

1    A    Because of past experience with him.  And

2 that's one of the reasons why I said I was going to

3 do it because my daughter and I have a very good

4 relationship.  And I don't want that to affect

5 anything.  So that's one of the reasons why I did

6 it.

7    **Q    And when you say past experience with him,**

8 **what do you mean?**

9    A    I mean, for example, like five years ago

10 with that and basically we didn't -- I didn't want

11 to go to court for a judge to tell me when I can see

12 our daughter.  And basically when he says you can

13 pick her up and then I go and then I don't get her,

14 that's kind of one of the reasons why I decided to

15 go to court to get custody, to share custody, so I

16 can get to see my daughter.

17         So that's one of the reasons why I went to

18 court to that because he would give me "oh, she

19 can't come."  And I would be furious because I'm her

20 mom.  And I want to be in Autumn's life.

21         So that's one of the reasons why I decided

22 to go to court to get some sort of -- so I can spend

23 time with her.

24         That's one of the reasons why I had called

25 the cops that day, because it was my turn. And he

1   wasn't going to give me Autumn.  So I called 911.

2       **Q       And what did you hope that the police**

3   **would do for you when you called 911?**

4       A      I was hoping that they at least can talk

5   to him and see the paper, it was my turn, and

6   basically give Autumn to me.  But that didn't

7   happen.

8       **Q       When you say give Autumn to you, what do**

9   **you mean?**

10      A      I meant by the court order, it was my

11  turn.

12      **Q       Did you ask the police when they were**

13  **there to take any action?**

14      A      No.  I didn't.  All I just asked -- I just

15  explained to them what happened.  And I showed them

16  the custody paper that we have of sharing, it was my

17  turn that Saturday.  And that's what I showed them.

18  And that was it.  I didn't say anything else

19  different more than I was just more focusing on me

20  getting my daughter.  That was I was focusing.

21          And I was very upset.  I was crying.  And

22  hurt because I don't understand if it was my turn

23  why she wasn't around for me to pick her up and take

24  her home.

25      **Q       Well, given that you were upset and you**

1  **were crying and you were speaking to the police**

2  **about not being able to see your daughter, do you**

3  **believe that you asked them to find out if your**

4  **daughter was in the apartment?**

5      A    I can't recall that, to be honest with

6  you.  I cannot recall that.

7      **Q    So there are some things about the**

8  **incident that you believe you cannot recall?**

9      A    Honestly, yeah.  Because it was a long

10  time ago.  And in the moment, when you are crying

11  and you are upset, it was everything was just glory

12  to me because I was hurting.  And I think we had

13  just finished a court hearing that week, and it was

14  really rough on me.  And so I honestly cannot

15  remember like making sure that she's in the house

16  because he told me that she wasn't home.  So I would

17  not tell them to go and make sure that -- because he

18  said that she wasn't around.

19      **Q    Well, Ms. Sandy, if you -- did you believe**

20  **him that she wasn't there?**

21      A     It was kind of hard to believe, but, yeah,

22  I actually didn't believe that she wasn't there.

23  But, I mean, that's what he said, she wasn't there.

24  So that's the reason why I called 911 because I

25  wanted to make sure I got my daughter.  It was my

1  turn.

2      **Q    So your belief was that your daughter was**

3  **there but that Mr. Rattray was lying and said she**

4  **wasn't and that he was refusing to turn her over to**

5  **you?**

6      A    Yes, somewhat, to be honest with you,

7  somewhat.  It was half and half.  It was he

8  purposely probably send her knowing that I was

9  coming to pick her up and/or she was there and he

10  didn't want to turn her over to me because it was my

11  turn.  It was 50/50, to be honest with you.

12      **Q    But was it your hope that the police would**

13  **investigate to determine what was actually going on?**

14      A    Yeah.  That was my hope, to make sure that

15  if she's in the house, then it was my turn to have

16  her.

17      **Q    Do you remember anything that either**

18  **officer said to you about what they were going to do**

19  **or in response to what you told them?**

20      A    The only thing -- to be honest with you,

21  the only thing I remember is when they say that they

22  were going upstairs, I stayed downstairs.  I didn't

23  know, I don't know what happened after that.

24      **Q    Do you recall whether they asked you**

25  **anything about the child's safety?**

1    A    No.  They -- I can't remember any one of

2  them asking me about her safety.  I must say to you

3  honestly that that's not something that comes to my

4  mind, I'm going to be honest with you.  That that

5  never crossed my mind when our daughter's with her

6  dad, that doesn't cross my mind, and that is a fact.

7    **Q    When you called the police, did you want**

8  **them to arrest Mr. Rattray?**

9    A    No.  I wanted them to talk to him so he

10  knows that what he did -- because it was my turn --

11  it was wrong and he's going against the court order

12  of giving Autumn to me.  That's the reason why I

13  called.  It wasn't to be arrest.  It wasn't to be

14  anything more than to get my daughter because it was

15  my turn.

16    **Q    And did you tell them that they had to**

17  **enforce the court order from the surrogate's court?**

18  **Did you tell that to the police?**

19    A    No.  No.  All I just said to them,

20  explained to them what happened, and I showed them

21  the court order.  And that's what happened.  It

22  wasn't to reinforce anything, to arrest Autumn's

23  dad.  It wasn't anything like that.  It was to make

24  sure that I get Autumn because it was my turn

25  because that was what the paper said.

1    **Q    Other than the conversation you told us**

2    **about where Mr. Rattray told you he would get you**

3    **arrested if you didn't appear for the deposition,**

4    **have you spoken to Mr. Rattray since then?**

5    A    Yeah.  Last Saturday I went to pick up our

6    daughter.  And he came downstairs.  And he said to

7    me, "I want to speak to Robert", which is my

8    husband.  "And then after I finish speaking to Mr.

9    Robert, I want to speak to you."  And then I kind of

10   find it weird that he wants to speak to both of us

11   separately.  And then when he was walking away, he

12   said, "because it's probably going to be

13   problematic."

14          So when he said that, I walked over to the

15   car.  And I told my husband to come out.  And he

16   says he doesn't want me there.  And my husband said,

17   "Well, if you don't want her here, then I can't say

18   anything.  I can't speak to you."  And then he said

19   okay.  And then he walk away.  And that was the

20   conversation we had last Saturday.

21   **Q    Was there any other time that the**

22   **plaintiff spoke to you about his lawsuit against the**

23   **police?**

24   A    A couple of years ago he had mentioned it

25   to me.  But besides that, there was nothing between

1  what's going on now, here he has not said anything

2  to me then except the one time when it's now.  But

3  that's it.

4      **Q     Did the plaintiff ever speak to you about**

5  **what you had said to the police on the date of this**

6  **incident?**

7      A    No.  No.  He never asked me anything.

8      **Q     Did the plaintiff tell you why he wanted**

9  **you to appear for a deposition in this case?**

10     A    Yeah.  He said because I was the witness

11  and I have to say what I told the 911 call and the

12  cops that came by.

13     **Q     He indicated that you signed a document**

14  **that the police gave you to sign after they went**

15  **upstairs; is that correct?**

16     A    No.  When they came back from upstairs,

17  she asked me to state -- to write, it was a pink

18  piece of paper I write on.  It was dark.  So my --

19  kind of crazy, but it was dark.  I remember it was a

20  pink piece of paper and I had to lean on the car to

21  write it.  And that was when they came from

22  upstairs.  That was when they were leaving, I had

23  was to write stating that I did not receive Autumn

24  on that day.

25     **Q     Uh-huh.  And at that time -- well, is it**

1  possible that you spoke -- at that time you said you

2  interacted with the female officer, in other words,

3  it was the female officer who asked you to fill out

4  that form; --

5      A     Yeah.

6      Q     -- is that right?

7      A     Yeah, uh-huh.

8      Q     Is it possible that previously when you

9  first saw the officers that you interacted with the

10 male officer?

11     A     Not one-on-one because both of them came

12 to me the same time.  So I was explaining to them

13 what happened.  And I show them the paper.  But not

14 to say one-on-one.  They were both there.

15     Q     And, Ms. Sandy, besides your custody

16 relationship with Mr. Rattray, do you have any type

17 of support relationship?  In other words, an

18 economic relationship with him in which you or him

19 exchange payments of any kind?

20     A     So I pay child support.  I pay child

21 support.  And that's basically it.  There's no

22 conversation.  If he feels like saying hi, he would

23 say hi.  Then I just pick up my daughter and just go

24 on my merry way.

25     Q     And how long have you paid child support



DM NYPD Deposition Officer Alyssa Trigueno 09 20 2021

**UNITES STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WENTWORTH RATTRAY,

       Plaintiff,

against                    Index No.: 17-CV-8560

POLICE OFFICER JOSE CADAVID
BADGE #9085 in his individual
and official capacity, POLICE OFFICER
ALYSSA TRIGUENO BADGE #16807
in her individual and official capacity,

       Defendant.

_____







**REMOTE DEPOSITION OF**

**ALYSSA TRIGUENO, OFFICER**

**TAKEN ON**
**MONDAY, SEPTEMBER 20, 2021**
**10:15 A.M.**

**NEW YORK**

1    A    Which narrative?  Because there are two

2  portions.  There is -- after the address or --

3  which narrative?

4    Q    Well, you can start at the beginning.  It

5  just says narrative and then it starts and

6  continues on.  Right?  So it says, "I came to pick

7  Autumn up at 7:00 p.m."

8        MR. UDALOV:  Objection.  The document

9  speaks for itself.

10        MR. RATTRAY:  The document does not tell

11  us who is making that statement.

12        MR. UDALOV:  You can ask that question.

13    Q    Officer Trigueno, the narrative section

14  there that states, "I came to pick up Autumn at

15  7:00 p.m, 11/5/16.  I have been calling her to let

16  her know that I am picking at 7:00 p.m.  Did not

17  answer any phone calls.  Then I saw the dad and he

18  told me that Autumn is not home and I would not be

19  seeing my child."

20        Is that an accurate representation of the

21  narrative as it's on this form?

22        MR. UDALOV:  Objection.

23    Q    Officer Trigueno, the narrative that I

24  just read to you, is that the narrative that you

25  entered under the domestic incident report or was

1    that entered by someone else?

2        A     The narrative that you've read, that's

3    the electronic version of the original domestic

4    incident report.  That narrative portion is what

5    the caller wrote on her end, on her statement.

6        Q     On her statement.  Okay.  Does that

7    statement -- is that the statement that you

8    provided to enter as a domestic incident report?

9    Because it sounds like you didn't enter it into the

10   system.  Is that what I'm understanding?

11       A     Correct.  I did not enter it into the

12   system, that is the original copy portion.

13       Q     The original copy was done by hand;

14   correct?

15       A     Correct.

16       Q     So you did an original copy by hand at

17   the scene?  At this time, plaintiff would like to

18   request a copy of that original done by hand

19   incident report by counsel.

20           MR. UDALOV:  Mr. Rattray, we provided

21   that copy to you on, give me one second.

22       Q     Officer Trigueno, we can go on while

23   counsel searches for this provisioning of that

24   document.  Officer Trigueno, the second portion of

25   that narrative, "At TPO P1 and P2 had a dispute

1  **over custody of child and dates to pick up child.**

2  **P1 called police because P2 refused to let P1 see**

3  **child.  P1 and P2 have joint custody of child.**

4  **"When officers responded to speak to P2, P2 was**

5  **being aggressive and refused officers to see child**

6  **nor show court papers.  P2 was being offensive and**

7  **cursing out officers.  Tried closing door. Child**

8  **was not at location at time so mother was unable to**

9  **pick up child."**

10          **Is that what you provided in your written**

11  **report to be entered on the official report?**

12     A    Yes, that was the summary of what

13  occurred that day.

14     **Q    Summary of what occurred that day?**

15          **MR. UDALOV:**  Mr. Rattray, can we take a

16  five-minute break?  I want to find that document.

17  Let's take a five-minute break, please.

18          **MR. RATTRAY:**  Sure, counsel, we'll take a

19  five-minute break.

20          **MR. UDALOV:**  Thank you.

21          **(Whereupon, there was a pause in the**

22  **proceeding.)**

23          **MR. RATTRAY:**  Mr. Udalov?

24          **MR. UDALOV:**  You should have it in your

25  e-mail box.  I think when I tried to e-mail it to

1    you it stayed in my track for some reason.

2              I just forwarded it to you.  So that was

3    a mistake on my part.

4         **MR. RATTRAY:**  Understood.  These things

5    happen.  I'm going to ask for just a small

6    additional -- actually, we're coming up on our

7    scheduled break, our scheduled ten-minute break for

8    11:30, so I'll go for another ten minutes and we'll

9    review it and we'll come back to it if we need to.

10   **Q    Officer -- if I can figure out this**

11   **screen share thing, I believe.  So I'm going to go**

12   **through now with you in the next ten minutes, the**

13   **rest of the domestic incident report while we get**

14   **the actual written copy so we can understand what**

15   **we're looking at I guess for everyone's review.**

16        **MR. UDALOV:**  Mr. Rattray, you should have

17   received the written copy in your e-mail.

18        **MR. RATTRAY:**  Thank you.  I'll look at it

19   on the next break and I will continue on from

20   there.

21   **Q    In this section of the domestic incident**

22   **report, would you say that the way the writings**

23   **that are here are an accurate characterization of**

24   **what you supplied to be written up?  Did they get**

25   **it right?**

1        **MR. UDALOV:**  Objection.  Mr. Rattray can

2    you specify what portion of the document that you

3    are referring to?

4        **MR. RATTRAY:**  I'm talking about the

5    second portion where it says, "At TPO and P1 and

6    P2."

7        A    Yes, that would be on the narrative.

8        **Q    I have a couple of areas that I'm**

9    **particularly interested in.  One of them is, it**

10   **says that plaintiff was being aggressive and**

11   **refused officers to see child nor show court**

12   **papers, right. So again, aggressive.  Can you help**

13   **me understand what you meant by aggressive?**

14       A    I meant in the statement from what I

15   recall the incident, the door was not being opened,

16   he wasn't able to -- he wasn't cooperating with us

17   and was being very uncooperative and wouldn't open

18   the door for us to see if the child was home.

19   That's what that means.

20       **Q    Okay.  So you were -- you said not**

21   **opening the door to let you see if the child was**

22   **home.  Is that what you just stated?**

23       A    Yes.

24       **MR. UDALOV:**  Objection.

25       **Q    What is the objection, counsel?**

1    **MR. UDALOV:**  It's not the

2  characterization of her testimony.

3    **Q     Officer Trigueno, can you help me**

4  **understand what you just stated?**

5    A     What I stated was -- what I meant what I

6  stated is refusing to open the door, wouldn't let

7  us in to see the child just to make sure that she

8  was home because the mother was concerned for the

9  daughter.

10    **Q     So was being uncooperative right, not**

11  **opening the door, right, and that's the definition**

12  **of aggressive that you're giving now?**

13    **MR. UDALOV:**  Objection.

14    **Q     Plaintiff is asking you, Officer Trigueno**

15  **to describe for him, for the court, what you**

16  **understand to be the aggressive acts that were**

17  **taken by the plaintiff that evening.  Because this**

18  **says the plaintiff was being aggressive.  Which one**

19  **of the acts were the aggressive acts by plaintiff?**

20    **MR. UDALOV:**  Objection.

21    **Q     Officer Trigueno, could you tell me what**

22  **plaintiff did that was aggressive?**

23    A     Keeping the door closed, was yelling and

24  cursing at officer.  Don't recall what statements

25  the plaintiff said however, it was considered

1    aggressive.

2    **Q      Understood.  So let's walk through a**

3    **timeline now because let's do -- you're outside the**

4    **door; right?**

5    A    Yes.

6    **Q      You were in the hallway and is the**

7    **plaintiff yelling at you in the hallway?**

8    **MR. UDALOV:**  Objection.

9    **Q      Officer Trigueno, while you were in the**

10   **hallway was plaintiff yelling at you?**

11   **MR. UDALOV:**  Objection.

12   **Q      Officer Trigueno, did you hear yelling**

13   **when you were in the hallway?**

14   **MR. UDALOV:**  Objection.  Be more specific

15   of when you're asking, when you're referring to

16   certain acts because it is not clear throughout

17   what you're asking.

18   **Q      Officer Trigueno, after you arrived at**

19   **plaintiff's apartment and were standing outside the**

20   **door before ringing the bell, did you hear yelling?**

21   A    No.

22   **MR. UDALOV:**  Objection.

23   **Q      So you didn't hear any yelling.  Did you**

24   **hear any yelling from inside of the apartment?**

25   **MR. UDALOV:**  Objection.

1      A      You're talking about the yelling between

2   the plaintiff or --

3      Q      **Did you hear plaintiff yelling inside his**

4   **apartment before you knocked on the door?  Did you**

5   **hear plaintiff yelling inside his apartment?**

6            MR. UDALOV:  Objection.  I don't think

7   the officer testified that she knocked on the door.

8      Q      **Prior to arriving at the door, did you**

9   **hear yelling in the apartment?**

10            MR. UDALOV:  Objection.

11      Q      **Officer Trigueno?**

12      A      No, I did not.

13      Q      **At some point, did someone knock on the**

14   **door or ring the bell?**

15            MR. UDALOV:  Objection.

16      Q      **Did you knock on the door, Officer**

17   **Trigueno?**

18      A      I don't know who knocked on the door or

19   rang the bell.

20      Q      **You do not recall who knocked on the door**

21   **or who rang the bell.  Did someone knock on the**

22   **door?**

23            MR. UDALOV:  Objection.  Ask a specific

24   question.

25            MR. RATTRAY:  I thought that was

1  specific.  Officer Trigueno does not recall

2  knocking on the door.

3          **MR. UDALOV:**  If you have a question about

4  knocking on the door, you should ask that question.

5          **MR. RATTRAY:**  I thought I just did and

6  Officer Trigueno said she does not recall who

7  knocked on the door.

8          **MR. UDALOV:**  My objection is stated.

9      **Q    Officer Trigueno, how would you expect**

10 **someone inside the apartment to know who is outside**

11 **the apartment?**

12         **MR. UDALOV:**  Objection.

13     **Q    Officer Trigueno?**

14     A    Yes.  I'm sorry, can you explain what

15 you're trying to ask?

16     **Q    I'm trying to ask how NYPD communicated**

17 **with the person inside apartment 3-C at 42 West**

18 **120th Street that police officers were at the door.**

19         **MR. UDALOV:**  Objection.

20     **Q    Officer Trigueno, did you or your partner**

21 **communicate that you were police officers?**

22     A    Yes.

23     **Q    How did you do that?**

24     A    Stating this is the NYPD.

25     **Q    So you stated that you were the NYPD?**

1    A     From that day I don't recall, but I do

2  know that we did announce ourselves.

3     **Q     Announce yourselves.  So when did you**

4  **announce yourself?  When you first arrived?  As you**

5  **will got out the elevator?  While you were**

6  **downstairs?**

7              MR. UDALOV:  Objection.

8     **Q     When did you announce yourself?**

9              MR. UDALOV:  Objection.

10     **Q     At what point did you announce yourself,**

11  **Officer Trigueno?  Please answer the question.**

12    A     At the door.

13     **Q     At the door.  So you arrived at the door**

14  **and just announced yourselves as NYPD?**

15              MR. UDALOV:  Objection.

16     **Q     How did you announce yourselves, Officer**

17  **Trigueno?**

18    A     I don't recall.  I just know that the

19  plaintiff behind the door knew that we were

20  officers.

21     **Q     How do you know that plaintiff knew you**

22  **were officers?**

23    A     Because plaintiff, I recall him opening

24  the door slightly and he saw our uniform and guns.

25  But his lock was still -- wasn't fully open.  It

1  had a chain lock.

2      **Q**    **It had a chain lock on the door?**

3      A    Yes.

4      **Q**    **Officer Trigueno, would it surprise you**

5  **if I told you that there is no chain lock on**

6  **plaintiff's door?**

7      **MR. UDALOV:**  Objection.  Was there a

8  question, Mr. Rattray?

9      **MR. RATTRAY:**  Yes, it was.

10      **Q**    **Would it surprise you Officer Trigueno,**

11  **if I told you that there is no chain lock on**

12  **plaintiff's door?**

13      **MR. UDALOV:**  Objection.

14      **Q**    **Officer Trigueno?**

15      A    Yes.  Hello?

16      **MR. UDALOV:**  Mr. Rattray, I think your

17  connection was lost.

18      **MR. RATTRAY:**  Apologies.  I lost the

19  connection there for a moment.

20      **Q**    **I missed your answer, Officer Trigueno.**

21  **Can you please repeat that?**

22      **MR. UDALOV:**  I would ask Mr. Rattray, to

23  please restate the question.

24      **Q**    **Officer Trigueno, would it surprise you**

25  **if plaintiff told you that there is no chain lock**

Officer Alyssa Trigueno    September 20, 2021    NDT Assgn # 52564    Page 63

1    on his door?

2            MR. UDALOV:  Objection.

3    Q    Would you be surprised by that?

4            MR. UDALOV:  Objection.

5    Q    Officer Trigueno?

6    A    Yes.  You're asking if I would be

7    surprised if there was no chain lock?

8    Q    Correct.

9    A    The present or in the past?

10    Q    There has never been a chain lock on that

11    door as long as plaintiff has lived in the

12    apartment.

13            MR. UDALOV:  Objection.

14    Q    Would that surprise you?

15            MR. UDALOV:  Objection.

16    A    Surprise me how?

17    Q    You just stated that the chain lock was

18    still on the door.  And plaintiff is prepared to

19    assert that there has never been a chain lock on

20    the door.

21            MR. UDALOV:  Objection.

22    Q    Would you find it surprising to know

23    that?

24            MR. UDALOV:  Objection.

25    A    I don't understand what the surprise

1    means.

2    **Q    Well, plaintiff is asking how you knew**

3    **there was a chain lock on the door.  You made a**

4    **statement.  How did you come to that conclusion?**

5              MR. UDALOV:  Objection.

6    **Q    Officer Trigueno, why would you say that**

7    **the door was still chain locked?  Did you see a**

8    **chain lock?**

9    A    I don't recall.  I remember because the

10   door -- how the door was open, it was slightly,

11   barely you can see inside.

12   **Q    Okay.  So if there was a chain lock on**

13   **the door -- you're familiar with how a chain lock**

14   **works; correct?**

15             MR. UDALOV:  Objection.

16   **Q    Are you familiar, Officer Trigueno, with**

17   **how a chain lock works?**

18             MR. UDALOV:  Objection.

19   **Q    Officer Trigueno, can you describe the**

20   **chain lock that you saw?**

21             MR. UDALOV:  Objection.

22   A    I don't recall the chain lock.

23   **Q    You don't recall the chain lock.  But you**

24   **made a statement a moment ago that there was a**

25   **chain lock still on the door.  We're just trying to**

1 **understand what kind of chain lock you saw so we**

2 **can document it.**

3        **MR. SCHIENER:** Objection. She didn't say

4 she saw a chain lock. You're misstating her

5 testimony at this point.

6        **MR. RATTRAY:** Chain lock on the door.

7        **MR. SCHIENER:** It is abusive and and

8 repetitive. Ask a factual question.

9        **MR. RATTRAY:** I'm trying to understand

10 what Officer Trigueno's statements mean.

11        **MR. SCHIENER:** Then ask a factual

12 question, please.

13    **Q    Officer Trigueno, can you describe what a**

14 **chain lock is? We're talking about the same or**

15 **different things here?**

16        **MR. UDALOV:** Objection.

17    **Q    I'm going to move on.     Officer**

18 **Trigueno --**

19    A    Yes.

20    **Q    We're back to the word aggressive. Can**

21 **you describe to me that plaintiff was being**

22 **aggressive?**

23        **MR. UDALOV:** Objection.

24        **MR. RATTRAY:** I'm sorry. Counsel, what

25 is the objection?

1    **MR. UDALOV:**  Please ask a specific

2  question.  If you're referring to a time on the

3  document, please be specific about it.

4    **Q    The document on the screen it says,**

5  **"Being aggressive and refuse officers to see child**

6  **or show court papers."  The document is D000068.**

7  **And in the narrative, the second populated block on**

8  **the third line reads -- or the second line,**

9  **starting at the end of the second line "P2 was**

10 **being aggressive and refused officers to see child**

11 **nor show court papers."  I'm trying to understand**

12 **from Officer Trigueno what aggressive means.**

13   **MR. UDALOV:**  Objection.  We already went

14 over this.  It's been already asked and answered.

15   **MR. RATTRAY:**  Thank you.

16   **Q    Now we'll move on to refuse officers to**

17 **see child.  Can you help me understand what**

18 **happened there?**

19   **MR. UDALOV:**  Objection.

20   **Q    Officer Trigueno, what request was made**

21 **of plaintiff?**

22   **MR. UDALOV:**  Objection.

23   **Q    Officer Trigueno, did you make a request**

24 **to see the child?**

25   **MR. UDALOV:**  Objection.

1    **Q    Officer Trigueno, referring to the**

2    **document on the screen, the line I just read, "P2**

3    **was being aggressive and refused officers to see**

4    **child or show court papers." What were you**

5    **referring to in the section "refused officers to**

6    **see child"?**

7    A    What I meant was showing court papers

8    stating that P2 had full custody of the child.

9    There was no court papers provided from either

10    party.

11    **Q    Okay. So no court papers provided from**

12    **either party?**

13    A    Correct.

14    **Q    We'll get back to that, but for now, I'm**

15    **just trying to focus on "refuse officers to see**

16    **child." Can you help me understand what is that**

17    **based on?**

18    A    Meaning that P2 did not open the door,

19    did not want officers to see the child, and was

20    very uncooperative and would not cooperate with the

21    officers in just letting us make sure the child was

22    okay based on the 9-1-1 call we received.

23    **Q    So Officer Trigueno, thank you. That's a**

24    **very good description. So you needed to see the**

25    **child; right? Is that what you were trying to do?**

1    A    Yes.

2    Q    And plaintiff refused to let you see the

3   child?

4    A    Correct.

5    Q    And you needed to make sure the child was

6   okay based on the 9-1-1 call.  Was that your

7   statement?

8    A    Yes.

9    Q    And plaintiff refused that request as

10  well?

11    A    Correct.

12    Q    And plaintiff refused to open his door

13  and that was a problem as well and so that's all

14  the things that are encapsulated and refused

15  officers?

16    A    Yes.

17    Q    Thank you.  Now, "nor show court papers."

18  Can you help us understand what is that statement

19  based on?

20        MR. UDALOV:  Objection.

21    Q    Did you make a request to see court

22  papers, Officer Trigueno?

23    A    I don't recall making a request, I just

24  know that no court papers were provided stating

25  which party has sole custody of the child.  Why it

1 is -- "nor show court papers that P2 had custody of

2 the child."

3     **Q    Okay.  I believe there must have been a**

4 **dialogue for this information that you just**

5 **described to us to become a part of the record;**

6 **right?  We wouldn't just assume these things.  Was**

7 **there a dialogue from where you extracted this**

8 **information?**

9         MR. UDALOV:  Objection.

10     **Q    Was there a request made to open the**

11 **door?**

12         MR. UDALOV:  Objection.

13     **Q    Officer Trigueno, did you make a request**

14 **to open the door?  For plaintiff to open his door?**

15     A    I believe I did.  I don't recall the

16 specific instance that occurred here.  I just know

17 -- I remember that we were trying to have the P2

18 open the door.  Did not want to open the door and

19 that's all I remember.

20     **Q    So how long did it take for P2 to open**

21 **the door?  Because you said the door was open at**

22 **some point.  How long did that take?  How long was**

23 **the refusal period?**

24         MR. UDALOV:  Objection.

25     **Q    Officer Trigueno, from the time you**

1  arrived at the door until the time the door was

2  open, how much time had passed?

3          MR. UDALOV:  Objection.

4      Q    How many minutes did you wait outside the

5  door before it was open?

6          MR. UDALOV:  Objection.  Which door are

7  you referring to, Mr. Rattray?

8          MR. RATTRAY:  The door to apartment 3-C

9  at 42 West 120th Street.

10         MR. UDALOV:  Please restate the question.

11     Q    Officer Trevino, at some point you

12 arrived at apartment 3-C at 42 West 120th Street.

13 How much time -- in minutes, please -- elapsed

14 between when you arrived at the door, announced

15 yourselves as NYPD officers and the time the door

16 was opened?

17     A    Opened as in fully opened?  That's the

18 part I'm confused about.

19     Q    Opened a little bit.  Opened in any way,

20 shape, or form.  Not locked.

21     A    From what I recall, the door was always

22 slightly opened until later on.  I don't recall the

23 minutes.  I would have to look at the dispatch

24 format you showed previously to know the exact

25 minutes that occurred.

1      **Q     Okay.  You have a recollection of the**

2  **event; correct?**

3      A     Yes.

4      **Q     And you were served a copy of the**

5  **complaint; correct?**

6      A     Yes.

7      **Q     And you are familiar with that complaint.**

8  **And in that complaint is a copy of the I-CAD or the**

9  **printout, the I-CAD printout with the time.  So you**

10 **have access to that information?**

11         MR. UDALOV:  Objection.  Mr. Rattray, if

12 you want to have Officer Trigueno look at a certain

13 document, you can just pull it up right now.

14     **Q     Officer Trigueno, is it reasonable to say**

15 **that sometime between 1851 and 1913 the door for**

16 **the apartment was opened?**

17         MR. UDALOV:  Objection.

18     **Q     Officer Trigueno?**

19         MR. UDALOV:  Objection.

20     **Q     Officer Trigueno, please answer the**

21 **question.**

22     A     Can you repeat that?

23     **Q     Is it reasonable to say that sometime**

24 **between 1851, right?  This document on the screen**

25 **that we're looking at on D0066, the top highlighted**

1  line 1851, when you and your partner arrived at the

2  location of the female caller downstairs and

3  1912:25 when the second call was placed by

4  plaintiff 1912; right?  That somewhere between

5  those two times was when the door was opened?

6          MR. UDALOV:  Objection.

7      Q    We're just trying to find a time when the

8  door was open by your estimation.

9          MR. UDALOV:  Objection.

10     Q    Officer Trigueno, please answer the

11 question.

12     A    From 1851 when we received the 9-1-1 call

13 to 1912, is that your question?  How long the door

14 has been slightly open?

15     Q    Right.  Somewhere in there the door was

16 open.  I'm trying to understand -- I'm giving you

17 the information here to refresh your recollection

18 so that you can perhaps recollect how long it was

19 you were outside the door prior to it being opened.

20 Because this is a -- oh, an approximately 21-minute

21 time period, it looks like --

22         MR. UDALOV:  Objection.  Mr. Rattray, if

23 you're looking at a specific document can you

24 please pull it up to see?

25         MR. RATTRAY:  I'm sorry, am I not sharing

1  the document?

2         **MR. UDALOV:**  You have the DIR report.  I

3  don't know what you're referring to right now.

4         **MR. RATTRAY:**  New York City Police

5  Department 9-1-1.

6         **MR. UDALOV:**  Can you put it on the

7  screen, please?

8         **MR. RATTRAY:**  It's not on the screen?

9         Okay.  My apologies.  I will start re-

10  sharing.

11     **Q     Officer Trigueno looking at the screen**

12  **highlighted in yellow, highlighted in orange, are**

13  **two time periods.**

14         **MR. UDALOV:**  Mr. Rattray, could you

15  please state for the record which document we're

16  looking at right now?

17         **MR. RATTRAY:**  We're looking at D00066.

18         This is the Domestic Incident Report

19  executed 12/9/2016, executed by NYPD Finese Wong,

20  932079.

21         **MR. UDALOV:**  That's not the Domestic

22  Incident report.  That's the New York City Police

23  Department 9-1-1.

24         **MR. RATTRAY:**  Okay.  New York City Police

25  Department 9-1-1.  Thank you.

1    **Q     And on this document it has times listed.**

2  **The time listed for the call, the initial time was**

3  **1851:56.  And the second call was 1912:25, which we**

4  **covered earlier.**

5       **The question is:  Is it reasonable to**

6  **assume, or is it reasonable to state that the door**

7  **being opened to plaintiff's apartment after your**

8  **arrival and your announcement that you were NYPD**

9  **officers at the door to his apartment on the third**

10  **floor, Apartment 3-C, is it reasonable to state**

11  **that that door was open sometime between those two**

12  **time periods?**

13       **MR. UDALOV:**  Objection.

14    **Q     Officer Trigueno?  Does this help to give**

15  **you some context as to when the door was open?**

16       **MR. UDALOV:**  Objection.

17    **Q     Does it help, Officer Trigueno?**

18    A     Yes.  But at the time I did not look at

19  my watch, like what time.

20    **Q     Understood.  We don't have an exact time,**

21  **but we have a range here; right?  We have between**

22  **1851 and 1912; right?  We believe somewhere between**

23  **there is where the door was opened?**

24    A     Yes.

25    **Q     Yes.  Thank you.**

1          MR. UDALOV:  Objection.

2      Q    That's all we were trying to get to. Just

3  some clarity.  Okay.  So, to go back to the

4  domestic incident report here, officer refused --

5  "P2 was being aggressive and refused officers to

6  see child nor show court papers."  So in order for

7  there to be a refusal, Officer Trigueno, what was

8  the request that plaintiff was refusing?  What

9  request did you make or your partner make?

10          MR. UDALOV:  Objection.

11          MR. RATTRAY:  Thank you, counsel, that

12  was a compound question.

13      Q    Officer Trigueno, did you make a request

14  to see a child?

15          MR. UDALOV:  Objection.

16      Q    Officer Trigueno, did you request that

17  plaintiff produce his child?

18          MR. UDALOV:  Objection.

19      Q    Please answer the question, Officer

20  Trigueno.

21      A    I don't recall if I made the request or

22  not due to the time period.  This incident occurred

23  in 2016 and now we're in 2021, so...

24      Q    Understood, understood.  Officer

25  Trigueno, given the time that has elapsed since

1    **this incident, would it not have been important to**

2    **document these things?**

3             **MR. UDALOV:**  Objection.

4        **Q    Officer Trigueno, did you write down**

5    **whether or not you requested to see the child**

6    **anywhere?**

7             **MR. UDALOV:**  Objection.

8        **Q    Officer Trigueno, did you document in**

9    **your written version of the DIR that you had asked**

10   **to see a child?**

11       A    The Domestic Incident report that I

12   wrote, it's a summary of what occurred and what is

13   stated on the narrative portion that I wrote,

14   that's what occurred.  I don't -- it does not state

15   whether I requested or requested seeing the child.

16   I don't recall if I did.

17       **Q    So second question.  Officer Trigueno,**

18   **why did you need to see the child?**

19       A    I needed to see the child due to the 9-1-

20   1 call that the mother wasn't able to pick up her

21   child and heard from her.  So I wanted to make sure

22   that the child was okay.

23       **Q    So did you investigate whether or not the**

24   **mother was in fact the mother?**

25             **MR. UDALOV:**  Objection.

1    **Q     Did you ask for any papers from the**
2  **mother?**

3         MR. UDALOV:  Objection.

4         **MR. RATTRAY:**  What is your objection,
5  counsel?

6         MR. UDALOV:  Objection to form.  Not
7  clear about what you mean by papers.

8    **Q     Officer Trigueno knows what I mean by**
9  **papers.  These are Officer Trigueno's terms.**
10 **Officer Trigueno, what papers were you interested**
11 **in seeing?**

12        MR. UDALOV:  Objection.

13   **Q     Officer Trigueno, in your document here**
14 **you write "nor showed court papers."  What court**
15 **papers are you referring to?**

16   A    Custody papers.

17   **Q     Custody papers.**

18   A    To see within those papers if there is a
19 court document from the judge or a timeframe to
20 pick up the child or drop off.  Usually that goes
21 with custodial agreements when it comes to a child.

