# 25-700

## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

--------------------------------

**Wentworth Rattray**,

       *Plaintiff-Counter-Claimant-Appellant*,

v.

**Police Officer Jose Cadavid, Badge #9085**, in his individual and official capacity, **Police Officer Alyssa Trigueno**, in her individual and official capacity,

       *Defendants-Counter-Defendants-Appellees*,

Police Officer Sgt. Mervin Bautista, in his individual and official capacity, The City of New York,

       *Defendants-Appellees*.

CORRECTED BRIEF OF APPELLANT WENTWORTH RATTRAY ON APPEAL
FROM THE DECISION AND FINAL JUDGMENT OF
THE SOUTHERN DISTRICT OF NEW YORK
17-CV-8560

## Contact Information

    Wentworth Rattray, pro se
    1039 Madison Street
    Annapolis, MD 21403
    (917) 353-9675

# Table of Contents

Contact Information ........................................................................................................... 1

Table of Authorities ........................................................................................................... 3

Jurisdictional Statement ..................................................................................................... 4

Statement of Relevant Facts .............................................................................................. 4

Standards of Review ........................................................................................................... 6

Statement of the Issues .................................................................................................... 18

Statement of the Case ...................................................................................................... 28

Summary of the Argument ............................................................................................... 30

Conclusion ........................................................................................................................ 38

Signature Page .................................................................................................................. 40

Certificate of Compliance ................................................................................................ 41

A 1 – Trial filings ............................................................................................................. 42

A 2 – Jury instruction ...................................................................................................... 42

A 3 – Motion to Compel un-Redaction ............................................................................ 43

A 4 – Denying Extension of Discovery ........................................................................... 44

A 5 – Doc 119 - Discovery Limited ................................................................................. 45

A 6 – No. 20–157. Caniglia v. Strom, 593 U.S (20-157). ............................................. 46

A 7 – No. 23–1239. Barnes v. Felix 605 U.S. ................................................................ 62

## Table of Authorities

1. *Abel v. United States (1960) 362 US 217, 4 L Ed 2d 668, 80 S Ct 683*

2. *Barnes v. Felix 605 U.S.*

3. *Bilida v. McCleod, 211 F.3d 166 (1st Cir. 2000)*

4. *Caniglia v. Strom, 593 U.S (20-157).*

5. *Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 381 (S.D.N.Y. 2013)*

6. *Cohen v. Norris (1962, CA9 Cal) 300 F2d 24.*

7. *Davis v. United States (1946) 328 US 582, 90 L Ed 1453, 66 S Ct 1256,* reh den *(1946) 329 US 824, 91 L Ed 700, 67 S Ct 107*.

8. *Fisher, 558 U.S. at 47*

9. *Goldfuss v. Davidson, 79 Ohio St. 3d 116, 123* (1997)

10. *Johnson v. Abdullah*, 2021-Ohio-3304

11. *Kentucky v. King, 563 U.S. 452, 462 (2011); id. at 470*

12. *Koon* v. United States, 518 U.S. 81, 100 (1996)

13. *Missouri v. McNeely, 569 U.S. 141, 151–52 (2013)*

14. ***Pierce v. Underwood,* 487 U.S. 552, 558 (1988)**

15. *R.T. v. Knobeloch*, 2018-Ohio-1596, (10th Dist.)

16. *Terry v. Ohio (1968)*

17. *Time Warner Entertainment Co. v. Six Flags Over Georgia*, 245 Ga. App. 334, 350 (2000).

18. *United States v. White (1944) 322 US 694, 88 L Ed 1542, 64 S Ct 1248, 14 BNA LRRM 746,* 152 ALR 1202

19. *Whitley v. Gwinnett County, 221 Ga. App. 18, 19 (1996)*

20. *York v. State, 242 Ga. App. 281, 287* (2000).

## Jurisdictional Statement

This brief is filed on behalf of Appellant Wentworth Rattray seeking a de novo review and a writ of coram vobis due to error of law and error of fact <u>Pierce v. Underwood, 487 U.S. 552, 558</u> (1988). Plaintiff Wentworth Rattray brought an action in United States District Court Southern District of New York against Defendants City of New York, Police Officer Jose Cadavid and Alyssa Trigueno alleging violations of his civil rights pursuant to 42 U.S.C. § 1983 arising from an incident that occurred in his home on November 5, 2016.

Trial proceeded on 8/29/2023 and the order was entered on 09/05/2023 by Hon. Paul G. Gardephe. A motion for new trial was denied by the trial court on 02/24/2025. Mr. Rattray properly filed the Notice of Appeal on 3/25/2025 within 30-days of the trial court's judgement.

The UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT has jurisdiction over appeals from cases tried in the United States District Court Southern District of New York.

## Statement of Relevant Facts

1. On November 5th 2016 Mr. Wentworth Rattray was alone at his residence in apartment 3C at 42 West 120th Street, NY, NY.

2. Out-of-state, non-custodial parent of the subject-child arrives at 42 W 120th St and placed a 911 call asserting that it is "her time to pick-up [her daughter]".

3. Officers Jose Cadavid and Alyssa Trigueno are dispatched to assist with a '*custodial dispute*'. ***Dkt. 39 Appendix Pg. 83 lines 9-22***

4. Officers arrive at Mr. Rattray's home and demand that Mr. Rattray, the custodial parent, produce the child.

5. Mr. Rattray is unable to produce the child as the child was not at home.

6. Officer Cadavid insists that Rattray produce the child. Officer Cadavid forces his way into the home, and upon searching the home, over Mr. Rattray's objection, Cadavid comes to believe that the child is not at home. After searching the home Cadavid detains Mr. Rattray in the home over an hour, from approximately 19:12 (7:12PM) until after 20:15 (8:15PM) when his supervisor, Lt Kosh, arrives at the home. ***Dkt. 39 Appendix Pg. 126*** [DM ICAD Event Chronology INCIDENT REPORT]

7. The supervisor reviews the details of the situation and instructs the officers to depart.

8. Mr. Rattray files a complaint with NYPD's Internal Affairs Bureau and in the Southern District of New York Wentworth Rattray v. The City of New York, Jose Cadavid, et al [17-CV-8560 (PGG)].

9. The case proceeds to trial where:

   a. At trial, Cadavid repeats allegations he first made in his deposition, that the mother told him of her concern for the child's safety and that Mr. Rattray used drugs and had drug-dealers visiting the home.

   b. At trial, Cadavid also raises ***new*** allegations of a welfare-check made by new undisclosed, unnamed witnesses, another unit, that was allegedly dispatched to verify the child's safety.

   c. At trial, the non-custodial mother emphatically refutes Cadavid's allegations, and repeats in essence her deposition

testimony that she made no statements to Cadavid alleging danger to the child or of alleged drug-use by Mr. Rattray or drug-dealers visiting the home.

    d. At trial, on cross examination, Cadavid acknowledges that:

        i. He perceived no imminent danger, and that he entered the home because 'there could be a possible crime of Mr. Rattray either abusing the child or some type of child crime'. ***Dkt. 39 Appendix Pg. 270 Ln. 17 through Pg. 276 Ln. 22***

        ii. He never told Mr. Rattray that there was any concern for the well-being of the subject child that evening. ***Dkt. 39 Appendix Pg. 276 Ln. 13-22***

10.     At trial the jury found for the defendants and a Verdict and subsequent Order was issued by the trail court on 09/05/2023.

11.     A motion for a new trial was filed by Mr. Rattray and it was denied by the lower court on 02/24/2025.

12.     A Notice of Appeal was filed by Mr. Rattray on 3/25/2025.

## Standards of Review

The *standard of review* for this appeal is a *mixed basis* as there are substantial issues where matters of law were submitted to the jury.

Questions of law are reviewable de novo. Pierce v. Underwood, 487 U.S. 552, 558 (1988) Trial courts do not have discretion to apply the law incorrectly or make errors of law. Johnson v. Abdullah, 2021-Ohio-3304

Factual errors presented in the court's characterization of the details of the case in its rulings also require application of the clearly *erroneous standard* of review.

Where the shifting of the burden of proof required to justify an exception under the warrant requirement was not sufficiently articulated in the jury instructions the applicable standard of review is *de novo*.

Where the court discounts the child's mother's eye-witness testimony on her statements to Cadavid and credits Cadavid's statements as more credible despite evidence in the courts records, (See Cadavid's testimony of his disciplinary record), of Cadavid's prior charges of making false statements being charged 30days of vacation, and still testifying that he didn't believe those charges to be true but still signed the paperwork. The applicable standard of review is *abuse of discretion.*

Where several factual issues that the trial court credits as fact where no evidence was presented or where no such allegation was made in the record (e.g., no evidence of texts from the mother made to Mr. Rattray on the day of the incident referred to in the courts denial Dkt. 300 of plaintiff's motion for a new trial Dkt. 290) the applicable standard is *de novo*.

Where the magistrate limited discovery declaring the request for 'all communications' as beyond the needs of the case the applicable standard of review is *abuse of discretion*.

i. Question of Law:
   1. Trial courts do not have discretion to apply the law incorrectly or make errors of law. *Johnson v. Abdullah*, 2021-Ohio-3304.
   2. Even assuming the facts are as alleged by Officer Jose Cadavid in his

testimony, a reasonable office or a magistrate would not conclude that there was imminent danger to Rattray or to the child. A properly instructed juror given all the circumstances set forth before him, including the veracity and basis of knowledge of persons supplying hearsay information, could conclude that Cadavid had no reasonable basis to detain Rattray and no fair probability to suspect that contraband or evidence of a crime would be found in Rattray's home.

3. After searching Rattray's home, Cadavid had no basis to continue his unwarranted detention of Mr. Rattray inside his home because as Cadavid testified "Q. But you didn't have a warrant here.

A. No.

Q. It would take too long to get; that was your testimony, right?

A. Yes."

Dkt. 296 Case 1:17-cv-08560-PGG-KHP Pg 116 of 179.

  ii.  Benchmark case:

1. *Johnson v. Abdullah*, 2021-Ohio-3304

2. *Barnes v. Felix 605 U.S.*

3. *Caniglia v. Strom, 593 U.S (20-157).*

  iii.  Note:

1. In the instant case, the legality of the search and seizure is a question of law that must be answered by the Court and cannot be answered by a jury. Cadavid's reasons for entering Mr. Rattray's home was not based on any exceptions to the warrant requirement. The search occurred in a home-not in a vehicle. No child, or drugs, or drug dealers were alleged to be in plain view of NYPD's police officer Jose Cadavid and none were found pursuant

to the unwarranted search to require a prolonged detention. Nor was any allegation of such findings made, nor that Officer Cadavid received permission to enter or search the home.

2. Cadavid testified that he based his search on what Cadavid alleges only he heard from the non-custodial mother and on what he and his partner characterized as Mr. Rattray being rude, aggressive, and uncooperative by not providing his child to facilitate Cadavid's custodial dispute investigation and in compliance with Cadavid's demand that Rattray produce the child.

3. After Cadavid's entry and search, his new demand was that Mr. Rattray should then tell him where the child was. ***Dkt. 39 Appendix Pg. 268 Ln. 2- Pg. 270 Ln. 25*** Even generously assuming Cadavid's testimony could be supported by evidence it is still insufficient to overcome the legal protections afforded Mr. Rattray in his home under the Fourth Amendment. Trial courts do not have discretion to apply the law incorrectly or make errors of law. *Johnson v. Abdullah*, 2021- Ohio-3304

4. Police Officers do not have discretion to search a *home* based on the community caretaking exception doctrine. *Caniglia v. Strom, 593 U.S (20-157).* " Court has repeatedly "declined to expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home." Collins, 584 U. S., at __ (slip op., at 8)."

5. "If exigent circumstances existed to enter Mr. Rattray's home and Officer Cadavid had probable cause to arrest Mr. Rattray, then the confinement was privileged." (Jury Instruction Dkt. 277 pg. 17) Defense argues that exercising a constitutional right, either by refusing to answer questions, failing to open the door of his home, closing the door to his home, failing to

produce a child that was not in the home, constituted the crime of and provided NYPD with probable cause for arresting Mr. Rattray for the offense of obstructing governmental administration. (Jury Instruction Dkt. 277 pg. 20)

- Cadavid testified that he had no articulable suspicion but based his search on "Possible crime being committed." ***Dkt. 39 Appendix Pg. 270 Ln. 14- Pg. 272 Ln. 21***

- Cadavid testified that after his search there was no imminent danger at the home on that evening and that he continued to detain Mr. Rattray until his supervisor arrived to assist him with completing his investigation. ***Dkt. 39 Appendix Pg. 274 Ln. 24- Pg. 275 Ln. 10***

- Even if Cadavid had articulable suspicion to believe a child was in the home and in imminent danger once he completed his search a reasonable officer would recognize that there was no longer a reason or basis to detain Mr. Rattray in the home.

b. Mixed review:

    i. As the appeal involves a mixed question of law and fact, where the trial court gave improper jury instructions. *See, e.g.*, *R.T. v. Knobeloch, 2018- Ohio-1596,* (10th Dist.) The jury cannot be relied upon to determine matters of law as instructed by the court's jury instruction.

    ii. Benchmark case: *R.T. v. Knobeloch*, 2018-Ohio-1596, (10th Dist.)

c. Substantial Evidence:

    i. Jury Decision goes against the weight of the evidence. The legality of Cadavid's search was not defined in the jury instruction and was erroneously left as a fact to be found by the jury. There is no dispute

that Cadavid's search was without warrant, and thus presumed to be unreasonable.  This presumption shifts the burden-of-proof to the state and/or Cadavid to prove an exception to the warrant requirement.  There was no stated exception to the warrant requirement.  There was no actual or alleged imminent danger or threat to the child or anyone else.  No real or perceived immediate threat or danger was articulated by Police Officer Jose Cadavid.  Even if there had been an articulated threat, the jury would need to be instructed that it would be the State's burden, Cadavid's burden, to prove exigence or any other claimed exception to the warrant requirement.

d.  Clearly Erroneous:

    i.  It was Clear Error for the District Court to issue the order denying Rattray's Discovery Request For ***All Communications*** regarding the November 5th, 2016 incident as Fourth Amendment cases must be considered in light of ***all*** the evidence. ***Dkt. 39 Appendix Pg.30 [A 5 – Dkt. Limiting Discovery]***

    ii.  Cadavid's search was without warrant, and thus presumptively unreasonable which shifts the burden to the state and/or Cadavid to prove an exception to the warrant requirement.  This ***shift*** was ***erroneously omitted*** from the jury instructions. Dkt. 277.  ( ***Dkt. 39 Appendix Pg.29***)

    iii. In the district court's Memorandum Opinion & Order [Dkt. 300 ] and . ***Dkt. 39 Appendix Pg.15***, the court erroneously credits officers with telling Rattray of Cadavid's concern for the child, "that they were checking on the welfare of his daughter". At trial, Cadavid testified on cross was that he did not tell Mr. Rattray why Cadavid wanted

Rattray to bring the child to him and further stated that he "would not have done that". ***Dkt. 39 Appendix Pg.276 Line 3- 22***

iv.