22   **Q     Okay, understood.  So did you ask for**
23 **custody papers, the court papers you refer to here**
24 **that plaintiff is refusing to provide?  Did you ask**
25 **for those papers of the female complainant that you**

1  had just met with at the location downstairs?

2              MR. UDALOV:  Objection.

3      Q    Did you ask the female caller for her

4  court papers?

5              MR. UDALOV:  Objection.

6      Q    Officer Trigueno, please answer the

7  question.

8      A    I did not speak to the female caller

9  initially, so no, I did not request for court

10  custody papers.

11      Q    All right.  Do you know if your partner

12  received court custody papers from the female

13  caller?

14              MR. UDALOV:  Objection.

15      A    No.  I don't recall.

16      Q    So at this point, you're outside the

17  door.  This could be a random person saying my

18  child is missing?

19              MR. UDALOV:  Objection.

20      Q    Officer Trigueno, did you ask to identify

21  the person that had made the call?

22              MR. UDALOV:  Objection.

23      Q    Did you ask that person for

24  identification, Officer Trigueno?

25              MR. UDALOV:  Objection.

1     **Q     Did you ask to see their driver's**

2  **license?**

3          **MR. UDALOV:**  Objection.

4          **MR. RATTRAY:**  What is your objection,

5  counsel?

6          **MR. UDALOV:**  Object to the form of the

7  question.

8     **Q     Officer Trigueno, the female caller, when**

9  **you responded to the scene, the female caller, did**

10 **you ask the female caller for identification?**

11         **MR. UDALOV:**  Objection.

12    **Q     Officer Trigueno, did you ask the female**

13 **caller to provide her driver's license?**

14         **MR. UDALOV:**  Objection.

15    **Q     Officer Trigueno?**

16    A     Yes.  So what I recall, the way I was

17 able to identify the caller/mother, she approached

18 us and said I called 9-1-1.  From what I recall

19 that day.  That's how I was able to know that that

20 was the caller/mother.

21    **Q     Based on the fact that she identified**

22 **that she had called 9-1-1?**

23    A     Correct.  And in the narrative, of the 9-

24 1-1 call it states that she will be in front of the

25 building, which is where we -- I arrived with

1    Officer Cadavid.

2        **Q     Fantastic.  Thank you.  But that really**

3    **only identifies that she's another 9-1-1 caller.**

4    **It doesn't identify that she's a parent; does it?**

5            **MR. UDALOV:**  Objection.

6        **Q     Does placing the 9-1-1 call, Officer**

7    **Trigueno, identify her as a parent?**

8            **MR. UDALOV:**  Objection.

9        A     It identifies her as a victim as in she

10    called 9-1-1.

11        **Q     So Officer Trigueno, your training tells**

12    **you what about 9-1-1 calls?**

13            **MR. UDALOV:**  Objection.

14        **Q     Officer Trigueno, does the fact that**

15    **someone calls 9-1-1 make them a victim?**

16            **MR. UDALOV:**  Objection.

17        **Q     Officer Trigueno, your statement just**

18    **now, do you recall that statement?  Do you want to**

19    **rephrase that statement because I don't know that I**

20    **can work with that with the competent attorneys**

21    **that you have.**

22            **MR. UDALOV:**  Objection.  What statement

23    are you referring to?

24        **Q     She said -- I'm sorry, I'll ask the court**

25    **reporter to read back the last question and**

1  response.

2            (Whereupon, a portion of the record was

3  read back by the court reporter for the record.)

4      Q    Thank you, Madam Court Reporter.  I think

5  I'm a little clearer now on the question. Officer

6  Trigueno, in your statement, how did you come to

7  characterize the 9-1-1 caller as a victim?

8            MR. UDALOV:  Objection.

9      Q    Your statement, did you say that she was

10 the victim in your statement just now, Officer

11 Trigueno?

12           MR. UDALOV:  Objection.  Which statement?

13     Q    Officer Trigueno, did you ever

14 characterize the 9-1-1 caller as a victim in your

15 testimony today?

16           MR. UDALOV:  Objection.

17           MR. RATTRAY:  What's your objection?

18           MR. UDALOV:  Which 9-1-1 caller are you

19 referring to?

20           MR. RATTRAY:  Very good.

21     Q    Officer Trigueno, did you ever

22 characterize the female 9-1-1 caller as a victim in

23 your testimony today?

24           MR. UDALOV:  Objection.

25           MR. RATTRAY:  What is your objection?

1          **MR. UDALOV:**  I'm objecting to the form of

2  the question.   The officer may answer if she

3  understands.

4          **Q      Officer Trigueno, please answer the**

5  **question.**

6          A     Your question is whether I said the

7  caller was a victim?

8          **Q      Yes, today.**

9          A      Yes, I did say that she was the caller/

10 victim and based on our training, the caller, if

11 it's not a third party, it would be a victim.

12         **Q      Understood.  And so your training then,**

13 **is the thing that categorizes the person who calls**

14 **9-1-1 as the victim; right?**

15         **MR. UDALOV:**  Objection.

16         **Q      Is that a judgment that you're making or**

17 **is that part of your training?  I believe you just**

18 **said your training teaches you that if it's not a**

19 **third party than the caller is the victim?**

20         **MR. UDALOV:**  Objection.

21         **Q      Did you just say that or not?**

22         **MR. UDALOV:**  Objection.

23         **MR. RATTRAY:**  What is your objection,

24 Mr. Udalov?

25         **MR. UDALOV:**  Please state a specific

1  question.  My objection is to the form of your

2  question.  If the officer understands, she can

3  answer.

4      **Q    Officer Trigueno, in this specific case,**

5  **who is the victim?**

6          MR. UDALOV:  Objection.

7      A    In this case, the caller would be the

8  victim as in like who needed police assistance.

9      **Q    And what did that caller need police**

10 **assistance with?**

11         MR. UDALOV:  Objection.

12     A    It would be the female caller who needed

13 police assistance.

14     **Q    Right.  So the female caller needed**

15 **police assistance.  With what?**

16         MR. UDALOV:  Objection.

17     **Q    Officer Trigueno?  What did she need**

18 **assistance with?**

19     A    With her custodial -- the caller had a

20 custodial dispute with the child's father and

21 needed our assistance to go and see her child and

22 make sure she's okay.

23     **Q    Did the caller state that the child was**

24 **in danger?**

25     A    I did not speak to the mother -- I mean

1   to the caller, so it was predominantly Officer

2   Cadavid.  However, that's all I remember from

3   there.

4        **Q     So Officer Cadavid is really the only**

5   **police officer that spoke to the female caller at**

6   **the scene prior to you coming upstairs to the**

7   **plaintiff's apartment?**

8        A    Yes.

9        **Q     Thank you.  And how about after leaving**

10  **plaintiff's apartment?  Did you then speak to the**

11  **female victim?**

12       A    After we left the plaintiff's apartment,

13  I spoke to the caller to get -- to see her ID so we

14  can do the domestic incident report and for her to

15  fill out her statement on the second page of the

16  domestic incident report.

17       **Q     You spoke with caller after leaving the**

18  **apartment and got ID after leaving the apartment?**

19       A    Yes.

20       **Q     At that time, did the female caller**

21  **provide you with the court custody papers we were**

22  **talking about before?**

23       A    No, she did not.

24       **Q     Did you ask for those court custody**

25  **papers at that time?**

1      A      No, I did not.

2      Q      But at that time, you were aware that

3  plaintiff had not provided those papers?  That the

4  male in apartment 3-C had not provided those

5  papers?

6      A      Yes.  He did not provide the papers.

7      Q      And his failure to provide those papers

8  were part of what you considered or you stated

9  earlier, refused officers; right?  And you gave

10 three things that plaintiff refused:  Did not open

11 door, did not want officers to see the child to

12 make sure child was okay based on the 9-1-1 call,

13 and he did not show court papers; correct?

14         MR. UDALOV:  Objection.

15     A      Yes.

16     Q      So those are the things that are

17 encapsulated in your refused officers to see child,

18 but you do not ask the female caller for those

19 documents.

20         MR. UDALOV:  Objection.

21     A      Right.

22     Q      So you speak to the female caller, she

23 does not provide custody papers, you asked her for

24 her ID; right?  Is that correct?

25     A      Yes, I asked her for ID to --

1      **Q      Do you recall what state her ID was from?**

2      A     No, I don't recall.

3      **Q      So here it says victim, right?  And it**

4  **gives a name and then it gives a city and a state?**

5           **MR. UDALOV:**  Mr. Rattray, please identify

6  the document we're looking at.

7      **Q      Sorry.  This document is New York City**

8  **Police Department Domestic Incident D00068. Officer**

9  **Trigueno, do you see this victim address line?**

10     A     No, I don't.

11     **Q      Sorry, it's here.**

12     A     It only says from the typed up, it says

13  the street -- actually it does, yes, it says street

14  number would be 46, street name would be Robert

15  Treat Drive and the city of Milford and the ZIP

16  code is 16460.

17     **Q      The ZIP code I'm seeing is different than**

18  **what -- can you see my screen?**

19     A     Yes.  You highlighted the ZIP code.  It's

20  06460.

21     **Q      So that is the ZIP code.  In what state**

22  **is that in?**

23     A     I don't know.

24     **Q      You don't recall from having looked at**

25  **the victim's ID what state she was from?**

1          MR. UDALOV:  Objection.

2      A     No.

3      Q     You do not.  Okay?

4      A     No.  Because this is the electronic

5  version of the domestic incident report.

6      Q     It's the electronic version and I have

7  the written version that you actually have and it

8  would be far more productive for me to look at that

9  version.

10          I say we take a ten-minute break, if

11  that's okay with everyone and we come back.  So

12  I'll take the ten minutes to review that written

13  version that Mr. Udalov has supplied and then I'll

14  come back and we'll come back and talk about that

15  version of the document.  Is that satisfactory to

16  counsel?

17          MR. UDALOV:  Come back at 12:22?

18          MR. RATTRAY:  We can come back at 12:25.

19          (Whereupon, there was a pause in the

20  proceeding.)

21      Q     Officer Trigueno, I'm going to pull up

22  the document that was provided by counsel and I'm

23  going to share that on the screen if that's okay.

24  Is that document visible, Officer Trigueno?

25          MR. UDALOV:  There are two documents.

1     **Q      There are two documents, correct.  One is**

2  **the document we were looking at before, the**

3  **Domestic Incident report as typed up.  And the**

4  **other one is the handwritten document that I**

5  **received today. Thank you, counsel for sending that**

6  **over.  I'm going to try to make it so we can see**

7  **the whole document.**

8          **Looks like we have it.  All right.  So**

9  **hopefully we can make this quick and we can move**

10  **on.**

11          **MR. UDALOV:**  I just want -- as we're

12  going forward if we're referring to the written

13  document we can refer to that.  If we refer to the

14  one that is digitized, just to be clear on the

15  record.

16          **MR. RATTRAY:**  Understood.  I appreciate

17  the help there.

18     **Q      Officer Trigueno, so the exercise we're**

19  **going to try do now is on this side we have your**

20  **written document as you wrote it.  And then on the**

21  **left side we have the typed up document as it was,**

22  **I guess, produced by the administrative folks I**

23  **take it.**

24          **Who would create this document once you**

25  **supplied the written document?  Who would create**

1    **the typed up -- who would make the entries?**

2        A    It would be the PA for the domestic

3    violence unit.

4        **Q    So the PA.  So this document was created**

5    **by PAA and we're just going to compare how the two**

6    **-- if I make that smaller, can you still see it?**

7            **MR. UDALOV:**  Yes.  And again, Mr.

8    Rattray, I know you just referred to the digital.

9    If you could make that clear for the record, like

10   which documents we're talking about, what we're

11   talking about.

12           **MR. RATTRAY:**  Yes, understood.

13       **Q    So the document on the right will be --**

14   **for the record, will be your handwritten document**

15   **and it is labeled as D000133 and D000134, and then**

16   **D000135.  Well, the last page 135 is not a written**

17   **document.  It appears to be a summary of the I-CAD**

18   **report.**

19           **The first two pages appear to be**

20   **handwritten and it looks like they are several**

21   **different handwritings.  We'll go through the**

22   **document.  So that will be the document on the**

23   **right.  The document on the left is D00098 --**

24   **sorry, D00068 and D00069 and it appears D00070 as**

25   **well, a location diagram.**

1          So we'll just be going through and just

2   verifying what on this document is -- should be

3   able to get this a little bit larger.  So the

4   questions I have on this document just state to

5   when did you write this document up.  Was this

6   written up at the 42 West 120th Street scene?

7   Downstairs with the female caller?  Prior to going

8   upstairs or was it written after returning from

9   going back downstairs, after returning from the

10  male caller's home?

11          (Whereupon, a handwritten document was

12  marked as Plaintiff's Exhibit 3, Bates stamped

13  D000133, D000134 for identification as of this

14  date.)

15   A    This was -- this document was created

16  after coming down from the plaintiff's apartment.

17   Q    Okay.  Understood.  So in this upper

18  portion that's titled Incident, is that a portion

19  of the document that you would complete by hand?

20   A    Yes.

21          MR. UDALOV:  Mr. Rattray, we're talking

22  about the written version right now.

23   Q    The written version, the document on the

24  right, the section labeled "Incident," is your

25  handwritten notes.  Is the incident number your

Officer Alyssa Trigueno     September 20, 2021     NDT Assgn # 52564     Page 91

1  **handwritten note as well or is that someone else's**

2  **handwriting?**

3      A     That would be someone else's handwriting.

4  I don't know whose handwriting that would be.

5      Q     **Just for clarity.  But the rest of those**

6  **boxes are your handwriting?**

7      A     Yes.  The first page minus the incident

8  would be my handwriting, yes.

9      Q     **So all of this we can assume is your**

10 **handwriting as you're describing it, the top and**

11 **your handwriting, does that continue down to**

12 **Incident Narrative?**

13     A     Yes.  The first page and then on the

14 second page up to my signature, that's my

15 handwriting and the up to the female caller.

16     Q     **Everything below on the second page where**

17 **it says "Statement of allegations supporting**

18 **deposition," that would be the female caller's**

19 **handwriting?**

20     A     Yes.

21     Q     **Awesome.  So in the upper portion then,**

22 **I'm going to ask you what the source of the**

23 **information that you have here.  And if you can**

24 **answer as straightforward as you can, that would be**

25 **great.**

1  **First, I'd just like to note that we have**

2  **victim P1 and I see that that's written on the form**

3  **so it almost forces you to choose, right?  And I**

4  **guess the caller gets written here.  It says,**

5  **"Milford."  For the city, state, and ZIP, it says**

6  **"Milford, Connecticut 06460"?**

7  A    Yes.

8  **Q    Fantastic.  So we cleared up that**

9  **question from earlier.**

10  **MR. UDALOV:** Objection.  Mr. Rattray,

11  which question from earlier?

12  **MR. RATTRAY:** We were trying to find out

13  the state that 06460 was in.  We couldn't recall

14  that, but hopefully this clears up that, where the

15  female caller resided.

16  **Q    I guess I should ask just to be clear,**

17  **did you complete this section based on observing an**

18  **identification or any court papers or is this from**

19  **the female caller's verbal statement?**

20  **MR. UDALOV:** Objection.  Mr. Rattray, if

21  you could ask that separately.

22  **Q    How did you get this information that you**

23  **have populated here?**

24  A    I received a statement from the ID of the

25  caller.

1    **Q     So you observed the caller's ID?**

2    A     Yes.

3    **Q     Thank you.  And how did you get this**

4    **information for the P2, the suspect?  How did you**

5    **get that information?**

6    A     From what I recall, I received that

7    information on -- at the apartment.

8    **Q     At the apartment?**

9    A     Yes.

10   **Q     Okay.  And how did you receive that**

11   **information at the apartment?**

12   A     I believe I requested ID of the suspect

13   in this case.  I don't recall, but I know, I recall

14   the victim didn't have P2's ID.

15   **Q     So victim did not have P2's ID.  This**

16   **information you believe you got from the apartment.**

17   **How did you get it in the apartment?  Was there**

18   **paperwork that you observed in the apartment?**

19   **Letters?  Or did -- how did you get that**

20   **information at the apartment?**

21   A     I believe the suspect gave it to us, his

22   ID.

23   **Q     So he gave you the information by reading**

24   **it off his ID or did he give you his ID?**

25   **MR. UDALOV:**  Objection.

1      **Q      I'm sorry, could you clarify your**

2  **response, your earlier response?  He gave it to us**

3  **from his ID I believe is what you said.  I'm trying**

4  **to understand, did he hand you the ID or did he**

5  **just tell you the information?**

6            **MR. UDALOV:**  Objection.  Mr. Rattray, if

7  you could ask the question separately?

8      **Q      Did plaintiff hand you his ID?**

9      A      I'm not sure.  I just -- from -- I

10  remember I received the information at the

11  apartment, but it wasn't through any documentation

12  or anything.  I'm assuming it was from the ID.  I

13  don't recall.

14      **Q      So do you recall your partner requesting**

15  **plaintiff's ID?**

16      A      No.

17      **Q      You do not recall that.  But somehow you**

18  **were able to retrieve plaintiff's ID?**

19      A      Yes.

20      **Q      And that's the source of this information**

21  **here, because it's spot on.**

22      A      Yes.

23      **Q      All that information can be gotten from**

24  **his ID except for the phone number.  Where did that**

25  **information come from?**

1          **MR. UDALOV:**  Objection.

2     **Q     How did you get this information onto the**

3  **form?**

4          **MR. UDALOV:**  You're referring to the

5  phone number; correct?

6          **MR. RATTRAY:**  The phone number on the

7  form on the right plaintiff's, it says, Suspect P2

8  and it's next to the box titled 42 West 120th

9  Street, Apartment 3-C, and there is a phone number

10  there.  I'm asking -- we are certain the

11  information came from the ID, I'm trying to figure

12  out where did the phone number come from?

13     A     I'm not sure where the phone number came

14  from.  I'm assuming it was given at the scene, but

15  not from the caller.  I'm not sure where the phone

16  number came from, honestly.

17     **Q     All right.  So down below it says, "Do**

18  **suspect and victim live together?"  And the check**

19  **there says, "No."  Is that correct?**

20     A     That is correct, yes.

21     **Q     Suspect P2 present and it says "Yes."**

22     A     Yes, correct.

23     **Q     It says, "Was suspect injured?"  It says**

24  **no there, I believe; is that correct?**

25     A     Yes, right.

1    **Q     Possible drug or alcohol use and that**

2    **says no, I believe?**

3         A     Yes, correct.

4         **Q     And suspect supervised.  And that says**

5    **status unknown.**

6         A     Correct.

7         **Q     Okay.  And then suspect relationship to**

8    **victim P1, it says other or does it say former**

9    **intimate partner?  I guess it says former --**

10        A     It's checked with former intimate

11   partner.

12        **Q     Okay, thank you, former intimate partner.**

13   **Do the suspect and victim have a child in common**

14   **and that says yes.**

15        A     Yes.

16        **Q     Fantastic.  And did the suspect make**

17   **victim fearful and that says yes.  Is that correct?**

18   **Is that the intended mark there?**

19        A     Yes, that's correct.

20        **Q     And above that, I'm sorry, I skipped**

21   **down, there was an emotional condition of victim**

22   **and there is a box for upset and one for nervous,**

23   **one for crying, one for angry, and one for other.**

24   **I'm guessing -- so the one that's checked there,**

25   **which box is checked there?  Is that crying?**

 1       A    Yes.

 2       **Q    So crying.  But upset is not checked and**

 3  **nervous is not checked?**

 4       A    Right.

 5       **Q    So suspect made victim fearful, it says**

 6  **yes.  We've covered that.  And weapon used.  It**

 7  **says no.**

 8       A    Correct.

 9       **Q    Gun, yes/no, nothing checked there.  And**

10  **suspect threats, it says no there.**

11       A    Correct.

12       **Q    And access to guns, it says no.**

13       **MR. UDALOV:**  Mr. Rattray, the document

14  speaks for itself.  Do you have any specific

15  related questions?

16       **MR. RATTRAY:**  I do, I do.  But I

17  apologize, counsel.  I just got this document and I

18  need to understand.

19       **MR. UDALOV:**  If you need more time to

20  review the document I suggest that we need to take

21  -- we need a lunch break.  That will give you --

22       **MR. RATTRAY:**  Well, I have specific

23  questions on these checks because they are long

24  checks and they cover --

25       **MR. UDALOV:**  I understand that.  What

1   you're asking for is this box checked yes.  The

2   document speaks for itself.  If you have a specific

3   question about those checks, I ask that you just

4   ask that question.

5       **Q     So visible marks, yes or no.  It says**

6   **"no."**

7       A     Correct.

8       **Q     Now, just to go through a few of these,**

9   **how did we get to check the box that says victim,**

10  **emotional condition of victim, victim was crying?**

11  **How did you check that box?**

12          **MR. UDALOV:**  Objection.

13      A     I checked off that box based off the

14  condition of the caller initially, because when she

15  approached us, she was crying.

16      **Q     And when she approached you, she was**

17  **crying?**

18      A     Yes.

19      **Q     Did she explain why she was crying?**

20      A     No, hence the statement that follows that

21  is where I would put what the victim was saying.  I

22  spoke to her, it would have been in that portion

23  underneath where it says why -- what were the first

24  words that victim said to responding officers at

25  the scene regarding the incident.  Just based on

1  the initial reaction when she approached us, she

2  was crying.

3      **Q      So crying is what you saw, but you didn't**

4  **hear any words because you don't have any words**

5  **documented here?**

6      A      Yes.

7      **Q      Understood.  So the person who spoke with**

8  **the victim at the scene was Officer Cadavid?**

9      A      Correct.

10     **Q      And presumably, the victim spoke.  Did**

11 **you observe her speaking?**

12         **MR. UDALOV:** Objection.  I want to get

13 much longer at what point.

14         **MR. RATTRAY:** At the initial contact.  At

15 the point where there was the crying.  After that

16 there was an engagement by the officer.

17         Was the victim speaking to Officer

18 Cadavid now, because we know the victim didn't

19 speak to

20 Officer Trigueno.  We have testimony here saying

21 the victim spoke to Officer Cadavid.

22         We don't know what was said, we're just

23 trying to assert whether that speaking was observed

24 by Officer Trigueno.

25     **Q      Officer Trigueno, did you see the victim**

1  speaking with Officer Cadavid?

2      A     Yes, I did.  I observed her speaking, I

3  observed her mouth moving towards Officer Cadavid's

4  direction.  So, yes, she was speaking, but I did

5  not hear the conversation due to -- if I did, it

6  would have been stated on the report.

7      **Q     Understood.  Thank you.  So then the rest**

8  **of this information then, where we say did suspect**

9  **make victim fearful, that did not come from the**

10 **initial conversation, did it?**

11     A     That came from -- yes, that came from the

12 initial conversation.  However, that is based on

13 observation because she never stated that she was

14 fearful, otherwise if any statements were made, it

15 would have been sent in that narrative there.  And

16 above the fearful.  It was based on her initial

17 reaction.

18     **Q     So did suspect make the victim fearful is**

19 **the question.  And the answer is yes.  But what is**

20 **that yes based upon?  We said we didn't hear her**

21 **speaking.  We saw her speaking to Officer Cadavid.**

22 **We're talking about initial contact now.  We're**

23 **trying to understand how this box is checked, based**

24 **on that initial contact if we're not having words,**

25 **we're seeing a conversation.**

1          **What is that fearful based on?  That**

2  **suspect made that victim fearful?**

3          **MR. UDALOV:**  Objection.  If you

4  understand, officer, you can answer.

5      A    It would be based on the observation and

6  the initial 9-1-1 call that she had not heard from

7  her daughter and the husband -- sorry, the

8  plaintiff wouldn't let the caller see her child.

9      **Q    And she said she was fearful?**

10     A    Based on recent air, yes, that --

11     **Q    What I heard is that she wanted to see**

12 **her child.  Not that suspect made her fearful.  So**

13 **what I'm trying to get to, what about the**

14 **conversation or the situation that allowed you to**

15 **conclude that the suspect made the victim fearful?**

16     A    Due to her not being able to see her

17 child, that made her fearful.

18     **Q    Not being able to see her child made her**

19 **fearful?**

20     A    Yes.

21     **Q    So not the suspect, right?  Not plaintiff**

22 **is making her fearful, but not being able to see**

23 **her child is making her fearful?**

24          **MR. UDALOV:**  Objection.

25     A    Yes.

1    **Q      Thank you, Officer Trigueno.  I think we**

2    **can move down.  Now, on the same form -- I think we**

3    **covered everything else we needed to cover here and**

4    **we talked about on the printed form, but we're**

5    **still looking at the form on the right.  We're**

6    **still looking at the handwritten form.**

7            **I think we've covered on the printed for**

8    **but I just want to ask you about this insertion**

9    **here that says for essentially the same content.**

10   **But this inserted statement that says, "Tried**

11   **closing door in between cursing out officers and**

12   **child was not at location at time, so mother was**

13   **unable to pick up child."  When was that added to**

14   **the report?**

15   A    The same time that I had written that

16   portion, however, I left that part out.  So that's

17   why, hence, the many lines there.

18   **Q      So during the time that you initially**

19   **arrived and you went upstairs and you interacted**

20   **with plaintiff and went back downstairs, who did**

21   **you speak with?**

22           **MR. UDALOV:**  Objection.

23   **Q      Can you list for me the people you had**

24   **conversations with during those times, from the**

25   **time you initially arrived at the scene to the time**

1    **that you were departing the scene?  Do you recall**

2    **the people you had conversations with?**

3              MR. UDALOV:  Objection.

4              **MR. RATTRAY:**  I'm sorry, what is the

5    objection?

6              **MR. UDALOV:**  When you say scenes, what

7    are you referring to?

8         **Q    From the time you responded to the radio**

9    **call until the time you radioed call ended back to**

10   **dispatch, can you list for me the people you spoke**

11   **with so we can keep that part straight?**

12        A    It would be mainly -- I remember I didn't

13   speak to the mother, but it was with the plaintiff

14   in the apartment.  I remember a conversation was

15   said, but didn't know that the plaintiff was being

16   very uncooperative.  Exactly what's stated on the

17   report, that's what it was.

18        **Q    So you spoke with the plaintiff?**

19        A    Um-hmm.

20        **Q    Who else?**

21        A    And after the scene, after we left the

22   apartment building, I spoke to the mother because I

23   needed to fill out the domestic incident report and

24   that's -- those are the two I spoken to, but the

25   mother at the end, not the beginning.

1       Q      Did you speak to anyone else?  Did you

2  speak to Officer Cadavid?

3              MR. UDALOV:  Objection.

4       Q      During the time we're talking about, the

5  question, Officer Trigueno, is:  During the time

6  that we were discussing before, from the time you

7  called, you know, arrived at the scene, and the

8  time you called departing the scene, who did you

9  speak with?  And you gave, so far, you've listed

10 plaintiff, you've listed the female caller, FC,

11 right?

12      A      At the end.  Not the beginning.

13      Q      And who else did you speak with?

14      A      I believe Officer Cadavid.  I don't

15 recall.  It was a simple conversation.

16      Q      You don't recall what was said between

17 you and Officer Cadavid?

18      A      Sorry, I don't recall.

19      Q      Do you recall anyone else that you spoke

20 with?

21              MR. UDALOV:  Objection.

22      Q      Do you recall speaking to anyone else

23 between the time you arrived at the scene and the

24 time you departed the scene?

25              MR. UDALOV:  Objection.

1      A      I don't know who was on scene.

2      **Q      I'm sorry, what was on scene?**

3      A      The lieutenant.

4      **Q      The lieutenant was on scene.  Okay.  Did**

5  **you speak with the lieutenant?**

6      A      No.

7      **Q      Did the lieutenant provide any**

8  **instructions to you then?**

9           **MR. UDALOV:**  Objection.

10     **Q      Did the lieutenant provide any**

11  **instructions to you, Officer Trigueno?**

12          **MR. UDALOV:**  Objection.

13     A      No.  I don't recall.  I didn't know who

14  was there.

15     **Q      Did the lieutenant arrive alone or did he**

16  **have a partner with him?**

17     A      Honestly, I don't know.  I just know he

18  was there.

19     **Q      So you're only able to observe the**

20  **lieutenant at the scene.  Understood.  And you do**

21  **not recall the lieutenant providing you any**

22  **direction or guidance?**

23          **MR. UDALOV:**  Objection.

24     **Q      Did the lieutenant provide you with any**

25  **guidance on how to process this scene?**

1              **MR. UDALOV:**  Objection.

2        A     No.

3        **Q     Where were you when the lieutenant**

4  **arrived?**

5        A     I was in front of the apartment.

6        **Q     In front of the apartment. Officer**

7  **Trigueno, did you enter the apartment at any point**

8  **during the --**

9        A     No. I only stayed -- as far as entering

10  the apartment, my foot was on the threshold of the

11  door.

12       **Q     Okay.  So you did not enter the**

13  **apartment.  Is there any particular reason why you**

14  **did not enter the apartment?**

15       A     No, there was no reason at all.

16       **Q     Did you observe your partner entering the**

17  **apartment?**

18       A     Yes, but it wasn't -- he didn't enter

19  fully or no one did a thorough search of the

20  apartment.  He just went inside and just went back

21  out.

22       **Q     So he just entered and went back out?**

23       A     Correct.

24       **Q     How long did that take?**

25              **MR. UDALOV:**  Objection.

1    **Q    Do you recall how long Officer Cadavid**

2  **was inside the apartment?**

3    A    I know it was very briefly.  It was

4  short.  It wasn't long.

5    **Q    Can you estimate for me how many minutes**

6  **that was?**

7         **MR. UDALOV:**  Objection.

8    A    I would say probably approximately two or

9  three minutes.  I'm not sure.  I just know it was

10  very short.

11    **Q    Two to three minutes.  And what happened**

12  **when Officer Cadavid entered the apartment?**

13    A    I remember that he just stepped inside,

14  looked left and right and from what I recall,

15  that's when the plaintiff said that his daughter

16  was at a friend's house.

17    **Q    Okay.  And then what happened?**

18    A    Then after that, Officer Cadavid stepped

19  out and that's where I draw a blank.  I don't

20  remember.  And then I do recall the plaintiff say

21  that the daughter will give the mom a call soon and

22  then we left.  That's what I remember.

23    **Q    Okay.  And then you left.  So in your**

24  **estimation, how long did this entire incident take?**

25    A    I would say incident from my assumption,

1  approximately like an hour.

2      **Q     Okay.  So one hour?**

3      A     That was from the 9-1-1 call came until

4  finalize, I would say approximately -- around that

5  time.  Not set on the time.  It would have to be

6  based on the report, what time the job was

7  finalized.

8      **Q     The job report was finalized, and we're**

9  **about to do that, we're good.  So this information**

10 **that you filled in here was not based on any**

11 **feedback or any guidance from Lieutenant Kohosh;**

12 **right?**

13      **MR. UDALOV:**  Objection.  Which

14 information are you referring to?

15      **MR. RATTRAY:**  I'm sorry.  Thank you,

16 thank you.  So the information in this area, the

17 incident narrative is filled out based on your

18 knowledge of the incident, not based on any

19 guidance or any feedback from Lieutenant Kohosh.

20      A     K-o-h-o-s-h.

21      **Q     Thank you, Officer Trigueno.  Now, we're**

22 **going to move down to the section where there is a**

23 **box.  If the victim answers yes to any of these**

24 **questions in the box, it says threatened to kill**

25 **you or your children and that's checked with "no;"**

## DM NYPD Deposition Officer Jose Cadavid 08 13 2021



**COURT REPORTING**

**LEGAL VIDEOGRAPHY**

**VIDEOCONFERENCING**

**TRIAL PRESENTATION**

**MOCK JURY SERVICES**

**LEGAL TRANSCRIPTION**

**COPYING AND SCANNING**

**LANGUAGE INTERPRETERS**



**NAEGELI**
DEPOSITION & TRIAL

**(800) 528-3335**

**NAEGELIUSA.COM**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

WENTWORTH RATTRAY,

     Plaintiff,

vs.                Case No. 17-CV-8560 (PGG)

CITY OF NEW YORK, et al.,

     Defendants.

_____

**CONFIDENTIAL**

**REMOTE DEPOSITION OF**

**JOSE CADAVID**

**TAKEN ON**
**FRIDAY, AUGUST 13, 2021**
**10:08 A.M**

**NEW YORK, NEW YORK**

1    **Q      You don't recall plaintiff refusing you**

2    **entry, or do you recall that?**

3        A    I do recall you refusing entry.

4    **Q      Do you recall you asking plaintiff to**

5    **allow you to enter to look around?**

6        A    I do not recall.

7    **Q      You do not recall that, okay.  All right.**

8    **So after plaintiff's refusal for you to enter, what**

9    **happened?**

10        A    After going back and forth of asking to

11    see your daughter and your refusal, I made my -- I

12    made entry into the apartment.

13    **Q      You made entry.  Did you get a warrant for**

14    **that entry?**

15        A    No.

16    **Q      And you made that entry based on what**

17    **information?**

18        A    I made that entry based on the

19    complainant's information from the day of the

20    incident.  And also the way you were being hostile,

21    being rude, and being very aggressive towards me and

22    my partner, that gave me more of a concern.

23    **Q      So hostile, rude and aggressive.  I'm**

24    **going to ask you if you can tell me what hostile --**

25    **what you categorize as hostile that plaintiff --**

1          **What made you decide to make entry into**

2   **the home as you described it?**

3      A    My decision to make entry was based on

4   your refusal to tell me the whereabouts about your

5   daughter or to produce your daughter, and my concern

6   was the safety of your daughter.

7      **Q    So your concern was the safety of my**

8   **daughter.  Did you consider that your forcible entry**

9   **could put her in more danger?**

10          **MR. UDALOV:**  Objection.

11     A    No.

12     **Q    Did you consider that your entry may be**

13  **dangerous to plaintiff?**

14     A    No.

15     **Q    Okay.  When you made entry, what did you**

16  **do?**

17     A    I made entry.  You backed up.  And I was

18  asking you about the whereabouts about your

19  daughter.

20     **Q    Okay.  Did you notice anything when you**

21  **made entry and I backed up?**

22     A    You seemed -- you were upset.

23     **Q    I was upset.  Did I look like I was in**

24  **pain?**

25     A    No.

Jose Cadavid    August 13, 2021    NDT Assgn # 52362    Page

1      **Q      Did you notice that the steel door of the**
2  **apartment had struck me on your entry?**
3      A      It did not struck you.
4      **Q      The door did not strike me on entry, when**
5  **you made your entry?**
6      A      From my recollection, no.
7      **Q      What was happening when you made entry?**
8      A      You were still yelling and cursing at me
9  and my partner.
10     **Q      I was still yelling and cursing at you and**
11 **your partner.  Do you recall plaintiff asking for**
12 **you to get a supervisor?**
13     A      I recall you asking me and my partner if
14 we had a search warrant.
15     **Q      You recall me asking if you had a search**
16 **warrant.  Do you recall me asking if you had a piece**
17 **of paper saying my daughter was supposed to be**
18 **anywhere or someplace else?**
19     A      I don't recall.
20     **Q      Okay.  Do you recall your partner saying**
21 **if I didn't have a piece of paper saying the child**
22 **was supposed to be with me, that I would be spending**
23 **the night downtown?**
24     A      I do not recall.
25     **Q      You do not recall that.  Okay.  So those**

1  things were not the triggers for you entering?

2          MR. UDALOV:  Objection.  Can you rephrase

3  the question?  It's confusing.

4      Q    So at that time -- I withdraw the

5  question.

6          A better question is what was plaintiff

7  doing immediately before you went to make entry?

8  Was plaintiff walking away from the door?  Was

9  plaintiff closing the door?  Was plaintiff trying to

10 get through the door past you?  What was happening?

11     A    Can you be a little more specific?

12     Q    So what was plaintiff doing at the moment

13 you began your entry?  Where was plaintiff relative

14 to the door?