"

Q. And so that just——and you didn't say to him, We think something's happening in that apartment, did you?

A. No.

Q. You didn't say to him, We're concerned that the child is being abused.

A. No.

Q. You didn't say to him, We're concerned that she's not safe.

A. No.

Q. You didn't say to him anything at all to suggest that——withdrawn.

You didn't say to him anything to the fact that you believed a crime was possibly being committed in that apartment, did you?

A. No.  I would not tell him that.

Q. And after you were in the apartment and you stayed there and it was clear the child wasn't there, you were still concerned about a crime?

A. Yes.

Q. An unspecified potential crime against the child.

A. Correct.

MS. GELLER:  Your Honor, if I may have a moment.

THE COURT:  Yes.

MS. GELLER:  Thank you, your Honor.  Nothing further.

"

v. A fourth error is the court's assertion that Mr. Rattray had custody papers and refused to provide the 'papers' to Officers.

1. The relevant family court order was drafted by the family court the prior day November 4th but not signed by judge Sweeting until

November 7th. While both Ms. Sandy and Mr. Rattray were aware of the pending Order neither could have provided a copy of the nunc pro tunc order because neither had the order on November 5th 2016. No one had those papers on Saturday, November 5th 2016. [Dkt. 47 -2C] and { **_Dkt. 39 Appendix Pg.141_** Relevant Family Court Order}. Providing any other papers could be seen as misleading since they were then superseded by the November 4th / 7th order.

vi. A fifth error is the Trial court's assertion in it's Memorandum Opinion & Order. [Dkt. 300 ] and { **_Dkt. 39 Appendix Pg. 147_** } that Sandy had sent text messages to Rattray on November 5th 2016 and that "There is no evidence that Rattray-who had obtained full custody of A. (see PXl (Oct. 5, 2016 Family Court Order) (Dkt. No. 251 -4) at 2)- ever responded to Sandy's text messages."

1. There is no evidence that Mr. Rattray received any messages from Sandy.

2. Ms. Sandy testified that she had sent the child text messages but there was no testimony that Mr. Rattray had prior knowledge of Ms. Sandy's texts to the child or of her plan to pickup or attempt visitation prior to Sandy's arrival at his home.

vii. A sixth error is the trial court's MEMORANDUM OPINION & ORDER where the court asserts that Mr. Rattray's behavior was violent. There is no evidence or testimony in the record of any allegation of violent conduct by Mr. Rattray. "His aggressive and

violent behavior- considered together..." ***Dkt. 39 Appendix Pg. 153 note 3***

While aggressive is a subjective measure and subject to the court's discretion, nothing in the record could reasonably be considered 'Violent behavior' by Mr. Rattray. ***Dkt. 39 Appendix Domestic Incident Report DIR Incident Narrative Pg. 128 Ln 1-19 and Appendix Pg. 271 Ln 1-19***

    viii.    These errors were **not harmless** in that:

        1.  One error prevented Mr. Rattray from performing sufficient discovery to discover the identity of key witnesses, the undisclosed and therefore un-deposed, officers that Officer Jose Cadavid would testify were sent to witnesses the child's wellbeing.

        2.  Another error omitted the shift of the burden of proof for exigency to the defendants under the warrant requirement. This shift, if communicated to a reasonable juror could have influenced the eventual outcome by setting a requirement for proof of exigency by defendants and reduced Mr. Rattray's burden under law.

        3.  A third error is the set of key details referenced in the court's analysis where the court omits or misinterprets key elements and mis-states material facts from the record in its analysis, often to the detriment of Mr. Rattray.

e.  Abuse of Discretion:

    i.  Discretionary decision

        1.  The failure to apply the law correctly in reaching a decision is always an abuse of discretion. *Koon v. United States, 518 U.S. 81,*

_100 (1996)_ ("A district court by definition abuses its discretion when it makes an error of law.")

2. Overlooking the inconsistencies in Cadavid's trial testimony where:

Cadavid testifies that he has no understanding of what false statements he was accused of making when he was docked vacation time. ***Dkt. 39 Appendix Pg. 119 Ln 2-21***

2    Q    *You don't know what you were accused of*

3    *making    a false statement about?*

4    A    *All I know is it was -- all I know is I*

5

6

7    *was charged with making a false statement.*

*Q    And they didn't tell you what the false statement that you were charged with was?*

8        A    *No.*

9        Q    *They never told you that?*

10        A    *No.*

11        Q    *Okay. And you didn't have to sign papers*

12    to    *acknowledge what that false statement was?*

13        A    *I did sign papers.*

14        Q    *You did sign papers, okay. But the nature*

15    of    *the false statement was not on those papers?*

16        A    *From my recollection, no.*

17        Q    *So to this day, you were accused of making*

18

19    *false statements, and you do not know what those false statements were about?*

20    A    *Correct.*

21    Q    *Thank you, Officer Cadavid.*

•

3. Cadavid's admission that he was unaware of any imminent danger but that "[He] was trying to establish that. ***Dkt. 39 Appendix Pg. 274 ln 24 - Pg. 275 ln 10***

    4.

5. Additionally, Cadavid's failure to call out for the child before or after entering the home along with his deposition testimony response when asked his intention if he found the child both strongly indicate that his intent was to what in his mind was 'returning the child to her mother'. ( ***Dkt. 39 Appendix Pg. 118 LN 18-25***):

"

        **Okay.  So when you conducted the search, what were you going to do if you found the child? What were you going to do with that child?**

    A    Take her outside --

    **MR. UDALOV:**  Objection.  It calls for speculation.

    **MR. RATTRAY:**  This is the officer testifying to his intent.

    "

  ii. Discovery rulings. Defendants' failure to comply with FRCP **Rule 26**.(a)(1)(**A**) with respect to the newly disclosed officer who were credited with assuring the

16

wellbeing of the child (Dkt 168 ) and ***Dkt. 39 Appendix Pg. 151*** was enabled by the court's discretionary limitation of Plaintiff's discovery requests for all communications related to the incident.  This created unfair surprise at trial where the custodial parent heard for the first time that NYPD officers were alleged to have made contact with his minor child on the evening of November 5th 2016.

    1.  *Time Warner Entertainment Co. v. Six Flags Over Georgia, 245 Ga. App. 334, 350 (2000)*.

iii.  Submission of verdict form or special interrogatories to the jury erroneously containing instructions for the jury to decide matters of Law.

  *Whitley v. Gwinnett County, 221 Ga. App. 18, 19 (1996); York v. State,* *242 Ga. App. 281, 287 (2000)*.

iv.  Even when viewed in the light most favorable to support the jury's verdict, the record reveals no relevant facts to support the verdict. Cadavid's testimony that he heard his supervisor, hear from the other, unnamed and previously undisclosed, police officers unit that the child was safe, is hearsay and not creditable given Cadavid's history of either making false statements on official reports or falsely admitting to making false statements while denying making the original false statement.

  f.  Plain Error:

i. No reasonable officer given the set of allegations Cadavid has testified to could believe that "a person within [the house] is in need of ***immediate*** aid," There is nothing in Cadavid's testimony that articulates an immediate need to render aid. After conducting the search no lawful reason for police to remain in the home or to continue to detain Mr. Rattray was articulated in Cadavid's testimony or in any evidence presented.

ii. A ruling which resulted in a miscarriage of justice, sets a dangerous post Caniglia v. Strom precedent, and could seriously affect the basic fairness, integrity, and public reputation of the judicial process.

iii. Benchmark Case:

1. *Goldfuss v. Davidson*, 79 Ohio St. 3d 116, 123 (1997)

iv.

21. Officer Jose Cadavid's unwarranted and thus presumptively unreasonable search requires, and presumably fails, the "strict scrutiny" of this Court in that Cadavid's search and demand to produce the child, if allowed, burdens a "fundamental right" of Plaintiff and of all parents, to be free from State interference without probable cause.

## Statement of the Issues

1. **SUPPRESSION OF EVIDENCE IN THE LOWER-COURT.**

   a. Defense failed to disclose material witnesses as required under FRCP Rule 26.(a)(1)(A):

     i.  The existence or identity of the officers that were sent to check on the child as testified to by Cadavid and cited in the court's denial of Mr. Rattray's retrial request was not disclosed to Mr. Rattray.

b.  In a ruling Magistrate Judge Parker disallowed Mr. Rattray's interrogatory request made as plaintiff under FRCP Rules, to receive 'all' communications about himself, the subject-child, and the subject child's mother (**Doc 119** ' Plaintiff is directed not to pose any additional interrogatories without leave of Court and Defendant is excused from answering the interrogatories').

c.  The magistrate ruled that:

     i.  Plaintiff's numerous discovery request exceeded the needs of the case and further ruled that

    ii.  for Plaintiff to make further discovery requests he had to secure the prior clearance of the court and be specific in his requests. However, with limited access to the information that the state has accumulated it is nearly impossible to know what the state has in its possession related to the case in order for a plaintiff to make narrow. Specific requests. (Doc 119 'Plaintiff is directed not to pose any additional interrogatories without leave of Court and Defendant is excused from answering the interrogatories')

   iii.  The magistrate's suppression of plaintiffs ability to conduct a fulsome discovery constrained plaintiff and was impactful to the case and to plaintiff's ability to call out inconsistencies in

Cadavid's testimony.

## 2. THE EXISTENCE OF ADDITIONAL NEW FACT WITNESSES WAS UNDUE SURPRISE AS THEY WERE FIRST DISCLOSED AT TRIAL.

a. Cadavid spontaneously, testified that other officers were dispatched and those officers traveled to the location of, and establish the wellbeing of, the subject child.

   i. No information on the existence of these officers was provided to plaintiff prior to courtroom testimony during the trial as required under FRCP Rule 26.(a)(1)(A).

   ii. Plaintiff was denied the opportunity to depose the still-unnamed individual officers, elicit their testimony in depositions, review their statements, or conduct an examination of their testimony at trial as required under FRCP Rule 26.(a)(1)(A).

   iii. That testimony is hearsay and should not be allowed without plaintiff having the opportunity to depose the officers.

   iv. This was not harmless, as the introduction of this testimony served to bolster the appearance-of-reasonableness of Cadavid's actions as he alleged in his testimony and also bolstered Cadavid's credibility as a witness in the eyes of the jury. This unchallenged testimony could have influenced reasonable jurors into giving more weight to Cadavid's testimony than they otherwise would. This broader team of unnamed investigators paints Cadavid as part of a larger action to secure a child, as opposed to plaintiff's testimony and recollection that the supervisor arrived at the home, listened to plaintiff's explanation, reviewed the available emails

and quickly directed Cadavid to leave the home. Plaintiff recalls no call for another unit to check on the child. This shorter supervisory investigation would tend to indicate to a reasonable juror that there was no basis for action on NYPD's part. Defendant's failure to disclose the members of the alleged broader investigative team deprived plaintiff of discovery and the ability to adequately prepare for trial.

**3. IN THE COURT'S DENIAL OF PLAINTIFF'S REQUEST FOR A NEW TRIAL (DKT. 290) THE COURT ERRONEOUSLY CREDITS THE EXISTENCE OF EVIDENCE THAT WAS NOT IN THE RECORD (Dkt. 300).**

a. Officer Cadavid in his deposition only alleges that he needed his supervisor to help him complete his investigation. At his deposition, Cadavid alleges only that his supervisor was able to ascertain the safety of the child but makes no mention of other officers, nor that those officers visited the child, or how Cadavid came to that conclusion about the supervisor's conclusion.

   i. Here the court erred in crediting that this information was presented in Cadavid's deposition (Dkt. 300). Cadavid testified that both he and the supervisor came to the conclusion that the child was safe based on a call to some location and some unknown officers visiting the child. The safety of the child is not something that Cadavid nor the supervisor could testify to as neither was not at the location where the child was, and Cadavid based his conclusion only on the half of the alleged phone-call he alleged that he heard and what the supervisor allegedly told him.