15     A    When I began entry, plaintiff started to

16 back away from the door.

17     Q    Started to back away.  What was he doing

18 immediately before you made entry?

19     A    Plaintiff was next to the door.

20     Q    Next to the door.  Was he closing the

21 door?

22          Was your foot in the door?  Did the door

23 contact your foot and then you made entry?

24     A    My foot was in the path of the doorway.

25     Q    Okay.  So would it be a stretch to say

1  plaintiff was closing the door and the door made

2  contact with your foot that was in the doorway, and

3  then you made entry?  Is that a proper sequence?

4          MR. UDALOV:  Objection.  Please just state

5  it in the form of a question.

6      Q    Okay.  The sequence I just laid out, does

7  that refresh your recollection, or do you have some

8  other recollection?  What is your recollection?

9          I withdraw the prior question.  I will ask

10 this one:  What is your recollection of the

11 sequence?

12     A    My recollection is you finally opened the

13 door slightly, and I immediately put my foot in the

14 doorway.

15     Q    Please continue up until you make entry.

16         MR. UDALOV:  Objection.  Please ask the

17 specific question.

18     Q    So what were you doing immediately -- so

19 that was when I first opened the door.  What were

20 you doing immediately before you made entry?  What

21 was I doing?

22     A    I was asking you about the whereabouts

23 about your daughter.

24     Q    Right.  You said the door was open

25 slightly.  Was I across the room?  Was I close to

1  the door?

2     A    You were close to the door.

3     Q    **Close to the door.  All right.  I'm going**

4  **to move on because I don't think there's much more**

5  **to be had here.**

6          **Once you made entry, where did you go?  To**

7  **your left, to your right?  Where did you go?**

8     A    Immediately after I made entry, I stood on

9  the other side of the door in your apartment asking

10  you the whereabouts of your daughter.

11    Q    **Okay.  What was my response?**

12    A    I do not recall.

13    Q    **You do not the recall the response.  Okay.**

14  **Then what did you do?**

15    A    I asked a few more times for the

16  whereabouts of your daughter.

17    Q    **Then what did you do?**

18    A    Then since I was not getting any response,

19  answer in regards to the whereabouts of your

20  daughter, I proceeded to look for your daughter in

21  the apartment.

22    Q    **How did you do that?**

23    A    I walked around.

24    Q    **Which direction did you go first, left or**

25  **right?**

Jose Cadavid    August 13, 2021    NDT Assgn # 52362    Page

1      A    I don't remember.

2      Q    **So you searched for the child?**

3      A    Yes.

4      Q    **Just inside the apartment?**

5      A    I'm sorry.  Can you repeat that?

6      Q    **Did you search only inside the apartment?**

7      A    Yes.

8      Q    **So did you check her bedroom?**

9      A    I checked the whole apartment.

10     Q    **You checked the whole apartment.  So you**

11   **checked the whole apartment.  You did not find the**

12   **child.  How long did that take?**

13     A    I do not remember.

14     Q    **Do you have an approximation?**

15     A    Maybe 10, 15 minutes.

16     Q    **So for 10 to 15 minutes, you searched the**

17   **home.**

18          **Would you say this was a large apartment?**

19     A    To my recollection, it was a small

20   apartment.

21     Q    **A small apartment.  So it took you 10 to**

22   **15 minutes to search the small apartment for a**

23   **child?**

24     A    With going back and forth with you, yes.

25     Q    **Okay.  After the search, did you have any**

1  **doubts whether the child was still in the apartment**

2  **or not?**

3      A    After the search, I did not have any

4  doubts that she was in there.

5      **Q    So at this point, you have no doubt the**

6  **child is not in the apartment or you're certain the**

7  **child is not in the apartment.  What did you do**

8  **then?**

9      A    I requested for the supervisor.

10      **Q    Okay.  So at that point, you requested a**

11  **supervisor.**

12          **Why did you need a supervisor at this**

13  **point?**

14      A    I needed a supervisor to do -- to help me

15  in the investigation to find out the whereabouts of

16  your daughter.

17      **Q    Okay.  Would you say you needed a warrant?**

18      A    No.

19      **Q    You didn't need a warrant?**

20      A    Is that a question?

21      **Q    I'm just confirming what you said.  Sorry.**

22  **Thank you.**

23          **So you needed a supervisor to help you**

24  **conduct the investigation.**

25      **MR. UDALOV:**  Mr. Rattray, please state it

1  in the form of a question.

2          **MR. RATTRAY:**  I withdraw it.  I was simply

3  restating what he said.  Thank you.

4      **Q    How long did it take for the supervisor to**

5  **arrive?**

6      A    I do not recall how long it took.

7      **Q    Did anything else happen while you waited**

8  **for the supervisor?  Did the supervisor --**

9  **withdrawn.**

10          **Did the supervisor eventually arrive?**

11     A    Yes.

12     **Q    Do you know what time that was?**

13     A    I do not.

14     **Q    Do you know what time you left the scene?**

15     A    What time we left the apartment or --

16     **Q    The apartment.**

17     A    No, I do not.

18     **Q    Okay.  So when you conducted the search,**

19  **what were you going to do if you found the child?**

20  **What were you going to do with that child?**

21     A    Take her outside --

22          **MR. UDALOV:**  Objection.  It calls for

23  speculation.

24          **MR. RATTRAY:**  This is the officer

25  testifying to his intent.

1      A     I don't know.

2      Q     **You don't know what you were accused of**

3   **making a false statement about?**

4      A     All I know is it was -- all I know is I

5   was charged with making a false statement.

6      Q     **And they didn't tell you what the false**

7   **statement that you were charged with was?**

8      A     No.

9      Q     **They never told you that?**

10     A     No.

11     Q     **Okay.  And you didn't have to sign papers**

12  **to acknowledge what that false statement was?**

13     A     I did sign papers.

14     Q     **You did sign papers, okay.  But the nature**

15  **of the false statement was not on those papers?**

16     A     From my recollection, no.

17     Q     **So to this day, you were accused of making**

18  **false statements, and you do not know what those**

19  **false statements were about?**

20     A     Correct.

21     Q     **Thank you, Officer Cadavid.**

22            **Officer Cadavid, are you familiar with the**

23  **patrol guide?**

24            **MR. UDALOV:**  Objection.  Which patrol

25  guide are you talking about?

1  understand.

2      A    Well, initially, no, because I was not

3  aware that I had hit a pedestrian.

4      Q    So the person you hit with your vehicle

5  was a pedestrian?

6      A    Yes.

7      Q    Did they survive?

8      A    I don't know.

9      Q    Why would you not know?

10          MR. SCHEINER:  Objection to form.

11      Q    Okay.  So did you return to the scene at

12  some point?

13      A    Yes.

14      Q    Was the person you struck still at the

15  scene when you returned?

16      A    Yes.

17          MR. SCHEINER:  Was there an answer?

18          MR. RATTRAY:  I didn't hear an answer.

19          THE WITNESS:  I said yes.

20      Q    Yes, the person was still at the scene.

21  Were they alive when you returned to the scene?

22      A    Yes.

23          MR. SCHEINER:  Objection to the form.

24      Q    They were alive.  Thank you.  Were you

25  charged for this accident?

```
 1            (Technical interruption.)

 2     Q     You're back now.  We lost you there.

 3  We'll let the court reporter tell you where she lost

 4  you.

 5            (Last answer read.)

 6     A     So I was flagged by another pedestrian.  I

 7  looked in my mirror, saw the pedestrian on the floor

 8  in the middle of the street.  I made a U-turn, went

 9  to where the pedestrian was struck, exited my

10  vehicle.  He was conscious, and I proceeded to call

11  911.

12     Q     Was that the truth?

13            MR. SCHEINER:  Objection to form.

14     Q     What you just stated, Officer Cadavid, is

15  what you told the officers; is that correct?

16     A     Yes.

17     Q     On page D00090, item 2 states that "Said

18  police officer Jose Cadavid, while off-duty and

19  assigned to the 28th precinct, on or about March 28,

20  2017, in the confines of the 108th precinct,

21  intentionally made one or more false official

22  statements at an official department interview

23  conducted pursuant to patrol guide section 206-13."

24            Is this the incident that we're referring

25  to in that investigation?
```

1          MR. SCHEINER:   Objection to form and

2     foundation.

3          A    Yes.

4          Q    Okay.  So this is describing that

5     investigation, and here they are charging you with

6     intentionally making one or more false official

7     statements.  What I'm trying to get to, Officer

8     Cadavid, is what you just said to us, is that what

9     you told the officers?

10              Because that was my question, what did you

11     tell them, and you told us what you told them.

12              So what I'm asking now is what you just

13     said to us, was that the true version or the false

14     version?

15              Because the NYPD -- you were not

16     criminally charged here, but NYPD has charged you

17     and found you guilty on their internal process of

18     making one or more -- intentionally made one or more

19     false official statements.

20              I'm just trying to understand if the

21     statement that you just read to us, if that is the

22     truth or is that the false statement referred to in

23     this document.

24              MR. SCHEINER:   Objection.  That was an

25     argument, not a question.

# DM ICAD Event Chronology INCIDENT REPORT (Dkt. 47-2)

Case 1:17-cv-08560-PGG   Document 47-2   Filed 08/03/18   Page 73 of 93

I/NetDispatcher -- Event Chronology

Page 1 of 3

# Event Chronology -- D16110518835

☑ System Comments  ☑ Associated Events

| Event | Time | Date | Terminal | Operator | Action |
|---|---|---|---|---|---|
| 16110518835 | 18:49:43 | 11/5/2016 | ps1-c076 | 363714 | ANI NUM=65983377, CALLER NAME=CELL SITE - TMOBILE, AN██████████ALI=1469 5TH AVE NEW YORK, COMMENT=: NW, COMPANY=TMOB, CLASS=WPH1,LAT=+040.803321,LONG=-073.945047,XY=XY (99946602,23158943) |
| | 18:50:04 | 11/5/2016 | ps1-c076 | 363714 | ANI NUM=65983303, CALLER NAME=CELL SITE - TMOBILE, AN████████████ALI=1469 5TH AVE NEW YORK, COMMENT=: NW, COMPANY=TMOB, CLASS=WPH2,LAT=+040.804113,LONG=-073.946228,XY=XY (99913865,23224211) |
| | 18:51:56 | 11/5/2016 | ps1-c076 | 363714 | EVENT CREATED: Location=42 W 120 ST MN , Cross Streets=MOUNT MORRIS PARK W /LENOX AVE , Name=CELL SITE - TMOBILE , Address=LL(-73:56:46.4209,40:48:14.9267); EST 4 MOUNT MORRIS PARK W MN , Call Source=ANI/ALI , Phone Number██████████, Zone=Z07 , PCT/Sector=28D , Post=28PP63 |
| | | | | | Route=D, PCT=28, Sector=28D, St=Pending, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Oper/Current=F |
| | 18:51:56 | 11/5/2016 | lci-search | 363714 | EVENT COMMENT=** LOI search completed at 11/05/16 18:51:56 |
| | | | | | FC STS CUSTODIAL DISP W FATHER OF CHILD.... FATHER REFUSING TO GIVE CHILD |
| | | | | | BACK.... FC HYSTERICAL CRYING..., IFO AGRESSORS HOME, AGRESSOR INSIDE 3C ON 3 |
| | | | | | FLR..... NO WPNS.... NO INUS.... |
| | 18:52:45 | 11/5/2016 | ps1-c076 | 363714 | EVENT COMMENT=AGRESSOR M,B,LIGHT SKIN, 48 YO, WRING OLIVE JKT, LIGHT KHAKI PANTS, BLK OR GRY T |
| | | | | | SHIRT, NAME GARY RATTRAY |
| | 18:52:56 | 11/5/2016 | ps1-c076 | 363714 | EVENT COMMENT=SFC SANDY██████████ |
| | 18:53:04 | 11/5/2016 | ps1-c076 | 363714 | EVENT COMMENT=ANI-ALI█████████CELL SITE - TMOBILE 1469 5TH AVE NW NEW YORK CGS:WPH2 LAT: |
| | | | | | 040.804113 LON:-073.946228 OPER MELIDONES, KRYSTIN M-C-MTCCP076 OPR 1988 |
| | 18:54:34 | 11/5/2016 | ps1-d07 | 362665 | EVENT COMMENT=Event D16110518835 has been displayed by the covering dispatcher |
| | | | | | ** >>>> by: 362665 at 11/05/16 18:54:34 on terminal: ps1-d07 |
| | 18:54:37 | 11/5/2016 | ps1-d07 | 362665 | Route=D, PCT=28, Sector=28D, St=Dispatch Assigned, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Oper/Current=F |
| | | | | | Unit=28D1-3, St=DA, Comment=Event D16110518835 Dispatch Assigned |
| | | | | | EVENT COMMENT=28D1-3 -- Event D16110518835 Dispatch Assigned |
| | 19:03:33 | 11/5/2016 | ps1-d07 | 362674 | Route=D, PCT=28, Sector=28D, St=Dispatch Assigned, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Oper/Current=F |
| | | | | | Route=D, PCT=28, Sector=28D, St=Assigned, P=5, |

I/NetDispatcher -- Event Chronology                                      Page 2 of 3 𝑏

|  |  |  |  |  |
|---|---|---|---|---|
| | | | | Open/Curent=F |
| | | | | Unit=2BD1-3, St=84, Loc=42 W 120 ST MN |
| | | | | Unit=2BD1-3, St=DP, Loc=42 W 120 ST MN |
| | | | | Unit=2BD1-3, St=84, Comment=DA Auto Promote, Loc=42 W 120 ST MN |
| | | | | EVENT COMMENT=2BD1-3 -- DA Auto Promote |
| 19:08:32 | 11/5/2016 | ps1-d07 | 362674 | Unit=2BD1-3, St=85, Loc=42 W 120 ST MN |
| 19:08:40 | 11/5/2016 | ps1-d07 | 362674 | Route=D, PCT=28, Sector=2BD, St=Assigned, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | Unit=28LT1, St=DA, Comment=Event D16110518835 Dispatch Assigned |
| | | | | EVENT COMMENT=28LT1 -- Event D16110518835 Dispatch Assigned |
| 19:09:56 | 11/5/2016 | ps1-d07 | 362674 | Route=D, PCT=28, Sector=2BD, St=Assigned, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | Unit=28LT1, St=DP, Loc=42 W 120 ST MN |
| 19:10:25 | 11/5/2016 | ps1-d07 | 362674 | Route=D, PCT=28, Sector=2BD, St=Assigned, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | Route=D, PCT=28, Sector=2BD, St=Assigned, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | Unit=28LT1, St=UC, Comment=Preempt |
| | | | | Unit=28LT1, St=AV |
| | | | | Unit=28LT1, St=DA, Comment=Event D16110518835 Dispatch Assigned |
| | | | | EVENT COMMENT=28LT1 -- Preempt |
| | | | | 28LT1 -- Event D16110518835 Dispatch Assigned |
| 19:11:04 | 11/5/2016 | ps1-d07 | 362674 | EVENT COMMENT=AUTH OF 28D---REQ LT TO LOC ---D2112 |
| 19:12:25 | 11/5/2016 | ps2-c042 | 363728 | EVENT COMMENT=ANOTHER CALL -- MC STS THE OFFICERS CAME INTO APARTMENT ASKING FOR ID AND PROOF |
| | | | | HE HAS CUSTODY OF HIS CHILD --- |
| 19:12:41 | 11/5/2016 | ps2-c042 | 363728 | EVENT COMMENT=MC STS HE ASKED THEM TO LEAVE AND THEY REFUSED |
| 19:13:08 | 11/5/2016 | ps2-c042 | 363728 | EVENT COMMENT=--- MC STS THEY ARE SEARCHING HIS APARTMENT ILLEGALLY |
| 19:13:26 | 11/5/2016 | ps2-c042 | 363728 | EVENT COMMENT=REQUESTING SGT TO LOC |
| 19:13:53 | 11/5/2016 | ps2-c042 | 363728 | EVENT COMMENT=MC RATTRAY CB ████████████ |
| 19:14:12 | 11/5/2016 | ps2-c042 | 363728 | EVENT COMMENT=1 OFFICERS BADGE IS 9985 -- OTHER OFFICER BADGE UNKN |
| 19:15:23 | 11/5/2016 | ps2-c042 | 363728 | EVENT COMMENT=MC REFUSED TO SPEAK WITH IAB --- ONLY WANTS SGT TO LOC |
| 19:15:30 | 11/5/2016 | ps2-c042 | 363728 | EVENT COMMENT=ANI-AC██████████/VERIZON WIRELESS 1980 7TH AVE SE SECTOR NEW YORK COS:WPH2 |
| | | | | LAT: 040.803137 LON: 073.946121 OPER GUTIERREZ, RICHARD A-C-PCPPDVCPS18-135 OPR |

2336

I/NetDispatcher -- Event Chronology                                  Page 3 of 3  *B*

| | | | | |
|---|---|---|---|---|
| 19:22:12 | 11/5/2016 | ps1-d07 | 362574 | Route=D, PCT=28, Sector=28D, St=Assigned, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | Unit=28LT1, St=DP, Loc=42 W 120 ST MN |
| 19:22:35 | 11/5/2016 | ps1-d07 | 362674 | Unit=28LT1, St=ER, Loc=42 W 120 ST MN |
| 19:38:32 | 11/5/2016 | ps1-rc01 | | Unit=28D1-3, St=~, Loc=42 W 120 ST MN |
| 19:41:08 | 11/5/2016 | ps1-d07 | 362674 | Unit=28D1-3, St=CU, Comment=Alarm Timer Extended: 30, Loc=42 W 120 ST MN |
| | | | | EVENT COMMENT=28D1-3 -- Alarm Timer Extended: 30 |
| 19:52:35 | 11/5/2016 | ps2-ts05 | 359149 | Unit=28LT1, St=~, Loc=42 W 120 ST MN |
| 20:10:32 | 11/5/2016 | ps2-ts06 | 338663 | Unit=28D1-3, St=~, Loc=42 W 120 ST MN |
| 20:11:58 | 11/5/2016 | ps1-d07 | 362674 | Route=D, PCT=28, Sector=28D, St=Assigned, P=5, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | Unit=28LT1, St=UC, Comment=Preempt |
| | | | | Unit=28LT1, St=AV |
| | | | | EVENT COMMENT=28LT1 -- Preempt |
| 20:11:59 | 11/5/2016 | ps1-d07 | 362674 | Route=D, PCT=28, Sector=28D, St=Assigned, P=5, Primary Unit=28D1-3, Primary Member=0, Current=F, Open =T, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | Unit=28LT1, St=DA, Comment=Event D16110518835 Dispatch Assigned |
| | | | | EVENT COMMENT=28LT1 -- Event D16110518835 Dispatch Assigned |
| 20:15:25 | 11/5/2016 | ps1-d07 | 362674 | Route=D, PCT=28, Sector=28D, St=Assigned, P=5, Primary Unit=28D1-3, Primary Member=0, Open =T, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | Route=D, PCT=28, Sector=28D, St=Assigned, P=5, Primary Unit=28D1-3, Primary Member=0, Current=T, Open =F, Type=52D6-DISPUTE: FAMILY, Open/Curent=F |
| | | | | EVENT CLOSED |
| | | | | Unit=28D1-3, St=AV |
| | | | | Unit=28LT1, St=AV, Loc=42 W 120 ST MN |
| | | | | Disposition Assigned=90F1 |

# DM Plain  DiR P1 DOMESTIC -INCIDENT REPORT (Dkt. 47-2)

| Agency<br>N Y POLICE<br>DEPT | ORI<br>NY03030002 | **NYPD DOMESTIC<br>INCIDENT REPORT** | Incident #<br>2016-028-010736 | | Complaint<br># |
|---|---|---|---|---|---|
| Date of Report<br>11-05-2016 | Time of Report<br>1958 | Date of<br>Occur<br>11-05-2016 | Time of<br>Occur<br>1851 | Response<br>Type<br>RADIO<br>RUN | ICAD #<br>D16110516835 | ICAD N/A<br>Reason: | Other<br>Reason: |
| Unfounded<br>NO | Address of Occurrence<br>42 WEST 120 STREET #3C<br>MANHATTAN NY | | Pct<br>28 | PSA | Sector<br>D |

### Victim: SANDY, WENDY M.

| Victim's Last Name, First M.I.<br>SANDY, WENDY M. | Alias | Address<br>46 ROBERT TREAT DR MILFORD CT | Pct | PSA |
|---|---|---|---|---|
| Sex: FEMALE<br>Self-Identified:<br>Race: BLACK<br>Ethnicity:<br>Language: ENGLISH | Date of Birth: ▮▮▮▮<br>Age: ▮▮ | Home Phone: ▮▮▮▮<br>Other Phone: | Member of Service: NO |
| SAFE# or way to contact<br>▮▮▮▮ | | Other Identifier |

### Suspect: RATTRAY, GARY WENTWORTH

| Suspect's Last Name, First<br>M.I.<br>RATTRAY GARY<br>WENTWORTH | Alias | Address<br>42 WEST 120 STREET #3C NEW YORK NY | Pct<br>28 | PSA |
|---|---|---|---|---|
| Sex: MALE<br>Self-Identified:<br>Race: BLACK<br>Ethnicity:<br>Language: ENGLISH | Date of Birth: 08 05 1967<br>Age: 49 | | Home Phone: 917<br>353-9675<br>Other Phone: | Member of<br>Service: NO |
| Do suspect and victim live together?<br>NO | Suspect (P2) Relationship<br>to Victim (P1): | Suspect/P2<br>Present:<br>YES | Was suspect injured?<br>NO |
| Do the suspect and victim have a<br>child in common?<br>YES | Possible drug or alcohol use?<br>NO | | Suspect<br>supervised?<br>Status Unknown |

### Victim Interview

**Emotional condition of VICTIM?**
Crying.

**What were the first words that VICTIM said to the Responding Officers at the scene regarding the incident?**
NA/

| Did suspect make victim fearful? YES<br>NA/ | Weapon<br>Used? | Gun: | Access to Guns?<br>NO | Injured?<br>NO | In Pain?<br>NO |
|---|---|---|---|---|---|
| Suspect Threats? | | | Strangulation? NO | Visible Marks? NO | |

### Suspect

**What did the SUSPECT say (Before and After Arrest) :**
N-A

710.30 completed?

## Child/Witness

| Person's Last Name,First M.I. | Alias | Address | | Relationship | Date of Birth | Phone |
|---|---|---|---|---|---|---|
| RATTRAY, AUTUMN | | 42 WEST 120 STREET #3C NEW YORK NY | | | 11/29/2005 | |

## Incident Narrative

Briefly Describe the circumstances of this incident:
AT TPO P1 AND P2 HAD A DISPUTE OVER CUSTODY OF CHILD AND DATES TO PICK UP CHILD. P1 CALLED POLICE, BECAUSE P2 REFUSED TO LET P1 SEE CHILD. P1 AND P2 HAVE JOINT CUSTODY OF CHILD. WHEN OFFICERS RESPONDED TO SPEAK TO P2, P2 WAS BEING AGGRESSIVE AND REFUSED OFFICERS TO SEE CHILD NOR SHOW COURT PAPERS. P2 WAS BEING OFFENSIVE AND CURSING OUT OFFICERS, TRY CLOSING DOOR. CHILD WAS NOT AT LOCATION AT TIME. SO MOTHER WAS UNABLE TO PICK UP CHILD

| DIR Repository checked | Order of Protection Registry checked? | Order of Protection in effect? | Order of Protection Type? |
|---|---|---|---|
| NO | NO | NO | |

## Evidence

| Evidence Present | Photos Taken: | Other Evidence: | Destruction of Property? |
|---|---|---|---|
| | | | |

## Prior History

Describe Victim's prior domestic incidents with this suspect (Last, Worst, First):
N/A

## Has Suspect ever:

| If the Victim answers "yes" to any questions in this box refer to the NYS Domestic and Sexual Violence Hotline at 1-800-942-6906 or Local Domestic Violence Service Provider. | | | | | Local Domestic Violence Service Provider Phone No. |
|---|---|---|---|---|---|
| Threatened to kill you or your children? NO | Strangled or "choked" you? NO | Beaten you while you were pregnant? NO | Is suspect capable of killing you or children? NO | Is suspect violently and constantly jealous of you? NO | Has the physical violence increased in frequency or severity over the past 6 months? NO |

## Interpreter

| Interpreter Used | Interpreter Requested | Interpreter's Last Name, First | Internet Service Provider |
|---|---|---|---|
| | | | |

Statement of Allegations/Supporting Deposition
I CAME TO PICK AUTUMN UP AT 7PM 11-5-16. I HAVE BEEN CALLING HER TO LET HER KNOW THAT I AM PICKING AT 7PM DID NOT ANSWER ANY PHONE CALLS THEN I SAW THE DAD AND HE HOLD ME ME THAT AUTUMN IS NOT HOME AND I WOULD NOT BE SEEING MY CHILD

Is there reasonable cause to suspect a child may be the victim of abuse, neglect, maltreatment or endagerment?

| Was DIR given to the victim at scene? YES | If No, Why?: | Was Victim Rights Notice given to victim YES | If No, Why?: | Entered By TaxID 345302 | Entered By Date 11/07 2016 |
|---|---|---|---|---|---|
| Reporting Officer: | Jurisdiction | Name TRIGUENO , ALYSSA | Rank POF | Tax ID 957226 | Date 11/07 2016 |
| Detective Assigned: | Name | | Rank | Tax ID | Date |

Case: 25-700, 09/26/2025, DktEntry: 39.1, Page 129 of 276
Case 1:17-cv-08560-PGG    Document  47-2    Filed 08/03/18    Page 129 of

Case 1:17-cv-08560-PGG    Document 47-2    Filed 08/03/18    Page 78 of 93

| Supervisor Sign-off: | Name BAUTISTA. MERVIN | Rank SGT | Tax ID 929894 | Date 11/08/2016 |
|---|---|---|---|---|

Case 1:17-cv-08560-PGG   Document 47-2   Filed 08/03/18   Page 91 of 93

μ

At a term of the Family Court of the
State of New York, held in and for the
County of New York, at 60 Lafayette
Street, New York, NY 10013, on
November 4, 2016

PRESENT:   Hon. J. Machelle Sweeting

In the Matter of a Custody/Visitation Proceeding

Wentworth Rattray,

Petitioner,

- against -

Sandy Wendy,

Respondent

File #:      263409
Docket #:   V-36024-16
             V-31854-16

ORDER
MODIFIED

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER
MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT,
35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF
COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON
THE APPELLANT, WHICHEVER IS EARLIEST.

IT IS ORDERED that

The order dated October 5, 2016 is hereby modified (to add an overnight on Saturday, December 3, 2016)
as follows:

Petitioner mother Sandy Wendy shall have visitation with the subject child Autumn Rattray on:

1)   Wednesday, November 2nd @ 5 p.m. to 8.30 p.m. pick up at the Children's Aid Society located on
     118th Street and drop off at the birth father's home

2)   Wednesday, November 9th @ 5 p.m. to 8:30 p.m. pick up at the Children's Aid Society located on
     118th Street and drop off at the birth father's home.

3)   Wednesday, November 16th @ 4 p.m. to 8:30 p.m. pick up at the Children's Aid
     Society located on 118th Street and drop off at the birth father's home.

4)   Sunday, November 27th @ 8 a.m. to 6 p.m.  pick up at birth father's home and drop off at birth
     father's home.

5)   Saturday, December 3rd @ 5 p.m. overnight to Sunday December 4th @ 6 p.m. pick up at birth
     father's home and drop off at birth father's home.

*This order is nunc pro tunc to 10/24/16

Dated: November 7, 2016                      ENTER

Hon. J. Machelle Sweeting

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

**WENTWORTH RATTRAY**

               Plaintiff,


       -against-

**THE CITY OF NEW YORK**;
POLICE OFFICER JOSE **CADAVID**, BADGE NO. 9085,
IN HIS INDIVIDUAL AND OFFICIAL CAPACITY;
POLICE OFFICER SGT MERVIN **BAUTISTA**, IN
HIS INDIVIDUAL AND OFFICIAL CAPACITY;
POLICE OFFICER ALYSSA **TRIGUENO**, IN HER
INDIVIDUAL AND OFFICIAL CAPACITY.


           Defendants,

                **Third (3rd)**

       **AMENDED COMPLAINT**

         **AND JURY DEMAND**

       **17-CV-8560** PGG

---

     Pro Se Plaintiff Wentworth Rattray alleges upon information, and belief, the following against Defendants, The City of New York, New York City Police Department (NYPD) Officers, Jose R Cadavid, Sgt. Mervin Bautista, and Alyssa Trigueno, that;

## JURISDICTION

1.  Jurisdiction of this Court is invoked pursuant to:

    a.  28. U.S. Code § 1331, 1343;

    b.  42. U.S. Code § 1983 Civil action for deprivation of rights;

    c.  42 U.S. Code § 1981(a) Equal rights under the law;

    d.  42 U.S. Code § 1981(c) Protection against impairment under color of State law;

    e.  Public Officers Law § 74 (3) Code of Ethics

    f.  This action also arises under the Fourth and Fourteenth Amendments to the Constitution of the United States.  42 U.S. Code § 1981(a) Equal rights under the law and 42 U.S. Code § 1981(c) Protection against impairment under color of State law

## VENUE

2.  Under 28 U.S.C. Sec. 1391(b), venue is proper in the Southern District of New York because the events giving rise to the plaintiffs' claims occurred within this Judicial District.

**PARTIES**

3.  Plaintiff Wentworth Rattray is a citizen of the United States. At all times here relevant:

   a.  Plaintiff resided in New York City, County, and State of New York;

   b.  Plaintiff had legal and physical custody of his minor child;

   c.  Plaintiff had not been reported as committing any crime or offense against any person or against the state;

   d.  Plaintiff stated to the mother and to Cadavid, Trigueno, and Sgt Hornandez on the relevant date, 11/05/2016, that Plaintiff had custody of the minor child and that the mother had no right to custody on that date.

   e.

4.  That at all times relevant herein, Defendants Police Officers Jose R Cadavid, Sgt. Mervin Bautista, and Alyssa Trigueno were duly appointed as police officers and were acting within the scope of their employment as employees of the New York City Police Department.

5.  That at all times relevant herein the defendant police officers named herein, upon information and belief, were members of the New York City Police Department assigned to the 28th police precinct located in New York City, New York and were bound to operate under the US Constitution, the policies and procedures of rules of the NYPD as defined in the NYPD Patrol Guide [Appendix_2_N] generally ["TAC_NYPD        Patrol_Guide-InvestigativeEncounters-2016"],        and        specifically[ "TAC_Appendix_2_N-NYPD Patrol_Guide-Investigative_Encounters-2016"]

6.  That the defendant NYPD police officers involved in the incident underlying this lawsuit were at all times mentioned in this complaint, agents, servants, and employees, acting within the scope of their employment by Defendant City of New York, and were duly appointed police officers in the New York City Police Department acting within their individual, and official capacity, and under color of law, that

is under color of law of the Constitution, statutes, laws, charter, ordinances, rules, regulations, custom and usages of the State of New York, and the City of New York.

7. That the Defendant, City of New York, is a municipal corporation within the State of New York.

8. Pursuant to Section 431 of its Charter, the City of New York has established and maintains the New York City Police Department as a constituent department or agency.

9. That on November 5th 2016 and at all times relevant hereto, the City of New York employed the defendant Police Officers (Police Officers Jose R Cadavid, Alyssa Trigueno, Sgt Hornandez, and Sgt Mervin Bautista) involved in this incident.

10. That on November 5th 2016 and at all times relevant hereto, Defendant City of New York, acting through the New York Police Department (or "NYPD"), was responsible for the policies, practices, supervision, implementation, and conduct of the Defendant police officers.  These policies and practices are outlined in

11. That at all times relevant hereto, Defendant City of New York, acting through the New York Police Department (or "NYPD"), was responsible for the New York City Police Department's policies, practices and procedures including the appointment, training, supervision, discipline and retention of the Defendant officers and of all NYPD officers, and dispatch personnel involved in the incidents complained of herein.

12. That at all times relevant hereto, Defendant City of New York was responsible for establishing and enforcing the rules, policies, practices and procedures of the NYPD, and for ensuring that on-duty NYPD personnel obey the laws in accordance with the Constitution of the United States of America, the State of New York, as well as the NYPD's policies, practices and procedures.

13. That NYPD Police Officer Jose R Cadavid upon information and belief was the responding male NYPD police officer who:

    a.  Cadavid threatened to "take down the door" of Plaintiff's home if Plaintiff didn't open the door to speak with him.

    b.  Cadavid asked if he could come in and look around after Plaintiff told Cadavid that the minor child was not at home.

    c.  Cadavid struck Plaintiff with a door while Cadavid pushed his way into Plaintiff's residence after Plaintiff refused Cadavid's request to come in and look around.

    d.  Cadavid conducted and unwarranted search of Plaintiff's home over Plaintiff's objections.

    e.  Cadavid commanded Plaintiff to produce Plaintiff's identification over Plaintiff's strenuous objections.

    f.  Cadavid retained Plaintiff's identification and remained inside Plaintiff's home for over 63 minutes.

    g.  Cadavid stood within 5 feet of Plaintiff's person, at D in [Appendix 2 K] blocking Plaintiff's access to the path to exit the home.

    h.  Cadavid read his badge number into the phone after Plaintiff called 911 to report that Cadavid had entered his home against his stated objection and was then standing inside Plaintiff's home and was refusing to leave.

    i.  Cadavid refused Plaintiff's request that Cadavid leave Plaintiff's home.

    j.  Cadavid refused Plaintiff's request that Plaintiff be allowed to leave Plaintiff's home.

**14.** That police officer Alyssa Trigueno upon information and belief, at all times relevant hereto, Officer Trigueno was the female NYPD police officer under the command of the 28th Precinct of the NYPD.

    a.  Cadavid refused Plaintiff's request that Cadavid leave Plaintiff's home.

    b.  Trigueno threatened Mr. Rattray by stating that if "[Plaintiff] didn't have a piece of paper saying that she's [the child] supposed to be with you [Plaintiff] we're going to take you [to jail] tonight". Plaintiff did not have a piece of paper matching the description of the NYPD officer.

15. That Defendant Trigueno is sued in her official capacity as an NYPD police officer in preparing the Domestic Incident Report (DIR# 2016-028-010736) that Plaintiff alleges was deliberately made incomplete, was inaccurate, and deliberately paints Plaintiff in an unfavorable and false light.

   a) Plaintiff alleges that NYPD officer Trigueno failed a duty to intervene in officer Jose Cadavid's misconduct.

   b) Plaintiff further alleges that Officer Trigueno failed to properly complete additional required paperwork as required by the New York Police Department Patrol Guide based on the facts of the incident and as required by the court-ordered monitor resulting from the Floyd case.

   c) Plaintiff further alleges that Officer Trigueno discriminated against plaintiff based on Plaintiff's sex resulting in Trigueno creating only documentation that worked against Plaintiff's custody interest in favor the female parent's interest and creating no documentation of the facts known to her at the time of creating the report after the incident;

16. That Defendant officer Sgt. Mervin Bautista was, at all times here relevant, a Sargent of the NYPD, and as such was acting in the capacity of an agent, servant and employee of the City of New York.

17. That officer Bautista was responsible for supervising the conduct of the officers including reviewing their reports for completeness and accuracy as to the facts known to him and them.

18. That Sargent Bautista is <u>not</u> sued in his official capacity for failing to review available records to ensure that officers under his supervision are performing their duties in accordance with Federal and State laws.

19. All other individual defendants ("the officers"), individuals whose names are currently unknown to plaintiff, are employees of the NYPD, and are sued in their individual and official capacity.

20. At all times here mentioned defendants were acting under color of state and local laws, ordinances, and guides, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City of New York, the State of New York and New York City's Police Department (NYPD).