*Trial* Transcript – Testimony (Dkt. 296 Pg 23)

"

Q. Officer Cadavid, I'm just going to reask the last question. Did you have an understanding of what the next steps Lieutenant Khosh continued to take were?

A. Yes.

Q. Could you describe what he relayed to you?

A. The next step was to send a police car over to the location where their daughter was, and to physically confirm that she was there and she was okay.

Q. All right. After that happened, what did you do?

A. After that happened, we were satisfied that the daughter was okay, we left.

Q. When you say "we," who are you referring to?

A. I'm sorry. My partner and Lieutenant Khosh.

"

As compared to his deposition:

*Cadavid's* **Deposition** *Pg 115*

"

8 **Q Okay. So the "Suspect Child Abuse" box**
9 **here is "No."**
10 **We can all see that. Between the time**
11 **when you suspected child abuse and when you no**
12 **longer suspected child abuse, what happened to**
13 **change your mind?**
14 A My supervisor responded, and together with
15 my supervisor, we were able to conclude the
16 investigation.

"

b. The names of the alleged additional investigating officers that reported to the supervisor after allegedly checking on the child at some undisclosed location were not provided as required by FRCP Rule 26.(a)(1)(A) during discovery. Without those officers' eye-witness testimony Cadavid, and his supervisor, could only speculate as to the safety of the child at trial.

c. The court alludes to text messages being sent to Mr. Rattray. No such text messages are in Mr. Rattray's or the court's records or testimony. Mr. Rattray received no texts from the child's mother. There was only testimony that the mother attempted to reach the child directly (as date and times were already set by court order from the Family Court) and received no response.

d. Even assuming all these extra-evidentiary embellishments are true the legality of the search is still a matter for a judge to decide, not a jury, and the allegations made by Cadavid do not present an imminent threat.

**4. IN THE COURT'S DENIAL OF PLAINTIFF'S REQUEST FOR A NEW TRIAL THE COURT DOES NOT ADDRESS THE MOTION'S ASSERTION THAT THE LEGALITY OF THE SEARCH IS A MATTER OF LAW FOR THE COURT, NOT THE JURY (Dkt. 300).**

**5. IN THE COURT'S DENIAL OF PLAINTIFF'S REQUEST FOR A NEW TRIAL THE COURT MISSTATES MR. RATTRAY'S OBJECTION TO THE WITNESSES NEWLY DISCLOSED WITNESSES (Dkt. 300 PG. 2).**

a. Mr. Rattray does not contend that Cadavid's statements regarding the presence of the responding supervisor, Lt. Kosh is new as indicated in the trial court's response (Dkt. 300 Pg. 2).

Instead, Rattray complains that Officer Cadavid's trial testimony newly discloses witnesses that were not disclosed during discovery (i.e., the officers who presumable went to check on the welfare of the minor child). Mr. Rattray stated in his supplement (Dkt. 280) that there was no such call made from his home and that he is not aware of any officers making contact with his minor child on the evening on November 5th, 2016. The disclosure of these key witnesses at trial presented undue surprise. The court's misstatement of Mr. Rattray's position indicates an abuse of discretion or reversible error.

b. The trial court credits Cadavid with having disclosed the witnesses during his deposition. However, the record shows that Cadavid merely mentions what he wanted to do, not what actually happened.

*Cadavid's Deposition Pg 27*
"

5 **Q So at this point, you have no doubt the**
6 **child is not in the apartment or you're certain the**
7 **child is not in the apartment. What did you do**
8 **then?**
9 A I requested for the supervisor.
10 **Q Okay. So at that point, you requested a**
11 **supervisor.**
12 **Why did you need a supervisor at this**
13 **point?**
14 A I needed a supervisor to do -- to help me
15 in the investigation to find out the whereabouts of
16 your daughter.
17 **Q Okay. Would you say you needed a warrant?**

18 A No.
"

*Cadavid's Deposition Pg 82*
"

**Q Why was a child maltreatment report not**
11 **completed?**
12 A Based on my supervisor's investigation and
13 my investigation, we concluded that the little girl
14 was safe.
"

*Cadavid's Deposition Pg 115*
"

8 **Q Okay. So the "Suspect Child Abuse" box**
9 **here is "No."**
10 **We can all see that. Between the time**
11 **when you suspected child abuse and when you no**
12 **longer suspected child abuse, what happened to**
13 **change your mind?**
14 A My supervisor responded, and together with
15 my supervisor, we were able to conclude the
16 investigation.
"

   c. The court credits Cadavid with being a credible witness and Mr.
Rattray with not being credible. This makes credibility a key
element of the case demanding that all the evidence be reviewed
and inconsistencies disclosed.

6. EVEN IF OFFICER CADAVID ALLEGES THAT HIS UNWARRANTED
SEARCH WAS PERMITTED UNDER LAW UNDER SOME EXCEPTION, (e.g.,
Community Caretaking), the burden of proof then shifts to Cadavid/the
state to prove the alleged exception to the warrant requirement as law

enforcement typically bears the heavy burden to justify warrantless searches, ensuring that such actions are strictly necessary and appropriately limited.

    a.  That shift of the burden of proof was not clearly presented to the jury in their instructions, but was alluded to only as "While Officer Cadavid must **produce** **evidence** supporting the existence of exigent circumstances, the ultimate burden of proof is on Mr. Rattray to prove that Officer Cadavid's entry and search violated his Fourth Amendment right to be free from unreasonable searches." (Dkt. 277 pg. 16) see also *R.T. v. Knobeloch*, 2018-Ohio-1596, 13 (10th Dist.). Merely mentioning that officer Cadavid must 'produce evidence' does not accurately convey the requirement that the state must meet the burden

       The Second Circuit has held that the burden of proof for establishing exigent circumstances during a warrantless search lies with law enforcement. They must demonstrate that the situation presented a compelling need for immediate action and that there was no time to secure a warrant. Even if this were a matter for a jury, the jury instructions were insufficient to convey this shift of the burden.

    b.  It is clearly established that unwarranted searches of the home are unlawful. Any exceptions requires the state or the one acting under color of law to provide evidence to meet its burden.

    c.  Based on the uncontested facts in the instant case, the legality of Cadavid's unwarranted search remains a matter of law for the court, not for the jury.

d. No exceptions to the warrant requirements were articulated, explicitly claimed, alleged, or stated by defendants and no evidence presented supports any exception.

e. A police officer's badge alone does not authorize Mr. Rattray's arrest and prolonged detention in the home without a duly issued warrant for purposes of investigative interrogation by the police or prosecutors.

    i. Defendants' emergency aid and community caretaking exception to the warrant requirement fails as:

        1. No real or imagined exigence or emergency was alleged or articulated in trial testimony or documented evidence from the evening of November 5th 2016.

        2. No evidence-of any emergency was alleged or articulated. Officer Cadavid's feelings of concern are insufficient to overcome the clearly-established warrant requirement.

        3. No threat, real or perceived, was articulated in Officer Cadavid's testimony or in the documentation created that evening.

    ii. Even if the mother did tell of drug-use and drug use, as Cadavid alleged in his testimony, that could be the basis for a warrant but does not rise to the level of imminent danger requiring immediate action by the police officer Jose Cadavid.

## Statement of the Case

Plaintiff Wentworth Rattray brought an action in United States District Court Southern District of New York against Defendants City of New York, Police Officer Jose Cadavid and Alyssa Trigueno alleging violations of his civil rights pursuant to 42 U.S.C. § 1983 arising from a November 5th, 2016 unwarranted search of Mr. Rattray's home by PO Jose Cadavid and the failure of PO Allyssa Trigueno to intervene and the subsequent hour-long seizure.

At the time Mr. Rattray was the custodial parent of a minor child who lived in the same home but was away visiting friends. The mother arrived outside Mr. Rattray's home to pick up her daughter for an unscheduled visit. Mr. Rattray told the mother that the child was not home and that she should follow Family Court judge's order concerning custody and scheduling visitation. Plaintiff then returned to his apartment.

 The mother called 911. Responding officers Cadavid and Trigueno set out to get the child for the mother.

At approximately 7:00 p.m. — a few minutes later — Officers **Cadavid** and Trigueno knocked on Mr. Rattray's door, announced themselves as police officers, and asked to speak to Mr. Rattray. Mr. Rattray asked why the officers were there, and one officer stated that the child's mother was downstairs to pick up her child. Officer **Cadavid** then asked Plaintiff to open the door so that they could talk. Since he was writing an email to inform the Family Court that the child's mother was attempting an unscheduled visitation, Mr. Rattray initially refused to open the door, stating that he could hear the officers clearly through the door.

Officer **Cadavid** replied that he was not going to speak through the door, and asked if Plaintiff wanted the officers to "take down the door." Mr. Rattray completed the email and then opened the door, stood in the doorway, and explained to the officers that the mother was either "mistaken, or . . . creating conflict to help her case."

The Officer Cadavid asked to see the child, and Mr. Rattray explained that "the child was not home and would not be made available to speak to them." Officer Cadavid also asked if he could come in and look around, and Mr. Rattray refused. Officer Trigueno implied that, if Mr. Rattray did not have documentation indicating that the child should be with him, then Mr. Rattray would be going to jail. Mr. Rattray responded by asking whether the officers had documents indicating that the child should be with someone else. Mr. Rattray asked to speak to an NYPD supervisor, and moved to end the conversation by closing the door until the supervisor arrived. Officer **Cadavid** used his foot to block the closing door, however, and pushed it open, forcing his way into the apartment.

Officer **Cadavid** then searched Plaintiff's apartment, walking through the kitchen, the bathroom, the living room, Plaintiff's daughter's room, and Plaintiff's room. Officer **Cadavid** also demanded that Mr. Rattray present his identification, which Mr. Rattray did. Officer **Cadavid** kept Mr. Rattray in the apartment. Mr. Rattray repeatedly asked Officer **Cadavid** to leave, and "reiterated that the minor child was not home, that she was where she needed to be, and that she was safe." Officer **Cadavid** refused to leave or to return Mr. Rattray's identification, which caused Mr. Rattray to become even more concerned for his own safety. Accordingly, Mr. Rattray called 911 to report that there was an officer searching his apartment against his wishes who refuses to leave. Mr. Rattray also asked that an

NYPD supervisor be sent to the scene, and the 911 operator offered to send assistance via a supervisor or internal affairs.

Trial proceeded on 8/29/2023. The jury was tasked with determining if Officer Cadavid violated Mr. Rattray's 4th Amendment rights, and if yes, what damages were suffered (Dkt. 277 ).

The jury found that there was no violation of the 4th Amendment and as such did not need to address the other questions. Mr. Rattray filed to inform the court of new uncorroborated statements introduced at trial (Dkt. 280). The court's order was entered on 09/05/2023 (Dkt. 281). A motion for new trial was denied by the trial court on 02/24/2025.

Mr. Rattray properly filed the Notice of Appeal on 3/25/2025 within 30-days of the trial court's judgement and seeks reversal on appeal of the trial court's denial of Plaintiff's motion for a new trial as allowed under FRCP Rule 50.(e).


## Summary of the Argument

The law is clearly established that a warrantless arrest inside the home violates the 4th Amendment. The warrant requirement provides supreme protection to a person in their home. That protection prevails even in the face of some unspecified potential harm as was present in Caniglia. Caniglia v. Strom, C.A. No. 15-525, 2019 WL 2358965 and as alluded to by Cadavid.

In rendering emergency assistance, the officer must have an objectively reasonable basis for believing that an individual within the home is in need of immediate assistance Fisher, 558 U.S. at 47 and the government or officers should not have

created the exigency. The Court reasoned that [t]hese are never very convincing reasons and, in these circumstances, certainly are not enough to by-pass the constitutional requirement. And similar to the instant case, the search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction. Defendants provided no clear and convincing evidence of any danger or other exigence. Here the finding of law was improperly presented to jury deliberations.

The Second Circuit has held that the burden of proof for establishing exigent circumstances during a warrantless search lies with law enforcement. They must demonstrate that the situation presented a compelling need for immediate action and that there was no time to secure a warrant. Even if this were a matter for a jury, the jury instructions were insufficient to convey this shift of the burden and officers provided no clear and convincing evidence of exigence.

Furthermore, it is clear that police may not continue to detain a person once they become aware of their error. No reasonable trained officer could have believed that it was lawful to continue to detain Mr. Rattray after searching the home and finding no evidence of the drugs or drug dealers as alleged, nor of foul play as alluded to by Cadavid in his trial testimony. No reasonable officer could believe it was lawful to continue to detain Mr. Rattray in his home after conducting their search and finding no child, no imminent danger, and no contraband.

*Trial Transcript – Testimony (Dkt. 296 Pg 13-14)*
"
Q. Did you look in any closets?

A. Yes, I did.

Q. Okay. Did you look in the kitchen cabinets?

A. No.

Q. Why not?

A. I was looking in general areas where the body of a girl
could fit.

Q. And did you find the plaintiff's daughter?

A. No, I did not.

"

*Trial Transcript – Testimony (Dkt. 296 Pg 14-15)*
"

Q. And at some point did you or your partner request a supervisor to the scene?

A. Yes.

Q. Why?

A. Because I still need to know where his daughter was. Since
I was trying to investigate her whereabouts, Mr. Rattray was
refusing to answer my questions, I needed my supervisor's
assistance, and Mr. Rattray also requested a full supervisor.