## PRELIMINARY STATEMENT

21. This is a civil rights action in which Plaintiff seeks relief for injuries including emotional distress and financial injuries resulting from a violation of his civil rights secured under the provisions of 42 U.S.C. Section 1983, and under the Fourth, and Fourteenth Amendments to the Constitution of the United States.

## FACTUAL ALLEGATIONS

22. On November 5, 2016, at approximately 6:52 p.m. Plaintiff, Mr. Rattray, was retrieving his mail inside his residential apartment complex located at 42 West 120th Street, New York, New York when Plaintiff observed Wendy Sandy, the mother of his child, standing outside his lobby door.

23. That the Plaintiff and Ms. Wendy Sandy, together have a minor child in common for which Mr. Rattray was granted full "Legal, Physical and Residential Custody of the minor child as set forth in the "Final Order of Custody and Visitation as Amended per the Honorable J. Machelle Sweeting Family Court judge State of New York, County of New York on December 22, 2016. **See Exhibit "A".**

24. That on November 5, 2016, Plaintiff had legal custody of his minor daughter for which the mother, Wendy Sandy was granted visitation by the Family Court on November 7, 2016.

25. The Family Court order on November 7, 2016, was ordered "Nunc pro tunc" to October 24, 2016. See **Appendix 1 Exhibit "B".**

   a) That based on the Family Court Order, Wendy Sandy did not have the legal right to visit her daughter on November 5, 2016, without consent of the Plaintiff.

   d) That Wendy Sandy stated that she was there to pick-up her child and demanded that Plaintiff bring the minor child to her in the lobby of his apartment building.

   e) That Plaintiff, Mr. Rattray, informed Ms. Wendy Sandy that she did not have the right to pick up her daughter that day per order of the Court.

f) That Plaintiff informed Ms. Wendy Sandy that she must comply with the court order and that she was requesting an unscheduled visit with her daughter, with no prior notice to Plaintiff and on a day that was not recognized by Judge Sweeting of the Family Court.

g) Plaintiff, while standing inside the lobby explained to the mother that the child was not available because the child was not home and that if the mother wants to request an unscheduled visit, she should arrange it ahead of time through her attorney.

h) That Plaintiff retreated into the building and into his apartment and sent an email to the family court, the mother's attorney and the Attorney for child notifying them that Ms Wendy Sandy was attempting an unscheduled pick-up.

26. That shortly before 7:00 p.m., two NYPD officers rang Plaintiff's doorbell and announced themselves as police officers and asked to speak with the Plaintiff.

a) Plaintiff asked the officer what this was about, and the officer stated that the child's mother was downstairs to pick up the minor child.

b) That the male officer (Jose R Cadavid), asked Plaintiff to open the door so they could talk, Plaintiff refused and said he could hear them clearly from inside his apartment.

c) Officer Jose Cadavid said he wasn't going to talk to Plaintiff through the door, and threatened Plaintiff stating "you want us to take-down the door?"

d) That Plaintiff was made fearful for his immediate safety and for the well-being of himself as well as for the security of the home he shares with his minor child if the door were to be damaged if Officer Jose Cadavid made good on his threat.

e) As a direct result of Cadavid's threat to "take down the door" Plaintiff, Mr. Rattray, opened the door, and stood at the doorway  [Appendix 2 K], still two-three feet inside his home  at "C" and explained to the two-armed NYPD police officers who were standing just outside the door (at "A" and "C") and within 4 feet of Plaintiff, that the mother was either mistaken, or was deliberately creating conflict to help her position in the ongoing case in Family Court.

67. That the Defendant officers willfully and deliberately ignored Plaintiff's liberty interest in the parent child relationship.

68. The Defendant police officers willfully and intentionally omitted key facts of the incident.

69. That the omissions were intended to depict the Plaintiff as an individual engaged in criminal activity.

70. The Defendants, by their unlawful actions and the filing of misleading reports intended to portray the Plaintiff in a false light.

71. That the Defendants acted in concert with one another in an effort to create a misleading and incomplete official report of the incident.

72. That the New York City Police Department failed to adequately train and supervise its officers in the filing of police reports and in properly investigating incidents involving custody and visitation rights of parental disputes involving minor children.

73. That Defendant Jose Cadavid acted maliciously and with intent to violate Plaintiff's rights.

74. That Defendant officers failed to intervene in the obviously illegal actions of Defendant Jose Cadavid against Plaintiff.

75. That the 911 dispatcher (Operator ID#363714) at 18:52PM (event # D16110518835) labeled Plaintiff as the aggressor even though there was no aggression by either parent.

76. As a direct and proximate result of the acts of defendants, Plaintiff suffered injuries and damages:

77. That the Defendants violated Plaintiff's right to Due Process of Law under the Fourteenth Amendment to the Constitution of the United States.

78. That the Defendants violated Plaintiff's right to be free from unlawful search and seizures under the Fourth Amendment to the United States Constitution.

79. That the Defendants violated Mr. Rattray's New York State Constitutional rights under Article 1, Section 6 to due process;

80. Mr. Rattray was subjected to and suffered undue emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, inconvenience, and anxiety.

87. That officer Jose Cadavid's actions are part of a broader pattern of systemic abuse of police power that has become prevalent in this police precinct and most minority communities.

88. These incidents are often dismissed at times even when there is serious bodily injury unless there is also recorded video.

89. That officer Jose Cadavid's abuse of his position in this incident is not just a violation of plaintiff's individual constitutional rights; it is a symptom of one cause of the defect in broader police to community relations which has the disparate impact of leaving Plaintiff and his community less safe.

90. That officers Jose Cadavid, Trigueno, Sargent Bautista, The City of New York, and the New York Police Department have a duty as servants of the law to follow procedures that are put in place to protect the rights of all the citizens of the United States as outlined in the Constitution of the United States.

91. Officers Jose Cadavid, Trigueno, and Bautista failed their duty to faithfully execute the responsibilities of their position and to protect the rights of Plaintiff Rattray.

92. That the City of New York and the NYPD failed their duty to properly supervise, train or discipline the individual Defendant officers.

93. That the unlawful action by the Defendant police officers' overly aggressive actions, puts the lives of citizens in jeopardy and that those actions have a disparate impact on the lives of black males.

94. That there appears to be two standards for enforcing laws where the police are only held accountable when there is irrefutable video evidence of bodily injury but the citizens' rights are trampled at any whim of an officer, however unwarranted, flawed, or biased that whim may be.

**AS AND FOR A <u>FIRST</u> CAUSE OF ACTION AGAINST DEFENDANTS UNDER 42 U.S. C. SECTION 1983, FOR VIOLATING PLAINTIFF'S CONSTITUTIONAL RIGHTS UNDER THE FOURTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES  AND UNDER THE <u>CONSTITUTION OF THE STATE OF NEW YORK ARTICLE 1 SECTION 12.</u>**

95. That Plaintiff repeats, reiterates and realleges each and every allegation contained in Paragraphs Numbered"1 through "94" with the same force and effect as though more fully set forth at length herein

# Relevant - Family Court Order

At a term of the Family Court of the
State of New York, held in and for the
County of New York, at 60 Lafayette
Street, New York, NY 10013, on
November 4, 2016

**PRESENT:** Hon. J. Machelle Sweeting

In the Matter of a **Custody/Visitation** Proceeding

**Wentworth Rattray,**

Petitioner,

- against -

**Sandy Wendy,**

Respondent.

**File#:** 263409
**Docket#:** V-36024-16
V-31854-16

**ORDER
MODIFIED**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT,OR30DAYSAFTERSERVICEBY A PARTY OR TI-IE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EJ\.RLIEST.

IT IS ORDERED that

The order dated October 5, 2016 is hereby modified (to add an overnight on Saturday, December 3, 2016) as follows:

Petitioner mother Sandy Wendy shall have visitation with the subject child Autumn Rattray on:

1) Wednesday, November 2nd @ 5 p.m. to 8:30 p.m. pick up at the Children's Aid Society located on 11g•h Street and drop off at the binh father's home

2) Wednesday, November 9•h @ 5 p.m. to 8:30 p.111. pick up at the Children's Aid Society located on 118th Street and drop off at the birth father's home.

3) Wednesday, November l6'h @4 p.m. to 8:30 p.m. p.m. to 8:30 p.111. pick up at the Children's Aid Society located on 11g•h Street and drop off at the birth father's home.

4) Sunday, November 27'h@ 8 a.m. to 6 p.m. pick up at birth father's home and drop off at birth father's home.

5) Saturday, December 3rd @ 5 p.m. overnight to Sunday December 4•h @ 6 p.m. pick up at birth father's home and drop off at birth father's home.

*This order is nunc pro tune to I0/24/16

Dated: November 7, 2016

ENTER

IRUE COPY Of
MAOE IN THE
&HO

1s 1s TO CE TIF)'. THAT THIS IS A
/112 σ-1μ -e 4:
ESIGNATED IN SUCH COF'f
RDER OF THE FAMILY COURT
CITY OF
YORK FOR THE COUNTY OF NEW YORK.
CLERK OF COURT
JUL-28 2023
DATE _____ 20____

2016110710S200MSWEET..... ....

Hon. J. Machelle Sweeting

141

# Previous - Family Court Order

At a term of the Family **Court** of the
State of New York, held in and for
the County of New York, at 60
Lafayette Street, New York, NY
10013, on October 24, 2016

**PRESENT:**   Hon. J. Machelle Sweeting

In the Matter of a **Custody/Visitation** Proceeding

**Sandy Wendy,**

Petitioner,

- against -

**Wentworth Rattray,**

Respondent.

| | |
|---|---|
| **File#:** | 263409 |
| **Docket#:** | V-31854-16 |
| | V-36024-16 |

**ORDER**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THIS ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK OF COURT, OR 30 DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON TIIE APPELLANT, WHICHEVER IS EARLIEST.

IT IS ORDERED that
\*   Beginning Wednesday, November 2, 2016, the terms, conditions and schedule as set forth in the July 28, 2016 Temporary Order of Visitation shall resume.

**Dated:** October 24, 2016

**EN TER**

2016102414061JMSWEETIN... ...4...... ... EF89239SCEJE3C9,\S7

*Hon: J.* **Machelle Sweeting**

At a term of the Family Court of the
State of New York, held in and for
the County of ew York, at 60
Lafayette Street, New York, NY
10013, on October 5, 2016

**PRESENT:**  Hon. J. Machelle Sweeting

In the Matter of a **Custody Visitation** Proceeding

**Sandy Wendy**,

Petitioner,

- against -

**Wentworth Rattray**,

Respondent.

| | |
|---|---|
| **File#:** | 263409 |
| **Docket#:** | V-31854-l6 |
| | V-36024-16 |

**ORDER**

PURSUANT TO SECTION 1113 OF THE FAMILY COURT ACT, AN APPEAL FROM THIS ORDER MUST BE TAKEN WITHIN 30 DAYS OF RECEIPT OF THE ORDER BY APPELLANT IN COURT, 35 DAYS FROM THE DATE OF MAILING OF THE ORDER TO APPELLANT BY THE CLERK.OF COURT, OR30DAYS AFTER SERVICE BY A PARTY OR THE ATTORNEY FOR THE CHILD UPON THE APPELLANT, WHICHEVER IS EARLIEST.

1T IS ORDERED that the mother Wendy Sandy does NOT have an existing order of parenting time and visitation with the subject child Autumn Rattray.

**Dated:** October 5, 2016

**ENTER**

2016100515A005WGWEETIN55/46796769237A5A4A9220634F882F8

**Hon. J. Machelle Sweeting**

## MEMORANDUM OPINION & ORDER (Dkt. 300)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENTWORTH RATTRAY,

Plaintiff,

v.

THE CITY OF NEW YORK, POLICE
OFFICER JOSE CADAVID (BADGE NO.
9085), and POLICE
OFFICER ALYSSA TRIGUENO,

Defendants.

**MEMORANDUM
OPINION & ORDER**

17 Civ. 8560 (PGG) (KHP)

PAUL G. GARDEPHE, U.S.D.J.:

In this Section 1983 action, Plaintiff Wentworth Rattray claims that New York

City Police Department ("NYPD") Officer Jose Cadavid violated his Fourth Amendment rights

by conducting an unlawful search of Rattray's apartment and arresting him without probable

cause. Rattray further alleges that NYPD Officer Alyssa Trigueno is liable for failing to

intervene in the unlawful search and false arrest. Defendants contend, <u>inter alia,</u> that exigent

circumstances justified Officer Cadavid's entry into Rattray's home.

Rattray's claims proceeded to trial on August 29, 2023. On September 1, 2023,

the jury returned a verdict in favor of the Defendants, finding that Plaintiff had not proven by a

preponderance of the evidence his Section 1983 unlawful search and false arrest claims against

Officer Cadavid. Because the jury found no constitutional violation, Rattray's failure to

intervene claim against Officer Trigueno likewise failed. (Verdict (Dkt. No. 279))

On September 25, 2023, Plaintiff moved for a new trial pursuant to Fed. R. Civ.

P. 59(a)(l) and 60(b)(2). (Pltf. Br. (Dkt. No. 291)) In moving for a new trial, Plaintiff argues

that "[t]he verdict [was] against the weight of the evidence because Officer Cadavid admitted

that he did not have exigent circumstances to enter Mr. Rattray's home." (Id. at 10)  According to Plaintiff, Officer Cadavid's testimony "precludes" a finding by the jury that exigent circumstances justified the warrantless entry into Plaintiffs home.  (Id. at 11)  Rattray also complains that Officer Cadavid's testimony "regarding the statements and actions by the responding supervisor, Lieutenant[] Khosh[,] .... was new and was not previously provided by Defendants during the course of discovery when Mr. Rattray was prose." (Id. at 16)

## BACKGROUND

I.    **PROCEDURAL HISTORY**

The Complaint was filed on November 2, 2017 (Cmplt. (Dkt. No. 2)); the Amended Complaint was filed on November 20, 2017 (Am. Cmplt. (Dkt. No. 6)); and the Second Amended Complaint ("SAC") was filed on June 29, 2018.  (SAC (Dkt. No. 42)).

On September 10, 2019, this Court granted in part Defendants' motion to dismiss the SAC.  (Dkt. No. 72)  On October 28, 2019, Rattray moved for leave to file the Third Amended Complaint ("TAC").  (Dkt. No. 75)

On November 7, 2019, this Court referred Rattray's motion to amend to Magistrate Judge Katharine Parker for a Report & Recommendation ("R&R").  (Dkt. No. 81)  In an April 20, 2020 R&R, Judge Parker recommended that Rattray be granted leave to amend as to certain claims. (R&R (Dkt. No. 87))  On July 16, 2020, this Court adopted Judge Parker's R&R (Dkt. No. 98), and Rattray filed the TAC on July 28, 2020.  (TAC (Dkt. No. 99))

The TAC asserts a Section 1983 unlawful search claim against Officers Cadavid and Trigueno; a Section 1983 false arrest claim against Officer Cadavid; and a Section 1983 failure to intervene claim against Officer Trigueno based on the alleged unlawful search and false arrest.  (Id.)

On April 15, 2022, Defendants moved for summary judgment on all of Rattray's claims. (Defs. Mot. (Dkt. No. 206)) This Court referred Defendants' motion to Judge Parker for an R&R. (Dkt. No. 208) In a September 14, 2022 R&R, Judge Parker recommended that Defendants' motion be granted as to the unlawful search claim against Officer Trigueno, the false arrest claim against Officer Cadavid, and the related failure to intervene claim against Officer Trigueno , but denied as to the unlawful search claim against Officer Cadavid and the related failure to intervene claim against Officer Trigueno. (R&R (Dkt. No. 221))

In a March 30, 2023 Memorandum Opinion & Order, this Court adopted Judge Parker's R&R in part. (Dkt. No. 225) This Court granted Defendants summary judgment on Plaintiffs unlawful search claim against Officer Trigueno, but otherwise denied Defendants' motion. (Id.)

Plaintiffs remaining claims against (1) Officer Cadavid for false arrest and unlawful search; and (2) Officer Trigueno for failure to intervene in the alleged false arrest and unlawful search, proceeded to trial on August 29, 2023.

## II.    THE EVIDENCE AT TRIAL

The credible evidence at trial showed the following:

In or about 2006, Plaintiff Rattray had a daughter, "A.", with non-party Wendy Sandy. (See Trial Transcript ("Tr.") 47-49 (Rattray))[1] Rattray's relationship with Sandy later ended, and the two agreed that Rattray would have custody of their daughter, while Sandy would have visitation rights. (See Tr. 50-51 (Rattray)) As time passed, Sandy became concerned that Rattray was deliberately interfering with her ability to see her daughter. Accordingly, in 2016,

---

[1]  Citations to the trial transcript are to the page numbers assigned by the court reporter. Citations to other documents reflect page numbers designated by this District's Electronic Case Files ("ECF") system.

Sandy brought an action in New York City Family Court seeking joint custody. (Tr. 51 (Rattray) ("Q. And that informal agreement ended when she filed the lawsuit you mentioned, family court, in January of 2016? A. Correct."); Tr. 63-64 (Sandy) ("One of the reasons why I filed for custody of our daughter is because every time I have to pick her up, it was an excuse .......I am [A.'s] mom, and I need to spend more time with her[,] .... so I can be in her life."); Tr. 88 (Sandy) ("Q. In fact, prior to November 5th, 2016, plaintiff had previously denied you access to your daughter, correct? A. Yes. Q. And, in fact, just that year you had started a custody case against him? A. Yes. Q. And you did that because you wanted to be in your daughter's life? A. Yes. Q. And before you went to court, he had control over when you can see her? A. Yes, that's true."); Tr. 192 (Rattray) ("Ms. Sandy's petition was for joint custody."))

By the time Sandy filed her custody action, her relationship with Rattray was strained. (Tr. 89 (Sandy) ("Q. And it's fair to say that the plaintiff wasn't happy when you filed for custody? A. No, he was never happy with this. Q. And is it fair to say that you and him didn't have a good relationship? A. No, it wasn't [a good relationship].")) And in the fall of 2016, Sandy and Rattray were engaged in Family Court proceedings regarding custody of A. (See PXl (Oct. 5, 2016 Family Court Order) (Dkt. No. 251 -1) at 2)

In text messages to Rattray on Saturday, November 5, 2016, Sandy stated that she would be coming by later that day to pick up A., who was then ten years old. (Tr. 49 (Rattray); Tr. 61-62 (Sandy)) There is no evidence that Rattray-who had obtained full custody of A. (see PXl (Oct. 5, 2016 Family Court Order) (Dkt. No. 251 -4) at 2)- ever responded to Sandy's text

messages. (See Tr. 62, 65, 68 (Sandy)) Sandy also called A.'s cell phone several times, but her calls went "straight to voice mail." (Tr. 65 (Sandy))

Rattray took his daughter to a dance class that day, and then to a playdate with a friend.  (Tr. 104 (Rattray))  Although A.'s "playdates [generally lasted] two hours," on this occasion Rattray allowed A. to stay at her friend's house, and he returned home alone, arriving at his apartment shortly before 7:00 p.m.  (See Tr. 58, 104-107 (Rattray); PX5 (Nov. 2016 Emails to Family Court Personnel) (Dkt. No. 259-5) at 3)  Meanwhile - although Sandy had not made contact with either Rattray or A. - she decided to drive from Milford, Connecticut to Rattray's Manhattan apartment to pick up her daughter for the weekend.  The drive to Manhattan took 1.5 to 2.5 hours.  (Tr. 74-75 (Sandy))  Sandy brought Family Court papers with her which she understood gave her the right to see A. every other weekend, and to pick up her daughter on November 5, 2016 in particular.  (Tr. 62 (Sandy); Tr. 84 (Sandy) ("Q.  So you traveled from Milford, Connecticut, to New York City, because you believed it was your turn to take [A.]?  A. I did not believe it was my turn to take [A.].  It was my turn.  I had the paper there."))

After arriving at Rattray's apartment building - located at 42 West 120th Street in Manhattan- Sandy rang the doorbell.  (Tr. 84 (Sandy); Tr. 284 (Trigueno))  Rattray came down to speak with her.  She told Rattray that it was her "turn" to see her daughter.  Rattray told Sandy that A. "was not home" and that Sandy would not be able to see her daughter that evening.  He then closed the door and went back upstairs.  (Tr. 84-85 (Sandy))  Their exchange took less than a minute.  (Tr. 183 (Rattray))

Sandy believed that her daughter was upstairs - inside Rattray's apartment - and that Rattray was deliberately preventing her from seeing her daughter.  (See Tr. 85 (Sandy) ("Q. And then he closed the door, as you previously testified, and went back up, inside?  A. Yes.  Q. But you didn't believe what the plaintiff was telling you, correct?  A. Yeah, yeah, I did not."))  She became extremely upset.  At 6:49 p.m., Sandy called 911 while "hysterical[ly] crying."  She

told the 911 operator that she had "visitation rights today," that she had come to pick up her

daughter, and that the father of the child was refusing to give the child to her. (DX A (911 Event

Chronology) (Dkt. No. 258) at 3; Tr. 66-68 (Sandy)) Sandy told the 911 operator that she was

standing in front of Rattray's apartment building at 42 West 120th Street, and she identified his

apartment number. (DX A (911 Event Chronology) (Dkt. No. 258) at 3)

At trial, Sandy testified that she had become extremely upset by the time she

called 911:

> THE COURT: ... [H]ow would you describe your tone in speaking with the 911 operator?
>
> THE WITNESS:  Well, I was very upset, and as a mom, and as my only child, I was very upset, and I was crying, because that -  following that, it was a Wednesday,  we had finished wrapping up with the court hearing, and I was very taken aback by all the stuff that I was hearing.  And it wasn't true.  So I was taken aback, and I was very upset about it.  So I guess that did take me back into like that same week, because I was very upset about what was going on, and I didn't want it to go that way.  So that's why maybe I sound like I was upset.  But I was upset, because that week was a horrible week for me.  So I was very upset about it, and not only that, I was upset that I was -I  did text him to let him know I'm  on my way.  And when I get there, that she wasn't there....
>
> I was very upset, because, like I said, again, I didn't want [A.] to think that I didn't care about anything, that I was taking it out on her.  So my tone was not in the very best way.  I was crying that whole entire time.  I was like not very happy about the outcome with the court hearing, so I was very upset about it.

(Tr. 68 (Sandy))

Sandy called 911 "because it was [her] turn ...  and [A.] wasn't there."  She

believed that if the police came they would "provide and give [her] [A.], so [that she] can have

[A.] for the weekend."  (Tr. 86 (Sandy))  Sandy testified that she "was going to fight, no matter

what, because I wanted to show [A.] that ...   I will go to the end of the earth for her."  (Tr. 66

(Sandy))

NYPD Officers Cadavid and Trigueno responded to the 911 call at approximately 7:00 p.m.  (Tr. 330 (Trigueno))  As they approached Rattray's apartment building at 42 West 120th Street, the officers encountered Sandy, who identified herself as the 911 caller.  (Tr. 284-85 (Trigueno); Tr. 361 (Cadavid))  As the officers approached Sandy, they noticed that she was upset and crying.  (Tr. 340, 345 (Trigueno); Tr. 361-62 (Cadavid))  Sandy told the officers that (1) it was her time to pick up her daughter; (2) Rattray had refused to let Sandy see her; (3) Sandy had not heard from her daughter; and (4) the girl was not answering her phone.  (Tr. 291 (Trigueno); Tr. 361 (Cadavid); DXF (Nov. 5, 2016 Domestic Incident Report) (Dkt. No. 258) at 24)

Officer Cadavid told Sandy that he could issue a "Domestic Incident Report" ("DIR") - an NYPD form memorializing the details of a custody dispute -  which she could show to a Family Court judge as proof that Rattray was not complying with the Family Court's custody order.  (Tr. 337 (Trigueno); Tr. 362 (Cadavid))  Cadavid explained to Sandy that, given the circumstances, issuing a DIR was all that he could do; he was not authorized to enforce visitation rights.  (Tr. 362-63 (Cadavid))  After Cadavid told Sandy that he could not enforce her visitation rights, she "became more upset [and] more emotional."  She told Officer Cadavid "that her daughter's life was in danger[] [and that she] was not safe in the apartment.  [Sandy] also stated to [Officer Cadavid] that Mr. Rattray does drugs and that he occasionally has drug dealers in the apartment."[2]  (Tr. 363 (Cadavid))

---

[2] Sandy testified at trial that she did not make these statements to Officer Cadavid.  (Tr. 71 (Sandy))  Her testimony on this point was not credible.  It was apparent at trial that Sandy was desperate to see her daughter that evening; that she believed that she had a legal right to see her; and that she believed that Rattray was improperly preventing her from seeing her daughter. Sandy had attempted to arrange visitation that day, but neither Rattray nor her daughter had returned her text messages or calls.  Moreover, Sandy and Rattray were in the midst of a custody battle, and Rattray had interfered in the past with Sandy's efforts to maintain a relationship with

Given Sandy's distraught behavior and her statements about Rattray, Officer Cadavid became concerned for "the safety of [Sandy's] daughter [and]........ felt [he had] to go upstairs ...  to check on the welfare of the[] child."  (See Tr. 364 (Cadavid))  The two officers then proceeded to Rattray's apartment on the third floor, knocked on the door, and told him that they were there to check on the welfare of his daughter.  (Tr. 365 (Cadavid))  In response, Rattray "started yelling[] [and] cursing" at the officers, and refused to answer questions.  (Tr. 365, 379-80 (Cadavid))  Rattray did not tell the officers that his daughter was not at home, nor did he explain that he had custody of the girl.  (Tr. 380 (Cadavid))  Officer Cadavid repeatedly asked Rattray to open the door so that they could speak with him and see A., but Rattray refused.  (Tr. 366-67 (Cadavid))  Officer Cadavid eventually threatened to take down the apartment door if Rattray did not open the door.  Rattray then cracked the door open.  (Tr. 366-68 (Cadavid))

_____

her daughter.  Although Sandy had not spoken with either Rattray or her daughter to confirm the visit, she nonetheless drove hours from Milford, Connecticut to Manhattan to see her daughter - only to be told that the girl was not at home and that Sandy would not be permitted to see her. Crying hysterically, she called 911, because she was prepared "to go to the end of the earth" to see her daughter and believed that police officers would be able to "give [her] [A.]" (Tr. 66, 86 (Sandy); (DXA (911 Event Chronology) (Dkt. No. 258) at 3)  After Officer Cadavid explained to Sandy that all he could do was complete a DIR form, Sandy knew that unless she provided the officers with a compelling reason to go to Rattray's apartment, she had no chance of seeing her daughter.  It was at this point that Sandy told Officer Cadavid that her daughter's life was in danger, that Rattray used drugs, and that drug dealers came to his apartment.

At trial, however, Sandy had compelling reasons to deny making these statements.  As an initial matter, her statements about Rattray's drug use and association with drug dealers were lies: Rattray "never even drank in front of [her]" and was "a great dad." (Tr. 67, 71 (Sandy)) Moreover, Rattray had insisted that she testify- at deposition and at trial - in support of his Section 1983 claim.  He had told her that if she did not testify "there would be a warrant for [her] arrest." (Tr. 92, 96 (Sandy))  In the end, Sandy "only agreed to testify at the deposition because [she] feared that if [she] did not cooperate [with Rattray] in giving that deposition, that would affect [her] ability to see [her] daughter." (Tr. 96 (Sandy))

In sum, Sandy's testimony concerning what she told Officer Cadavid- after he told her that all he could do was complete a DIR form -was not credible.  By contrast, Officer Cadavid's testimony on this point was entirely credible.

Officer Cadavid then put his foot "between the door frame and the door to prevent [Rattray] from trying to close it." (Tr. 368 (Cadavid))

"[Y]elling[] [and] cursing," Rattray continued to refuse to answer Officer Cadavid's questions about his daughter, complaining that the officers "had no search warrant." (Tr. 383 (Cadavid))  Rattray soon attempted to close the door, but was unable to do so because Officer Cadavid's foot was in the way.  (Id.)

At trial, Officer Cadavid testified that Rattray's belligerence, his refusal to answer questions, and his efforts to shut the apartment door made Cadavid's "concern level rise[]" regarding the safety of Rattray's daughter.  Officer Cadavid concluded that - in refusing to show his daughter - Rattray was "trying to hide something." (Tr. 383-84 (Cadavid))  Making a "split second decision[,]" Officer Cadavid "pushed [his] way into the apartment." (Tr. 384 (Cadavid))  Once inside the apartment, Officer Cadavid again asked Rattray where his daughter was.  Rattray refused to answer the question and became more agitated.  (Tr. 384-85 (Cadavid))  Officer Cadavid then spent "approximately one minute" searching the apartment for Rattray's daughter. (Tr. 268 (Rattray); Tr. 385-86 (Cadavid))  The girl was not present in the apartment.  (Tr. 386 (Cadavid))

After determining that the daughter was not in the apartment, Officer Cadavid again asked Rattray where his daughter was.  Rattray did not provide any information about her whereabouts.  He did not tell Cadavid that his daughter was at a friend's house, or that Sandy did not have custody of her.  (Tr. 386-87 (Cadavid))  And although Officer Cadavid asked Rattray for "court paperwork" concerning custody of A., Rattray did not disclose that he had obtained multiple court orders awarding him custody of the girl, and granting Sandy only visitation

rights.[3]  (Tr. 386-87 (Cadavid); Tr. 192-196 (Rattray); PX2 (Oct. 24, 2016 Family Court Order)

(Dkt. No. 259-2) at 2)

Shortly after Officer Cadavid's search of the apartment, Rattray called 911 to

complain and to request that a supervisor come to his apartment.  Officer Cadavid separately

requested that his supervisor come to the apartment to assist in investigating the daughter's

whereabouts.  (Tr. 129, 131 (Rattray); Tr. 387 (Cadavid))  NYPD Lieutenant Khosh arrived at

---

[3]  Rattray largely disputed Officer Cadavid's description of their interactions at the apartment
door and during Officer Cadavid's search.  According to Rattray, he was "pretty easygoing" with
the officers and had a "regular demeanor" when they arrived at his apartment.  Rattray also
testified that he told the officers that his daughter was not at home and that he had custody over
her.  (Tr. 112-16 (Rattray))  Rattray was not a credible witness, however.

For example, Rattray testified on direct examination that he did not show the officers proof that
he had custody of A. because he had no such proof; "[t]hey asked for papers, and I didn't have
any papers."  (Tr. 138 (Rattray))  On cross-examination, however, Rattray admitted that he had
obtained six Family Court orders granting him custody of A., and awarding Sandy only visitation
rights.  (Tr. 192-96 (Rattray))

And at the same time that Rattray was refusing to provide the officers with any information
concerning his daughter's whereabouts and the custody arrangements, he was writing emails to
Family Court personnel.  In a 7:01 p.m. email, Rattray advised the Family Court that Sandy was
"downstairs ...  expecting to pick up [A.]."  (PX5 (Nov. 2016 Emails to Family Court Personnel)
(Dkt. No. 259-5) at 3)  In a second email, Rattray states that "there are two officers who have
entered my home against my wishes and refuse to leave until I can provide proof that I should
have custody of [A.], of [A.'s] well being[,] and of [A.'s] whereabouts."  (Id. at 2)  While
Rattray testified at trial that the officers "never said" that "they were [at his apartment] to check
on [Rattray's] daughter's well-being" (Tr. 200 (Rattray)), it is apparent from Rattray's
contemporaneous email that this testimony - like much of Rattray's  account- is false.

Rattray also testified that - 12 to 18 months after the November 5, 2016 incident-he sought
treatment for the alleged emotional trauma he had suffered.  He later admitted, however, that he
did not seek any such treatment until 2019, after this lawsuit was filed.  (Tr. 240-42 (Rattray))

In sum, Rattray was not a credible witness.  The credible evidence at trial demonstrated that he
was inexplicably belligerent and uncooperative throughout his encounter with Officer Cadavid.
His aggressive and violent behavior- considered together with Sandy's information that Rattray
used drugs and had drug dealers over to his apartment - gave Officer Cadavid concern about
A.'s safety.

the apartment about an hour later.  (See Tr. 132 (Rattray))  He spoke with Rattray, and Rattray

stated that his daughter was at a friend's house.  (See Tr. 391 (Cadavid))  Lieutenant Khosh then

sent "a police car over to the location where [the] daughter was[] to physically confirm" her

location and her safety.[4]  (Tr. 395 (Cadavid))  After Lieutenant Khosh confirmed that Rattray's

daughter was safe, he and the Defendant officers left the apartment.  (Id.)

## IV.    JURY VERDICT AND PLAINTIFF'S POST-TRIAL MOTION

On September 1, 2023, the jury returned a defense verdict, finding that Rattray

had not proven his Section 1983 false arrest and unlawful search claims against Officer Cadavid,

and thus had not proven his failure to intervene claims against Officer Trigueno.  (Verdict (Dkt.

No. 279))  On September 5, 2023, this Court entered judgment in favor of Defendants.

(Judgment (Dkt. No. 281))

On September 25, 2023, Plaintiff moved for a new trial pursuant to pursuant to

Fed. R. Civ. P. 59(a)(l) and 60(b)(2).  (Pltf. Br. (Dkt. No. 291))  Plaintiff argues that the jury's

verdict is against the weight of the evidence.  (Id. at 10)

## DISCUSSION

## I.    LEGAL STANDARD

"Rule 59 of the Federal Rules of Civil Procedure permits a court, on motion, to

'grant a new trial on all or some of the issues ...  after a jury trial, for any reason for which a new

trial has heretofore been granted in an action at [law] in federal court.'"  Springer v. Cedro, 894

F. Supp.2d 474,481 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 59(a)(l)(A)).  "The decision to

grant a new trial pursuant to Rule 59(a) is committed to the sound discretion of the trial judge."

---

[4]  Rattray testified that Lieutenant Khosh never asked him where his daughter was, and that Rattray never told Lieutenant Khosh where she was.  (See Tr. 167 (Rattray))  Like much of Rattray's testimony, this assertion was not credible.

Livingston v. Escrow, 2014 WL 1466469, at *2 (W.D.N.Y. Apr. 15, 2014) (citing Sequa Corp. v. GBJ Corp., 156 F.3d 136, 143 (2d Cir. 1998)). For a court "to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or … [that] the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237,245 (2d Cir. 2003) (internal quotations and citations omitted). "Accordingly, '[o]n a motion for a new trial, the moving party bears [a]heavy burden.'" Prendergast v. Pac. Ins. Co., 2013 WL 5567656, at *5 (W.D.N.Y. Sept. 25,2013) (quoting Manes v. Metro-North Commuter R.R., 801 F. Supp. 954, 956 (D. Conn. 1992), affd, 990 F.2d 622 (2d Cir. 1993)). "Furthermore, 'Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a "second bite at the apple."'" Kogut v. Cty. of Nassau, 2013 WL 3820826, at *2

(E.D.N.Y. July 22, 2013) (quoting O'Connell v. Onondaga Cty., 2013 WL 998598, at *1

(N.D.N.Y. Mar. 13, 2013)).

## II.  **ANALYSIS**

Plaintiff argues that no evidence at trial supports a jury finding that exigent

circumstances justified Officer Cadavid's warrantless entry into Rattray's home. (Pltf. Br. (Dkt.

No. 291))

With respect to the exigent circumstances exception to the Fourth Amendment's

warrant requirement, the Court instructed the jury as follows:

> As a general matter, in order to search a home, a police officer must obtain a
> search warrant from a magistrate or judge. If a police officer does not have a
> search warrant, an officer may not enter or search someone's home absent consent
> or exigent circumstances. Exigent circumstances exist where a police officer
> reasonably believes that entry or a search is necessary in order to render
> emergency assistance to an injured person, or to protect someone from imminent
> Injury.

In determining whether exigent circumstances existed in this case, you must consider the totality of the circumstances confronting the defendants, including whether there was a need to make a prompt assessment based on the information that was available.