Q. When you say you were investigating her whereabouts, do you
have concerns for her physical well being at this point?

A. Yes.

Q. Why?

A. Because, based on the allegations of the mother, based on
how Mr. Rattray was acting, his demeanor, and his refusal to
answer my questions of where she was, her whereabouts, I was
more concerned about her well being and her safety.

Q. At some point did a supervisor come to Mr. Rattray's apartment?

A. Yes.

"

*Trial Transcript – Testimony (Dkt. 296 Pg 17)*
"

Q. Why did you remain in the apartment?

A. Because we were waiting for the supervisor, and there was

an ongoing investigation.

Q. When you say there was an ongoing investigation, what do

you mean?

A. I was still -- I was investigating the whereabouts of his daughter.

Q. And you said you were by the door. Where is the plaintiff?

A. He's -- so there's a kitchen counter that runs approximately three to four feet in front of me. So he's sitting at the edge of the kitchen counter.

"

*Trial Transcript – Testimony (Dkt. 296 Pg 18)*
"

Q. I'm sorry. What was the last thing you said?

A. At that point, I don't know whether there's a crime

committed against -- in regards to his daughter.

Q. You don't know if there was a crime committed against his daughter?

A. Yes.

Q. Did you suspect there was a crime committed against his

daughter?

A. At that point, yes, I was suspecting.

Q. And what was that suspicion based on?

A. That suspicion was based on the mother's allegations,

Mr. Rattray's demeanor, his actions, and also his refusal to

answer my questions, to tell me her whereabouts, where she was,

and the fact that he tried closing the door on us.

"

At trial Mr. Rattray asserted that defendants, Cadavid and Trigueno, violated his Fourth Amendment rights when they (1) entered his apartment "without a valid search warrant and without probable cause or legal justification"; and (2) "unlawfully, and unreasonably searched [his] residence without a warrant, and without consent, and (3) unreasonably detained him in his home for over an hour." (SAC (Dkt. No. 42) at 112, 114-15)  42 U.S.C. § 1983;  and Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 381 (S.D.N.Y. 2013).

*Trial Transcript – Testimony (Dkt.* 296 *Pg 18)*
"

Q. Okay. Did you have grounds to arrest him?

A. Yes.

Q. And for what?

A. When I was asking Mr. Rattray for information in regard to

his daughter, he was refusing, and the fact that he tried

closing the door on us, I -- I had grounds of OGA, which is

obstructing governmental administration, in regard to my

investigation.

"

Defendants' testimony did not dispute that Cadavid entered Mr. Rattray's residence without a warrant, detained, and questioned him. (Def. Br (Dkt. No. 57) at 19 (Dkt. No. 285, 283, and 287) Defendant's argue, however, that there was no Fourth Amendment violation because the search was conducted pursuant to the emergency aid and community caretaking exceptions to the warrant requirement since Cadavid was concerned for the child's well being. Cadavid makes no notes or entries to record any exigence, and the domestic incident report shows no allegation of danger or exigence [Appendix 17 CV 8560 PGG 2023 DM Plain DiR P1 DOMESTIC INCIDENT REPORT.pdf ] and ***Dkt. 39 Appendix Pg.128.***

However, as a matter of law, the community caretaking exception to the warrant requirement does not extend to the home (Caniglia v. Strom, 593 U.S). Additionally, "Any warrantless entry based on exigent circumstances must, of course, be supported by a genuine exigency." see Kentucky v. King, 563 U.S. 452, 462 (2011); *id.* at 470. Here, defendants allege nothing that rises to the level of perceived or actual exigence,


*Trial Transcript – Testimony (Dkt. 296 Pg 18)*

"

Q. Did you suspect there was a crime committed against his daughter?

A. At that point, yes, I was suspecting.

Q. And what was that suspicion based on?

A. That suspicion was based on the mother's allegations, Mr. Rattray's demeanor, his actions, and also his refusal to

answer my questions, to tell me her whereabouts, where she was,

and the fact that he tried closing the door on us.

"

The instructions to the jury required the jury to determine a matter of law where the facts of Cadavid's entry was not in dispute nor was the fact that there was no emergent or exigent circumstance. Requiring the jury to determine if [there a violation of Mr. Rattray's Fourth Amendment right under the Constitution by Cadavid's unwarranted search of Mr. Rattray's home] was an abuse of discretion. Even in a jury trial, matters of law are not fit for juries to settle. Matters of law are for the judge, for the court, to settle.

Passing these matters of law to a jury to reach a verdict was a clear error in the lower court. Furthermore, the court limiting Mr. Rattray's discovery requests and defendants' failure to disclose fact witnesses during discovery as required under Rule 26.(a)(1)(A) prevented the consideration of "all of the facts and circumstances of the case." Missouri v. McNeely, 569 U.S. 141, 151–52 (2013)

A 4th Amendment claim, is to be considered in the totality of the facts. "all of the facts and circumstances of the case." Missouri v. McNeely, 569 U.S. 141, 151–52 (2013) but by the court limiting Mr. Rattray's reasonable discovery requests for all communications the court erred and provided windows where new facts were inserted. That error prevented Mr. Rattray from being aware of the existence of material aspects of the case and prevented the pursuit of testimony of the new key fact witnesses Cadavid testified to at trial.

Prior Courts, in rejecting government's claims (e.g., that a search was conducted because of the opium smell in a room), held that the government offered no

reason for not obtaining a search warrant prior to a search except the inconvenience to the officers and some slight delay necessary to prepare papers and present the evidence to a magistrate. Kentucky v. King, 563 U.S. 452, 462 (2011); *id.* at 15 where the court reasoned that smell in a home was not enough to bypass the warrant requirement.  In the current case, Cadavid says he became concerned for he child's well being and conducted his search based on that feeling.

In its ruling denying the Rule 50 motion for a new trial the trial court uses its discretion to give ample weight and credibility to Cadavid's testimony even where it is contradicted by evidence in the record and by third-party-witness testimony. Despite evidence in Cadavid's disciplinary record to indicate that he is prone to making false statements, the court fails to take notice that the contemporaneous written records from the night in question, 5 November 2016, has no mention of drugs, drug-dealers, or danger to child.  Despite Cadavid's de-novo allegations of danger only arising at his deposition years after the incident, and mere months after he lost his sister in an incident that High Point, NC police reported, Cadavid concocts in his deposition testimony a version of events that reads quite similar to the events in High Point, NC adding new undocumented details as his concerns based on what he had heard from the mother years before.  Despite Cadavid's partner, Officer Trigueno, testifying that she heard no allegation of drugs, drug-dealers, or danger to the child from the mother and the refutation of those allegations by the alleged originator of the allegations, the court credit's Cadavid's testimony as credible.  This level of one-sided analysis in the court's denial of Plaintiff's motion for a new trial rise to the level of <u>abuse of discretion</u> and should be considered as part of this request for de novo review.

## Conclusion

Given the weight placed on the testimony of Police officer Cadavid, appellant seeks a new trial as the outcome of this court's de novo review and that the Court remand the case to the lower court for a new trial and further requests that the appellate court:

1. the case be remanded to the district court and the request for a new trial be granted;

    a. and that the court compel defendants to:

        i. produce the identity of the unit/officers whom Cadavid alleged in his trial testimony to have visited the minor child on November 5th 2016 as required under FRCP Rule 26.(a)(1)(A). This would afford appellant the opportunity to depose those officers, review their records of their any alleged interaction with appellant's minor child.

    b. produce all records of the incident that involve or pertain to Mr. Rattray or the minor child on November 5th 2016 (e.g., phone logs, dispatch logs, logbook entries, aided reports), including with the officers who were alleged to have visited the minor child and any reports or communications produced to document their findings. As allowing parties to bring undisclosed witnesses into a trial and testifying to what those undisclosed witnesses discovered at some remote site would undermines a key element of fairness and fact-finding in the judicial process.

2. Instruct the trial court on the trial court's jurisdiction on matters of law (Dkt. 277).

a. That the burden of proof borne by the defendants be included in any jury instruction. (Dkt. 277)

b. That matters of law are to be decided by the court, not the jury.

c. That in light of the absence of contention as to if there was a search, or if that search was warrantless, and if Mr. Rattray was detained for over an hour pursuant to that search, the burden of proof for exigent circumstances shifts to the state/officers (i.e., Mr. Rattray does not bear the burden of proving there was no exigence particularly since no exigence was demonstrated or alleged.)

## Signature Page

For the forgoing reasons, appellant plaintiff respectfully requests that the lower court's Order entered on 02/24/2025 Dkt. 300 and on 09/05/2023 Dkt. 281 be reversed and vacated, and direct the discovery requests, a new trial, and that the Court grant such additional relief as the Court deems just and proper.

Dated:        October 16, 2025 Annapolis, Md

Respectfully submitted,

/s/*Wentworth Rattray*

Wentworth Rattray, pro se
1039 Madison Street
Annapolis, MD 21403

(917) 353-9675

## Certificate of Compliance

I hereby certify that this brief complies with the type-volume limitations set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure and Second Circuit Rule 32(g)(1). This principal/opening brief contains 9,014 on 41 pages in compliance with this Circuit's 14,000-word limit on principal briefs set in Circuit Rule 32(b). This total volume contains 20,339 words on 75 pages including key case, Caniglia v. Strom. I further certify that this brief complies with the typeface and type style requirements of Rule 32(a)(5)-(6) of the Federal Rules of Appellate Procedure and Second Circuit Rule 32(a-g). This brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman for the main text and 12-point for the supplemental material.

Dated:          October 16, 2025 - Annapolis, Md

                        Respectfully submitted,

                        /s/ *Wentworth Rattray*

                        Wentworth Rattray, pro se
                        1039 Madison Street
                        Annapolis, MD 21403

                        (917) 353-9675

## A 1 – Trial filings

| 02/24/2025 | 300 | MEMORANDUM OPINION & ORDER re: 290 MOTION for New Trial . filed by Wentworth Rattray. For the reasons stated above, Plaintiff's motion for a new trial (Dkt. No. 290) is denied. The Clerk of Court is directed to terminate the motion and to close this case. (Signed by Judge Paul G. Gardephe on 2/24/2025) (rro) (Entered: 02/25/2025) |
| --- | --- | --- |
| 11/16/2023 | 296 | TRANSCRIPT of Proceedings re: Jury Trial held on 8/31/2023 before Judge Paul G. Gardephe. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2023. Redacted Transcript Deadline set for 12/18/2023. Release of Transcript Restriction set for 2/14/2024..(Moya, Goretti) (Entered: 11/16/2023) |
| 09/25/2023 | 290 | MOTION for New Trial . Document filed by Wentworth Rattray..(Benoit, Angela) (Entered: 09/25/2023) |
| 09/06/2023 | 282 | LETTER addressed to Judge Paul G. Gardephe from Melissa S. Geller dated 09/06/2023 re: Post-Trial Briefing Schedule. Document filed by Wentworth Rattray. (Wang, Yudi) (Entered: 09/06/2023) |
| 09/05/2023 | 281 | JUDGMENT: It is hereby ORDERED, ADJUDGED AND DECREED: That after a Jury Trial before the Honorable Paul G. Gardephe, United States District Judge, the jury having returned a verdict in favor of Defendants, the Complaint is hereby dismissed. (Signed by Judge Paul G. Gardephe on 9/5/2023) (ate) (Entered: 09/05/2023) |
| 09/01/2023 | 280 | DECLARATION OF WENTWORTH RATTRAY(Supplement). Document filed by Wentworth Rattray. (sc) (Entered: 09/05/2023) |
| 08/31/2023 | 277 | Jury Instructions. Members of the jury, that concludes my instructions to you. I will ask you to remain seated for a moment while I confer with the attorneys to see if there are any additional instructions that they would like me to give. The Marshal will now be sworn. Members of the jury, you may now begin your deliberations. (yv) (Entered: 09/01/2023) |

## A 2 – Jury instruction

| 08/31/2023 | 277 | Jury Instructions. Members of the jury, that concludes my instructions to you. I will ask you to remain seated for a moment while I confer with the attorneys to see if |
| --- | --- | --- |

| | | |
|---|---|---|
| | | there are any additional instructions that they would like me to give. The Marshal will now be sworn. Members of the jury, you may now begin your deliberations. (yv) (Entered: 09/01/2023) |

## A 3 – Motion to Compel un-Redaction

| | | |
|---|---|---|
| 06/21/2021 | 146 | FIRST MOTION to Compel Defendants and Defendant's Employer (The City Of New York and the NYPD) to Unredacted copy of all ==disciplinary reports and investigation/arrest report for Cadavid as a result of his off-duty hit-and-run incident;== ==compelling the City of New York to forensically retrieve and produce the 911 recordings;== ==Subpoena for Deposition of key NYPD personnel *Allow Zoom Depositions*== and *Plaintiff's.*, FIRST MOTION for Extension of Time to Complete Discovery *until August 5th 2021 pending Defendant's providing documents and agreeing to scheduling depositions.* Document filed by Wentworth Rattray..(Rattray, Wentworth) (Entered: 06/21/2021) |