In determining whether exigent circumstances existed, the core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or to take immediate action with respect to Mr. Rattray's daughter. On the other hand, exigent circumstances did not exist if a reasonable, experienced officer in Officer Cadavid's position, knowing the facts he knew, would not have believed entry was necessary to render aid or to take action.

The question of whether a police officer reasonably believed that someone was in danger or in need of assistance is an objective one. This question should be answered with regard to what a reasonable officer would have believed under the totality of the circumstances. A search is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the search.

While Officer Cadavid must produce evidence supporting the existence of exigent circumstances, the ultimate burden of proof is on Mr. Rattray to prove that Officer Cadavid's entry and search violated his Fourth Amendment right to be free from unreasonable searches. If you find that exigent circumstances existed[] that justify Officer Cadavid's entry into and search of Mr. Rattray's home, then you must find in favor of Officer Cadavid on Mr. Rattray's unlawful search claim.

(Tr. 601-03)[5]

Plaintiff argues that "Officer Cadavid did not have any objectively reasonable basis to believe [Rattray's daughter] was in imminent danger, even if the Court credits his testimony that Ms. Sandy stated there were drugs and possibly drug dealers in the apartment."

(Pltf. Br. (Dkt. No. 291) at 11) In this regard, Plaintiff argues that

when Officers Cadavid and Trigueno approached the apartment, they heard no evidence of any other person in the apartment, much less "drug dealers." When Mr. Rattray opened the door, Officers Cadavid and Trigueno both testified that they heard no evidence of other people in the apartment. Officer Cadavid testified that he entered the home because he believed some crime of child abuse was being committed. But, there was no evidence proffered by Ms. Sandy that Mr. Rattray abused [his daughter]. And there was no history of child abuse in Mr.

---

[5] Plaintiff did not argue at trial, and has not argued in his motion for a new trial, that the Court's jury instruction concerning exigent circumstances is erroneous.

Rattray's record, even if Officer Cadavid had run a search for Mr. Rattray's history.  Neither defendant heard a child crying or calling for help, or saw any evidence that a child was in the apartment.  Officer Cadavid offered no evidence at all to support a suspicion of child abuse.

(Id. at 11-12) (internal citations omitted)

       Plaintiff also quotes Officer Cadavid's testimony that while he was concerned that A. was "not safe ...  [and] was in danger," he did not believe that she was in "imminent danger":

"Q.    Okay.  So you've got the drugs and the drug dealers, right?

A.    Yes.


Q.    And the yelling and the cursing.

A.    Yes.

Q.    And your analysis that it's not normal, it's not a normal reaction, right?

A.    Yes.

Q.    And that's the basis for your belief that the child was in imminent danger.

A.    Not imminent, but also from what Ms. Sandy stated, that she was not safe, that she was in danger.

Q.    Okay.  That was the basis for your testimony that she was in imminent danger.

A.    I wouldn't consider that imminent danger.

Q.    You wouldn't consider that imminent danger.

A.    No, not my definition."

(Id. at 13-14) (quoting Tr. 487 (Cadavid)); (see also id. at 14) (citing Tr. 489-91 (Cadavid testifying that he did not believe that the child was in "imminent danger" and that he did not enter the apartment because he believed the child was in "imminent danger"))

       Plaintiff goes on to argue that the evidence regarding exigent circumstances was "insufficient to overcome the presumption that a warrantless entry is unreasonable[,]" and that

therefore "[t]he jury's verdict is against the weight of all available evidence[] [and a] new trial is warranted."  (Id. at 15-16)

As an initial matter, the Court gives little weight to Plaintiff's argument that Officer Cadavid conceded that A. was not in "imminent danger."  While Officer Cadavid testified that the circumstances did not meet his "definition" of "imminent" danger, he repeatedly testified that he believed- based on what Sandy had told him about Rattray and Rattray's behavior -  that A. was "not safe," was "in danger," and "could be hurt," and that he "needed to take urgent action to address those concerns."  (Tr. 487-91, 501-02 (Cadavid))

In any event, the jury's determination as to exigent circumstances did not turn on Officer Cadavid's subjective beliefs.  As this Court instructed the jury, "[t]he question of whether a police officer reasonably believed that someone was in danger or in need of assistance is an objective one ....... A search is reasonable under the Fourth Amendment[,] regardless of the individual officer's state of mind, as long as the circumstances[,] viewed objectively[,] justify the search."  (Tr. 602; see also Brigham City, Utah v. Stuart, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'") (quoting Scott v. United States, 436 U.S. 128, 138 (1978) (emphasis in Brigham City); Michigan v. Fisher, 558 U.S. 45, 49 (2009) ("the test ...  is not what [a police officer] believed, but whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger") (quoting Brigham City, 436 U.S. at 406).

In determining whether exigent circumstances exist, "'the totality of the circumstances confronting law enforcement agents in the particular case [must be considered].'" United States v. Klump, 536 F.3d 113, 117 (2d Cir. 2008) (quoting United States v. MacDonald,

916 F.2d 766, 769 (2d Cir. 1990) (en banc)). "Ultimately, '[t]he essential question in

determining whether exigent circumstances justified a warrantless entry is whether law

enforcement agents were confronted by an "urgent need" to render aid or take action.'" Loria v.

Gorman, 306 F.3d 1271, 1284 (2d Cir. 2002) (quoting MacDonald, 916 F.2d at 769) (quoting

Dorman v. United States, 435 F.2d 385,391 (D.C. Cir. 1970) (en banc)). Here, the "totality of

the circumstances" confronting Officer Cadavid would have indicated to a reasonable police

officer that the ten-year-old A. might be in danger, and that there was an "urgent need" to "take

action" to ensure her safety.

        As an initial matter, when Officer Cadavid arrived at 42 West 120th Street -  in

response to the 911 call -  he encountered Sandy, the "hysterically crying" mother who had called

911.  Sandy identified herself as the 911 caller, and the officers noticed that she was upset and

crying.  (Tr. 284-85, 340, 345 (Trigueno); Tr. 360-62 (Cadavid))  Sandy told the officers that (1)

it was her time to pick up her daughter; (2) Rattray had refused to let Sandy see her; (3) Sandy

had not heard from her daughter; and (4) the girl was not answering her phone.  (Tr. 291

(Trigueno); Tr. 361 (Cadavid); DXF (Nov. 5, 2016 Domestic Incident Report) (Dkt. No. 258) at

24)  Sandy also told Officer Cadavid that "that her daughter's life was in danger[] [and that she]

was not safe in the apartment."  Sandy explained "that Mr. Rattray does drugs and that he

occasionally has drug dealers in the apartment."  (Tr. 363 (Cadavid))  In that moment, there was

no obvious reason for Officer Cadavid to distrust Sandy's account, and he quite reasonably

determined that he had "to go upstairs ...  to check on the welfare of the[] child."  (Tr. 364

(Cadavid))

        When Officer Cadavid knocked on Rattray's door, he explained that he was there

to check on the welfare of Rattray's daughter.  Rattray flew into a rage, aggressively yelling and

cursing; he refused to answer Officer Cadavid's questions about the whereabouts of his daughter,
he refused to open the door, and he attempted to close his door once he cracked it open. (Tr.
365, 379-83 (Cadavid)) As Officer Cadavid testified, Rattray's behavior was "not a normal
reaction" to the sort of welfare check that the officer was attempting to perform. (Tr. 487
(Cadavid)) Indeed, Rattray's aggressive behavior led Officer Cadavid to believe that Rattray
might be "under the influence of something," which tended to corroborate Sandy's assertion that
Rattray used drugs. (Tr. 369 (Cadavid)) Rattray's continued belligerence, his refusal to answer
questions, his refusal to open his door, and his later efforts to close the door once opened made
Officer Cadavid's "concern level rise[]" for the safety of the ten-year-old girl. Officer Cadavid
concluded that Rattray was "trying to hide something." (Tr. 383-84 (Cadavid))

Rattray's behavior in response to the officers' child welfare check- considered
together with Sandy's assertions that (1) she was scheduled to pick up her daughter at Rattray's
apartment; (2) Rattray had refused to produce the girl; (3) Sandy could not reach her daughter;
(4) the girl was not safe and Sandy feared for her life; and (5) Rattray used drugs and had drug
dealers over to his apartment - sufficed to create exigent circumstances.

"Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to
invoke the emergency aid exception." Fisher, 558 U.S. at 49. "'Probable cause for a forced
entry in response to exigent circumstances requires finding a probability that a person is in
"danger."'" Fernandez v. City of New York, 457 F. Supp. 3d 364,381 (S.D.N.Y. 2020) (quoting
Kerman v. City of New York, 261 F.3d 229,236 (2d Cir. 2001)). "When information is received
from a putative victim or an eyewitness, probable cause exists unless the circumstances raise
doubt as to the person's veracity." Curley v. Vill. of Suffern, 268 F.3d 65, 70 (2d Cir. 2001)
(internal citations omitted); see also Lenzo v. City of New York, 2022 WL 656831, at *2

(S.D.N.Y. Mar. 4, 2022) (report of stalking made by arrestee's girlfriend was sufficient to sustain

finding of probable cause absent indicia of falsity); Szil v. de Blasio, 2017 WL 11490683, at *3

(S.D.N.Y. Oct. 27, 2017) ("Plaintiff's allegations that police arrested him in response to a call

from an alleged victim of domestic violence fail to state a claim that officers arrested him

without probable cause.  He does not allege, for example, that police officers had any reason to

doubt his wife's statements.").  As noted earlier, Officer Cadavid had no reason to doubt Sandy's

veracity.

      Loria v. Gorman, 306 F.3d 1271, 1276-77 (2d Cir. 2002) and United States v.

Paige, 493 F. Supp. 2d 641, 647 (W.D.N.Y. 2007)- cited by Plaintiff (Pltf. Reply (Dkt. No. 295)

at 3-4)-do not support his argument that exigent circumstances were absent here.

        In Loria, police officers went to Loria's home to investigate a noise complaint.

Loria refused to speak with the officers about the noise complaint, and then attempted to close

his door on the officers.  Loria, 306 F.3d at 1276-77.  The defendant officer- Charles Gorman-

pushed the door open, stepped into Loria's home, and arrested him, charging him with

obstructing governmental administration.  Id. at 1277.  After the obstruction charge was

dismissed, Loria brought a Section 1983 claim for false arrest arguing, inter alia, that there were

no exigent circumstances justifying the warrantless arrest in his home.  Id. at 1278-79, 1283-84.

Defendant Gorman conceded that "at the time of the arrest no one was in danger and no

'emergency situation' existed."  Id. at 1284.  Given these facts, the Second Circuit concluded

that "exigent circumstances were not present."  Id. at 1285.

        Loria provides no support for Rattray's arguments here.  As discussed above, a

reasonable officer would conclude - in the circumstances here - that there was an "urgent need"

to determine whether A. was safe or was in danger.  Acknowledging Plaintiffs argument that a

person's "lack of cooperation [with the police] does not create exigent circumstances" (Pltf.

Reply (Dkt. No. 295) at 4), the facts here involve much more than a lack of cooperation.

In Paige, the court addressed a motion to suppress evidence recovered in a

warrantless search of Paige's apartment. Police officers had responded to a 911 call reporting a

stabbing "around the corner from" Paige's apartment building. Police found a stabbing victim at

that location. Paige, 493 F. Supp. 2d at 643. Although there was "no evidence [that] connected

the sole stabbing victim, found in front of [an apartment building located] some distance from

Defendant's apartment, or any other participant in the altercation, to Defendant's apartment or to

Defendant as the assailant[,]" police officers conducted a warrantless search of Paige's

apartment, and recovered a firearm. Id. at 645,647. In opposing Paige's motion to suppress, the

Government argued "that the officers' warrantless entry was justified by exigent circumstances

based on the need to locate and assist potential victims of the earlier altercation in front of

Defendant's apartment." Id. at 647. The Paige court rejected that argument, because "there was

no indication ...  that someone in the apartment was in need of assistance." Id. at 648. Here, by

contrast, a reasonable officer would have concluded that a person in need of assistance - the ten-

year-old A. - might be located inside Rattray's apartment.

In sum, Plaintiff Rattray has not demonstrated that the jury reached a "seriously

erroneous result" in concluding that Officer Cadavid's search of Rattray's apartment was

justified by exigent circumstances. Manley, 337 F.3d at 245 (internal quotations and citations

omitted).

Plaintiff also argues that a new trial is warranted under Fed. R. Civ. P. 60(b)(2)

because Officer Cadavid's testimony regarding certain "statements and actions by the responding

supervisor, Lieutenant Filipp Khosh[,]" constitutes "new evidence." (Pltf. Br. (Dkt. No. 291) at

16) The testimony referenced by Plaintiff concerns Lieutenant Khosh's direction that a patrol car confirm that A. was safe at her friend's home.  (See id.) (citing Tr. 475-76, 484, 390 (Cadavid)).

Because Rule 60(b) "allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances."  Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986).  To obtain relief under Rule 60(b)(2), a party must show that "'(1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.'"  United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 392 (2d Cir. 2001) (quoting United States v. IBT, 179 F.R.D. 444, 447 (S.D.N.Y. 1998)); accord Apex Emp. Wellness Servs., Inc. v. APS Healthcare Bethesda, Inc., 2017 WL 456466, at *7 (S.D.N.Y. Feb. 1, 2017).

Here, the alleged "new evidence" Plaintiff cites was not in fact new.  After extended colloquy with the lawyers at trial, and after reviewing Officer Cadavid's deposition (see Tr. 475-84), this Court concluded that Officer Cadavid "clearly testified at his deposition that the lieutenant did in fact obtain information about the whereabouts of the daughter and that she was at a friend's house."  (Tr. 484)  Accordingly, there is no basis for relief under Rule 60(b)(2).

**<u>CONCLUSION</u>**

For the reasons stated above, Plaintiffs motion for a new trial (Dkt. No. 290) is

denied.  The Clerk of Court is directed to terminate the motion and to close this case.

Dated: New York, New York
        February 24, 2025

                                    SO ORDERED.


                                    Paul G. Gardephe
                                    United States District Judge

# 17 CV 8560 PGG 2021 Transcript
# Discovery Limitation 2 (Dkt 168)

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK


In re:                                  :
                                            Docket #17cv8560
WENTWORTH RATTRAY,                       : 17-cv-08560-PGG-KHP


                      Plaintiff,         :


  - against -                            :


CADAVID, et al.,                         :
                                            New York, New York
                                         : September 28, 2021
                      Defendants.
------------------------------------------------ : TELEPHONE CONFERENCE


                     PROCEEDINGS BEFORE
          THE HONORABLE JUDGE KATHARINE H. PARKER,
               UNITED STATES MAGISTRATE JUDGE



APPEARANCES:

For Plaintiff:              WENTWORTH RATTRAY, Pro Se
                            42 West 120th Street, #3C
                            New York, New York 10027


For Defendants:             NEW YORK CITY LAW DEPARTMENT
                            BY:  ANDREY UDALOV, ESQ.
                                 ALAN SCHEINER, ESQ.
                            100 Church Street
                            New York, New York 10007




Transcription Service:  Carole Ludwig, Transcription Services
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:   Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|

None

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|

None

1                              PROCEEDINGS

2              THE CLERK:  Calling case 17cv8560, Rattray v.

3    Cadavid.  The Honorable Katharine H. Parker, presiding.

4              Beginning with the plaintiff, can you please state

5    your name for the record?

6              MR. WENTWORTH RATTRAY (THE PLAINTIFF):  I am

7    Wentworth Rattray, pro se plaintiff in this matter.

8              THE HONORABLE KATHARINE H. PARKER (THE COURT):

9    Good afternoon.

10             THE CLERK:  And counsel for the defendant, please

11   make your appearance for the record.

12             MR. ANDREY UDALOV:  Your Honor, Andrey Udalov

13   for the defendants and my colleague, Alan Scheiner, as

14   well.

15             THE COURT:  Okay.

16             MR. ALAN SCHEINER:  Good afternoon, Your

17   Honor.

18             THE COURT:  Good afternoon.  A few

19   preliminaries. I'd ask that you keep your phones on

20   mute unless you are speaking to eliminate background

21   noise.  The Court is making a recording of this

22   conference.  If you'd like a transcript, you may order

23   one.  My deputy will put something up on the docket

24   after this conference about how you can order the

25   transcript. The Court prohibits others from recording

```
 1                            PROCEEDINGS
 2   and rebroadcasting Court conferences.  Violations of
 3   this rule may result in sanctions. And I want to
 4   remind everyone that this is a public line and that
 5   members of the press and public may listen on a listen
 6   only basis.
 7            Okay, this is a discovery conference and there
 8   are a couple of issues.  First, Mr. Rattray, you have
 9   requested permission to further depose Officer Cadavid
10   regarding a particular topic, specifically a history
11   with domestic disputes in his family. And there's also
12   an issue with who to, who can act as a court reporter
13   with respect to the deposition of Officer Trigueno.
14   And, finally, Mr. Cadavid -- I'm sorry, Mr. Rattray,
15   you've also asked to amend the complaint and rejoin
16   the City to this case.
17            Let's first talk about the deposition of
18   defendant Cadavid. The defendant has moved for a
19   protective order to preclude further questioning of
20   Officer Cadavid regarding his personal history of
21   family domestic situations and I did want to hear a
22   little bit from the parties on this.  Let me hear from
23   defendants first.
24            MR. UDALOV:  Your Honor, with respect to that
25   particular issue, we did file a motion for a
```

1                              PROCEEDINGS

2  protective order and we believe that the inquiry was

3  entirely irrelevant for purposes of plaintiff's claim,

4  especially regarding the situation that was inquired

5  into.  That particular situation did not occur at the

6  time of the incident, that situation, unfortunately,

7  occurred during this year, earlier in this year, I

8  believe in February.  It does not go to any merits of

9  any of plaintiff's claims, especially considering that

10 the claims at issue are, I believe in this case they

11 require an objective understanding and not a

12 subjective. So plaintiff, so the fact that plaintiff's

13 trying to inquire through this line of questioning

14 into subjective motives of Officer Cadavid on the day

15 in question are entirely irrelevant for purposes of

16 his claims at this issue.

17         THE COURT:  Thank you.  Mr. Rattray, I'll give

18 you two minutes.

19         THE PLAINTIFF:  Yes, Your Honor. Officer

20 Cadavid had made, had answered a question posed about

21 his personal experience, mother, father, brother,

22 sister, with domestic violence, and Officer Cadavid

23 stated he had no such knowledge or no such experience.

24 Documentation, documents provided by counsel,

25 defendant's counsel, indicate a history with domestic

```
 1                        PROCEEDINGS
 2   incidents in his police report.  Plaintiff was
 3   attempting to ask Officer Cadavid about that incident
 4   or that history to understand how that impacted his
 5   personal ability to be objective in that situation.
 6   Officer Cadavid said no, which contradicted the
 7   evidence that plaintiff was looking at.  Plaintiff
 8   also did a search and understood that Officer Cadavid
 9   had made public statements about ongoing domestic
10   incidents with his sister, and so plaintiff was
11   attempting to ask Officer Cadavid about those publicly
12   available statements that he made regarding an
13   incident earlier this year in High Point, North
14   Carolina, and simply asking him about his own
15   statements. And that's where the train left the rails,
16   and counsel objected and stopped the inquiry.
17            THE COURT:  So I have --
18            MR. UDALOV:  Your Honor, if I --
19            THE COURT:  I've heard enough. I've reviewed
20   the information submitted and under the Federal Rules
21   of Civil Procedure, Rule 26(B)(1), parties are
22   entitled to discovery on matters that are relevant to
23   the claims and defense and proportional to the needs
24   of the case. And Rule 26(C)(1) also provides for the
25   ability for a party to apply for a protective order,
```

```
 1                          PROCEEDINGS
 2   and a Court may, for good cause, issue a protective
 3   order to protect the party or person from annoyance,
 4   embarrassment, oppression, undue burden and expense.
 5   And when determining whether such a protective order
 6   is appropriate, the Court considers the evidence of
 7   annoyance, embarrassment, oppression or undue burden
 8   and expense, how central or tangential the evidence
 9   sought is in relation to the central issues in the
10   litigation, the importance of the issues in the
11   litigation to the public, the parties' stakes in the
12   outcome of a litigation, whether the evidence sought
13   is available from other sources, and whether the
14   discovery of evidence can be conditioned on terms that
15   would alleviate the hardship in producing it.
16           Here, in considering all of these factors, I
17   find that the protective order should be granted and
18   no further questioning should be permitted of Officer
19   Cadavid on this topic.  It is a personal matter and
20   there is no legitimate basis to inquire into it. It's
21   not relevant to the claims and defenses and, further,
22   I think it's a completely inappropriate line of
23   questioning. So for that reason, the motion for a
24   protective order is granted, and for the same reason,
25   plaintiff's request to complete the deposition of
```

```
 1                        PROCEEDINGS
 2   Officer Cadavid is denied.
 3              THE PLAINTIFF:  Your Honor, Your Honor, one
 4   point of clarification, if I may?
 5              THE COURT:  Yes.
 6              THE PLAINTIFF:  Just to clarify, plaintiff was
 7   not asking Officer Cadavid for plaintiff's own
 8   pleasure.  Plaintiff was simply making a statement or
 9   requesting of Officer Cadavid that he had made a
10   statement that was demonstrably false.
11              THE COURT:  It's not, it's not relevant to
12   this matter and I've heard enough. I'm not hearing any
13   more.  This is completely irrelevant and it is,
14   frankly, cruel to be asking Officer Cadavid about
15   this. And so I'm not going to hear any more on this.
16              The second, the second issue has to do with
17   deposing officer Trigueno via Zoom or video, but with
18   an out of state court reporter. Rule 28 in the Rules
19   of Civil Procedure states that, "If there is, within
20   the United States," which is where we are, "a deposition
21   may be taken before an officer authorized to administer
22   oaths either by federal law or by the law in the place of
23   examination, or a person appointed by the Court where the
24   action is pending to administer oaths and take testimony."
25   Rule, the first part that I read is what applies here so,
```

```
 1                           PROCEEDINGS
 2   Mr. Rattray, is the court reporter that your proposing to
 3   use authorized to administer oaths by federal law or New
 4   York law?
 5            THE PLAINTIFF:  Your Honor, I believe that
 6   court reporter to be a federally, a federal, a, I
 7   won't say federal, but a member of the Court Reporters
 8   Association and capable of conducting a deposition
 9   across the nation, except for states that have
10   specific requirements for licensures within those
11   specific states. I do not have yet in my possession
12   the documents to support that.
13            THE COURT:  Well, the rule 28(A)(1)(a) and if,
14   in fact, the court reporter satisfies the requirements
15   of Rule 28(A)(1)(a) then it is appropriate, otherwise
16   the court reporter is not appropriate. The person to
17   be the reporter has to satisfy the requirements of
18   that rule.   So if you don't know, you've got to find
19   out or get somebody else who does satisfy that rule,
20   Mr. Rattray.
21            THE PLAINTIFF:  Understood, Your Honor.
22   Plaintiff is attempting to retrieve the actual
23   documents. I've been assured verbally by the agency
24   that that reporter is certified, however, I don't have
25   the documents bearing proof to be able to provide to
```

```
 1                        PROCEEDINGS
 2  the Court as yet.
 3          THE COURT:  You don't need to provide it to
 4  the Court, you are going to have to provide it to the
 5  defendants. I take it that defendants are questioning
 6  the certification, is that correct?
 7          MR. UDALOV:  Yes, Your Honor, and it was based
 8  on the initial, there was, the court reporter was
 9  apparently in Canada and that's when the issues that
10  arose that we addressed, I believe in the letter that
11  we submitted on September 13th.
12          THE COURT:  Well, if somebody, in this day and
13  age of Covid and remote depositions, I don't know if
14  the person, if the person happens to be in Canada but
15  is otherwise authorized --
16          MR. UDALOV:  Your Honor, that particular
17  stenographer, Your Honor, she was not, not in New York
18  and not anywhere in the United States. That was
19  according to what the stenographer told us during, during,
20  I believe this was on August 20, 2021.
21          THE PLAINTIFF:  To, Your Honor, if I may, to
22  clarify the situation, the, there were two
23  depositions, one of Officer Trigueno and one of
24  Officer Cadavid. The first time we tried to, we tried
25  to depose Officer Cadavid, the court reporter was not
```

```
 1                              PROCEEDINGS
 2   challenged at the time.  Subsequent to that,
 3   subsequent to that deposition, we attempted to depose
 4   Officer Trigueno.  That court reporter was an out of
 5   state person and, in fact, not in the United States and
 6   was not licensed in the United States.  We ended that
 7   attempt and rescheduled with a different court reporter on
 8   a different date and then we were able to get a certified
 9   court reporter.  So the, and that's where the issue came
10   up, the questions came up around the first deposition.
11   Those questions were not raised at the time, but because
12   of the issue with the second deposition, that cased
13   defendants to then raise questions about, well, who was
14   the first court reporter. And so we're trying to get that
15   information now.
16              MR. UDALOV:  Yes, Your Honor, and with respect
17   to the first, during the deposition of Officer
18   Cadavid, we believe that the stenographer was licensed
19   in Ohio and not in New York, and we don't have
20   information whether that stenographer was federally,
21   was allowed (indiscernible) under federal law. So we
22   don't have that information yet, we were only able to
23   find that out after we received the transcript of the
24   deposition of Officer Cadavid.
25              THE COURT:  Well the person needs to be
```

```
 1                          PROCEEDINGS
 2   authorized either by federal law or the place of
 3   examination.  So that's the rule.  I'm going to assume
 4   that you are going to follow it with respect to the
 5   remaining depositions and if there's a problem you can
 6   bring it to my attention.  But I'm going to consider
 7   this resolved and assume, Mr. Rattray, that you will
 8   follow that rule in terms of who engage to be the
 9   court reporter.
10          THE PLAINTIFF:  Yes, Your Honor.
11          THE COURT:  Now, the last thing is, Mr.
12   Rattray, you've asked to amend the complaint again,
13   but the period for amending pleadings has long passed.
14   And in order to justify filing an amended complaint,
15   you have to demonstrate good cause for amending it
16   now.  Whether good cause exists largely turns on the
17   diligence of the moving party and I am not sure why
18   you think at this point it is appropriate to amend,
19   again, when discovery is basically nearly complete.
20          THE PLAINTIFF:  Your Honor, plaintiff is still
21   receiving documents from defendants and did not have
22   access to these documents during, for most of discovery,
23   during the deposition an additional document popped up
24   that was quite helpful.  Plaintiff is still reviewing
25   the information before him, but plaintiff sees now the
```

1                           PROCEEDINGS

2   culpability, if you will, at least by plaintiff's

3   belief, the record, the records that defendants have

4   produced have shown that the City of New York knew or

5   should have known that these officers were not

6   performing their duties, that they needed to be

7   trained properly or additionally and, in fact, had on

8   some occasions disciplined them for failing to make

9   memo entries, as we see in this case.  You know,

10  having retaliatory arrests as we allege in this case,

11  or unlawful arrests, but a litany of constitutional

12  violations in their record going back several years.

13  And we also have documents from supervisors or folks

14  who are in a supervisory role stating that their job

15  is not to, you know, supervise or review documents

16  just simply to make sure that boxes are filled in and

17  they attest to that in the record. That information,

18  plaintiff believes, you know, is sufficient to plead

19  municipal liability in this this case.  But, again,

20  those documents were not available.

21          THE COURT:  Okay, I'd like to hear from

22  defendant regarding the good cause standard.

23          MR. UDALOV:  Your Honor, we believe there is

24  no good cause right now to amend the complaint.  The

25  issues in this case revolve around plaintiff's alleged

PROCEEDINGS

1

2   false arrest and unlawful entry into his apartment.

3   What plaintiff is talking about now with respect to

4   documenting or recording records, that is, that does

5   not, one, address the issues in this case, and is not

6   relevant for purposes of whether the officers' actions

7   were objectively reasonable.

8           Additionally, we have filed a motion also on

9   September 24th outlining our position as the plaintiff

10  has not pled, has not stated any (indiscernible) like

11  a policy or custom with respect to the issues in this

12  case.  Same thing with, and respect to -- yes, Your

13  Honor, sorry, I apologize, Your Honor, just looking at

14  my documents right now.

15          Additionally, this incident, Your Honor,

16  revolves around, it last approximately an hour.  What

17  plaintiff was alleging with respect to thinking that

18  his, the DIR report wasn't sufficiently complete in

19  this case, and also right now I'm not entirely sure as

20  to which documents that plaintiff was referring to.

21  When he's saying that he just received the one, the

22  one that I believe he's referring to that he received

23  at the deposition, a recent deposition of Officer

24  Trigueno was a carbon copy of the DIR report that we

25  already provided him.  And, additionally, based on

PROCEEDINGS

1
2    plaintiff merely saying that he believes that the DIR

3    report or something was not according to what she

4    thinks that the events should have been recorded as,

5    that does not rise to the level of a constitutional

6    violation in this case.

7            And I believe also, Your Honor, with respect

8    to the disciplinary records, I mean plaintiff had them

9    already as far as I believe he received those

10   disciplinary records in this case, I apologize again,

11   I'm looking at the records of when we sent this, I

12   believe initial disclosures, they were earlier on this

13   year, and I know with respect to the supplemental

14   disclosures, I think he's had them at least since

15   August of this year. So I think with all the issues

16   that he's raising, now addressing, especially when we

17   are already completing depositions and it's been so

18   close to discovery already concluding, that it's

19   entirely inappropriate. There is no good cause right

20   now to amend the complaint a fourth time.

21           THE COURT: Okay. I'm just taking a look at

22   the docket here because right now, let me just see

23   here --

24           THE PLAINTIFF: Your Honor, if I may, just to

25   clarify some things that were not --

                              PROCEEDINGS

1

2          THE COURT:  I'm a little bit unclear about

3   this.  I already issued a report and recommendation

4   earlier this year with respect to an amendment, so I'm

5   not sure how what's being proposed differs from that.

6   Mr. Scheiner, if you want to provide any

7   clarification?

8          THE PLAINTIFF:  This is Mr. Rattray.

9          MR. SCHEINER:  Well, Your Honor, this is Alan

10  Scheiner.  I mean my, Mr. Udalov might have more

11  background on this, but you are correct that

12  previously you rejected an attempt to sue the City in

13  this case.  And in our view there is nothing, nothing

14  new here, this is just a new attempt to do exactly the

15  same thing. Mr. Rattray's theory is that the City

16  should have I guess fired or disciplined Officer

17  Cadavid sooner or should have intervened in this

18  particular case, as I understand his allegations, as

19  it was going on.  But those allegations relate to this

20  particular person in this particular incident, they

21  don't relate to a policy or practice which he has not

22  demonstrated, and which he doesn't, you know, have

23  allegations so support.

24          So in addition to this being, you know, very

25  late in the day, and also the plaintiff did have

```
1                        PROCEEDINGS
2  discovery of a disciplinary record prior, there were I
3  think two rounds of discovery with respect to
4  disciplinary records, but there was the initial one
5  and then a secondary one, but I don't think there is
6  anything very new that justifies this late round, this
7  late attempt to amend because there is no new evidence
8  of any policy or practice which is what is required.
9          Also, I want to mention that, of course, a
10 Monell claim requires an underlying constitutional
11 violation.  And we believe that there's already
12 sufficient record for summary judgment on the
13 underlying constitutional claim and many Courts have
14 bifurcated discovery and bifurcated claims because the
15 expense and burden of a Monell claim is, you know,
16 oftentimes greater than that related to the underlying
17 claim. And if the underlying claim is invalid, there's
18 no need to even address Monell issues.
19          Here we think that the facts which are
20 undisputed, despite disputes about irrelevance
21 matters, the basic underlying facts are undisputed.
22 Mr. Rattray, the mother of Mr. Rattray's daughter
23 called the police and told the police in person that
24 she felt that her daughter's life was in danger
25 because she could not find her she believed her
```

| | PROCEEDINGS |
|---|---|
| 1 | |
| 2 | daughter to be with Mr. Rattray.  The police went to |
| 3 | his apartment to question him and try to ascertain |
| 4 | whether the daughter was safe.  When they questioned |
| 5 | him, he refused to answer their questions and he |
| 6 | refused to allow them in the apartment. That is |
| 7 | undisputed. So in order to find out if she was in |
| 8 | there and safe - |
| 9 | THE PLAINTIFF:  I object, Your Honor -- |
| 10 | MR. SCHEINER:  May I finish, Your Honor, |
| 11 | please? |
| 12 | THE COURT:  Hang on, Mr. Rattray, I'll let you |
| 13 | speak after Mr. Scheiner's done. |
| 14 | MR. SCHEINER:  So that much is undisputed, |
| 15 | that he did not answer their questions, he did not let |
| 16 | them in.  And Officer Cadavid and Officer Trigueno |
| 17 | both believe that in order, that this was an exigent |
| 18 | circumstance and they had to find out whether the |
| 19 | daughter was, in fact, there and whether she was safe. |
| 20 | So Officer Cadavid went in and looked around. That's |
| 21 | all he did is he looked around.  And Mr. Rattray was |
| 22 | never placed in handcuffs, he was never in police |
| 23 | custody, and this whole incident, this whole back and |
| 24 | forth took no more than an hour, if that. I think |
| 25 | there is some dispute about how long, but the point |

1                          PROCEEDINGS

2  is, is that Mr. Rattray had an interaction with police

3  at his apartment.  Because Mr. Rattray objects to

4  this, we have spent many, many hours in discovery,

5  including many hours in which Mr. Rattray has asked

6  irrelevant questions and oppressive questions and, as

7  Your Honor observed, cruel questions, attempting to,

8  in my opinion, gain some vindictive, you know,

9  vindictive pleasure out of torturing these officers

10  who went to his apartment in order to protect his own

11  daughter. And we think that these facts are clear

12  enough that these officers are entitled to dismiss all

13  of the case, you know, at least, you know, under

14  grounds, under constitutional grounds as well as

15  qualified immunity, if not, you know, the basic

16  underlying constitutional grounds.  And, therefore,

17  that, you know, there is no need to go any further

18  with the matter.

19          So I think that although I think the amendment

20  is ill timed and there is no actual, and it would be

21  futile based on the plaintiff's own version of his

22  case, that Your Honor need not even reach that

23  question now.  Because if Your Honor were to hear a

24  summary judgment motion now, I think that you would

25  determine that there is no underlying constitutional

| 1 | PROCEEDINGS |

```
 1                        PROCEEDINGS
 2  violation and, therefore, there is no need to go any
 3  further.
 4            THE COURT:  Okay, thank you.  Mr. Rattray,
 5  I'll let you respond.
 6            THE PLAINTIFF:  Your Honor, plaintiff
 7  strenuously objects to any motion for summary judgment
 8  or dismissal at this stage.  Given the recent Caniglia
 9  v. Strom ruling on police, on warrantless searches,
10  plaintiff feels strongly that there is sufficient
11  evidence here.  One is of particular note, plaintiff
12  objects to defense counsel's allegation that the
13  mother told Officer Cadavid that that is an undisputed
14  fact, that is entirely disputed.  Plaintiff has only
15  in deposition heard Officer Cadavid speak of mother
16  said, mother told him that child's life was in danger.
17  That is, when we were in the deposition was the first
18  time that came up.
19            Officer Cadavid went on to embellish that the
20  mother told him that I used drugs, that I have drug
21  dealers over the house. In fact, the description that
22  Officer Cadavid gives the plaintiff more fits the
23  person who was his sister's partner than it fits
24  plaintiff. And, Your Honor, I know in embarked on
25  bringing that particular incident up, but that is an
```

PROCEEDINGS

1

2  observation that plaintiff has only recently through

3  reading through the deposition observed and feel is

4  relevant to this matter. This entire case will rest on

5  Officer Cadavid's credibility and when he makes

6  statements that are not in line with the evidence, the

7  documents that he produced over, or that his partner

8  produced over time, I feel his credibility is at stake

9  here.