## A 4 – Denying Extension of Discovery

| 10/20/2021 | 176 | ORDER denying 170 Motion for Reconsideration ; denying 174 Motion for Extension of Time to Complete Discovery; denying 175 Motion for Protective Order. The Court denies these motions. The Federal Rules of Civil Procedure give District Courts broad discretion to manage discovery. In re Subpoena Issued to Dennis Friedman, 350 F.3d 65, 69 (2d Cir. 2003). The Court has discretion to limit the frequency and extent of use of discovery methods, including depositions, if the discovery is unreasonably cumulative or duplicative, if the party seeking discovery already has had ample opportunity to obtain the information sought, or if the burden or expense of the discovery outweighs its likely benefit. Fed. R. Civ. P. 26(b)(2), as further set forth in this Order. As noted in the previous Order, the parties were directed to submit a status report to this Court advising it of the mutually agreed-upon deposition date. The Court understands that the parties are still attempting to land on a date on or before October 28, 2021 and trusts they will work cooperatively and promptly to finalize a date and time. Because the deposition is limited to one hour, the parties and witness should be able to find a time by then. Accordingly, the Court excuses the parties from submitting a letter regarding the time and date of the deposition; however, the parties should submit a letter by October 31, 2021 confirming that the deposition has been completed. The Clerk of the Court is directed to terminate ECF Nos. 170, 174, and 175. SO ORDERED.. (Signed by Magistrate Judge Katharine H. Parker on 10/20/2021) (vfr) (Entered: 10/20/2021) |

## A 5 – Doc 119 - Discovery Limited

| 01/07/2021 | 119 | ORDER. Defendants have raised objections to certain discovery served by Plaintiff in this case. At today's conference, this Court held that Defendants would not be required to produce documents pertaining to dismissed claims, documents pertaining to Defendants' medical and mental health and drug and alcohol use, and documents pertaining to Defendants' family. The Court also narrowed many of the document requests in ECF 115-2, and the Court refers the parties to the transcript of the conference for the court's decision on these requests. With respect to requests 74, 75, 76, 81, 82, 86, 87, Defendants need not respond insofar as they do not seek relevant information and are disproportionate to the needs of the case. To the extent Plaintiff has served contention interrogatories, they are improper at this time and Defendants need not respond to the extent they do not comply with the Local Rules. Additionally, many of the questions in ECF 115-1 can be posed to Defendants in their depositions, which is a more efficient way of obtaining the information. Therefore, Plaintiff is directed not to pose any additional interrogatories without leave of Court and Defendant is excused from answering the interrogatories. Defendants are directed to respond to Plaintiff's requests to admit in accordance with the FRCP. (HEREBY ORDERED by Magistrate Judge Katharine H. Parker) (Text Only Order) Copies of Notice of Electronic Filing To Be Mailed By Clerks Office. (Parker, Katharine) (Entered: 01/07/2021) |
|---|---|---|

## A 6 – No. 20–157. Caniglia v. Strom, 593 U.S (20-157).

(Slip Opinion)  OCTOBER TERM, 2020  1

CANIGLIA *v.* STROM

Opinion of the Court

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CANIGLIA *v.* STROM ET AL.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

No. 20–157. Argued March 24, 2021—Decided May 17, 2021

During an argument with his wife, petitioner Edward Caniglia placed a handgun on the dining room table and asked his wife to "shoot [him] and get it over with." His wife instead left the home and spent the night at a hotel. The next morning, she was unable to reach her husband by phone, so she called the police to request a welfare check. The responding officers accompanied Caniglia's wife to the home, where they encountered Caniglia on the porch. The officers called an ambu- lance based on the belief that Caniglia posed a risk to himself or others. Caniglia agreed to go to the hospital for a psychiatric evaluation on the condition that the officers not confiscate his firearms. But once Caniglia left, the officers located and seized his weapons. Caniglia sued, claiming that the officers had entered his home and seized him and his firearms without a warrant in violation of the Fourth Amendment. The District Court granted summary judgment to the officers. The First Circuit affirmed, extrapolating from the Court's decision in *Cady* v. *Dombrowski,* 413 U. S. 433, a theory that the officers' removal of Caniglia and his firearms from his home was justified by a "community caretaking exception" to the warrant requirement.

***Held***: Neither the holding nor logic of *Cady* justifies such warrantless searches and seizures in the home. *Cady* held that a warrantless search of an impounded

vehicle for an unsecured firearm did not violate the Fourth Amendment. In reaching this conclusion, the Court noted that the officers who patrol the "public highways" are often called to discharge noncriminal "community caretaking functions," such as responding to disabled vehicles or investigating accidents. 413 U. S., at 441. But searches of vehicles and homes are constitutionally different, as the *Cady* opinion repeatedly stressed. *Id.,* at 439, 440– 442. The very core of the Fourth Amendment's guarantee is the right of a person to retreat into his or her home and "there be free from unreasonable governmental intrusion." *Florida* v. *Jardines*, 569 U. S. 1, 6. A recognition of the existence of "community caretaking" tasks, like rendering aid to motorists in disabled vehicles, is not an open-ended license to perform them anywhere. Pp. 3–4.

953 F. 3d 112, vacated and remanded.

THOMAS, J., delivered the opinion for a unanimous Court. ROBERTS, C. J., filed a concurring opinion, in which B        REYER, J., joined. A LITO, J., and KAVANAUGH, J., filed concurring opinions.

*NOTICE*: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

SUPREME COURT OF THE UNITED STATES

_____

No. 20–157

_____

EDWARD A. CANIGLIA, PETITIONER *v.* ROBERT F. STROM, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  [May 17, 2021]

JUSTICE THOMAS delivered **the opinion of the Court**.

 Decades ago, this Court held that a warrantless search of an impounded vehicle for an unsecured firearm did not violate the Fourth Amendment.  *Cady* v. *Dombrowski*, 413 U. S. 433 (1973).  In reaching this conclusion, the Court observed that police officers who patrol the "public highways" are often called to discharge noncriminal "community caretaking functions," such as responding to disabled vehicles or investigating accidents. *Id.*, at 441. The question today is whether *Cady*'s acknowledgment of these "caretaking" duties creates a standalone doctrine that justifies warrantless searches and seizures in the home. It does not.

I

 During an argument with his wife at their Rhode Island home, Edward Caniglia (petitioner) retrieved a handgun from the bedroom, put it on the dining room table, and asked his wife to "shoot [him] now and get it over with."  She declined, and instead left to spend the night at a hotel.  The next morning, when petitioner's wife discovered that she could not reach him by telephone, she called the police (respondents) to request a welfare check.

 Respondents accompanied petitioner's wife to the home, where they encountered petitioner on the porch. Petitioner spoke with respondents and confirmed his wife's account of the argument, but denied that he was suicidal. Respondents, however, thought that petitioner posed a risk to himself or others. They called an ambulance, and petitioner agreed to go to the hospital for a

psychiatric evaluation— but only after respondents allegedly promised not to confiscate his firearms. Once the ambulance had taken petitioner away, however, respondents seized the weapons. Guided by petitioner's wife—whom they allegedly misinformed about his wishes—respondents entered the home and took two handguns.

Petitioner sued, claiming that respondents violated the Fourth Amendment when they entered his home and seized him and his firearms without a warrant. The District Court granted summary judgment to respondents, and the First Circuit affirmed solely on the ground that the decision to remove petitioner and his firearms from the premises fell within a "community caretaking exception" to the warrant requirement. 953 F. 3d 112, 121–123, 131 and nn. 5, 9 (2020). Citing this Court's statement in *Cady* that police officers often have noncriminal reasons to interact with motorists on "public highways," 413 U. S., at 441, the First Circuit extrapolated a freestanding community-caretaking exception that applies to both cars and homes. 953 F. 3d, at 124 ("Threats to individual and community safety are not confined to the highways"). Accordingly, the First Circuit saw no need to consider whether anyone had consented to respondents' actions; whether these actions were justified by "exigent circumstances"; or whether any state law permitted this kind of mental-health intervention. *Id.,* at 122– 123. All that mattered was that respondents' efforts to protect petitioner and those around him were "distinct from 'the normal work of criminal investigation,'" fell "within the realm of reason," and generally tracked what the court viewed to be "sound police procedure." *Id.,* at 123–128, 132– 133. We granted certiorari. 592 U. S. ___ (2020).
3

## II

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The "'very core'" of this guarantee is "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" *Florida* v. *Jardines*, 569 U. S. 1, 6 (2013).

To be sure, the Fourth Amendment does not prohibit all unwelcome intrusions "on private property," *ibid.*—only "unreasonable" ones. We have thus recognized

a few permissible invasions of the home and its curtilage. Perhaps most familiar, for example, are searches and seizures pursuant to a valid warrant. See *Collins* v. *Virginia*, 584 U. S. ___, ___–___ (2018) (slip op., at 5–6). We have also held that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to "'render emergency assistance to an in- jured occupant or to protect an occupant from imminent injury.'" *Kentucky* v. *King*, 563 U. S. 452, 460, 470 (2011); see also *Brigham City* v. *Stuart*, 547 U. S. 398, 403–404 (2006) (listing other examples of exigent circumstances).

And, of course, officers may generally take actions that "'any private citizen might do'" without fear of liability. *E.g., Jardines*, 569 U. S., at 8 (approaching a home and knocking on the front door).

 The First Circuit's "community caretaking" rule, however, goes beyond anything this Court has recognized. The decision below assumed that respondents lacked a warrant or consent, and it expressly disclaimed the possibility that they were reacting to a crime. The court also declined to consider whether any recognized exigent circumstances were present because respondents had forfeited the point.

Nor did it find that respondents' actions were akin to what a private citizen might have had authority to do if petitioner's wife had approached a neighbor for assistance instead of the police.

 Neither the holding nor logic of *Cady* justified that approach. True, *Cady* also involved a warrantless search for a firearm. But the location of that search was an impounded vehicle—not a home—"'a constitutional differ- ence'" that the opinion repeatedly stressed. 413 U. S., at 439; see also *id.,* at 440–442. In fact, *Cady* expressly contrasted its treatment of a vehicle already under police control with a search of a car "parked adjacent to the dwelling place of the owner." *Id.*, at 446–448 (citing *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971)).

*Cady*'s unmistakable distinction between vehicles and homes also places into proper context its reference to "community caretaking." This quote comes from a portion of the opinion explaining that the "frequency with which . . . vehicle[s] can become disabled or involved in . . . accident[s] on public highways" often requires police to perform noncriminal "community caretaking functions," such as providing aid to motorists. 413 U. S., at 441. But, this recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere.

*     *     *

What is reasonable for vehicles is different from what is reasonable for homes. *Cady* acknowledged as much, and this Court has repeatedly "declined to expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home." *Collins*, 584 U. S., at ___ (slip op., at 8). We thus vacate the judgment below and remand for further proceedings consistent with this opinion.

*It is so ordered.*

1

ROBERTS, C. J., concurring

SUPREME COURT OF THE UNITED STATES

———————

No. 20–157

———————

EDWARD A. CANIGLIA, PETITIONER *v.* ROBERT F. STROM, ET AL .

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

[May 17, 2021]

CHIEF JUSTICE ROBERTS, with whom JUSTICE BREYER joins, concurring.

Fifteen years ago, this Court unanimously recognized that "[t]he role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties." *Brigham City* v. *Stuart*, 547 U. S. 398, 406 (2006). A warrant to enter a home is not required, we explained, when there is a "need to assist persons who are seriously injured or threatened with such injury." *Id.,* at 403; see also *Michigan* v. *Fisher*, 558 U. S. 45, 49 (2009) (*per curiam*) (warrantless entry justified where "there was an objectively reasonable basis for believing that medical assistance was needed, or persons were in danger" (internal quotation marks omitted)). Nothing in today's opinion is to the contrary, and I join it on that basis.

SUPREME COURT OF THE UNITED STATES

Cite as: 593 U. S. ____ (2021)                    53

ALITO, J., concurring

———————

No. 20–157

———————

EDWARD A. CANIGLIA, PETITIONER *v.* ROBERT F.
STROM, ET AL .

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE FIRST CIRCUIT

[May 17, 2021]

JUSTICE ALITO, concurring.

I join the opinion of the Court but write separately to explain my understanding of the Court's holding and to highlight some important questions that the Court does not decide.

1. The Court holds—and I entirely agree—that there is no special Fourth Amendment rule for a broad category of cases involving "community caretaking." As I understand the term, it describes the many police tasks that go beyond criminal law enforcement. These tasks vary widely, and there is no clear limit on how far they might extend in the future. The category potentially includes any non-law-enforcement work that a community chooses to assign, and because of the breadth of activities that may be described as community caretaking, we should not assume that the Fourth Amendment's command of reasonableness applies in the same way to everything that might be viewed as falling into this broad category.

The Court's decision in *Cady* v. *Dombrowski*, 413 U. S. 433 (1973), did not recognize any such "freestanding" Fourth Amendment category. See

ALITO, J., concurring

*ante*, at 2, 4. The opinion merely used the phrase "community caretaking" in passing.

413 U. S., at 441.

 2. While there is no overarching "community caretaking" doctrine, it does not follow that all searches and seizures conducted for non-law-enforcement purposes must be analyzed under precisely the same Fourth Amendment rules developed in criminal cases. Those rules may or may not be appropriate for use in various non-criminal-law-enforcement contexts. We do not decide that issue today.

3.    This case falls within one important category of cases that could be viewed as involving community caretaking: conducting a search or seizure for the purpose of preventing a person from committing suicide. Assuming that petitioner did not voluntarily consent to go with the officers for a psychological assessment,[1] he was seized and thus subjected to a serious deprivation of liberty.  But was this warrantless seizure "reasonable"? We have addressed the standards required by due process for involuntary commitment to a mental treatment facility, see *Addington* v. *Texas*, 441 U. S. 418, 427 (1979); see also *O'Connor* v. *Donaldson*, 422 U. S. 563, 574–576 (1975); *Foucha* v. *Louisiana*, 504 U. S. 71, 75–77, 83 (1992), but we have not addressed Fourth Amendment restrictions on seizures like the one that we must assume occurred here, *i.e.*, a short-term seizure conducted for the purpose of ascertaining whether a person presents an imminent risk of suicide. Every State has laws allowing emergency seizures for psychiatric treatment, observation, or stabilization, but these laws vary in many respects, including the

---

[1] The Court of Appeals assumed petitioner's consent was not voluntary because the police allegedly promised that they would not seize his guns if he went for a psychological evaluation.  953 F. 3d 112, 121 (CA1 2020).
The Court does not decide whether this assumption was justified.