10        Plaintiffs would also ask the Court leave to

11  depose the mother in the case so that we could get her

12  statement of what she told Officer Cadavid. Officer

13  Cadavid's partner has made statements that are

14  inconsistent with Officer Cadavid's in that she did

15  not hear the mother say that the child was in danger.

16  Officer Cadavid has testified under oath that he, he,

17  the mother told him that, and his partner, that the

18  child's life was in danger. So I think those issues

19  need to be resolved.

20        And in the, you know, plaintiff's explanation

21  of the incident, as outlined in the third amended

22  complaint, appendix L, you know, the interview with

23  the Internal Affairs Bureau clearly shows that the

24  City of New York officer held in his understanding of

25  when officers are allowed to do searches in his mind,

```
 1                    PROCEEDINGS
 2  that, that officers were allowed to search,
 3  regardless, as long as there is someone who calls 911.
 4  And he explains that to plaintiff during his
 5  investigation at plaintiff's home. That is in, again,
 6  Appendix L or Appendix 2, Item L of the third amended
 7  complaint, Your Honor.  And plaintiff believes that
 8  that is sufficient to justify and to demonstrate
 9  municipal liability, that there is a pattern and
10  practice of NYPD of how they handle domestic incidents
11  and how they investigate and discipline their
12  officers.
13             THE COURT:  So I think that what I haven't
14  heard is good cause for amending the complaint, yet
15  again, to add a claim that I already found was not
16  supported. It doesn't sound like there is any new
17  evidence that would support this proposed amendment
18  and I'm not going to permit another amendment to the
19  pleading.
20             There's the remaining deposition that is going
21  to occur, I guess of Officer Trigueno, what is, when
22  can that be taken?
23             MR. SCHEINER:  Your Honor, this is Alan
24  Scheiner, we already actually had the deposition of
25  Officer Trigueno, if I could clarify something about
```

1                          PROCEEDINGS

2    the issue of the court reporter's credentials. The

3    court reporter for Officer Trigueno who appeared

4    actually had, was credentialed in New York, so they

5    were able to conduct the deposition in New York.  So

6    there is no dispute about that.  What we found when we

7    got a transcript of the deposition of Officer Cadavid,

8    was that that court reporter was licensed in Ohio. And

9    when we learned that, we raised an objection in our

10   submissions to the Court to that transcript and the

11   further use of it because we learned, as soon as we

12   learned that they were not admitted in, or rather

13   licensed in New York.  It simply did not come up at

14   the deposition and it, you know, it's never been an

15   issue in the past as to where, court reporters

16   generally know that they should be licensed in the

17   place where the deposition is being taken, so that is

18   not something that is not normally inquired into at

19   the time of the deposition, but as soon as we learned

20   of it we raised it.

21           But putting that aside for the moment, in our

22   view there are no further depositions to be taken

23   because we think the matter is ripe for summary

24   judgment. Now the plaintiff has just raised his

25   request to depose the mother who spoke to the police,

1                              PROCEEDINGS

2    and, you know, she is a witness to what she told the

3    police. So, you know, I can't object and say she's not

4    a relevant witness, I wasn't aware, however, that he

5    wanted to depose her and I don't know if she's on his

6    disclosures, initial disclosures as a witness that he

7    intends to call at trial. So, you know, we would

8    object on that basis if she is not.

9           THE COURT:  Mr. Rattray, did you list your

10   former wife or your child's mother as a witness?  Mr.

11   Rattray, I can't hear you, you may be on mute.

12          THE PLAINTIFF:  Yes, Your Honor, apologize. I

13   believe I listed everyone that I was aware of having,

14   having there, but I may have presumed that she was, of

15   course, the complainant and, therefore, would be a

16   witness and accessible. But plaintiff would need to

17   look up that document, Your Honor.

18          THE COURT:  So you don't know?  I mean you

19   should have known that she's a witness because that's

20   the person who made the complaint, so I think you had

21   plenty of time to depose her if you wanted to.

22   Nevertheless, in light of your pro se status, I'll

23   permit you thirty days from today to complete the

24   deposition of the child's mother. And, again, the

25   court reporter, whoever you get to do the transcript,

```
 1                      PROCEEDINGS

 2   has to, you know, has to be certified consistent with

 3   the Federal Rule 28.

 4             THE PLAINTIFF:  Understood, Your Honor.

 5             THE COURT:  I am only extending discovery for

 6   this one purpose, this one deposition, otherwise

 7   discovery is complete.

 8             MR. SCHEINER:  Your Honor, if I may ask,

 9   obviously I do not represent that witness, I have no

10   intention to, but in our view Mr. Rattray has

11   unreasonably extended the length of depositions, asked

12   invasive and oppressive and irrelevant questions, and

13   we'd like to ask that a judicial officer be present

14   for that deposition for the protection of the witness

15   from harassment and general regulation of the

16   proceedings and limiting them to a proper and

17   questioning and relevant matter.  They have an ongoing

18   dispute, Your Honor.

19             THE COURT:  What I am going to do is I am

20   going to put a time limit on the deposition. The time

21   limit will be one hour.

22             THE PLAINTIFF:  Thank you, Your Honor.

23             THE COURT:  And the deposition questions must

24   focus on the report to the police and nothing else.

25   That's the only thing that you're permitted to
```

1                          PROCEEDINGS

2   question the witness about. It should take less than

3   an hour actually.  Do you understand, Mr. Rattray?

4              THE PLAINTIFF:  I understand, Your Honor.  I,

5   I will object to defendant counsel's characterization

6   of my questions as cruel.  Plaintiff never asked the

7   officer about his deceased relatives, plaintiff simply

8   asked him if he had ever had any experience with that,

9   because that is an item that is in the, the

10  supplemental disclosures that they had recently

11  provided to plaintiffs.  And he made a, he

12  contradicted that document and plaintiff went to pull

13  up a recording where he, himself, had said something

14  to the contrary.

15             THE COURT:  I don't need to hear anything

16  else. I don't need to hear anything else on this. I'm

17  going to grant your request to take a maximum of one

18  hour of a deposition of the child's mother and it

19  should, your questions must focus on what was reported

20  to the police. That is the only thing that is

21  relevant, what was reported to the police, do you

22  understand, Mr. Rattray?

23             THE PLAINTIFF:  Your Honor, I would like to

24  clarify, reported to the police, including the 911

25  call to the dispatch and what was said to the Officers

```
 1                        PROCEEDINGS
 2   Cadavid, Trigueno and Koch after they returned
 3   downstairs --
 4           THE COURT:  Yes.
 5           THE PLAINTIFF:  Before they came upstairs and
 6   before they arrived at the scene, is that correct?
 7           THE COURT:  Yes, that's what you may ask her
 8   about.
 9           THE PLAINTIFF:  Thank you.
10           THE COURT:  Okay.  So this means that all
11   discovery will be completed by the end of October, how
12   long will defendants need to file a motion for summary
13   judgment after that?
14           MR. SCHEINER:  Thirty days, Your Honor.
15           THE COURT:  Okay, a motion for summary
16   judgment will be due on November 30th.
17           MR. SCHEINER:  Well because of Thanksgiving,
18   Your Honor, if I could ask for an additional week
19   after that?
20           THE COURT:  So you want to do it December 6th?
21           MR. SCHEINER:  Yes, Your Honor.
22           THE COURT:  All right.  And in light of your
23   pro se status, Mr. Rattray, I will give you, and also
24   the holidays, I'm going to give you until January 28th
25   to respond, to file an opposition to the motion for
```

1                          PROCEEDINGS

2  summary judgment, and the reply will be due February

3  16th.  I'll put this schedule in an order.

4          Okay, anything further from plaintiff?

5          THE PLAINTIFF:  Nothing further, Your Honor.

6  There were several statements made during the

7  deposition of Officer Cadavid that would have required

8  an additional written response from his supervisors,

9  specifically what he told his supervisor, and the

10  investigating NYPD officer regarding what he wrote,

11  which conflicts again with what the discussion he and

12  I had in Appendix L.  If Your Honor would allow those

13  written, written depositions or written requests for

14  information, plaintiff would appreciate that.

15          THE COURT:  No, there is no more discovery.

16  You've had plenty of time to conduct discovery.

17          All right, anything further from defendants?

18          THE PLAINTIFF:  No, just outlining, Your Honor,

19  that plaintiff, again, did not have access to these

20  documents until recently and didn't have access to

21  statements from the defendants until, in deposition,

22  until recently.

23          MR. SCHEINER:  Your Honor, if it's not clear,

24  that was the plaintiff who was just speaking.  There

25  is nothing further from defendants, Your Honor.

```
 1                          PROCEEDINGS
 2             THE COURT:  Okay, great.  Thank you, everyone,
 3   I'll issue an order today with the schedule.  Have a
 4   good day.
 5                  (Whereupon, the matter is adjourned.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

30

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of Wentworth Rattray

v. Cadavid, et al., Docket #17cv8560, was prepared using

digital transcription software and is a true and accurate

record of the proceedings.

Signature:      *Carole Ludwig*

                    Carole Ludwig

Date:      October 4, 2021

## JURY INSTRUCTIONS - (Dkt 277)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WENTWORTH RATTRAY,

                 Plaintiff,

      v.                                 17 Civ. 8560 (PGG)

POLICE OFFICER JOSE CADAVID
(BADGE NO. 9085) and POLICE
OFFICER ALYSSA TRIGUENO,

                 Defendants.

**<u>JURY INSTRUCTIONS</u>**

September 1, 2023

## I.    GENERAL INSTRUCTIONS

### A.    Introductory Remarks

Members of the jury, I will now instruct you as to the law that governs this case. You have been handed a copy of the instructions I will read.  Please read along with me.  You will be able to take your copy of the instructions into the jury room.

You have heard all of the evidence in the case as well as the final arguments of the lawyers.  You have paid careful attention to the evidence, and I am confident that you will act together with fairness and impartiality to reach a just verdict.

There are three parts to these instructions.  First, there are general instructions about your role, and about how you are to go about deciding the factual issues in this case.  I will then instruct you as to the law that applies to the specific claims in this case.  Finally, there are more general instructions about such matters as communications with the Court, about deliberations, and about returning a verdict.

It is important that you listen carefully.  I'm reading these instructions from a prepared text because the law is made up of words that are very carefully chosen.  This is not a time to ad lib.  So when I tell you what the law is, it is critical that I use exactly the right words.

### B.    Role of the Court

My duty is to instruct you on the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.  With respect to legal matters, you must take the law as I give it to you.  If any attorney has stated a legal principle different from any that I state to you in my instructions, it is my instructions that you must follow.

You are to consider these instructions together as a whole; in other words, you are not to isolate or give undue weight to any particular instruction.  You must not substitute your own notions or opinions of what the law is or what you think it ought to be.

C.    **Role of the Jury**

As members of the jury, you are the sole and exclusive judges of the facts. You decide what happened. You must determine the facts based solely on the evidence received in this trial. Any opinion I might have regarding the facts is of absolutely no consequence.

D.    **Role of Counsel**

The personalities and the conduct of counsel in the courtroom are not in any way at issue. If you formed an opinion of any kind as to any of the lawyers in the case, favorable or unfavorable, whether you approved or disapproved of their behavior as advocates, that should not enter into your deliberations at all.

From time to time, the lawyers and I had conferences at the bench and other conferences out of your hearing. These conferences involved procedural and evidentiary matters, and should not enter into your deliberations at all.

Lawyers have a duty to object when the other side offers testimony or other evidence that the lawyer believes is not admissible. It is my job to rule on those objections. Why an objection was made is not your concern. You should not draw any inference simply from the fact that a lawyer objects to a question. If I sustained the objection, you may not consider the testimony or exhibit at issue; if I overruled the objection, you should consider the testimony or exhibit just as you would any other evidence in the case.

E.    **Sympathy or Bias**

You must evaluate the evidence calmly and objectively, without prejudice or sympathy. You must be completely fair and impartial. Your verdict must be based solely on the evidence presented at this trial, or the lack of evidence. Our system of justice cannot work unless you reach your verdict through a fair and impartial consideration of the evidence.

You may not consider, in deciding the facts of the case, any personal feelings you

4

may have about the race, national origin, sex or age of any party or witness.  You must regard the parties as of equal standing in the community, and of equal worth.  All parties are entitled to the same fair trial at your hands.  They stand equal before the law, and are to be dealt with as equals in this court.

### F.   **Burden of Proof**

The preponderance of the evidence standard applies to all disputed issues in this case.

To establish by a preponderance of the evidence means that the evidence of the party having the burden of proof must be more convincing and persuasive to you than the evidence opposed to it.  A preponderance of the evidence means the greater weight of the evidence.  The difference in persuasiveness need not be great:  it requires only that you find that the scales tip, however slightly, in favor of the party having the burden of proof – that what that party claims is more likely than not true.  If you find that the credible evidence as to a particular issue is evenly divided, then you must find in favor of the party not having the burden of proof.

What is important here is the quality and persuasiveness of the evidence relied on by a party, and not the number of witnesses, the number or variety of the exhibits that party introduced, or the length of time that party spent on a particular subject.  In determining whether any fact has been proven by a preponderance of the evidence, you may consider the testimony of the witnesses, the exhibits received in evidence, and any stipulated facts, regardless of which side introduced this evidence.  Simply because I have permitted certain evidence to be introduced does not mean that I have decided that it is important or significant.  That is for you to decide.

G.    **What Is and Is Not Evidence**

In determining the facts, you must rely upon your recollection of the evidence. The evidence in this case includes the testimony of the witnesses and the exhibits received in evidence.

As I instructed you at the outset of the trial, you are not to consider questions asked by the lawyers as evidence. It is the witnesses' answers that are evidence, not the questions. The questions are significant only insofar as they put the answers in context.

From time to time, I asked witnesses questions. You should draw no inference from that. My questions were only intended for clarification or to expedite matters, and were not intended to suggest any opinion on my part as to whether any witness was more or less credible than any other witness, or any view as to what your verdict should be.

If I struck or excluded testimony, you may not consider that testimony in rendering your verdict.

To constitute evidence, exhibits must first be received in evidence. Exhibits marked for identification but not admitted are not evidence, nor are materials that were used only to refresh a witness's recollection.

Arguments by the lawyers are not evidence, because the lawyers are not witnesses. What they have said to you in their opening statements and in their closing arguments may help you understand the evidence and assist you in reaching a verdict, but these arguments are not evidence. Moreover, if your recollection of the evidence differs from the statements made by the lawyers in their arguments to you, it is your recollection that controls.

Finally, any statements that I may have made during the trial do not constitute evidence. Similarly, any statements or rulings I have made during the trial, are not any indication of my views as to what your decision should be. The decision here is for you alone.

6

It is for you alone to decide what weight, if any, should be given to the testimony and the exhibits received in evidence in this case.

**H.**     **Direct and Circumstantial Evidence**

Generally, there are two types of evidence that you may consider in reaching your verdict.

Direct evidence is testimony by a witness about something he or she knows by virtue of his or her own senses – something seen, felt, touched, or heard.  For example, if a witness were to testify that when he or she left home this morning, it was raining, that would be direct evidence about the weather.  Direct evidence may also be in the form of an exhibit.

Circumstantial evidence is evidence from which you may infer the existence of certain facts.  For example, assume that when you came into the courthouse this morning the sun was shining and it was a nice day.  Assume that the courtroom blinds are drawn and you can't look outside.  As you are sitting here, someone walks in with an umbrella, which is dripping wet.  A few minutes later another person enters with a wet raincoat.  Now, you can't look outside the courtroom and see whether it is raining.  So you have no direct evidence of that fact.  But based on the facts that I have asked you to assume, you could conclude that it had been raining.

That is all there is to circumstantial evidence.  On the basis of reason, experience, and common sense, you infer from one established fact the existence or non-existence of some other fact.

The matter of drawing inferences from facts in evidence is not a matter of guesswork or speculation.  A proper inference is a logical, factual conclusion that you might reasonably draw from other facts that have been proven.  It is often the case that material facts – such as what a person was thinking or intending – are not easily proven by direct evidence.  Proof of such matters is often established by circumstantial evidence.

Circumstantial evidence is of no less value than direct evidence.

## I.   <u>Witness Credibility</u>

You should evaluate the credibility or believability of the witnesses by using your common sense.  Common sense is your greatest asset as a juror.  Ask yourself whether the witness appeared honest, open and candid.  Did the witness appear evasive or as though he or she was trying to hide something?  How responsive was the witness when questioned by opposing counsel as compared to that witness's responsiveness when questioned by his own lawyer?

If you find that any witness lied under oath, you should view the testimony of that witness cautiously and weigh it with great care.  It is for you to decide, however, how much of that witness's testimony, if any, you wish to believe.  Few people recall every detail of every event precisely the same way.  A witness may be inaccurate, contradictory, or even untruthful in some respects, and yet entirely believable and truthful in other respects.  It is for you to determine whether such inconsistencies are significant or inconsequential, and whether to accept or reject all, or to accept some and reject the balance of, that witness's testimony.

In sum, it is up to you to decide whether a witness's testimony is truthful and accurate, in part, in whole, or not at all, as well as what weight, if any, to give to that witness's testimony.

In evaluating the testimony of any witness, you may consider, among other things:

- the witness's intelligence;

- the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

- the witness's memory;

- any interest, bias, or prejudice the witness may have;

- the manner of the witness while testifying; and

8

- the reasonableness of the witness's testimony in light of all the evidence in the case, including testimony from other witnesses and the exhibits that have been received in evidence.

**J.    Prior Inconsistent Statements**

You have heard evidence that, at some earlier time, witnesses have said or done something that counsel argues is inconsistent with their trial testimony.

Evidence of prior allegedly inconsistent statements was introduced to help you decide whether to believe the trial testimony of a witness. If you find that a witness made an earlier statement that conflicts with the witness's trial testimony, you may consider that fact in deciding how much of the witness's trial testimony, if any, to believe.

In making this determination, you may consider whether the witness purposely made a false statement or whether it was an innocent mistake; whether the inconsistency concerns an important fact, or whether it had to do with an insignificant detail; whether the witness had an explanation for the inconsistency, and whether that explanation accords with your common sense.

It is exclusively your decision, based upon all the evidence and your own good judgment, whether the prior statement was inconsistent, and if so how much weight, if any, to give the inconsistent statement in determining whether to believe all, part of, or none of that witness's testimony.

**K.    Bias of Witnesses**

In deciding whether to believe a witness, you should consider any evidence that the witness is biased in favor of, or against, one side or the other. Likewise, you should consider evidence of any interest or motive that the witness may have in cooperating with one side or the other. You should also take into account any evidence that a witness may benefit in some way

from the outcome of the case.

It is your duty to consider whether any witness has permitted bias or interest to color his or her testimony. If so, you should view that witness's testimony with caution, weigh it with great care, and subject it to close and searching scrutiny.

Of course, the mere fact that a witness has an interest in the outcome of this case does not mean that the witness has not told the truth. It is for you to decide from your observations and applying your common sense and life experience whether the possible interest of any witness has intentionally or otherwise colored or distorted that witness's testimony. You are not required to disbelieve a witness with an interest in the outcome of this case; you may accept as much of that witness's testimony as you deem reliable and reject as much as you deem unworthy of acceptance.

## II.    INSTRUCTIONS AS TO SPECIFIC CLAIMS

I will now turn to the law that governs the specific claims in this case.

### A.    The Parties

As you know, the plaintiff in this case is Wentworth Rattray.

The defendants are Officers Jose Cadavid and Alyssa Trigueno of the New York City Police Department.

As I have said, all of the parties here are entitled to the same consideration by you. The fact that the defendants are police officers does not mean that they are entitled to any greater or lesser consideration by you. Again, all parties stand equal before the law.

You will be asked to render a separate verdict as to each defendant. Accordingly, you must consider separately, as to each defendant, whether Mr. Rattray has proven his claims by a preponderance of the evidence. Each defendant is entitled to have the claims against him or her decided on the basis of their own acts, statements, and conduct.

**B.    Section 1983 Claim[1]**

Mr. Rattray's claims are brought under a federal civil rights statute, Title 42, United States Code, Section 1983.  This statute provides a remedy for individuals who have been deprived of their constitutional rights by a person acting under color of state law.

Mr. Rattray has brought the following claims under Section 1983:

1.    an unlawful search claim against Officer Jose Cadavid;

2.    a false arrest claim against Officer Cadavid;

3.    a failure to intervene claim against Officer Allyssa Trigueno related to the unlawful search claim against Officer Cadavid; and

4.    a failure to intervene claim against Officer Trigueno related to the false arrest claim against Officer Cadavid.

The Defendants deny all of Mr. Rattray's claims.

Section 1983 states that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . .

To establish a Section 1983 claim, a plaintiff must prove, by a preponderance of the evidence, each of the following three elements:

First, that the acts complained of were committed by a defendant acting under color of state law;

Second, that in committing these acts, the defendant intentionally or recklessly deprived the plaintiff of a right secured by the Constitution or laws of the United States; and

---

[1] Based on the jury charge in <u>Allen v. Williams et al.</u>, 16 Civ. 3403 (PGG) (April 2019) and <u>Myers v. Moore et al.</u>, 13 Civ. 1006 (PGG) (July 2018).

<u>Third</u>, that the defendant's acts were the proximate cause of injuries sustained by the plaintiff.

I will now discuss each of these three elements in detail.

1.      **<u>First Element – Acting Under Color of State Law</u>**[2]

The first element of a Section 1983 claim is that the conduct complained of was committed by a defendant acting under color of state law.  Here, it is undisputed that the Defendants – as officers of the New York City Police Department – were acting under color of state law.

2.      **<u>Second Element – Deprivation of a Federal Right</u>**[3]

The second element of a Section 1983 claim is that the defendant you are considering, in committing the conduct complained of, intentionally or recklessly deprived Mr. Rattray of a federal right.  In order for Mr. Rattray to establish this element, he must show that the conduct a defendant engaged in under color of state law caused Mr. Rattray to suffer the loss of a federal right, and that, while engaged in that conduct, the defendant acted with an intent to deprive Mr. Rattray of his rights or with a reckless disregard for the law.

An act is intentional if it is done voluntarily and deliberately and not because of mistake, accident, negligence, or other innocent reason.  Intent can be proven directly or by reasonable inference from circumstantial evidence.

An act is reckless if it is done in conscious disregard of its known probable consequences.  In other words, even if a defendant did not intentionally seek to deprive a plaintiff of his rights, if he nevertheless purposely disregarded the high probability that his actions would deprive plaintiff of his rights, then the state of mind element would be satisfied.

---

[2]  <u>Id.</u>
[3]  <u>Id.</u>

In determining whether a person acted intentionally or recklessly, you should remember that there is no way of looking into a person's mind. You must consider what was done, what the people involved said was in their minds, and your evaluation of all of the testimony and other evidence concerning this issue.

In order for a plaintiff to prevail on a Section 1983 claim, there must be some evidence of personal involvement by a defendant.[4] Personal involvement may be shown through evidence of direct participation, that is, personal participation by one who has knowledge of the facts that render the conduct illegal, or indirect participation, such as ordering or helping others to commit the unlawful acts.[5]

As I mentioned a moment ago, Mr. Rattray contends that Officer Cadavid violated his constitutional rights by subjecting him to an illegal search and an unlawful arrest. He further contends that Officer Triguero violated his constitutional rights by failing to intervene to prevent the illegal search and unlawful arrest. You will consider each claim separately and determine whether Mr. Rattray has proven the elements of each claim by a preponderance of the evidence.

I will now discuss each of Mr. Rattray's claims in detail.

a.    **Deprivation of a Federal Right:  Unlawful Search**[6]

The Fourth Amendment to the United States Constitution protects the right of persons to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. Mr. Rattray claims that his right not to be subjected to an unreasonable search was violated when Officer Cadavid searched his apartment on November 5, 2016.

---

[4]  Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013)
[5]  Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (defining personal involvement to encompass both (1) "direct participation," such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal"; and (2) indirect participation, such as "ordering or helping others to do the unlawful acts").
[6]  Based on Sand, Modern Federal Jury Instructions-Civil P 87.03 and charge in Bah v. City of New York, 13 Civ. 6690 (PKC).

As a general matter, in order to search a home, a police officer must obtain a search warrant from a magistrate or judge. If a police officer does not have a search warrant, an officer may not enter or search someone's home absent consent or "exigent circumstances."[7] Exigent circumstances exist where a police officer reasonably believes that entry or a search is necessary in order to render emergency assistance to an injured person or to protect someone from imminent injury.[8]

In determining whether exigent circumstances existed in this case, you must consider the totality of the circumstances confronting the defendants, including whether there was a need to make a prompt assessment based on the information that was available. In determining whether exigent circumstances existed, the core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer to believe that there was an urgent need to render aid or to take immediate action with respect to Mr. Rattray's daughter.[9] On the other hand, exigent circumstances did not exist if a reasonable, experienced officer in Officer Cadavid's position, knowing the facts he knew, would not have believed entry was necessary to render aid or to take action.

---

[7] United States v. Allen, 813 F.3d 76, 81 (2d Cir. 2016) ("It is therefore settled law that, at a minimum, law enforcement officers violate [the Fourth Amendment] when, in the absence of exigent circumstances or consent, they physically enter protected premises to effect a warrantless search or arrest.").

[8] Hurlman v. Rice, 927 F.2d 74, 81 (2d Cir. 1991) ("Emergency circumstances mean circumstances in which the child is immediately threatened with harm, for example, where there exists an 'immediate threat to the safety of the child.'" (quoting Sims v. State Dep't of Pub. Welfare of State of Tex., 438 F. Supp. 1179, 1192 (S.D. Tex. 1977), rev'd on other grounds Moore v. Sims, 442 U.S. 415 (1979).

[9] Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) ("[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."); Harris v. O'Hare, 770 F.3d 224, 235 (2d Cir. 2014), as amended (Nov. 24, 2014) ("The core question is whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action.") (quoting United States v. Simmons, 661 F.3d 151, 157 (2d Cir. 2011)); .

14

The question of whether a police officer reasonably believed that someone was in danger or in need of assistance is an objective one. This question should be answered with regard to what a reasonable officer would have believed under the totality of the circumstances. A search is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the search.[10]

While Officer Cadavid must produce evidence supporting the existence of exigent circumstances, the ultimate burden of proof is on Mr. Rattray to prove that Officer Cadavid's entry and search violated his Fourth Amendment right to be free from unreasonable searches.[11] If you find that exigent circumstances existed that justify Officer Cadavid's entry into and search of Mr. Rattray's home, then you must find in favor of Officer Cadavid on Mr. Rattray's unlawful search claim.

### b.    Deprivation of a Federal Right:  False Arrest[12]

Mr. Rattray claims that Officer Cadavid falsely arrested him on November 5, 2016.

The elements of false arrest are:

1.    the defendant intended to confine plaintiff;

2.    plaintiff was conscious of the confinement;

---

[10] Brigham, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.' . . . It therefore does not matter . . . whether the officers entered the kitchen to arrest respondents and gather evidence against them or to assist the injured and prevent further violence.") (quoting Scott v. United States, 436 U.S. 128, 138 (1978)).

[11] Harris, 770 F.3d at 234 & n.3 ("[A]s in all civil cases, 'the ultimate risk of non-persuasion must remain squarely on the plaintiff in accordance with established principles governing civil trials.") (quoting Ruggiero v. Krzeminski, 928 F.2d 558, 563 (2d Cir. 1991)); see also id. at 243 ("[T]he presumption of unreasonableness attached to warrantless searches 'may[, however,] cast upon the defendant the duty of producing evidence of . . . exceptions to the warrant requirement.'") (quoting Ruggiero, 928 F.2d 558, 563).

[12]  Based on Myers, 13 Civ. 1006 (PGG).

3.     plaintiff did not consent to the confinement; and

4.     the confinement was not otherwise privileged.[13]

A person has been confined if, in light of all the circumstances, a reasonable person would have believed that he was not free to leave.[14]

In determining whether a reasonable person would have believed that he was not free to leave, a jury may consider, among other circumstances, the number of officers present, whether an officer displayed a firearm, whether the officer used force against the plaintiff, and whether the officer's language or tone of voice indicated that compliance might be compelled.[15] A jury must assess the coercive effect of an officer's conduct as a whole, rather than considering in isolation a particular aspect of an officer's conduct.[16]

The burden is on Mr. Rattray to prove by a preponderance of the evidence the first three elements. If you find that Mr. Rattray has not proven any one of the first three elements – that is, that Officer Cadavid intended to confine Mr. Rattray, that Mr. Rattray was conscious of the confinement, and that he did not consent to the confinement – then you must find for Officer Cadavid on the false arrest claim. If you find that Mr. Rattray has proven each of the first three elements of a false arrest claim, then you must go on to consider whether the confinement was privileged.

If exigent circumstances existed to enter Mr. Rattray's home <u>and</u> Officer Cadavid had probable cause to arrest Mr. Rattray, then the confinement was privileged.[17]

As I instructed you a moment ago in connection with Mr. Rattray's unlawful search claim, a law enforcement officer's entry into a home is unreasonable if it is not supported

---

[13] <u>Savino v. City of New York</u>, 331 F.3d 63, 75 (2d Cir. 2003).
[14] <u>Posr v. Doherty</u>, 944 F.2d 91, 97 (2d Cir. 1991).
[15] <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980).
[16] <u>Simon v. City of New York</u>, 893 F.3d 83, 99 (2d Cir. 2018).
[17] <u>Id.</u>; <u>Savino</u>, 331 F.3d at 76.

16

by a search warrant, consent, or exigent circumstances.  This rule applies with equal force to Mr.

Rattray's false arrest claim.[18]  Accordingly, if you find that Mr. Rattray has proven each of the

first three elements of a false arrest claim, and you find that exigent circumstances did not exist

to justify entry into Mr. Rattray's home, then you must find for Mr. Rattray on his false arrest

claim against Officer Cadavid.[19]  If you conclude that exigent circumstances justified entry into

Mr. Rattray's home, then you must go on to consider whether probable cause existed to arrest

Mr. Rattray.

On the issue of whether probable cause existed to arrest Mr. Rattray, the

defendants – and not Mr. Rattray – bear the burden of proof.[20]  I will now define probable cause.

### (1)     <u>Probable Cause</u>[21]

Police officers have probable cause to arrest when they have knowledge or

reasonably trustworthy information of facts and circumstances sufficient to warrant a person of

reasonable caution in the belief that the person to be arrested has committed or is committing a

crime.[22]  An officer may arrest a suspect only if there are specific and articulable facts, together

---

[18]  <u>Loria v. Gorman</u>, 306 F.3d 1271, 1283–84 (2d Cir. 2002) ("The Supreme Court recently reiterated the firmly established rule that 'police officers need either a warrant or probable cause plus exigent circumstances in order to make a lawful entry into a home.' . . . Therefore, Gorman's entry into Loria's home and seizure of him without a warrant violated a constitutional right unless justified by exigent circumstances.").

[19]  <u>United States v. Allen</u>, 813 F.3d 76, 85 (2d Cir. 2016) ("We therefore hold that irrespective of the location or conduct of the arresting officers, law enforcement may not . . . effect a warrantless arrest of a suspect in his home in the absence of exigent circumstances.").

[20]  <u>Savino</u>, 331 F.3d at 76.

[21]  Based on <u>Myers</u>, 13 Civ. 1006 (PGG).

[22]  <u>Betts v. Shearman</u>, 751 F.3d 78, 82 (2d Cir. 2014).

with rational inferences drawn from those facts, that reasonably suggest criminal activity has occurred or is imminent.

Although probable cause requires more than a mere suspicion of wrongdoing, it does not require absolute certainty or concrete proof of each element of a crime.[23] Moreover, because police officers in the field face practical limitations in ascertaining an individual's state of mind, the law affords officers significant latitude in determining whether an individual has the necessary intent to commit a crime.[24]

The existence of probable cause is measured at the moment of arrest, not based on later developments.[25] Accordingly, the question of whether probable cause existed is not a matter of hindsight. Instead, a jury must consider the circumstances as they appeared to the officer at the time. Moreover, the existence of probable cause is not negated simply because Officer Cadavid may have ignored statements by Mr. Rattray that his daughter was safe or was not in the home.[26] However, you should be aware that an officer's failure to make a further inquiry when a reasonable person would have done so may be evidence of a lack of probable cause.[27]

---

[23] Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013); see also Ganek v. Leibowitz, 874 F.3d 73, 86 (2d Cir. 2017) ("The law has long recognized that probable cause does not demand evidence of every element of a crime – not even to support a person's arrest.").

[24] Ganek, 874 F.3d at 86 ("[T]he law is particularly tolerant with respect to the mens rea element of a crime on a probable cause showing."); Kass v. City of New York, 864 F.3d 200, 210 (2d Cir. 2017) ("[B]ecause the practical restraints on police in the field are greater with respect to ascertaining intent . . . , the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great.") (internal quotation marks and citations omitted).

[25] Shamir v. City of N.Y., 804 F.3d 553, 557 (2d Cir. 2015).

[26] Panetta v. Crowley, 460 F.3d 388, 395 (2d Cir. 2006).

[27] Lowth v. Town of Cheektowaga, 82 F.3d 563, 571 (2d Cir. 1996)

Because the existence of probable cause is analyzed from the perspective of a reasonable person standing in the officer's shoes, the officer's actual subjective beliefs are irrelevant to the determination of probable cause.[28]

Because an arresting officer might not be aware of every aspect of an investigation, you may also presume that the information known to one officer is known to all of the other officers working together on the investigation.[29]  Furthermore, probable cause may exist even if an officer has relied on mistaken information, so long as it was reasonable for him to rely on it.[30]

In determining whether probable cause existed, there need only have been probable cause to arrest Mr. Rattray for any criminal offense.[31]  Accordingly, if there was probable cause to believe at the time of the arrest that Mr. Rattray had committed any criminal offense, then the arrest was lawful.[32]

Here, the defense contends that on November 5, 2016, probable cause existed to arrest Mr. Rattray for the offense of obstructing governmental administration.  I will instruct you as to the elements of that offense.  Bear in mind that you are being asked only to decide whether the defendants had probable cause to believe that Mr. Rattray had committed this crime, and not whether Mr. Rattray was in fact guilty of this crime beyond a reasonable doubt.

---

[28]  Whren v. United States, 517 U.S. 806, 812-813 (1996).

[29]  United States v. Colon, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion[,] but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation........ The collective knowledge doctrine was developed in recognition of the fact that with large police departments and mobile defendants, an arresting officer might not be aware of all the underlying facts that provided probable cause or reasonable suspicion, but may nonetheless act reasonably in relying on information received by other law enforcement officials.") (citations omitted).

[30]  Bernard v. U.S., 25 F.3d 98, 102 (2d Cir. 1994).

[31]  Devenpeck v. Alford, 543 U.S. 146, 153 (2004).

[32]  Id.

Under the New York Penal Law, a person is guilty of obstructing governmental administration when he "intentionally obstructs, impairs or prevents the administration of law . . . or prevents or attempts to prevent a public servant from performing an official function by means of intimidation, physical force or interference, or by means of any independently unlawful act."[33] One does not obstruct governmental administration merely by refusing to answer police questions, however.[34]  And words alone, even if abusive, do not provide probable cause to believe that the crime of obstructing governmental administration has taken place.  The interference at issue must be, at least in part, physical in nature.  Stated another way, while mere words alone do not constitute physical force or interference, words coupled with actions are sufficient.[35]

If you find that exigent circumstances justified entry into Mr. Rattray's apartment, and that there was probable cause to arrest Mr. Rattray, then you must find in favor of Officer Cadavid on Mr. Rattray's false arrest claim.

### c.  Deprivation of a Federal Right:  Failure to Intervene[36]

Mr. Rattray has brought Section 1983 failure to intervene claims against Officer Trigueno.  All police officers have an affirmative duty to intervene to protect the constitutional rights of individuals from infringement by other police officers in their presence.[37]  This means

---

[33] New York Penal Law § 195.05.  Adapted from the jury instructions in Choi v. City of New York, 10 Civ. 6617 (JPO) Uzoukwu v. Krawiecki, 10 Civ. 4960 (RA).

[34] Uzoukwu v. City of New York, 805 F.3d 409, 414 (2d Cir. 2015) ("Under New York law, it is clearly established that Uzoukwu's constitutionally protected silence could not constitute any element of the crime of obstructing governmental administration, even if such silence interfered with the officers' attempt to investigate whether Uzoukwu was violating park rules.").

[35] Id. at 415 ("[I] if the district court wished to provide more guidance than a simple, unequivocal "no," it could have instructed the jury that '[w]hile mere words alone do not constitute physical force or interference, words coupled with actions are sufficient.'") (quoting People v. Chang, 25 Misc. 3d 1213(A), (Crim. Ct. 2009)).

[36] Based on Allen, 16 Civ. 3403 (PGG); Myers, 13 Civ. 1006 (PGG).

[37] Terebesi v. Torreso, 764 F.3d 217, 243 (2d Cir. 2014) ("'It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of

that if a police officer witnesses another officer committing an unlawful search or an unlawful arrest, the officer observing such misconduct has an affirmative duty to stop the constitutional violation, even if he or she is not directly involved in conducting the unlawful search or making the false arrest.[38]  The observing officer's failure to intervene would make him or her liable for the preventable harm proximately caused by the other officer's unlawful search or unlawful arrest.[39]

In order for a plaintiff to prevail on a failure to intervene claim, he must show that he suffered a preventable violation of his constitutional rights.[40]  Here, in order for Mr. Rattray to prevail on his failure to intervene claim against Officer Trigueno as it relates to his unlawful search claim against Officer Cadavid, Rattray must show that an unlawful search occurred on November 5, 2016.  Likewise, to prevail on his failure to intervene claim against Officer Trigueno as it relates to false arrest, Mr. Rattray must show that he was unlawfully arrested on November 5, 2016.  Accordingly, if you conclude that Mr. Rattray has not proven his unlawful search claim against Officer Cadavid, his failure to intervene claim against Officer Trigueno based on the alleged unlawful search likewise fails.  And if you conclude that Mr. Rattray has not proven his false arrest claim against Officer Cadavid, his failure to intervene claim against Officer Trigueno based on the alleged unlawful arrest claim likewise fails.[41]

---

citizens from infringement by other law enforcement officers in their presence.'") (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)).

[38]  O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988); Brewton v. City of New York, 550 F. Supp. 2d 355, 368 (E.D.N.Y. 2008).

[39]  Terebesi, 764 F.3d at 243 ("An officer who fails to intercede in the use of excessive force or another constitutional violation is liable for the preventable harm caused by the actions of other officers.").

[40]  Id.; see also McIntosh v. City of New York, No. 17-617, 2018 WL 542583, at *3 (2d Cir. Jan. 25, 2018) ("Because there have been no violations of McIntosh's constitutional rights, as discussed above, it necessarily follows that the defendants cannot be liable for their failure to intercede in such non-existent violations.").

[41]  See, e.g., Atkins v. Cnty. of Orange, 372 F. Supp. 2d 377, 407 (S.D.N.Y. June 3, 2005) ("[Plaintiff]'s failure to intervene claims premised on his excessive force claim are dismissed.

Moreover, an officer can only be held liable for preventable harm caused by the actions of another officer if there was a realistic opportunity to prevent the harm from occurring.[42]  Accordingly, if you find that Officer Trigueno did not have sufficient time to intervene on Mr. Rattray's behalf in connection with either the alleged unlawful search or the alleged unlawful arrest – assuming either one occurred – or if she was incapable of intervening because she was otherwise engaged, then you should not hold her liable for failing to intervene.[43]

3.    **Third Element – Proximate Cause**[44]

If Mr. Rattray has proven that Officer Cadavid acting under color of state law recklessly or intentionally deprived him of a constitutional right, or that a Officer Trigueno failed to intervene to prevent the deprivation of Mr. Rattray's constitutional rights, the final element of a Section 1983 claim that he must prove is that the defendant you are considering proximately caused injuries that Mr. Rattray has proven he sustained.  Proximate cause means that there must be a sufficient causal connection between the act of the defendant you are considering and any injury or damages sustained by Plaintiff.  An act or omission is a proximate cause if it was a substantial factor in bringing about or actually causing injury, that is, if the injury or damage was a reasonably foreseeable consequence of that defendant's act.

A proximate cause need not always be the nearest cause either in time or space. In addition, there may be more than one proximate cause of an injury or damage.  Many factors or the conduct of two or more people may operate at the same time, either independently or together, to cause an injury.

---

[Plaintiff] has failed to establish any constitutional violations based on excessive force. . . . Accordingly, [Plaintiff]'s claims based on a failure to intervene with respect to his excessive force claims are dismissed.").

[42] Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) ("In order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.").

[43] O'Neill, 839 F.2d at 11.

[44] Based on Allen, 16 Civ. 3403 (PGG); Myers, 13 Civ. 1006 (PGG).

A defendant is not liable if Mr. Rattray's injuries were caused by a new or independent source that intervenes between the defendant's acts or omissions and Mr. Rattray's injuries, however. A defendant is also not liable if Mr. Rattray's injuries were caused by a third person and the defendant's acts or omissions were not a substantial factor in bringing about or causing the injury.

### C.    Damages[45]

I will now instruct you on damages. You should not infer that Mr. Rattray is entitled to recover damages merely because I am instructing you on damages. It is exclusively your function to decide liability, and I am instructing you on damages only so that you will have guidance should you decide that Mr. Rattray is entitled to a recovery. If you return a verdict in favor of Mr. Rattray on liability according to my instructions on the law, then you must consider the issue of damages. If you return a verdict for Officer Cadavid or Officer Trigueno as to liability on a particular claim, then you need not consider damages as to that claim.

### 1.    Compensatory Damages

If you find that Mr. Rattray has proven one or more of his claims by a preponderance of the evidence, you will go on to consider the matter of compensatory damages.

There is no claim for economic damages in this case, but Mr. Rattray is seeking damages for alleged emotional distress.

You may award compensatory damages only for injuries that Mr. Rattray proves were caused by a defendant's wrongful conduct. The damages that you award must be fair compensation – no more and no less – for the harm, if any, which resulted from a defendant's wrongful conduct. The purpose of the law is to make Mr. Rattray whole – to put him in the same

---

[45] Based on Allen, 16 Civ. 3403 (PGG); Myers, 13 Civ. 1006 (PGG).

position that he would have been in had there been no violation of his rights.  The purpose of

such an award of damages is not to punish a defendant.

You should not award compensatory damages for speculative injuries, but only

for the alleged emotional distress that Mr. Rattray has proven that he actually suffered, or which

he has proven that he is reasonably likely to suffer in the future.  You may award Mr. Rattray

such amount you find is fair and just compensation for any pain and suffering caused by a

defendant's misconduct, as well as for loss of liberty, emotional distress, fear, personal

humiliation and indignation as a result of a defendant's misconduct.

You may not award Mr. Rattray damages for an injury that existed prior to the

incidents at issue, or for injuries, pain and suffering, or emotional distress caused by factors other

than the unlawful conduct of a defendant.

In determining the appropriate amount of compensatory damages to award to Mr.

Rattray, you should be guided by dispassionate common sense.  You must use sound discretion

in fixing an award of damages, drawing reasonable inferences from the facts in evidence.  You

may not award damages based on sympathy, speculation, or guesswork.  On the other hand, the

law does not require that Mr. Rattray prove his damages with mathematical precision, but only

with as much definiteness and accuracy as the circumstances permit.  No evidence of the

monetary value of such intangible things as pain and suffering and emotional distress need be

introduced into evidence.[46]

2. **Nominal Damages**[47]

If you return a verdict in Mr. Rattray's favor on one or more of his claims, but

find that Mr. Rattray has failed to prove any amount of compensatory damages, you must award

---

[46]  Based on <u>Allen</u>, 16 Civ. 3403 (PGG); <u>Myers</u>, 13 Civ. 1006 (PGG).
[47]  Based on <u>Allen</u>, 16 Civ. 3403 (PGG).

24

Mr. Rattray "nominal damages."[48]  "Nominal damages" are awarded as a recognition that a plaintiff's rights have been violated, even if he suffered no actual injury.

You may not award both nominal and actual damages to Mr. Rattray; either he suffered actual damages, in which case you must award him actual damages, or else he did not, in which case you must award nominal damages.  Nominal damages may only be awarded for a token sum, up to $1.

3. **Punitive Damages**[49]

Mr. Rattray also seeks an award of punitive damages.  If you find that Mr. Rattray has proven by a preponderance of the evidence that Officer Cadavid is liable, then you must decide whether to award Mr. Rattray punitive damages as against him.  Mr. Rattray also bears the burden of proof as to punitive damages.  He must demonstrate by a preponderance of the evidence that punitive damages are appropriate here.

The fact that I am giving you instructions on punitive damages should not be considered an indication of any view on my part as to what your verdict should be, or whether punitive damages should be awarded.  As with compensatory damages, I am providing this instruction to you merely to provide guidance in the event that you decide that Officer Cadavid is

---

[48] Matusick v. Erie County Water Authority, 757 F.3d 31, 64 (2d Cir. 2014) ("'[A]n award of nominal damages is not discretionary where a substantive constitutional right has been violated . . . .' The instructions should be clear that the jury 'must' award nominal damages if it finds that the plaintiff has shown no actual injury from a proven constitutional violation."); see also Brooker v. State, 206 A.D.2d 712, 712 (3rd Dep't 1994) (affirming award of nominal damages in case where police officer "'technically' assaulted claimant and subjected him to a battery when, in effecting an unauthorized arrest, he grabbed claimant by the neck and physically removed him from a tavern," but "claimant suffered no injury as a result"); 16 N.Y.Prac., New York Law of Torts § 21:2 ("Another tort action in which nominal damages are awarded is assault and battery.").

[49] Based on Allen, 16 Civ. 3403 (PGG); Myers, 13 Civ. 1006 (PGG); see also King v. Macri, 993 F.2d 294, 297 (2d Cir. 1993) (allowing punitive damage award against individual defendants in Section 1983 case, even when no compensatory award was made).

liable on a claim, and that punitive damages are appropriate.  It is entirely up to you to decide

whether or not punitive damages should be awarded in this case.[50]

   You may award punitive damages if you believe that Officer Cadavid should be

punished for conduct that was motivated by an evil motive or intent, or that involved callous

disregard or reckless indifference to Mr. Rattray's rights.[51]

   Mr. Rattray is not entitled to punitive damages as a matter of right.  In

determining whether an award of punitive damages is appropriate, you must make a judgment

about Officer Cadavid's conduct.  To make that judgment, it is important to keep in mind the

reasons for awarding punitive damages:  to punish a defendant for malicious conduct against a

plaintiff or callous disregard for or reckless indifference to a plaintiff's rights, and to deter the

defendant or others like the defendant from engaging in similar conduct.[52]  Thus, you should

consider whether the award of punitive damages will accomplish this dual purpose of

punishment and deterrence.

   Here, Mr. Rattray argues that punitive damages are appropriate because Officer

Cadavid acted with conscious wrongdoing, and acted wantonly, willfully, with ill will and

malice.  According to Plaintiff, Officer Cadavid knew that there were no exigent circumstances

that could justify a warrantless search of Mr. Rattray's apartment and Mr. Rattray's arrest in his

home, and he knew that there was not probable cause to arrest Mr. Rattray.  Defense counsel

responds that Officer Cadavid did not act with conscious wrongdoing, and did not act wantonly

---

[50]  Based on <u>Allen</u>, 16 Civ. 3403 (PGG); <u>Myers</u>, 13 Civ. 1006 (PGG).

[51]  <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983) ("[A] jury may be permitted to assess punitive
damages in an action under § 1983 when the defendant's conduct is shown to be motivated by
evil motive or intent, or when it involves reckless or callous indifference to the federally
protected rights of others.").

[52]  <u>United States v. Space Hunters, Inc.</u>, 429 F.3d 416, 428 (2d Cir. 2005) ("The purpose of
punitive damage awards is to punish the defendant and to deter him and others from similar
conduct in the future.") (internal quotation marks and citation omitted).

and willfully, or with ill will and malice, and instead was motivated at all times by a concern for

the safety of Mr. Rattray's daughter.  Defense counsel also contends that Officer Cadavid

believed that exigent circumstances justified the warrantless search of Mr. Rattray's apartment

and any arrest of Mr. Rattray that took place in his home, and that any arrest that did take place

was supported by probable cause.

The decision whether to award punitive damages against Officer Rattray is for

you and you alone, subject to these instructions.

## III.   FINAL INSTRUCTIONS ON PROCEDURE

### A.   Right to See Exhibits and Hear Testimony; Communications With Court

Ladies and gentlemen of the jury, that concludes my instructions to you

concerning the specific claims in this case.  You will soon retire to the jury room and begin your

deliberations.  All of the documentary exhibits that were admitted into evidence during the trial

will be sent into the jury room.  If you wish to hear any of the audio evidence, let us know, and

we will play it for you here in the courtroom.  If you want any of the testimony, you may request

that.  Please remember that it is not always easy to locate what you might want, so be as specific

as you possibly can be in requesting exhibits or portions of testimony.

If you want any further explanation of the law as I have explained it to you, you

may also request that.  As I noted earlier, however, you will each be permitted to take your copy

of the instructions into the jury room.

Any communication to me should be made in writing, signed by your foreperson,

include the date and time, and be given to one of the Marshals.  Please make any notes as clear

and precise as possible.  Do not tell me or anyone else how the jury stands on any issue until

after a unanimous verdict is reached.

**B.      Duty to Deliberate/Unanimous Verdict**

It is your duty as jurors to consult with one another and to deliberate with a view

to reaching an agreement.  Each of you must decide the case for himself or herself, but you

should do so only after a consideration of the case with your fellow jurors, and you should not

hesitate to change an opinion when convinced that it is erroneous.  Discuss and weigh your

respective opinions dispassionately, without regard to sympathy, without regard to prejudice or

favor for either side, and adopt that conclusion which in your good conscience appears to be

most in accordance with the truth.

Your verdict must be unanimous, but you are not bound to surrender your honest

convictions concerning the effect or weight of the evidence for the mere purpose of returning a

verdict or solely because of the opinion of other jurors.  Each of you must make your own

decision about the proper outcome of this case based on your consideration of the evidence and

your discussions with your fellow jurors.  No juror should surrender his or her conscientious

beliefs solely for the purpose of returning a unanimous verdict.

If you are divided, do <u>not</u> report how the vote stands, and if you have reached a

verdict do not report what it is until you are asked in open court.

**C.      Verdict Form**

Your verdict will be organized according to a verdict form.  This form will assist

you in reaching a verdict and lists the questions you must answer based on the instructions that I

have given.

**D.      Duties of Foreperson**

Finally, I referred a moment ago to a foreperson.  It is customary for Juror

Number 1 to serve as the foreperson, and that is what we will do here.  The foreperson doesn't

have any more power or authority than any other juror, and the foreperson's vote or opinion

doesn't count for any more than any other juror's vote or opinion. The foreperson is merely your spokesperson to the court. The foreperson will send out any notes, and when the jury has reached a verdict, the foreperson will notify the Marshal that the jury has reached a verdict, and you will come into open court and deliver your verdict.

### E. Return of Verdict

After you have reached a verdict, your foreperson will fill in the verdict form that has been given to you, sign and date it and advise the marshal outside your door that you are ready to return to the courtroom.

Each of you must be in agreement with the verdict that is announced in court. Once your verdict is announced by your foreperson in open court and officially recorded, it cannot ordinarily be revoked.

## IV.  CONCLUSION

Members of the jury, that concludes my instructions to you. I will ask you to remain seated for a moment while I confer with the attorneys to see if there are any additional instructions that they would like me to give.

*       *       *       *

The Marshal will now be sworn. Members of the jury, you may now begin your deliberations.

N8VDRAT1

## JURY TRIAL - TRANSCRIPT - (Dkt 296)

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------------------------------------------------x

3  WENTWORTH RATTRAY,

4                    Plaintiff,

5            v.                                17 Civ. 8560 (PGG)

6  POLICE OFFICER JOSE CADAVID
   (Badge No. 9085) and POLICE
7  OFFICER ALYSSA TRIGUENO,

8                    Defendants.             Jury Trial
   ------------------------------------------------------------------------x
9                                            New York, N.Y.
                                             August 31, 2023
10                                           9:30 a.m.

11  Before:

12                        HON. PAUL G. GARDEPHE,

13                                           District Judge

14                        APPEARANCES

15  DUANE MORRIS, LLP
          Attorneys for Plaintiff
16  BY:  MELISSA S. GELLER, ESQ.
          YUDI KATIE WANG, ESQ.
17        ANGELA J. BENOIT, ESQ.

18  NEW YORK CITY LAW DEPARTMENT
    OFFICE OF THE CORPORATION COUNSEL
19        Attorneys for Defendants
    BY:  FELIX DE JESUS, ESQ., Assistant Corporation Counsel
20        HANNAH V. FADDIS, ESQ., Assistant Corporation Counsel

21

22

23

24

25