ALITO, J., concurring

categories of persons who may request the emergency action, the reasons that can justify the action, the necessity of a judicial proceeding, and the nature of the proceeding.[2] Mentioning these laws only in passing, petitioner asked us to render a decision that could

———————

call features of these laws into question. The Court appropriately refrains from doing so.

4.　This case also implicates another body of law that petitioner glossed over: the so-called "red flag" laws that some States are now enacting. These laws enable the police to seize guns pursuant to a court order to prevent their use for suicide or the infliction of harm on innocent persons. See, *e.g.,* Cal. Penal Code Ann. §§18125–18148 (West Cum. Supp. 2021); Fla. Stat. §790.401(4) (Cum. Supp. 2021); Mass. Gen. Laws Ann., ch. 140, §131T (2021). They typically specify the standard that must be met and the procedures that must be followed before firearms may be seized. Provisions of red flag laws may be challenged under the Fourth Amendment, and those cases may come before us. Our decision today does not address those issues.

5.　One additional category of cases should be noted: those involving warrantless, nonconsensual searches of a home for the purpose of ascertaining whether a resident is in urgent need of medical attention and cannot summon help. At oral argument, THE CHIEF JUSTICE posed a question that highlighted this problem. He imagined a situation in which neighbors of an elderly woman call the police and express concern because the woman had agreed to come over for dinner at 6 p.m., but by 8 p.m., had not appeared or called even though she was never late for anything. The woman had not been seen leaving her home, and she was not answering the phone. Nor could the neighbors reach her relatives by

———————

[2] See Brief for Petitioner 38–39, n. 4 (gathering state authorities); L. Hedman et al., State Laws on Emergency Holds for Mental Health Stabilization, 67 Psychiatric Servs. 579 (2016).

ALITO, J., concurring

phone. If the police entered the home without a warrant to see if she needed help, would that violate the Fourth Amendment? Tr. of Oral Arg. 6–8.

Petitioner's answer was that it would. Indeed, he argued, even if 24 hours went by, the police still could not lawfully enter without a warrant. If the situation remained unchanged for several days, he suggested, the police might be able to enter after obtaining "a warrant for a missing person." *Id.,* at 9.

4          CANIGLIA *v.* STROM

THE CHIEF JUSTICE's question concerns an important real-world problem. Today, more than ever, many people, including many elderly persons, live alone.[3] Many elderly men and women fall in their homes,[4] or become incapacitated for other reasons, and unfortunately, there are many cases in which such persons cannot call for assistance. In those cases, the chances for a good recovery may fade with each passing hour.[5] So in THE CHIEF JUSTICE's imaginary case, if the elderly woman was seriously hurt or sick and the police heeded petitioner's suggestion about what the Fourth Amendment demands, there is a fair chance she would not be found alive. This imaginary woman may have

---

[3] Dept. of Commerce, Bureau of Census, The Rise of Living Alone, Fig. HH–4 (2020), https://www.census.gov/content/dam/Census/library/visualizations/time-series/demo/families-and-households/hh-4.pdf; Ortiz-Ospina, The Rise of Living Alone (Dec. 10, 2019), https://ourworldindata.org/living-alone; Smith, Cities With the Most Adults Living Alone (May 4, 2020), https://www.self.inc/blog/adults-living-alone.

[4] See B. Moreland, R. Kakara, & A. Henry, Trends in Nonfatal Falls and Fall-Related Injuries Among Adults Aged ≥65 Years—United States, 2012–2018, 69 Morbidity and Mortality Weekly Rep. 875 (2020).

[5] See, *e.g.,* J. Gurley, N. Lum, M. Sande, B. Lo, & M. Katz, Persons Found in Their Homes Helpless or Dead, 334 New Eng. J. Med. 1710 (1996).

ALITO, J., concurring

regarded her house as her castle, but it is doubtful that she would have wanted it to be the place where she died alone and in agony.

 Our current precedents do not address situations like this. We have held that the police may enter a home without a warrant when there are "exigent circumstances." *Payton* v. *New York*, 445 U. S. 573, 590 (1980).  But circumstances are exigent only when there is not enough time to get a warrant, see *Missouri* v. *McNeely*, 569 U. S. 141, 149 (2013); *Michigan* v. *Tyler*, 436 U. S. 499, 509 (1978), and warrants are not typically granted for the purpose of checking on a person's medical condition. Perhaps States should institute procedures for the issuance of such warrants, but

——————————

in the meantime, courts may be required to grapple with the basic Fourth Amendment question of reasonableness.

 6. The three categories of cases discussed above are simply illustrative. Searches and seizures conducted for other non-law-enforcement purposes may arise and may present their own Fourth Amendment issues. Today's de- cision does not settle those questions.

*     *     *

 In sum, the Court properly rejects the broad "community caretaking" theory on which the decision below was based.  The Court's decision goes no further, and on that understanding, I join the opinion in full.

ALITO, J., concurring

SUPREME COURT OF THE UNITED STATES

_____

No. 20–157

_____

EDWARD A. CANIGLIA, PETITIONER *v.* ROBERT F. STROM, ET AL
.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIRST CIRCUIT

[May 17, 2021]

JUSTICE KAVANAUGH, concurring.

 I join the Court's opinion in full. I write separately to underscore and elaborate on THE CHIEF JUSTICE's point that the Court's decision does not prevent police officers from taking reasonable steps to assist those who are inside a home and in need of aid. See *ante,* at 1 (ROBERTS, C. J., concurring). For example, as I will explain, police officers may enter a home without a warrant in circumstances where they are reasonably trying to prevent a potential suicide or to help an elderly person who has been out of contact and may have fallen and suffered a serious injury. Ratified in 1791 and made applicable to the States in 1868, the Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As the constitutional text establishes, the "ultimate touchstone of the Fourth Amendment is reasonableness." *Riley* v. *California*, 573 U. S. 373, 381 (2014) (internal quotation marks omitted). The Court has said that a warrant supported by probable cause is ordinarily required for law enforcement officers to enter a home. See U. S. Const., Amdt. 4. But drawing on common-law analogies and a commonsense appraisal of what is "reasonable," the Court has recognized various situations where a warrant is not required. For example, the exigent circumstances doctrine allows officers to enter a home without a warrant in certain situations, including: to fight a fire and investigate its cause; to prevent the imminent destruction of

ALITO, J., concurring

evidence; to engage in hot pursuit of a fleeing felon or prevent a suspect's escape; to address a threat to the safety of law enforcement officers or the general public; to render emergency assistance to an injured occupant; or to protect an occupant who is threatened with serious injury. See *Mitchell* v. *Wisconsin*, 588 U. S. ___, ___ (2019) (plurality opinion) (slip op., at 6); *City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, 612 (2015); *Kentucky* v. *King*, 563 U. S. 452, 460, 462 (2011); *Michigan* v. *Fisher*, 558 U. S. 45, 47 (2009) (*per curiam*); *Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006); *Minnesota* v. *Olson*, 495 U. S. 91, 100 (1990); *Michigan* v. *Clifford*, 464 U. S. 287, 293, and n. 4 (1984) (plurality opinion); *Mincey* v. *Arizona*, 437 U. S. 385, 392–394 (1978); *Michigan* v. *Tyler*, 436 U. S. 499, 509–510 (1978); *United States* v. *Santana*, 427 U. S. 38, 42–43 (1976); *Warden, Md. Penitentiary* v. *Hayden*, 387 U. S. 294, 298–299 (1967); *Ker* v. *California*, 374 U. S. 23, 40–41 (1963) (plurality opinion).

Over the years, many courts, like the First Circuit in this case, have relied on what they have labeled a "community caretaking" doctrine to allow warrantless entries into the home for a non-investigatory purpose, such as to prevent a suicide or to conduct a welfare check on an older individual who has been out of contact. But as the Court today explains, any such standalone community caretaking doctrine was primarily devised for searches of cars, not homes. *Ante,* at 3–4; see *Cady* v. *Dombrowski*, 413 U. S. 433, 447–448 (1973).

That said, this Fourth Amendment issue is more labeling than substance. The Court's Fourth Amendment case law already recognizes the exigent circumstances doctrine, which allows an officer to enter a home without a warrant if the "exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City*, 547 U. S., at 403 (internal quotation marks omitted); see also *ante,* at 3. As relevant here, one such recognized "exigency" is the "need to assist persons who are seriously injured or threatened with such injury." *Brigham City*, 547 U. S., at 403; see also *ante,* at 1 (ROBERTS, C. J., concurring). The Fourth Amendment allows officers to enter a home if they have "an objectively reasonable basis for believing" that such help is needed, and if the officers' actions inside the

ALITO, J., concurring

home are reasonable under the circumstances. *Brigham City*, 547 U. S., at 406; see also *Michigan* v. *Fisher*, 558 U. S., at 47–48.

 This case does not require us to explore all the contours of the exigent circumstances doctrine as applied to emergency-aid situations because the officers here disclaimed reliance on that doctrine.  But to avoid any confusion going forward, I think it important to briefly describe how the doctrine applies to some heartland emergency-aid situations.  As Chief Judge Livingston has cogently explained, although this doctrinal area does not draw much attention from courts or scholars, "municipal police spend a good deal of time responding to calls about missing persons, sick neighbors, and premises left open at night."  Livingston, Police, Community Caretaking, and the Fourth Amendment, 1998 U. Chi. Leg. Forum 261, 263 (1998)  And as she aptly noted, "the responsibility of police officers to search for missing persons, to mediate disputes, and to aid the ill or injured has never been the subject of serious debate; nor has" the "responsibility of police to provide services in an emergency." *Id.,* at 302.

 Consistent with that reality, the Court's exigency precedents, as I read them, permit warrantless entries when police officers have an objectively reasonable basis to believe that there is a current, ongoing crisis for which it is reason-

4          CANIGLIA *v.* STROM

KAVANAUGH, J., concurring

able to act now. See, *e.g., Sheehan*, 575 U. S., at 612; *Michigan* v. *Fisher*, 558 U. S., at 48–49; *Brigham City*, 547 U. S., at 406–407. The officers do not need to show that the harm has already occurred or is mere moments away, because knowing that will often be difficult if not impossible in cases involving, for example, a person who is currently suicidal or an elderly person who has been out of contact and may have fallen.  If someone is at risk of serious harm and it is reasonable for officers to intervene now, that is enough for the officers to enter.

ALITO, J., concurring

A few (non-exhaustive) examples illustrate the point. Suppose that a woman calls a healthcare hotline or 911 and says that she is contemplating suicide, that she has firearms in her home, and that she might as well die. The operator alerts the police, and two officers respond by driving to the woman's home. They knock on the door but do not receive a response. May the officers enter the home? Of course.

The exigent circumstances doctrine applies because the officers have an "objectively reasonable basis" for believing that an occupant is "seriously injured or threatened with such injury." *Id.,* at 400, 403; cf. *Sheehan*, 575 U. S., at 612 (officers could enter the room of a mentally ill person who had locked herself inside with a knife). After all, a suicidal individual in such a scenario could kill herself at any moment. The Fourth Amendment does not require officers to stand idly outside as the suicide takes place.[6] Consider another example. Suppose that an elderly man is uncharacteristically absent from Sunday church services

and repeatedly fails to answer his phone throughout the day and night. A concerned relative calls the police and asks the officers to perform a wellness check. Two officers drive to the man's home. They knock but receive no response. May the officers enter the home? Of course. Again, the officers have an "objectively reasonable basis" for believing that an occupant is "seriously injured or threatened with such injury." *Brigham City*, 547 U. S., at 400, 403. Among other possibilities, the elderly man may have fallen and hurt himself, a common cause of death or serious injury for older individuals. The Fourth Amendment does not prevent the officers from entering the home and checking on the man's well-being.[7]

To be sure, courts, police departments, and police officers alike must take care that officers' actions in those kinds of cases are reasonable under the circumstances.

---

[6] In 2019 in the United States, 47,511 people committed suicide. That number is more than double the number of annual homicides. See Dept. of Health and Human Servs., Centers for Disease Control and Prevention, D. Stone, C. Jones, & K. Mack, Changes in Suicide Rates—United States, 2018–2019, 70 Morbidity and Mortality Weekly Rep. 261, 263 (2021) (MMWR); Dept. of Justice, Federal Bureau of Investigation, Uniform Crime Report, Crime in the United States, 2019, p. 2 (2020).

[7] In 2018 in the United States, approximately 32,000 older adults died from falls. Falls are also the leading cause of injury for older adults. B. Moreland, R. Kakara, & A. Henry, Trends in Nonfatal Falls and FallRelated Injuries Among Adults Aged ≥ 65 Years—United States, 2012– 2018, 69 MMWR 875 (2020).

ALITO, J., concurring

But both of those examples and others as well, such as cases involving unattended young children inside a home, illustrate the kinds of warrantless entries that are perfectly constitutional under the exigent circumstances doctrine, in my view.

With those observations, I join the Court's opinion in full.