```
 1              (Case called; jury not present)

 2              THE COURT:  Please be seated.

 3              I understand the parties have some issues they want to

 4    raise.

 5              MS. GELLER:  For the plaintiff, your Honor, very


 6    briefly, this is in the way of a heads up for a potential

 7    argument later.  We may have a Rule 50 application of our own

 8    on affirmative action -- excuse me, affirmative action --

 9    affirmative defenses; and as concern jury instructions,

10    yesterday in their Rule 50 application, defense counsel said

11    something about probable cause concerning obstruction of

12    governmental administration.  We intend to move on the ground

13    that under New York law, obstruction of governmental

14    administration does not exist where the obstruction is there is

15    only or merely the refusal to answer police questions.

16              We will rely on -- I'm going to get the case wrong,

17    Uzoukwu v. City of New York.  That's 805 F.3d 409, 414 to 418,

18    (2nd Cir. 2015).  In that case, there is an extensive

19    discussion of well-established New York case law, and that case

20    actually involved a clarification on an instruction -- on jury

21    instructions on a 1983 action.

22              We will also, when the Court conducts their charge

23    conference, oppose an instruction that the police had probable

24    cause to detain Mr. Rattray on the grounds of obstruction of

25    governmental -- obstruction of governmental and -- or
```

N8VDRAT1                              Cadavid - Direct

1                    (In open court; jury present)

2                    THE DEPUTY CLERK:  All rise

3                    THE COURT:  Please be seated.

4                    Good morning, ladies and gentlemen.  We will be

5       continuing this morning with the direct examination of Officer

6       Cadavid.

7                    Officer Cadavid, you remain under oath.

8                    Please proceed.

9                    MS. FADDIS:  Thank you, your Honor.

10        JOSE CADAVID, resumed.

11      DIRECT EXAMINATION

12      BY MS. FADDIS:

13      Q.  Good morning, Officer Cadavid.

14      A.  Good morning, counsel.

15      Q.  I just want to start where we picked up -- or where we left

16      off yesterday.  You were describing for the jury that --

17      plaintiffs' behavior when you first approached his door and

18      started asking questions about his daughter.

19                   Do you remember giving that testimony yesterday?

20      A.  Yes.

21      Q.  And just so we again pick up where we left off, can you

22      describe for the jury, when the door was closed and you were

23      talking to the plaintiff about his daughter initially, what was

24      his -- can you describe in sum and substance his response to

25      you?

 1   A.  His response -- he was yelling, cursing at us behind a
 2   closed door, and refusing to answer my questions.
 3   Q.  And what questions -- again, you said you don't recall
 4   specific words, but do you remember in sum and substance what
 5   questions you were asking him?
 6   A.  If I -- if we could talk to him; if he could open the door;
 7   if I could see his daughter; and the whereabouts of his
 8   daughter.
 9   Q.  And did you convey to the plaintiff at that point, before
10   the door was open, that you were there to check on the welfare
11   of his daughter?
12   A.  Yes.
13   Q.  At any point, before that door opened, did the plaintiff
14   tell you that his daughter was not home?
15   A.  No.
16   Q.  At any point before that door opened, did the plaintiff
17   tell you that he had custody of his daughter and the mother had
18   no right to see her?
19   A.  No.
20   Q.  Now, Officer Cadavid, you've been a police officer for 17
21   years, right?
22   A.  Correct.
23   Q.  Was that the first domestic incident that you responded to
24   as a police officer?
25   A.  No.

1    Q.  And based on your experience as a police officer with

2    domestic incidents, are there any particular concerns you have

3    when responding to that type of job?

4            MS. GELLER:  Objection -- withdrawn.

5            THE WITNESS:  May I answer?

6            THE COURT:  You may answer.

7    A.  I'm sorry.  Can you repeat the question?

8    Q.  Absolutely.

9            Are there any specific concerns that you have as a

10   police officer responding to a domestic incident type job as

11   opposed to some other type of police job?

12   A.  Yes.

13   Q.  And could you just describe just generally for the jury

14   what those are?

15   A.  Generally, when we're responding to a domestic incident,

16   it's a more dangerous job for us to respond.  One reason is

17   because the layout of the apartment, we don't know the layout

18   of the apartment.  They do, the caller, or whoever's involved

19   in the family incident.  So we're at a disadvantage there.  And

20   normally, in a family dispute, both parties are heated.  So

21   when we arrive, they are already upset, angry, so we're

22   responding to a situation where both parties are already

23   heated, and we have to try to mediate the situation, and try

24   and calm everybody down.

25   Q.  Officer Cadavid, at some point after you told Mr. Rattray

1  that if he didn't open the door, it might be taken off, he did

2  open the door, right?

3  A.  Correct.

4  Q.  Okay.  And after the door was opened, what happened?

5  A.  After he opened the door, I immediately put my foot in the

6  doorway.

7  Q.  And could you just tell the jury why you did that?

8  A.  From experience, I've had multiple times where they will

9  open the door, and then they will shut it in my face.

10  Q.  So why is that a problem, or is that a problem?

11  A.  Because now I have to try and get the door open again.

12  Q.  Okay.  And why do you need the door open?

13  A.  Because in this incident, I'm trying to investigate the

14  welfare of their daughter.

15  Q.  Why does it matter in investigating the welfare of his

16  daughter if the door is open or not?

17  A.  Because if the door is not open, it becomes harder for us.

18  I have to go through the channels to try and get the door open,

19  so it becomes harder for me.  If the door is open, I could stop

20  it from being shut closed.

21  Q.  After -- what was the conversation that you had --

22  withdrawn.

23        What, if anything, did you say to the plaintiff after

24  he opened the door?  And, again, in sum and substance if you

25  don't recall the specific words.

1  A.  After he opened the door and I put my foot in the doorway,

2  I kept asking him if I could see his daughter, the whereabouts

3  of her, if she was home, and that I needed to see her.

4  Q.  And what was the plaintiff's reaction?

5  A.  He was refusing to answer my questions.  He was still

6  yelling, cursing, and he stated that we had no search warrant.

7  Q.  At that point, had you entered his home?

8        Let me be more specific.  At the point where the

9  plaintiff first said to you "you don't have a search warrant,"

10 had you entered his home yet?

11 A.  No.

12 Q.  Up to that point, had you told him you were going to enter

13 his home?

14 A.  No.

15 Q.  And can you describe what happened next?

16 A.  Mr. Rattray tries to close -- he tries to push the door

17 closed, but because my foot was in the way, he was unable to.

18 Now, at this point I'm more concerned, because he's trying to

19 close the door on us, and that's leading me to believe that

20 he's trying to hide something, why is he not producing his

21 daughter, showing me his daughter.

22        So at this point, I'm -- my concern level rises.  Now

23 I push my way in.

24 Q.  When you say your concern level rises, what were you

25 concerned about?

1    A.  The safety of his daughter.

2    Q.  And you said that he was closing the door, you thought he

3    might be trying to hide something, and that raised your concern

4    level, right?

5    A.  Correct.

6    Q.  Before he did that, did you have concerns about the safety

7    of his daughter?

8    A.  I still had concerns.

9    Q.  And prior to him trying to close the door, what were your

10   concerns based on?

11   A.  My concern was based on the allegations of Ms. Sandy, and

12   the way Mr. Rattray was acting, his demeanor, the way he was

13   yelling at us.

14   Q.  You said your foot prevented the door from closing.  What

15   happened next?

16   A.  So Mr. Rattray tried closing the door.  At this point -- at

17   this point I had to make a split second decision.  I -- the

18   best decision I could make was I pushed my way into the

19   apartment.

20   Q.  And when you pushed your way into the apartment, what was

21   the first thing you did when you crossed into the apartment?

22   A.  The door swung open.  Mr. Rattray stepped back, a few feet

23   back.  I entered the apartment.  I was approximately maybe a

24   foot into the apartment.

25   Q.  Okay.  And what happened next?

1    A.  I was still asking Mr. Rattray for the whereabouts, if I

2    could see his daughter, if she was home.  Mr. Rattray still

3    refused to answer.

4    Q.  When you say he refused to answer, do you -- did he say or

5    do anything, or was he completely silent, or something else?

6    A.  No.  He was still -- he was still yelling, still cursing at

7    us.  At this time, he mentioned that we had no search warrant,

8    and his yelling started getting more and more and more loud, to

9    the point where his voice was almost becoming high-pitched.

10   Q.  And what did you do next?

11   A.  I continued asking Mr. Rattray information about his

12   daughter, the whereabouts, if I could see her, and he was still

13   refusing.  At this point I took it upon myself to start looking

14   around the apartment while my partner watched Mr. Rattray.

15   Q.  When you say you were looking around the apartment, what

16   specifically did you do?

17   A.  I walked around the apartment.  I went into the bedrooms.

18   Q.  So you went into the bedrooms.  Where else in the apartment

19   did you go?

20   A.  The bathroom.

21   Q.  Did you look in any closets?

22   A.  Yes, I did.

23   Q.  Okay.  Did you look in the kitchen cabinets?

24   A.  No.

25   Q.  Why not?

```
 1   A.  I was looking in general areas where the body of a girl
 2   could fit.
 3   Q.  And did you find the plaintiff's daughter?
 4   A.  No, I did not.
 5   Q.  At that point, did you have any reason to believe that
 6   Mr. Rattray's daughter was in the apartment?
 7   A.  No.
 8   Q.  So once you determined that she wasn't in the apartment,
 9   what did you do?
10   A.  I was still asking Mr. Rattray about the whereabouts, where
11   his daughter was, a few other things that I don't -- I don't
12   remember.
13   Q.  When you say a few other things, what do you mean?
14           MS. GELLER:  Objection.  He just said he doesn't
15   remember.
16           MS. FADDIS:  I'm just trying to understand if he asked
17   other questions, or what he means by that, your Honor.
18           THE COURT:  Okay.  Go ahead.
19           THE WITNESS:  I did ask him about his daughter, where
20   she was.  I also asked -- I remember asking him about court
21   paperwork.
22   Q.  Up to this point, are you -- so you've now completed the
23   search, and his daughter's not in the apartment, right?  That's
24   where we are in the story, right?
25   A.  Correct.
```

1   Q.  Up to that point, had Mr. Rattray ever said to you "my

2   daughter's not home?"

3   A.  He was still refusing to answer my questions.

4   Q.  Up to that point, had he ever said "she's with friends?"

5   A.  No.

6   Q.  Up to that point, had he ever said "her mother doesn't have

7   any right to see her today; I have email that proves it?"

8   A.  No.

9   Q.  Did he ever try to show you any paperwork?

10  A.  No.

11  Q.  And at some point did you or your partner request a

12  supervisor to the scene?

13  A.  Yes.

14  Q.  Why?

15  A.  Because I still need to know where his daughter was.  Since

16  I was trying to investigate her whereabouts, Mr. Rattray was

17  refusing to answer my questions, I needed my supervisor's

18  assistance, and Mr. Rattray also requested a full supervisor.

19  Q.  When you say you were investigating her whereabouts, do you

20  have concerns for her physical well being at this point?

21  A.  Yes.

22  Q.  Why?

23  A.  Because, based on the allegations of the mother, based on

24  how Mr. Rattray was acting, his demeanor, and his refusal to

25  answer my questions of where she was, her whereabouts, I was

1    more concerned about her well being and her safety.

2    Q.  At some point did a supervisor come to Mr. Rattray's

3    apartment?

4    A.  Yes.

5    Q.  Did you overhear the plaintiff make a 911 call?

6    A.  Yes.

7    Q.  And did you say anything on that 911 call?

8    A.  Yes.

9    Q.  What was that?

10   A.  I read out my badge number.

11   Q.  Why did you do that?

12   A.  So the 911 operator knows that there are officers there,

13   and to identify myself to the 911 operator.

14   Q.  And was that 911 call placed before or after you had

15   requested a supervisor to the scene?

16   A.  After.

17   Q.  Do you recall how long it took a supervisor to respond?

18   A.  My recollection, 20, 30 minutes.

19   Q.  And during that 20 to 30 minutes, where were you?

20   A.  I -- at that point, I was standing by the doorway.

21   Q.  When you say by the doorway, were you inside or outside of

22   the apartment?

23   A.  I was inside of the apartment, approximately a foot in

24   front of the doorway.

25   Q.  Was the door open?

1    A.  Yes.

2    Q.  Why did you remain in the apartment?

3    A.  Because we were waiting for the supervisor, and there was

4    an ongoing investigation.

5    Q.  When you say there was an ongoing investigation, what do

6    you mean?

7    A.  I was still -- I was investigating the whereabouts of his

8    daughter.

9    Q.  And you said you were by the door.  Where is the plaintiff?

10   A.  He's -- so there's a kitchen counter that runs

11   approximately three to four feet in front of me.  So he's

12   sitting at the edge of the kitchen counter.

13   Q.  And you said a moment ago that the door remained open the

14   whole time, right?

15   A.  Yes.

16   Q.  Why did the door remain open?

17   A.  So Mr. Rattray was still yelling at the top of his lungs.

18   At this time, while he's sitting at the edge of the counter, he

19   starts slamming the kitchen counter.  And the kitchen is --

20   it's right there, and I notice a block with knives.  And I'm

21   becoming more concerned, because now this could escalate to a

22   whole different level.  So I stand by the doorway, just in

23   case, if it does escalate, I could close the door and run down

24   the hallway to give myself distance between me and Mr. Rattray.

25   Q.  Was the plaintiff free to leave his apartment while you

1    were waiting for your supervisor?

2    A.  No.

3    Q.  Why not?

4    A.  First, he requested a supervisor, he wanted to speak to a

5    supervisor.  Second, it was a pending investigation.  I was

6    still -- I still needed to know the whereabouts of his

7    daughter.  At this point, I don't know if there was a crime

8    committed in regard to his daughter.

9    Q.  I'm sorry.  What was the last thing you said?

10   A.  At that point, I don't know whether there's a crime

11   committed against -- in regards to his daughter.

12   Q.  You don't know if there was a crime committed against his

13   daughter?

14   A.  Yes.

15   Q.  Did you suspect there was a crime committed against his

16   daughter?

17   A.  At that point, yes, I was suspecting.

18   Q.  And what was that suspicion based on?

19   A.  That suspicion was based on the mother's allegations,

20   Mr. Rattray's demeanor, his actions, and also his refusal to

21   answer my questions, to tell me her whereabouts, where she was,

22   and the fact that he tried closing the door on us.

23   Q.  Officer Cadavid, who was the supervisor who arrived on the

24   scene?

25   A.  Lieutenant Khosh.

1    Q.  And what happened when the lieutenant arrived?

2    A.  When the lieutenant arrived, I spoke to him.  I explained

3    to him the situation.  And then the lieutenant wanted to go

4    speak to Mr. Rattray.

5    Q.  Were you -- did you overhear the conversation between the

6    lieutenant and the plaintiff?

7    A.  Yes.

8    Q.  Do you -- what do you recall, if anything, about that

9    conversation?

10   A.  I recall the lieutenant telling Mr. Rattray, why are you

11   not cooperating with my officers, and he asked him for -- if he

12   had any paperwork, anything from the courts in regard to

13   visitation of their daughter, and he also asks the whereabouts

14   of Mr. Rattray's and Sandy's daughter.

15   Q.  And do you know if the plaintiff provided the lieutenant

16   any information?

17   A.  Yes.

18   Q.  Okay.  And do you know what that information consisted of?

19   A.  The whereabouts of his daughter.

20   Q.  What --

21        MS. GELLER:  Object -- withdrawn.

22   Q.  What, if any, further action did the lieutenant take that

23   you observed?

24   A.  The lieutenant took that information.  There was a call

25   made to where his daughter was to confirm that she was there.

 1              MS. GELLER:  Objection, your Honor.  Foundation.

 2              THE COURT:  Well, can you explore that?

 3              MS. FADDIS:  Yes, your Honor.  The specific question

 4   was what he observed, so I assume that's what he's responding

 5   to, but let me pause here.

 6   Q.  And, Officer Cadavid, let me ask you, you mentioned a phone

 7   call.  Were you present for that phone call?

 8   A.  Yes.

 9   Q.  Okay.  Did you observe the lieutenant make a phone call?

10   A.  Yes.

11   Q.  Could you hear his side of the phone call?

12   A.  The lieutenant's side, yes.

13   Q.  Could you hear the other side?

14   A.  No.

15   Q.  Okay.  Based on the lieutenant's side of the phone call,

16   did you have an understanding of what the phone call consisted

17   of?

18   A.  Yes.

19   Q.  Okay.  And could you describe what the phone call consisted

20   of?

21   A.  I heard the lieutenant asking if their daughter was at the

22   location -- at the number that he was calling, and he asked for

23   the address.

24   Q.  Okay.  Do you know, again based on your own observations,

25   if the lieutenant took any further action to ascertain the

1    location of the plaintiff's daughter?

2    A.  Yes, he did.

3    Q.  And what was that?

4    A.  He was going -- he sent a unit over to that address to

5    physically confirm that she was there and she was okay.

6           MS. GELLER:  Objection, your Honor.  This is now

7    hearsay.

8           THE COURT:  I'm sorry.  I can't hear you.

9           MS. GELLER:  This is now hearsay.

10           THE COURT:  Well, you're going to have to lay a

11   foundation for how he knows this.

12           MS. FADDIS:  Sure, your Honor.

13   BY MS. FADDIS:

14   Q.  Did you have a further conversation with the lieutenant

15   after the phone call that he made?

16   A.  Yes.

17   Q.  Did he communicate to you that he intended to take any

18   further steps with regard to the plaintiff's daughter?

19   A.  Yes.

20   Q.  Okay.  And what did he communicate with you?

21           MS. GELLER:  Objection.  Still hearsay, your Honor.

22           MS. FADDIS:  It goes to his understanding, your Honor.

23           THE COURT:  I'll see the lawyers at sidebar.

24           (Continued on next page)

25

1          (At sidebar; jury not present)

2          THE COURT:  I don't see it as hearsay.  Well, I'm not

3    sure exactly what the testimony is going to be, but if the

4    testimony is going to be that he told -- that the lieutenant

5    told Cadavid that he was sending a unit over to check on the

6    daughter, I don't see how that's hearsay.  It's not being

7    offered for the truth.

8          MS. GELLER:  Okay, your Honor.  I understand the

9    ruling.

10         THE COURT:  Is that what the testimony is?

11         MS. FADDIS:  That's it, your Honor.  Thank you.

12         (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (In open court; jury present)
 2    BY MS. FADDIS:
 3    Q.  Officer Cadavid, I'm just going to reask the last question.
 4    Did you have an understanding of what the next steps Lieutenant
 5    Khosh continued to take were?
 6    A.  Yes.
 7    Q.  Could you describe what he relayed to you?
 8    A.  The next step was to send a police car over to the location
 9    where their daughter was, and to physically confirm that she
10    was there and she was okay.
11    Q.  All right.  After that happened, what did you do?
12    A.  After that happened, we were satisfied that the daughter
13    was okay, we left.
14    Q.  When you say "we," who are you referring to?
15    A.  I'm sorry.  My partner and Lieutenant Khosh.
16    Q.  Okay.  Did you ever return to Ms. Sandy, to speak with
17    Ms. Sandy?
18    A.  Yes.
19    Q.  Okay.  Did you speak with her or did Officer Trigueno speak
20    with her or someone else?
21    A.  I believe I spoke to her.
22    Q.  Did Ms. Sandy complete a domestic incident report as far as
23    you know?
24    A.  Yes.
25    Q.  Did you assist her in -- well, did you prepare --
```

1    withdrawn.