## A 7 – No. 23–1239. Barnes v. Felix 605 U.S.

(Slip Opinion)          OCTOBER TERM, 2024      1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See United States v. Detroit Timber & Lumber Co., 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

BARNES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE  ESTATE OF BARNES, DECEASED v. FELIX ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 23–1239. Argued January 22, 2025—Decided May 15, 2025

Respondent Roberto Felix, Jr., a law enforcement officer, pulled over Ashtian Barnes for suspected toll violations.  Felix ordered Barnes to exit the vehicle, but Barnes began to drive away.  As the car began to move forward, Felix jumped onto its doorsill and fired two shots inside.  Barnes was fatally hit but managed to stop the car.  About five seconds elapsed between when the car started moving and when it stopped. Two seconds passed between the moment Felix stepped on the doorsill and the moment he fired his first shot.

Barnes's mother sued Felix on Barnes's behalf, alleging that Felix violated Barnes's Fourth Amendment right against excessive force.  The District Court granted summary judgment to Felix, applying the Fifth Circuit's "moment-of-threat" rule. The Court of Appeals af- firmed, explaining that the moment-of-threat rule requires asking only whether an officer was "in danger

ALITO, J., concurring

at the moment of the threat that resulted in [his] use of deadly force." 91 F. 4th 393, 397. Under the rule, events "leading up to the shooting" are "not relevant." Ibid. Here, the "precise moment of threat" was the "two seconds" when Felix was clinging to a moving car. Id., at 397–398. Because Felix could then have reasonably believed his life in danger, the panel held, the shooting was lawful. Id., at 398.

Held: A claim that a law enforcement officer used excessive force during a stop or arrest is analyzed under the Fourth Amendment, which requires that the force deployed be objectively reasonable from "the perspective of a reasonable officer at the scene." Graham v. Connor, 490 U. S. 386, 396. The inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances." County of Los Angeles v. Mendez, 581 U. S. 420, 427–428; Tennessee v. Garner, 471 U. S.

2

Syllabus

1, 9. That analysis demands "careful attention to the facts and circumstances" relating to the incident. Graham, 490 U. S., at 396.

Most notable here, the "totality of the circumstances" inquiry has no time limit. While the situation at the precise time of the shooting will often matter most, earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Prior events may show why a reasonable officer would perceive otherwise ambiguous conduct as threatening, or instead as innocuous. Plumhoff v. Rickard, 572 U. S. 765, well illustrates this point. There, an officer's use of deadly force was justified "at the moment" partly because of what had transpired in the preceding period. Id., at 777. The moment-of-threat rule applied below prevents that sort of attention to context, and thus conflicts with this Court's instruction to analyze the totality of the circumstances. By limiting their view to the two seconds before the shooting, the lower courts could not take into account anything preceding that final moment. So, for example, they could not consider the reasons for the stop or the earlier interactions between the suspect and officer. And because of that limit, they could not address whether the final two seconds of the encounter would look different if set within a longer timeframe. A rule like that, which precludes consideration of prior events in assessing a police shooting, is not reconcilable with the fact-dependent and context-sensitive approach this Court has prescribed. A court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders.

Cite as: 593 U. S. ____ (2021)              64

ALITO, J., concurring

 The Court does not address a separate question about whether or how an officer's own "creation of a dangerous situation" factors into the reasonableness analysis.  The courts below never confronted that issue, and it was not the basis of the petition for certiorari. Pp. 4–9.

91 F. 4th 393, vacated and remanded.

KAGAN, J., delivered the opinion for a unanimous Court.  KAVANAUGH, J., filed a concurring opinion, in which THOMAS, ALITO, and BARRETT, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

————————

## No. 23–1239

————————

JANICE HUGHES BARNES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ASHTIAN  BARNES, DECEASED, PETITIONER v.

ROBERTO FELIX, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 15, 2025]

JUSTICE KAGAN delivered the opinion of the Court.

 A police officer's use of deadly force violates the Fourth Amendment when it is not "objectively reasonable." Graham v. Connor, 490 U. S. 386, 397 (1989).  And that inquiry into reasonableness, we have held, requires assessing the "totality of the circumstances."  Id., at 396 (quoting Tennessee v. Garner, 471 U. S. 1, 9 (1985)).

## ALITO, J., concurring

The question here is whether that framework permits courts, in evaluating a police shooting (or other use of force), to apply the so-called moment-of-threat rule used in the courts below. Under that rule, a court looks only to the circumstances existing at the precise time an officer perceived the threat inducing him to shoot.  Today, we reject that approach as improperly narrowing the requisite Fourth Amendment analysis.  To assess whether an officer acted reasonably in using force, a court must consider all the relevant circumstances, including facts and events leading up to the climactic moment.

I

On the afternoon of April 28, 2016, Roberto Felix, Jr., a law enforcement officer patrolling a highway outside Houston, received a radio alert about an automobile on the road with outstanding toll violations.  Felix soon spotted the car, a Toyota Corolla, and turned on his emergency lights to initiate a traffic stop.  The driver, Ashtian Barnes, pulled over to the highway's shoulder.

Parking his own car just behind, Felix walked to the Corolla's driver-side door and asked Barnes for his license and proof of insurance. Barnes replied that he did not have his

license with him, and that the car was a rental in his girlfriend's name. As he spoke, Barnes rummaged through some papers inside the car, causing Felix to tell him several times to stop "digging around."  Felix also commented that he smelled marijuana, and asked if there was anything in the car he should know about.  Barnes responded that he might have some identification in the trunk.  So Felix told him to open the trunk from his seat.  Barnes did so, while also turning off the ignition.  All that happened (as a dashcam recording of the incident shows) in less than two minutes.

Then things began moving even faster.  With his right hand resting on his holster, Felix told Barnes to get out of the car. Barnes opened the door but did not exit; instead, he turned the ignition back on.  Felix unholstered his gun and, as the car began to move forward, jumped onto its doorsill.  He twice shouted, "Don't fucking move."  And with no visibility into the car (because his head was above the roof), he fired two quick shots inside. Barnes was hit, but managed to stop the car.  Felix then radioed for back-up.  By the time it arrived, Barnes was dead. All told, about five seconds elapsed between when the car started moving and when it stopped. And within that period, two seconds passed between the moment Felix stepped on the doorsill and the moment he fired his first shot.

ALITO, J., concurring

Barnes's mother, Janice Barnes, sued Felix on her son's behalf.  The suit, brought under 42 U. S. C. §1983, alleged that Felix had violated Ashtian Barnes's Fourth Amendment rights by using excessive force against him.

The District Court granted summary judgment to Felix.  The court explained that to prevail on her claim, Mrs. Barnes needed to show that Felix's use of force was "objectively unreasonable." 532 F. Supp. 3d 463, 468 (SD Tex. 2021). In the usual excessive-force case, the court noted, the inquiry into reasonableness would involve considering a variety of circumstances.  See id., at 468–469. But when an officer has used deadly force, the court continued, "the Fifth Circuit has developed a much narrower approach."  Id., at 469. Then, a court could ask only about the situation  existing "at the moment of the threat" that sparked the fatal shooting. Ibid. (quoting Rockwell v. Brown, 664 F. 3d 985, 991 (CA5 2011); emphasis in original).  The District Court identified that moment as "the two seconds before Felix fired his first shot," when he was standing on the doorsill of a moving vehicle. 532 F. Supp. 3d., at 471.  At that moment, the court found, an officer could reasonably think himself "at risk of serious harm."  Id., at 472.  And under the Fifth Circuit's rule, that fact alone concluded the analysis.  The court explained that it could not consider "what had transpired up until" those last two seconds, including Felix's decision to jump onto the sill. Id., at 471.  Although a "more robust examination" might have aided in assessing the reasonableness of the shooting, the court was "duty bound" by "Circuit precedent" to "limit[ its] focus" to the "exact moment Felix was hanging onto Barnes's" moving car. Id., at  472.

The Court of Appeals affirmed, explaining that it too was "[b]ound" by "this Circuit's moment of threat doctrine."  91 F. 4th 393, 394, 397 (2024).  Under that rule, the panel agreed, the "inquiry is confined to whether the officer[]"  was "in danger at the moment of the threat that resulted in [his] use of deadly force."  Id., at 397. Any prior events "leading up to the shooting," including actions the officer took, were simply "not relevant." Ibid. (quoting Harris v. Serpas, 745 F. 3d 767, 772 (CA5 2014)).  And here, as the District Court found, the "precise moment of the threat" was the "two seconds" when Felix was clinging to a moving car. 91 F. 4th, at 397–398.  Because Felix could then have reasonably believed his life in danger, the panel concluded, his decision to shoot "did not violate Barnes's constitutional rights." Id., at 398.

In a concurring opinion, Judge Higginbotham (who also authored the panel opinion) expressed "concern" with the Fifth Circuit's moment-of-threat doctrine. Ibid. He thought that rule inconsistent with this Court's directive to assess the reasonableness of an officer's use of force, including deadly force, by "look[ing] to the totality of circumstances." Id., at 399. Under the totality approach, Judge Higginbotham wrote, a court could consider not just the "precise millisecond" when an officer deploys force, but everything that "ha[d] transpired up until" that

ALITO, J., concurring

time.  Ibid. And with that wider focus, Judge Higginbotham would have found that Felix's shooting of Barnes was unreasonable. See id., at 401.

 We granted certiorari to address whether, in resolving Fourth Amendment excessive-force claims, courts may apply the moment-of-threat rule just described.  See 603 U. S. ___ (2024). We hold they may not because that rule constricts the proper inquiry into the "totality of the circumstances."

II

 A claim that a law enforcement officer used excessive force during a stop or arrest is "analyzed under the Fourth Amendment." Graham, 490 U. S., at 395; see Amdt. 4 (applying to "seizures" of "persons").  The "touchstone of the Fourth Amendment is 'reasonableness,'" as measured in objective terms. Brigham City v. Stuart, 547 U. S. 398, 403 (2006). So the question in a case like this one, as this Court has often held, is whether the force deployed was justified from "the perspective of a reasonable officer on the scene," taking due account of both the individual interests and the governmental interests at stake.  Graham, 490 U. S., at 396; County of Los Angeles v. Mendez, 581 U. S. 420, 428 (2017).

 That inquiry into the reasonableness of police force requires analyzing the "totality of the circumstances."  Id., at 427–428; Garner, 471 U. S., at 9.  There is no "easy-to-apply legal test" or "on/off switch" in this context.  Scott v. Harris, 550 U. S. 372, 382–383 (2007).  Rather, the Fourth Amendment requires, as we once put it, that a court "slosh [its] way through" a "factbound morass."  Id., at 383.  Or said more prosaically, deciding whether a use of force was objectively reasonable demands "careful attention to the facts and circumstances" relating to the incident, as then known to the officer. Graham, 490 U. S., at 396.  For example, the "severity of the crime" prompting the stop can carry weight in the analysis. See ibid.; Garner, 471 U. S., at 11. So too  can actions the officer took during the stop, such as giving warnings or otherwise trying to control the encounter.  See id., at 12; Kingsley v. Hendrickson, 576 U. S. 389, 397 (2015). And the stopped person's conduct is always relevant because it indicates the nature and level of the threat he poses, either to the officer or to others.  See ibid.; Graham, 490 U. S., at 396.

 Most notable here, the "totality of the circumstances" inquiry into a use of force has no time limit.  Of course, the situation at the precise time of the shooting will often be what matters most; it is, after all, the officer's choice in that moment that is under review. But earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones. Or as the Federal Government puts the point, those later, "in-the-moment" facts "cannot be hermetically sealed off from the context in which they arose." Brief for United States

ALITO, J., concurring

as Amicus Curiae 14. Taking account of that context may benefit either party in an excessive-force case. Prior events may show, for example, why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening.  Or instead they may show why such an officer would have perceived the same conduct as innocuous.  The history of the interaction, as well as other past circumstances known to the officer, thus may inform the reasonableness of the use of force.

 The Court's decision in Plumhoff v. Rickard, 572 U. S. 765 (2014), well illustrates the point. The excessive-force claim there concerned the fatal shooting of a driver at the end of a "dangerous car chase" lasting more than five minutes. Id., at 768. The driver had sped away from a traffic stop on a well-used road, and tried to outrun as many as six police cruisers at speeds sometimes exceeding 100 miles per hour. Eventually, the fleeing car ran into one of the cruisers and came "to a near standstill." Id., at 776. The driver, though, still tried to escape, pumping the gas in a way that sent his wheels "spinning" and then putting the car into reverse. Ibid. At that point, one of the officers fired several shots into the car. In a suit brought against the officer, the driver's daughter contended that those shots were taken when the chase was "already over." Id., at 777.  But this Court rejected that claim based on everything that had happened during the incident—the driver's "outrageously reckless" behavior over the prior "five minutes," as well as his last-second efforts to again take flight. Id., at 776. Given all of those events, the Court explained, a reasonable officer would have concluded that the driver was "intent on resuming" his getaway and, if allowed to do so, would "again pose a deadly threat for others." Id., at 777. In short, the shooting was justified "at the moment" it occurred partly because of what had transpired in the preceding period. Ibid.