2              The domestic incident report has to be completed by

3    both the victim and a police officer, right?

4    A.  Correct.

5    Q.  Were you the police officer that completed any portion of

6    the domestic incident report?

7    A.  I was not.

8    Q.  At any time did you have to review the domestic incident

9    report to verify it?

10   A.  No.

11   Q.  Now, Officer Cadavid, at any time on November 5th, 2016,

12   was the plaintiff arrested?

13   A.  No.

14   Q.  Did you ever threaten to place him in handcuffs?

15   A.  No.

16   Q.  Okay.  Did you have grounds to arrest him?

17   A.  Yes.

18   Q.  And for what?

19   A.  When I was asking Mr. Rattray for information in regard to

20   his daughter, he was refusing, and the fact that he tried

21   closing the door on us, I -- I had grounds of OGA, which is

22   obstructing governmental administration, in regard to my

23   investigation.

24   Q.  All right.  Officer Cadavid, I want to detour a little bit.

25   In 2017, did you give a statement in connection with a NYPD

N8VDRAT1                         Cadavid - Direct

1   investigation relating to an off-duty incident that you were

2   involved in?

3   A.  Yes.

4   Q.  Okay.  And were you charged administratively by your

5   employer, the NYPD, with making a false statement in that case?

6   A.  Yes.

7   Q.  And did you plead guilty to that administrative charge?

8   A.  I did.

9   Q.  And did you, in fact, make a false statement in the course

10  of that investigation?

11  A.  I did not.

12  Q.  I'm sorry.  The door closed.  I didn't hear you.

13  A.  No.

14  Q.  Why did you plead guilty to something you didn't believe

15  you had done?

16  A.  Okay.  So pending the investigation, I was placed on

17  administrative duty --

18          MS. GELLER:  Your Honor, I have an objection here.

19          THE COURT:  All right.  Do you want to be heard at

20  sidebar?

21          MS. GELLER:  Yes, please.

22          (Continued on next page)

23

24

25

1          (In open court; jury present)

2          THE COURT:  Sorry for the delay, ladies and gentlemen.

3   I am going to strike the last question and answer.  You should

4   disregard it.  It should play no role in your deliberations.

5          All right.  Go ahead.

6   BY MS. FADDIS:

7   Q.  Officer Cadavid, in connection with the guilty plea that

8   you testified to a moment ago, were you disciplined by your

9   employer?

10  A.  Yes.

11  Q.  And what was that discipline?

12  A.  It was one year probation, dismiss probation, and 30

13  vacation days taken away.

14  Q.  That was in 2017?

15  A.  For the 2017 incident.

16         THE COURT:  When you say dismissal of probation, does

17  that mean at any time during the one-year period, you could

18  have been dismissed at the discretion of the police

19  commissioner?

20         THE WITNESS:  Correct.

21         THE COURT:  Okay.

22  Q.  Officer Cadavid, were you equipped with a body-worn camera

23  on the date of this incident?

24  A.  No.

25  Q.  Had body-worn cameras been issued to your precinct at that

1    time?

2    A.   No.

3    Q.   Officer Cadavid, as a general matter, do you have an

4    understanding of whether a warrant is required to enter

5    someone's home without their permission?

6    A.   Yes.

7    Q.   What is our understanding?

8    A.   One, a crime being committed; and the second reason is

9    there's a medical emergency.

10   Q.   Did you have a warrant to enter the plaintiff's home in

11   this case?

12   A.   No.

13   Q.   Did you go get a warrant?

14   A.   No.

15   Q.   Why not?

16   A.   The process to get a warrant, it takes a lot of time.  It

17   takes -- it could take up to one, two days to actually get a

18   warrant.

19   Q.   So why didn't you get a warrant in this case?

20   A.   Based on the allegations of the mother, there was no time

21   to actually go get a warrant.

22   Q.   And when you entered the plaintiff's apartment without a

23   warrant, on what grounds do you believe you were able to do so?

24   A.   That the daughter was not safe, that she was in danger.

25   Q.   And I just want to recap.  When you approached the

1    plaintiff's apartment, were you concerned for his daughter's

2    safety?

3    A.   Yes.

4    Q.   Do you believe that she was possibly in danger?

5    A.   Yes.

6    Q.   And at that moment when you first approached his apartment,

7    why did you believe that she was possibly in danger?

8    A.   I was going based on the allegations of the mother, her

9    demeanor, how she was hysterically crying.  That gave me

10   concern that she was concerned for her daughter's safety.

11   Q.   And what specific allegations did she make regarding her

12   daughter's safety?

13   A.   She stated to me that her daughter was not safe in the

14   apartment, that Mr. Rattray does drugs, and that he

15   occasionally has drug dealers over at the apartment.

16   Q.   And when you first engaged the plaintiff, you're speaking

17   to him at his doorway, did you have concerns at that time

18   regarding his daughter's safety?

19   A.   While speaking to Mr. Rattray, my concern was rising.

20   Q.   I'm sorry.  I didn't hear that answer.  What was that?

21   A.   My concern was -- I was having more concern.

22   Q.   Okay.  And why?

23   A.   Again, based on the allegations of the mother, her

24   demeanor, and with the briefings that I was having with

25   Mr. Rattray while the door was closed, his actions, his

1   demeanor, his refusal to answer my questions, I was becoming

2   more concerned.

3   Q.  And after you entered the plaintiff's apartment, were you

4   still concerned for his daughter's safety?

5   A.  Yes.

6   Q.  Did you say at that point your concerns were the same as,

7   greater than, or less than, something else, the concerns you

8   had before you entered?

9   A.  I'm sorry.  Can you repeat?

10  Q.  I'm going to withdraw that question, because it was

11  terrible.

12         Let me ask you again.  What was your level of concern

13  after you searched the plaintiff's apartment compared to when

14  you were standing in the hallway outside his apartment?

15  A.  It was higher.

16  Q.  Why?

17  A.  Because he -- I -- the fact that the daughter was not in

18  the apartment, and he was still not telling me where she was, I

19  was concerned that something could have happened to her, and

20  that he's trying to hide it, he's not telling me where she is.

21  Q.  And, again, at any point did the plaintiff make any effort

22  to resolve those concerns that you had?

23  A.  No.

24         MS. FADDIS:  One moment, your Honor.  Nothing further

25  at this time, your Honor.

1  Q.  And where it says "possible drug and alcohol use," that's

2  checkmarked "no," right?

3  A.  Yes.

4  Q.  And here, briefly describe the circumstances of this

5  incident, we've seen this before as well, correct?

6  A.  Correct.

7  Q.  And TPO, that means I think we have on the record time,

8  place, location?

9  A.  Yes --

10          THE COURT:  I thought it was time, place, occurrence.

11          THE WITNESS:  Occurrence.

12          MS. GELLER:  Sorry.  My mistake.  Thank you, your

13  Honor.

14  Q.  Time, place, occurrence?

15  A.  Yes.

16  Q.  A dispute over custody of child, right?

17  A.  Yes.

18  Q.  That's what it says?

19  A.  Yes.

20  Q.  And taking a look at this narrative, there's nothing in

21  here about danger to the child, correct?

22          MS. FADDIS:  Objection, your Honor.  The witness

23  didn't write the document.

24          THE COURT:  I understand that, but she's asking a

25  question about what's in the document, so your objection is

1    overruled.

2    Q.   There's nothing in here about drugs in the document,

3    correct?

4    A.   No.

5    Q.   And nothing in here about concern for child safety,

6    correct?

7    A.   No.

8    Q.   And nothing in here about a concern that the child might be

9    dead, right?

10   A.   No.

11   Q.   And this is the narrative from Ms. Wendy, correct?

12   A.   Correct.

13   Q.   And there's nothing in here about drugs or drug dealers,

14   right?

15   A.   Correct.

16   Q.   And there's nothing in here about the child being in

17   danger, correct?

18   A.   Correct.

19   Q.   And there's nothing in here about her worried that her

20   child might be harmed, correct?

21   A.   Correct.

22   Q.   I'd like to show you what's been marked -- what's been put

23   in evidence as Exhibit 5, Plaintiff's Exhibit 5.

24        You didn't draft this document either, right?

25   A.   Correct.

1    Q.  But here in this, if you could look at the fourth paragraph

2    down, I opened the door, and they said they had a report that

3    the child is not being made available to the mother, and they

4    asked if I could come to the door.  And there's nothing about

5    drugs or drug dealers or concern for the child being in danger

6    or harmed in this paragraph, is there?

7            MS. FADDIS:  Objection, your Honor.  This is the

8    plaintiff's statement.

9            MS. GELLER:  It's in evidence, your Honor.

10           THE COURT:  Yes.  I understand that.

11           Again, counsel is just inquiring of the witness

12   whether those statements appear in this document.  The jury

13   understands that he didn't prepare the document.

14           Go ahead.

15           MS. GELLER:  Thank you, your Honor.

16   Q.  There is no mention of drugs in this paragraph, is there,

17   sir?

18   A.  Correct.

19   Q.  And there's no mention of drug dealers in this paragraph,

20   correct?

21   A.  Correct.

22   Q.  And there's no mention of the child being in danger,

23   correct?

24   A.  Correct.

25   Q.  And there's no mention of concern that the child might be

N8VDRAT1                        Cadavid - Cross

1   harmed, correct?

2   A.  Correct.

3   Q.  Now, when you arrived at the door, at Mr. Rattray's door,

4   and you knock, knock, knock, NYPD, right?

5   A.  Correct.

6   Q.  And that's pretty standard?  You announce yourselves so

7   people know police are on the line -- the ELMO and I are not

8   friends.

9           You didn't say bang, bang, bang, anybody in the

10  apartment with you, did you?

11  A.  No.

12  Q.  You never asked who's in the apartment, right?

13  A.  I don't recall.

14  Q.  And you never asked if there are any weapons in the home?

15  A.  Yeah, we would ask that.

16  Q.  You would ask that.  You asked that when you banged on the

17  door, are there weapons in the home?

18  A.  No.

19  Q.  Now, if a concern was that he potentially had drug dealers

20  in the apartment, that's something that's important to know,

21  right?

22  A.  Correct.

23  Q.  You would want to know if there's other adults in that

24  building -- in that apartment?

25  A.  Correct.

1   Q.  And you would want to know there's other adults in that

2   apartment, possibly breaking the law, right?

3   A.  Correct.

4   Q.  That would be important for you to know for your

5   investigation?

6   A.  Yes.

7   Q.  That would be important for you to know for your safety?

8   A.  Yes.

9   Q.  And that would be important for your partner to know for

10  her safety?

11  A.  Yes.

12  Q.  Because people doing bad things tend to react poorly,

13  correct?

14  A.  Correct.

15  Q.  But you didn't ask when you arrived at the door of his

16  apartment if there was anybody else in the apartment, correct?

17  A.  I don't remember.

18          MS. FADDIS:  Objection, asked and answered.

19  Q.  I'm sorry.  Could you repeat the answer?

20  A.  I don't remember.

21  Q.  Well, I think you just said you didn't, correct?

22          MS. FADDIS:  Objection, your Honor.  Mischaracterizing

23  the testimony.

24          THE COURT:  All right.  Did you ask about whether

25  there was anybody else in the apartment when you knocked on the

N8VDRAT1                          Cadavid - Cross

1   door?

2              THE WITNESS:  I don't remember asking.

3              THE COURT:  I'm sorry?

4              THE WITNESS:  I don't remember asking.

5              THE COURT:  Okay.

6   Q.  You don't remember asking either way is what your testimony

7   is?

8   A.  No, I don't remember.

9   Q.  All right.  So you're at the door, let's stay at the door

10  of the apartment for a minute, and just before he opens the

11  door, right, you're coming up, you're coming down a normal

12  hallway in a normal pre-war building in Manhattan, right?

13  A.  Yes.

14  Q.  And you don't hear a loud noise coming from the other side

15  of the door?

16  A.  I do not.

17  Q.  You don't hear any children at all?

18  A.  No.

19  Q.  No children's voices?

20  A.  No.

21  Q.  No crying?

22  A.  No.

23  Q.  No one screaming?

24  A.  No.

25  Q.  Nobody talking loudly?

 1    A.   No.

 2    Q.   You don't hear any talking at all, right?

 3    A.   No.

 4    Q.   Nobody crying for help?

 5    A.   No.

 6    Q.   And then Mr. Rattray eventually opens the door, right?

 7              Well, let's back up a second.  Bang, bang, bang.  You

 8    don't hear anything.  Again, same question, you don't hear a

 9    bunch of people talking, right?

10    A.   Correct.

11    Q.   You only hear one voice?

12    A.   Correct.

13    Q.   So now Mr. Rattray, he opens the door, right?

14    A.   Not right away.

15    Q.   We'll get to that, but eventually he opens the door?

16    A.   Yes.

17    Q.   And he opens the door you say a crack?

18    A.   Yeah.  Enough for me to put my foot in the doorway.

19    Q.   Enough for you to get your foot in the door?

20    A.   Yes.

21    Q.   But here again you don't hear any children in the

22    background?

23    A.   No.

24    Q.   And you don't hear anybody crying?

25    A.   No.

1   Q.  And here it's just Mr. Rattray, right?

2   A.  Yes.

3   Q.  You don't hear any other voices in the background?

4   A.  No.

5   Q.  No cries for help?

6   A.  No.

7   Q.  No drug dealers, right?

8   A.  At that point, I don't know.

9   Q.  At the time, you didn't see any sign of any drug dealers in

10  his apartment?

11  A.  Well, the way he had the door open, I can't see into the

12  apartment.

13  Q.  But you didn't see anything at the time, right?

14  A.  At what time?

15  Q.  When he had the door cracked, you did not see other adults

16  in the apartment?

17  A.  I can't see in the apartment.

18  Q.  And you didn't hear any other adults in the apartment?

19  A.  No.

20  Q.  Mr. Rattray wasn't covered in blood, right?

21  A.  No.

22  Q.  He didn't looked mussed or like he'd been in a scuffle,

23  correct?

24  A.  Well, at that time when the door is cracked open, I don't

25  remember seeing Mr. Rattray.

1   Q.  All right.  So at one point you -- then you've got your

2   foot in the door, and then you pushed the door open, and you

3   enter the apartment?

4   A.  Correct.

5   Q.  And now you're standing in the apartment, right?

6   A.  Correct.

7   Q.  And it's kind of small?

8   A.  Yes.

9   Q.  And you can see, for the most part, the majority of the

10  apartment?

11  A.  Yeah.

12  Q.  And it's just a normal apartment in a normal building in

13  Manhattan, right?

14  A.  Yes.

15  Q.  A well-kept home?

16  A.  From my recollection, yeah.

17  Q.  And no kids there either, right?  Don't see any children,

18  right?

19  A.  From my immediate point of view, no.

20  Q.  Okay.  And no blood?

21  A.  No.

22  Q.  No drug dealers there either, right?

23  A.  I still haven't established that.

24  Q.  No.  You're standing -- I'm asking, you're standing in the

25  apartment, right?  And you do not see any sign of any other

1    adults in that the apartment?

2    A.   In the area where I could see, no.

3    Q.   And there's no sign of anybody injured?

4    A.   No.

5    Q.   And there's no sign of imminent injury to anybody?

6    A.   At that point I can't establish that yet.

7    Q.   From where you're standing when you step into the door when

8    you first step into the apartment, there is no sign of imminent

9    injury to anybody?

10   A.   From there, no.

11   Q.   And at this point I think you testified that you're now

12   asking for the whereabouts of his daughter?

13   A.   Correct.

14   Q.   That's your testimony, right?

15   A.   Yes.

16   Q.   You want to know where she is?

17   A.   Yes.

18   Q.   And you still think she's in imminent danger inside the

19   home?

20   A.   I wouldn't say imminent.  I'm still concerned about her

21   safety.

22   Q.   Based on what Ms. Sandy said about Mr. Rattray doing drugs,

23   and having drug dealers over to the apartment occasionally?

24   A.   Based on that, and based on Mr. Rattray's attitude, and his

25   yelling and cursing and refusal to answer my questions.

1   Q.  Well, but as you're standing there, there's no torture

2   device on the wall, right?

3   A.  No.

4   Q.  It's just a home, yeah?

5   A.  From the looks of it, yeah.

6   Q.  So you don't see anything in this apartment that could give

7   rise to a concern that anybody was in imminent danger of being

8   harmed?

9   A.  In the area where I was standing, no.

10  Q.  And at this point you've really shifted your focus to

11  finding the child, haven't you?

12  A.  Yes.

13  Q.  And so now you take a turn, and you go into the child's

14  room, right?

15  A.  Yes.

16  Q.  And as you step into the room, you look around, and it's a

17  kid's room, right?

18  A.  Yes.

19  Q.  My Little Pony sheets?  Do you remember that?

20  A.  I don't remember.

21  Q.  But a kid's room?

22  A.  Yes, I could tell it was a kid's room.

23  Q.  Stuffed animals everywhere maybe?

24  A.  I don't remember.

25  Q.  Little girl's room per se you think?

 1                    (In open court)

 2    BY MS. GELLER:

 3    Q.    Now, Officer Cadavid, today you testified that——and please

 4    correct me if I'm wrong, but I think you testified that while

 5    you were standing at the door——well, withdrawn.  Let me provide

 6    more context.

 7                    After Mr. Rattray opens the door, that's what we're

 8    going to talk about now, after he's opened the door, right?

 9    A.    Okay.

10    Q.    And he's standing at the door, and I think you testified

11    that he said something about, *Well, you don't have a warrant,*

12    or, *Do you have a warrant,* right?

13    A.    Correct.

14    Q.    And I think you testified——and I think you also testified

15    that when you stood in his apartment, you also asked——or he

16    also said something about how you don't have a warrant.  Did I

17    get your testimony right?

18    A.    Correct.

19    Q.    And you said no, right?

20    A.    Correct.

21    Q.    You didn't have a warrant, right?

22    A.    Correct.

23    Q.    Now as you were standing outside of Mr. Rattray's door——and

24    his door is open, right?

25                    THE COURT:    Well, how open is it at this point?

1          MS. GELLER:    I'm sorry, your Honor.  I apologize.  I'm

2     going to try to be more specific.

3          THE COURT:    Well, I was asking the officer.  When he

4     first opened the door, how open was it?

5          THE WITNESS:    Maybe 5, 6 inches; enough for me to put

6     my foot in the doorway.

7          THE COURT:    Okay.  And I think you told us you could

8     see——could you see his face?

9          THE WITNESS:    I——I don't remember seeing his face.

10         THE COURT:    Could you see part of his face?

11         THE WITNESS:    I——I don't remember.

12         THE COURT:    Okay.

13    BY MS. GELLER:

14    Q.    So you remember the door being open a bit, but you don't

15    remember actually seeing Mr. Rattray.

16    A.    Correct.

17    Q.    Now you testified yesterday and today that you eventually

18    made entry into the apartment based on the complainant's

19    information from the day of the incident.  And by complainant,

20    you meant Ms. Wendy.

21    A.    By complainant, yes, Ms. Wendy.

22         THE COURT:    We've been referring to her as Ms. Sandy.

23    Could we just stay with that so we don't get confused.

24         MS. GELLER:    Yes, your Honor.  Yes.  Sorry.  Yes,

25    Ms. Sandy.

1    Q.    And that was the information, that the daughter wasn't safe

2    because the——we talked about this again, the drugs and the drug

3    dealers, right?

4    A.    Well, that was part of the information.  There was other

5    information I based my entry on.

6    Q.    No, I understand that, but we're talking just about the

7    section about the complainant's information; that's the

8    information you had, drugs and drug dealers, right?

9    A.    And she wasn't safe.

10   Q.    And she wasn't safe.  And you didn't have any more

11   information on that she wasn't safe beyond the drug and drug

12   dealers, right?

13   A.    From my recollection, correct.

14   Q.    Just that she wasn't safe generally.

15   A.    Yeah.

16            THE COURT:    Do you recall whether Ms. Sandy had said

17   anything about whether she could reach her daughter, that she'd

18   tried to reach her daughter that day and was not able to reach

19   her?  Do you recall her saying anything like that to you?

20            THE WITNESS:    To that substance, yes.

21   Q.    What did she say?

22   A.    That she——that she was trying to reach her, that she has a

23   cellphone, she wasn't answering her cellphone, she's been——she

24   was trying to contact her, and she was unsuccessful.

25   Q.    And the other reason you made entry was the plaintiff's

1    demeanor.

2    A.    Correct.

3    Q.    That he was being hostile, being rude, right?

4    A.    I didn't say hostile.  He was yelling, cursing.

5    Q.    I think hostile was the term——was the hostile term used in

6    your deposition, sir?

7    A.    In the deposition, yes.

8    Q.    And rude?

9    A.    Yes.

10   Q.    And that gave you more of a concern.

11   A.    It——yes.

12   Q.    Because I think you testified a normal person would be more

13   cooperative.

14   A.    Yes.

15   Q.    And I think your testimony was that a normal parent would

16   be, *What are you talking about,* would say, *What are you talking*

17   *about, here's my child, everything's fine*?

18   A.    Yes.

19   Q.    That was your testimony, right?

20   A.    Yes.

21   Q.    You've been a police officer kind of a long time, right?

22   A.    Correct.

23   Q.    You've encountered people who are mistrustful of the

24   police.

25   A.    I'm sorry?

1    Q.    You've encountered people who are mistrustful of the

2    police.

3    A.    Yes.

4    Q.    You've encountered people who don't want to talk to the

5    police.

6    A.    Correct.

7    Q.    And you know that people don't have to talk to you if they

8    don't want to, right?

9    A.    Correct.

10   Q.    You've arrested people before?

11   A.    Yes.

12   Q.    And you have that little spiel memorized, right?

13              THE COURT:    I'm sorry?

14              MS. GELLER:    Excuse me.  I apologize, your Honor.

15   Q.    When you arrest somebody, you have a series of things you

16   have to tell them, right?

17   A.    For the most part, yeah.

18   Q.    And one of them is that they have the right to remain

19   silent, correct?

20   A.    Correct.

21   Q.    And that applies whether you're under arrest or not.

22   A.    It's based on the situation.  If I'm doing an

23   investigation, asking questions, if they're under arrest, I do

24   let them know their rights.

25   Q.    Right.  But even if they're not under arrest, if you ask

1    them questions, they have the right to tell you they don't want

2    to answer.

3    A.    Correct.

4    Q.    And a person in their home, they don't have to let you in,

5    right?

6    A.    Correct.

7    Q.    They can keep their door shut, right?

8    A.    Yes.

9    Q.    They can close the door on you if they don't want to talk

10    anymore, right?

11    A.    They can.

12    Q.    They're allowed to do that.

13    A.    Yes.

14    Q.    There is no crime for closing the door because a police

15    officer is asking questions, right?

16    A.    No.

17    Q.    Now if you were——if a normal parent would say, *What are you*

18    *talking about, here's my child, everything's fine,* that's very

19    hard to do if the child isn't there, right?

20    A.    Correct.

21    Q.    And I think——well, withdrawn.

22            And you've testified, or did——and you really don't

23    remember everything that Mr. Rattray said to you that day,

24    right?

25    A.    No.

1   Q.    He could have said she wasn't there, you don't remember,

2   right?

3   A.    I don't remember.

4   Q.    And when you asked the whereabouts of his daughter, you

5   don't remember what he said to that either, do you?

6   A.    No.

7   Q.    At some point I think you testified that——and you can tell

8   me if I've got this wrong, but I think at some point you

9   testified that you asked him to show you court papers?

10  A.    Correct.

11  Q.    And that was while you were in the apartment?

12  A.    Yes.

13  Q.    To prove that he had custody of the child.

14  A.    Not custody.  It was in regards to the visitations.

15  Q.    You were asking him to show you court papers as regards

16  visitation?

17  A.    Correct.

18  Q.    You were asking him to show you court papers that he had

19  visitation?

20  A.    Well, based on what Ms. Sandy was——what she was telling me,

21  the reason why she was there, I wanted to know if he had

22  paperwork that would show who had the daughter at what time,

23  what date.  I wasn't——I wasn't there to establish custody.

24  Q.    Right.  Because you——and you had no authority to enforce

25  visitation anyway, right?

1    A.    Correct, but I just wanted to see——I wanted to confirm what

2    Ms. Sandy was saying.

3    Q.    You were in his home, trying to confirm what Ms. Sandy was

4    saying; is that your testimony?

5    A.    Yes.

6    Q.    Even though if she did have visitation——withdrawn.

7              Even though——try this again.  Even though, even if you

8    had seen a piece of paper saying she had visitation, there was

9    nothing you could do, right?

10   A.    Yes.

11   Q.    The best you could do was fill out a DIR.

12   A.    Correct.

13   Q.    And you don't recall your partner, Officer Trigueno, saying

14   that, *If you don't have a piece of paper, you're going*

15   *downtown*; you don't recall that either, right?

16   A.    I do not.

17   Q.    And you don't recall the plaintiff requesting a supervisor

18   before he tried to close the door?

19   A.    No.

20   Q.    And you don't recall——when you were in the plaintiff's

21   apartment, you don't recall the plaintiff saying she was on a

22   playdate.

23   A.    I know——I know he didn't say that.

24   Q.    I'm sorry?  What was that?

25   A.    He didn't say that.

1    Q.    Your testimony is that he didn't say that.

2    A.    Yes.

3    Q.    If you could take a look at page 31, line 25, and we're

4    going to go over into line 32——excuse me.  Go onto the next

5    page.  Just let me know when you're there.

6    A.    Okay.

7    Q.    And in your deposition, you were asked:

8                "Do you recall me telling you she was on a playdate?"

9                And your answer:  "I do not.  I do recall you refusing

10   to answer my question."

11   A.    Yes.

12   Q.    So you didn't say in your deposition that he did not say

13   that, right?

14   A.    In my deposition, no.

15   Q.    So one of the reasons why you felt you had cause to make

16   entry was Mr. Rattray's demeanor.

17   A.    That was one of the reasons, yes.

18   Q.    Okay.  Because that's not how a normal person would react.

19   A.    Correct.

20   Q.    Now the Fourth Amendment standard that you have to comply

21   with is not normality, right?

22               MS. FADDIS:    Objection.

23               THE COURT:    Sustained.

24   Q.    So you bang on the door and there's a back-and-forth,

25   right?

Case: 25-700, 09/26/2025, DktEntry: 39.1, Page 268 of 276

1    A.    Yes.

2    Q.    You demand to see the child.

3    A.    I ask.

4    Q.    You demand——you asked that he produce the child.

5    A.    I ask to see the child.

6    Q.    And then you threaten to take his door down.

7    A.    Correct.

8    Q.    He opens the door, and you stick your foot in there, right?

9    A.    Correct.

10    Q.    Right away.

11    A.    Yes.

12    Q.    You don't wait for him to answer any questions; you stick

13    your foot in there right away.

14    A.    Correct.

15    Q.    So that you can make sure that door stays open.

16    A.    Yes.

17    Q.    That he can't exercise his right to close that door, right?

18                MS. FADDIS:    Objection.

19                THE COURT:    Sustained.

20    Q.    So that he can't close the door, right?

21    A.    Correct.

22    Q.    And then as he's got his door open, you demand to see the

23    child again.

24    A.    I ask——I asked to see the child and her whereabouts.

25    Q.    Okay.  And at this point you have no knowledge of who has

1    custody.

2    A.    No.

3    Q.    You have no knowledge of who has visitation.

4    A.    No.

5    Q.    You have no knowledge of the history of this custody

6    dispute.

7    A.    No.

8    Q.    You have no knowledge of the——you have no knowledge of the

9    relationships between the parties.

10   A.    No.

11   Q.    You have no knowledge if this has happened before.

12   A.    No.

13   Q.    You have no context for the history of this dispute at all,

14   right?

15   A.    I——I don't recall, 'cause when I spoke to Ms. Sandy, she

16   might have stated the history, but I don't remember that.

17   Q.    And so as Mr. Rattray's standing at the door and you're

18   asking to see his child, and you're asking him to prove the

19   whereabouts of his child, he's irate.

20   A.    He's——yeah.

21   Q.    And you continue to ask him to prove where his child is,

22   right?

23   A.    I continued——I continued to ask him where——if I could see

24   his child.

25   Q.    And when you were in his apartment and you did your search,

1   you approached and you asked for his ID, right?

2   A.    Yes.

3   Q.    And you held it in your hand, right?

4   A.    I don't remember.

5   Q.    Well, and at some point you threatened him with child

6   protective services, right?

7   A.    No.

8   Q.    You don't remember that?

9   A.    I never stated that.

10  Q.    Your testimony is that you didn't say, "When asked why they

11  needed my ID, he said he needed to know who he was talking to

12  for when he called child services"?  You didn't say that?

13  A.    No.

14  Q.    You had no basis to call child services at that point,

15  right?

16  A.    Not at that point, no.

17  Q.    No grounds to believe that Mr. Rattray was in some way

18  harming his daughter.

19  A.    I——at that point I didn't know yet.

20  Q.    You had no basis to believe that Mr. Rattray was harming

21  his daughter, right?

22  A.    Well, I had——I was going based on what the mother was——the

23  allegations the mother was saying.

24  Q.    Okay.  But Ms. Sandy didn't say he hurts her, right?

25  A.    No.

1   Q.   Didn't say——she didn't say he hits her, right?

2   A.   No.

3   Q.   She didn't say, *I'm worried he will harm her,* right?

4   A.   No.

5   Q.   And you didn't see any evidence of that in the apartment

6   when you searched it.

7   A.   No.

8   Q.   Now when you entered the apartment and you pushed the door

9   in, Mr. Rattray stood back, right?

10   A.   To my recollection, yeah, he——as soon as he noticed I was

11   pushing my way in, he took a few steps back.

12   Q.   He stepped back.  And he didn't try to push you out?

13   A.   No.

14   Q.   He didn't try to close the door and shove you out the door.

15   A.   No.

16   Q.   He made no attempt to stop you whatsoever.

17   A.   No.

18   Q.   No, he didn't make an attempt to stop you, right?

19   A.   Correct.

20   Q.   Now when you come in, you're in full police uniform, right?

21   A.   Yes.

22   Q.   And when you are on patrol, you have a bulletproof vest?

23   A.   Yes.

24   Q.   You wear that under your shirt?

25   A.   Yes.

1    Q.    I think you defined imminent earlier in your testimony

2    today, right?  Well, let me——withdrawn.  Withdrawn.  I got that

3    wrong.

4                You defined when you can enter a home——

5    A.    Correct.

6    Q.    ——right?  And that was if you have a warrant?

7    A.    With a warrant, yes.

8    Q.    But you didn't have a warrant here.

9    A.    No.

10   Q.    It would take too long to get; that was your testimony,

11   right?

12   A.    Yes.

13   Q.    And you didn't have a medical emergency.

14   A.    No.

15   Q.    No knowledge of a medical emergency.

16   A.    No.

17   Q.    And so I think you just said that what we just went through

18   was not your definition of imminent, right?

19   A.    Correct.

20   Q.    So what was your basis for entering the apartment?

21   A.    Possible crime being committed.

22   Q.    Possible crime being committed.

23   A.    Yes.

24   Q.    Possible crime being committed was the yelling?

25   A.    No.  It was the——with the daughter, that she could be

1    abused, she could be hurt.

2    Q.    Your testimony is that you believed the child was being

3    abused.

4    A.    Well, my——

5              MS. FADDIS:    Objection.

6              THE COURT:    Overruled.

7    A.    My testimony is based on the allegations from Ms. Sandy

8    saying that she's not safe and in danger, now I'm——there could

9    be a possible crime of Mr. Rattray either abusing the child or

10   some type of child crime.

11   Q.    Forgive me here for a minute, because I'm a little

12   confused.

13             We just went through the grounds for your entry, and

14   you don't believe that those were exigent circumstances, right?

15   Withdrawn.  You don't believe that those showed imminent

16   danger, as you define, it, right?

17   A.    Yes.

18   Q.    So you made entry into the apartment because you believe

19   that a crime was being committed?

20   A.    I was trying to establish, I was trying to investigate,

21   yes.

22   Q.    Okay.  Now Ms. Sandy just said, *My child isn't safe,* right?

23   A.    Yes.

24   Q.    She didn't say he abuses her.

25   A.    No.

1    Q.    She didn't say he hits her.

2    A.    No.

3    Q.    She didn't say he commits crimes against her.

4    A.    No.

5    Q.    She didn't mention any crime at all, did she?

6    A.    No.

7    Q.    She didn't even mention a concern for a crime, did she?

8    A.    Well, when she stated that she's not safe and in danger.

9    Q.    She didn't say, with any specificity, any crime against a

10   child when she talked to you, did she?

11   A.    No specific crime.

12   Q.    What she said was that he does drugs, right?

13   A.    That was one, yeah, one.

14   Q.    And that he has drug dealers over the apartment, right?

15   A.    Correct.

16   Q.    Those were the specifics she gave.

17   A.    Yes.

18   Q.    So when you're standing at the door, that's all the

19   information you have, right?

20   A.    Yes.

21   Q.    And you didn't make entry because you were concerned that

22   child was in imminent danger; that's your testimony?

23   A.    I'm sorry.  Can you repeat that question.

24   Q.    You didn't make entry because you were concerned the child

25   was in imminent danger.

1   A.    Imminent danger, no.

2   Q.    You entered the apartment because you say here that you

3   thought he was committing some kind of crime against the child.

4   A.    I was trying to establish that.

5   Q.    Based on what Ms. Sandy said below.

6   A.    Yes.

7   Q.    Some unspecified crime against the child.

8   A.    Yes.

9   Q.    You can't articulate what that crime might be.

10  A.    At that point, no.

11  Q.    And you had additional concern because of the way

12  Mr. Rattray responded.

13  A.    Yes.

14  Q.    That when you asked to see his daughter, he told——he

15  refused to tell you where she was.

16  A.    Yes.

17  Q.    And that when you demanded he produce her, he refused to

18  comply.

19  A.    When I asked for him to show me his daughter, yes, he was

20  refusing.

21  Q.    Okay.  But you don't remember one way or the other that he

22  said she wasn't home.

23  A.    No, I do not recall.

24  Q.    You don't recall that.

25  A.    No.

1    Q.    Or that she wasn't available; you don't recall that.

2    A.    No.

3    Q.    And so that just——and you didn't say to him, We think

4    something's happening in that apartment, did you?

5    A.    No.

6    Q.    You didn't say to him, We're concerned that the child is

7    being abused.

8    A.    No.

9    Q.    You didn't say to him, We're concerned that she's not safe.

10   A.    No.

11   Q.    You didn't say to him anything at all to suggest

12   that——withdrawn.

13              You didn't say to him anything to the fact that you

14   believed a crime was possibly being committed in that

15   apartment, did you?

16   A.    No.  I would not tell him that.

17   Q.    And after you were in the apartment and you stayed there

18   and it was clear the child wasn't there, you were still

19   concerned about a crime?

20   A.    Yes.

21   Q.    An unspecified potential crime against the child.

22   A.    Correct.

23              MS. GELLER:    Your Honor, if I may have a moment.

24              THE COURT:    Yes.

25              MS. GELLER:    Thank you, your Honor.  Nothing further.