 The moment-of-threat rule applied in the courts below prevents that sort of attention to context, and thus conflicts with this Court's instruction to analyze the totality of the circumstances. Recall that the District Court and Fifth Circuit limited their view to the two seconds before the shooting, after Felix had stepped onto the doorsill of Barnes's car.  See supra, at 3–4. Those courts believed that, under Fifth Circuit precedent, they could not take into account anything preceding that final moment.  See 532 F. Supp. 3d, at 471 (excluding analysis of "what had transpired up until the shooting itself"); 91 F. 4th, at 397 (agreeing that "actions leading up to the shooting are not relevant").  So, for example, they could not consider the reasons for the stop or the earlier conduct of, and interactions between, the suspect and officer. And because of that limit, they could not address whether the final two seconds of the encounter would look different if set within a longer timeframe.  It is as though the Court in Plumhoff could consider only the instant when the chased car was at a "near standstill," and not the earlier time when it zigzagged down a busy roadway at speed. 572 U. S., at 776.  To be sure, historical facts will not often matter as much as they did there to the reasonableness analysis.  See supra, at 6.  And some of

ALITO, J., concurring

those facts may not be relevant at all. But no rule that precludes consideration of prior events in assessing a police shooting is reconcilable with the fact-dependent and context-sensitive approach we have prescribed.  A court deciding a use-of force case cannot review the totality of the circumstances if it has put on chronological blinders.

 That point is so evident that not even Felix quarrels with it; his defense of the decisions below instead relies on taking a different view of their meaning and of the question they raise. First, the agreement with what we have said: Yes, Felix acknowledges, prior events are not "off limits" in the reasonableness inquiry, for they may "inform the perspective of the reasonable officer." Tr. of Oral Arg. 79; Brief for Respondent 2. Just so.  But now the divergence: According to Felix, the courts below acted consistently with that alltimes-considered principle. The Fifth Circuit's moment-ofthreat doctrine, Felix argues, in fact allows courts to assess many pre-shooting facts and circumstances—and courts applying it often do so. See id., at 20 (citing other Fifth Circuit decisions). All that the doctrine bars is a single kind of in- quiry—into whether an officer's earlier error itself "created the need for deadly force." Id., at 21; see Tr. of Oral Arg. 53. And on that issue, Felix submits, the Fifth Circuit is right: "[A]n officer doesn't lose his right to defend himself just because" he previously "made a mistake." Ibid.        But whatever might be said of Fifth Circuit law generally, the decisions below applied a rule about timing. As shown above, both lower courts took pains to explain that, in evaluating the shooting's reasonableness, they could look only to a two-second snippet of the encounter.  See supra, at 3–4. And because that was the reasoning in the case before us, that is the reasoning we must address.  It could make no difference to our decision here if the Fifth Circuit in other cases eschewed a strict time limit, as Felix claims.  And anyway, we are not sure Felix correctly describes the overall state of Fifth Circuit law. Consider Harris v. Serpas—a Fifth Circuit decision relied on below.  See 91 F. 4th, at 397.  The court there noted the plaintiffs' recital of several historical facts—actions of both the suspect and the officer in the period prior to the shooting. See 745 F. 3d, at 772. And the court recognized that this Court's decisions directed an inquiry into the "the 'totality of the circumstances.'"  Ibid. (quoting Graham, 490 U. S., at 396).  But then came the following: "This [Circuit], however, has narrowed that test" in deadly force cases, holding that the inquiry there is "confined to whether the [officer] was in danger at the moment of the threat that resulted in the [officer's] shooting." Ibid. (alterations in original).  The problem with the statement is apparent.  As we have explained, a court cannot thus "narrow" the totality-of-the-circumstances inquiry, to focus on only a single moment.  It must look too, in this and all excessive-force cases, at any relevant events coming before.

 We do not address here the different question Felix raises about use-of-force cases: whether or how an officer's own "creation of a dangerous situation" factors into the reasonableness analysis. Brief for Respondent 22; see supra, at 8.  As in another of our recent Fourth Amendment cases,

ALITO, J., concurring

that issue is not properly before us. See Mendez, 581 U. S., at 429, n. The courts below never confronted the issue, precisely because their inquiry was so time-bound. In looking at only the two seconds before the shot, they excluded from view any actions of the officer that allegedly created the danger necessitating deadly force. See supra, at 3–4. So, to use the obvious example, the courts below did not address the relevance, if any, of Felix stepping onto the doorsill of Barnes's car. And because they never considered that issue, it was not the basis of the petition for certiorari. The question presented to us was one of timing alone: whether to look only at the encounter's final two seconds, or also to consider earlier events serving to put those seconds in context.       With that matter resolved, we return everything else to the courts below. It is for them now to consider the reasonableness of the shooting, using the lengthier timeframe we have prescribed.

 Accordingly, we vacate the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.


It is so ordered.

ALITO, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 23–1239

_____

JANICE HUGHES BARNES, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ASHTIAN  BARNES, DECEASED, PETITIONER v.

ROBERTO FELIX, JR., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 15, 2025]

 JUSTICE KAVANAUGH, with whom JUSTICE THOMAS,  JUSTICE ALITO, and JUSTICE BARRETT join, concurring.

 I join the Court's opinion. I agree that the officer's actions during the traffic stop in this case should be assessed based on the totality of the circumstances.  I write separately to add a few points about the dangers of traffic stops for police officers, particularly when as here the driver pulls away in the midst of the stop.

 Even for routine traffic violations, traffic stops are "fraught with danger to police officers." Michigan v. Long, 463 U. S. 1032, 1047 (1983).  An "inordinate risk confront[s] an officer as he approaches a person seated in an automobile."  Pennsylvania v. Mimms, 434 U. S. 106, 110 (1977) (per curiam). That is in part because officers operate at a "tactical disadvantage" when "approaching an unknown vehicle, with limited visibility and unpredictable threats." Brief for National Fraternal Order of Police as Amicus Curiae 4. As this Court noted nearly 50 years ago, "a significant percentage of murders of police officers occurs when the officers are making traffic stops."  Mimms, 434 U. S., at 110 (quoting United States v. Robinson, 414 U. S. 218, 234, n. 5 (1973)).  Traffic stops remain highly dangerous today. See Dept. of Justice, Federal Bureau of Investigation, Law Enforcement Officers Killed and Assaulted, 2023 (2024) (Table 27). On April 8, 2023, two officers were shot and killed at an intersection in Cameron, Wisconsin, after stopping a car for a warrant and welfare check on the driver.   On December 8, 2024, an officer was shot and killed after he pulled over a pickup truck with expired license plates in a Super 8

ALITO, J., concurring

motel parking lot in Terrell, Texas. See Brief for State of Texas et al. as Amici Curiae 1, and n. 4. The list goes on and on.

Officers cannot let their guard down and assume that any particular traffic stop will be safe— even if a driver is pulled over for nothing more than a speeding violation, a broken taillight, or the like. The driver may be drunk, on drugs, armed, or some combination thereof. Or the driver may have committed (or may be about to commit) a serious crime. "People detained for minor offenses" such as ordinary traffic violations "can turn out to be the most devious and dangerous criminals." Florence v. Board of Chosen Freeholders of County of Burlington, 566 U. S. 318, 334 (2012). Timothy McVeigh, the man responsible for the 1995 Oklahoma City bombing, was stopped for a missing license plate, which ultimately led to his apprehension for the bombing. See ibid. Likewise, serial killer Ted Bundy was pulled over based on a stolen-vehicle alert in Pensacola, Florida. When informed that he was under arrest, Bundy kicked the officer's legs out from under him, and the two struggled over the officer's gun before the officer was able

_____

to subdue and arrest Bundy. See Bundy v. Dugger, 850 F. 2d 1402, 1422 (CA11 1988); see also Brief for State of Texas et al. as Amici Curiae 11–12, and n. 12. So even though most traffic stops end without incident, traffic stops are nonetheless inherently risky for police officers. And when, as in this case, the driver suddenly pulls away in the midst of a stop, the risks multiply. A driver speeding away from a traffic stop could easily endanger bystanders and other drivers— especially if the fleeing driver is under the influence of alcohol or drugs, as might well be the case when a driver flees. Moreover, the very "fact that a suspect flees when suspected of a minor offense," such as speeding or a failure to pay tolls, "could well be indicative of a larger danger." Lange v. California, 594 U. S. 295, 331 (2021) (ROBERTS, C. J., concurring in judgment). Fleeing from the traffic stop could suggest that the driver is preparing to commit or has committed a more serious crime—and is attempting to evade detection or arrest. The driver may have illegal drugs or an illegal gun in the car. Or the driver may be unlawfully in the country and fear removal if apprehended. He might have a warrant out for his arrest. He could have an abducted child in the car. See Tr. of Oral Arg. 18. Or as the tragic 2025 New Year's terrorist attack in New Orleans illustrates, the driver might intend to use the car as a weapon. See id., at 24.

The possibilities are many. But the key point is a commonsense one: A driver who speeds away from a traffic stop can pose significant dangers to both the officer and the surrounding community.

ALITO, J., concurring

 The question when a driver flees, therefore, is not merely whether the underlying traffic violation "presents risks to public safety"—it is also "whether flight," and what that flight might indicate or enable, "does so." Lange, 594 U. S., at 331 (ROBERTS, C. J., concurring in judgment). In those circumstances, in other words, it is not only the "severity of the crime" that prompted the stop that is relevant to the "totality of the circumstances" inquiry. Graham v. Connor, 490 U. S. 386, 396 (1989) (quotation marks omitted). The Fourth Amendment analysis must also take account of the suspect's attempt "to evade" the officer "by flight." Ibid. What should the officer do when a driver flees from a traffic stop? There are no easy or risk-free answers. Every feasible option poses some potential danger to the officer, the driver, or the public at large—and often to all three. And an officer in that situation must make a split-second choice among those various dangerous options.

 First, the officer could simply let the driver go. But because the fleeing driver might be a threat to the community, letting the driver go may exacerbate the dangers, rather than mitigate them. Encouraging officers to stand back and allow drivers to take off would also create "perverse incentives" for those who are stopped by the police. Scott v. Harris, 550 U. S. 372, 385 (2007). If doing nothing in response to a fleeing driver became a known and regular practice among police officers, that would presumably embolden some drivers who otherwise might have thought twice about taking off.

 Of course, the officer could let the driver go in the moment but then attempt to catch the driver by, for example, tracking the car's license plate or reviewing surveillance footage. See Tr. of Oral Arg. 8. But after letting the driver go, the police may not be able to later track down the car or the driver of the car. Even if the police are able to do so, the escaped driver may pose a serious risk to the public in the interim. And given that the driver has already shown a propensity to evade law enforcement by fleeing a traffic stop, attempting to execute an arrest upon finding the driver could itself be dangerous for the police and others. Second, the officer could get back in his police car and give chase, or could radio other officers to pursue the driver.

But a high-speed chase likewise can be exceptionally dangerous to the officer, the driver, and others on the road. "Vehicular pursuits" are "often catastrophic." Lange, 594 U. S., at 324 (ROBERTS, C. J., concurring in judgment).

Many real-world examples demonstrate as much. Plumhoff v. Rickard involved a "'dangerous car chase'" in which the driver "tried to outrun as many as six police cruisers at speeds sometimes exceeding 100 miles per hour," ending in the "fatal shooting" of the driver. Ante, at 6 (quoting 572 U. S. 765, 768 (2014)). In Scott v. Harris, multiple police cars "with blue lights flashing and sirens blaring" chased the driver "for nearly 10 miles" while "he ignored their

ALITO, J., concurring

warning to stop," culminating in an officer ramming the driver off the road. 550 U. S., at 384. Moreover, a recent study concluded that a significant percentage of those killed in police chases are not the fleeing drivers but rather are passengers or bystanders. From 2017 through 2022, more than 500 bystanders were reportedly killed as a result of police chases.

Third, the officer might try to shoot out the tires of the fleeing car, or otherwise try to hinder the car's movement, in order to bring it to a stop. But shooting at a car, especially its tires, can be "dangerous" and is often "ineffective." Even if the officer manages to hit the tires, the driver could lose control and crash into others on the road. That course of action also poses the risk of the officer accidentally shooting the driver or innocent passengers.

Fourth, as happened here, the officer could attempt to stop the fleeing driver at the outset by jumping on or reaching into the car. The dangerousness of that option is readily apparent. Perhaps the driver will hit the brakes once he realizes an officer is clinging to the car or

———————

attempting to reach through the window. But if the driver does not slow down, then the officer may suffer serious and perhaps fatal injuries. The officer could try to fire his weapon to incapacitate the driver and bring the car safely to a stop. But the car may be just as likely to go careening into traffic, thereby threatening the safety of the officer, other drivers, passengers, pedestrians, and more.

I could go on. The point here is that when a driver abruptly pulls away during a traffic stop, an officer has no particularly good or safe options. None of the options available to the officer avoids danger to the community, and all of them require life-or-death decisions that must be made in a few seconds in highly stressful and unpredictable circumstances.

Of course, when an officer uses force against a fleeing driver, the judiciary still must assess any resulting Fourth

Amendment claim under the standard of objective reasonableness. Under this Court's precedents, that inquiry involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Graham, 490 U. S., at 396 (quoting Tennessee v. Garner, 471 U. S. 1, 8 (1985)). In conducting that analysis, judges should keep in mind that it is one thing to dissect and scrutinize an officer's actions with the "20/20 vision of hindsight," "in the peace of a judge's chambers." Graham, 490 U. S., at 396 (quotation marks omitted). It is quite another to make "split-second judgments" on the ground, "in circumstances that are tense, uncertain, and rapidly evolving." Id., at 397. In analyzing the reasonableness of an officer's conduct at a traffic stop,

Cite as: 593 U. S. ____ (2021)          75

ALITO, J., concurring

particularly traffic stops where the driver has suddenly pulled away, courts must appreciate the extraordinary dangers and risks facing police officers and the community at large.